Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542 <br><br> vs. <br><br> MALLINCKRODT ARD INC FKA QUESTCOR PHARMACEUTICALS INC | NO. 2018-14059 |

## COVER SHEET OF MOVING PARTY

Date of Filing  December 06  2019

Moving Party MALLINCKRODT ARD INC FKA QUESTCOR PHARMACEUTICALS INC;  MALLINCKRODT PLC

Counsel for Moving Party  DANIEL J SHERRY, Esq., ID: 21654

Document Filed (Specify) MOTION TO STAY

Matter is: _ (Appealable)                                              X (Interlocutory)

Discovery Needed: __ (Yes)                                        __ (No)

If applicable, Civil Case Management Order Discovery Deadline: _____

-----------------------------------------------------------------------------------------------
**CERTIFICATIONS -** Check **ONLY** if appropriate:
_ Counsel certify that they have conferred in a good faith effort to resolve the subject
    discovery dispute. **(Required by Local Rule 208.2(e) on motions relating to discovery.)**

_ Counsel for moving party certifies that the subject **civil motion** is **uncontested** by all
    parties involved in the case.  (If checked, skip Rule to Show Cause section below.)

By: _____
Counsel for Moving Party

-----------------------------------------------------------------------------------------------
**RULE TO SHOW CAUSE -** Check **ONE** of the Choices Listed Below:

_____ Respondent is directed to show cause why the moving party is not entitled to the relief
requested by filing an **answer** in the form of a **written response** at the **Office of the  Prothonotary** on or
before the                    day of                                20___.

_____ Respondent is directed to show cause, in the form of a **written response**, why the
attached Family Court Discovery Motion is not entitled to the relief requested.  Rule    Returnable and
Argument the            day of                            , 20___
at **1:00 p.m.**  at **321 Swede Street, Norristown, PA**.

_____ Respondent is directed to file a **written response** in conformity with the Pennsylvania
Rules of Civil Procedure.

_____ Rule Returnable at time of trial.

By: _____

Revised 06.19

Court Administrator

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Revised 06.19

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IN THE COURT OF COMMON PLEAS
## FOR MONTGOMERY COUNTY, PENNSYLVANIA

| | |
|---|---|
| **INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542,**<br><br>Plaintiff,<br><br>v.<br><br>**MALLINCKRODT ARD INC.,** *et al.,*<br><br>Defendants. | Civil Action No. 2018-14059 |

## [PROPOSED] ORDER GANTING MALLINCKRODT ARD INC. AND MALLINCKRODT PLC'S MOTION TO STAY

AND NOW, this _____ day of _____, _____, upon consideration of

Mallinckrodt ARD Inc. and Mallinckrodt plc's Motion to Stay and any responses thereto, it is

ORDERED and DECREED that the motion is GRANTED.

BY THE COURT,

_____

STEVEN C. TOLLIVER, SR., J.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IN THE COURT OF COMMON PLEAS
## FOR MONTGOMERY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| **INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542,**<br><br>Plaintiff,<br><br>v.<br><br>**MALLINCKRODT ARD INC.,** *et al.*,<br><br>Defendants. | : : : : : : : : : : : | Civil Action No. 2018-14059 |

## MALLINCKRODT ARD INC. AND MALLINCKRODT PLC'S
## <u>MOTION TO STAY</u>

Defendants Mallinckrodt ARD Inc. and Mallinckrodt plc (collectively, "Mallinckrodt") hereby move to stay all proceedings in this case. A stay would conserve judicial resources, avoid duplicative litigation burdens, and avoid potentially inconsistent rulings of law. Defendants are litigating two earlier-filed putative class action cases in federal court (one of which was filed by IUOE's attorneys) based on the same operative facts and alleged violations of law asserted by IUOE here. The earlier-filed cases are in discovery, and a stay would cause no prejudice to Plaintiff International Union of Operating Engineers Local 542 ("IUOE").

Defendants Express Scripts Holding Company, Express Scripts, Inc., Curascript, Inc., Curascript SD, United BioSource Corporation, and Accredo Health Group, Inc. do not oppose the Motion. IUOE opposes the Motion.

In support of this Motion, Mallinckrodt states as follows:

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1.      Two putative class actions against Defendants alleging the same operative facts and violations of federal antitrust law[1]—the first of which was filed by the attorneys who represent IUOE in this case—have been pending in federal court in the Northern District of Illinois for more than two years.

2.      In the first, the city of Rockford, Illinois, represented by IUOE's attorneys, purports to assert claims on behalf of a class consisting of "all third party payors and their beneficiaries . . . that paid for Acthar from August 2007 through the present."  Second Am. Class Action Compl. ¶ 165, *City of Rockford v. Mallinckrodt ARD, Inc.,* No. 3:17-cv-50107 (N.D. Ill. Dec. 8, 2017) ("*Rockford*"), ECF No. 98 (attached as Ex. A).

3.      The second case, which was originally filed in the Central District of California then transferred to the Northern District of Illinois to be coordinated with *Rockford*, was filed by a different plaintiff on behalf of a putative class consisting of "all third-party payors, or their assignees, who have, as indirect purchasers, in whole or in part, paid for, provided reimbursement for, and/or possess the recovery rights to reimbursement for the indirect purchase of Acthar from August 1, 2007 to present."  First Am. Class Action Compl. at ¶ 184, *MSP Recovery Claims Series LLC, et al., v. Mallinckrodt ARD Inc., et al.,* No. 1:18-cv-00379 (N.D. Ill. Apr. 10, 2019) ("*MSP*") (together with *Rockford*, the "federal cases"), ECF No. 165 (attached as Ex. B).

4.      Plaintiff IUOE falls into at least one and arguably both of the classes proposed by plaintiffs suing Defendants in the federal cases.

---

[1] All three actions name two Mallinckrodt entities (Mallinckrodt ARD, Inc. and Mallinckrodt plc) and five Express Scripts entities (Express Scripts Holding Company, Express Scripts, Inc., Curascript, Inc., Curascript SD, and United BioSource Corporation).  This action adds a sixth Express Scripts defendant, Accredo Health Group, Inc.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

5.      The core allegations in the federal cases are the same as those asserted by IUOE here: all three cases challenge Mallinckrodt's distribution agreement for Acthar® with Curascript and the acquisition of the rights to develop Synacthen by Questcor, which Mallinckrodt acquired in 2014. *Rockford* and *MSP* involve alleged violations of federal antitrust law. *Rockford* also involves alleged violations of state antitrust laws. *MSP* involves alleged violations of state consumer protection statutes, including the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§201, *et seq.* ("UTPCPL").

6.      Almost all of IUOE's legal claims have been asserted in the federal cases. Like the putative class in *MSP*, IUOE alleges that Defendants violated the UTPCPL. The putative *Rockford* class originally alleged the same common law and contract claims as IUOE—unjust enrichment; conspiracy to defraud (aiding and abetting); breach of contract; breach of the implied covenant of good faith and fair dealing; and promissory estoppel.[2] The only claim asserted by IUOE not asserted in *Rockford* or *MSP* is negligent misrepresentation.

7.      Furthermore, IUOE relies on the same factual allegations asserted in the federal cases. A great number of IUOE's allegations in support of its claims are the same as or similar to the allegations in from the *Rockford* complaint. For example:

---

[2] The court in *Rockford* dismissed the common law and contract claims without prejudice, leaving only the federal and state antitrust claims. *See City of Rockford v. Mallinckrodt ARD Inc.*, 360 F.Supp.3d 730, 778 (N.D. Ill. 2019).

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| IUOE Amended Complaint | Rockford Second Amended Complaint |
|---|---|
| "One of the largest [specialty pharmacy distributors] in America is ESI's CuraScript, which ESI has owned since 2004.  In 2007, Mallinckrodt decided to embark on a 'new strategy' and it changed its distribution of Acthar.   Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt decided to limit Acthar distribution exclusively through ESI's CuraScript.   In effect, Mallinckrodt contracted with the agent of its leading customers, **including IUOE Local 542**, and the largest SPD at the time, in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly. . . ." ¶¶ 8-9 (emphasis added). | "One of the largest specialty pharmacy distributors in America is ESI's CuraScript, which ESI has owned since 2004.  In 2007, Mallinckrodt decided to embark on a 'new strategy' and it changed its distribution of Acthar.   Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt decided to limit Acthar distribution exclusively through ESI's CuraScript.   In effect, Mallinckrodt contracted with the agent of its leading customers in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly." ¶ 7 |
| "Mallinckrodt's strategy to protect its monopoly power in the market for ACTH drugs was successful.  But-for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price." ¶ 148 | "Mallinckrodt's strategy to protect its monopoly power in the market for ACTH drugs was successful.  But for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price." ¶ 151 |
| "Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed ESI's competitive pressure in the marketplace to cause Acthar prices to be lower. Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present." ¶ 161 | "Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed ESI's competitive pressure in the marketplace to cause Acthar prices to be lower. Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present." ¶ 164 |

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

8.      Moreover, IUOE's complaint frames the underlying dispute in this case nearly identically to the dispute underlying *MSP*.  *Compare* IUOE Am. Compl. ¶ 5 ("[The issue is] whether Mallinckrodt's actions in contracting with the largest agent of its leading customers, Express Scripts, and in acquiring the only competitive product in the marketplace, Synacthen, constitute unlawful efforts to retain, maintain and enhance Mallinckrodt's monopoly power over Acthar in the ACTH market."), *with* Ex. B, First Am. Class Action Compl. ¶ 183, *MSP*, ECF No. 165 ("Through the exclusive contract for distribution of Acthar with Express Scripts and its purchase of Synacthen, the only potential competitive product, Mallinckrodt has retained 100% of the market for ACTH products.  This monopoly power allowed Defendants to increasingly raise the prices of Acthar to the detriment of third-party payers such as Plaintiffs' Assignors.").

9.      Given the overlap in the theories of harm and the factual allegations in IUOE's complaint and those in the federal cases, Mallinckrodt respectfully requests that the Court stay this case.

10.     Importantly, a stay will not be prejudicial to IUOE because it is a member of one or both of the proposed classes in the earlier-filed cases.  Plaintiff's counsel apparently filed this case out of concern for a statute of limitations defense.  But staying this case, now that it has been filed, will not affect IUOE's rights.  Proceeding with IUOE's case in parallel with *MSP* and *Rockford* would unnecessarily strain the Court's resources, impose duplicative litigation burdens on the parties, and could result in potentially inconsistent rulings.

11.     Furthermore, the nearly complete overlap between the factual allegations in the federal cases and the factual allegations in this case means that a substantial amount of the discovery sought by plaintiffs in the federal cases will overlap with that sought by IUOE.  There is no reason for two courts to supervise discovery simultaneously.  *Rockford* and *MSP* are

5

coordinated for discovery purposes and fact discovery is ongoing.  Magistrate Judge Lisa Jensen is holding frequent in-person status conferences in the federal cases to manage discovery and adjudicate any disputes.

12.     In the alternative, should this Court decide to continue the proceedings in parallel, it should align discovery management and the schedule in this case with the federal cases.

13.     Proceeding concurrently with the federal cases would result in unnecessary use of judicial resources and duplicative effort by all involved.  This court "has the inherent, equitable power to stay the proceedings in the second suit during the pendency of the prior suit." *Singer v. Dong Sup Cha*, 550 A.2d 791, 793 (Pa. Super. Ct. 1988) (citing *Klein v. City of Philadelphia*, 465 A.2d 730, 731 (Pa. Commw. Ct. 1983)). *See also Pezzino v. Seven Springs*, 17 Pa. D. & C. 4th 44, 46 (Pa. Ct. C.P. 1992).  A stay is appropriate where proceeding in two or more cases in different courts would "create a duplication of effort on the part of the parties and waste judicial resources by requiring two courts . . . to litigate a matter that in all likelihood could be fully addressed in one forum." *PNC Bank, Nat. Ass'n v. Bluestream Tech., Inc.*, 14 A.3d 831, 835 (Pa. Super. Ct. 2010) (quoting *Norristown Automobile Co., Inc. v. Hand*, 562 A.2d 902, 905 (Pa. Super. Ct. 1989)).

14.     Courts routinely grant stays of cases that seek to adjudicate the same causes of action on behalf of the same parties as a case already pending in another court.  In *Pezzino*, for example, the plaintiff filed a negligence suit in New Jersey Superior Court, then an identical complaint in the Somerset County Court of Common Pleas.  *Pezzino*, 17 Pa. D. & C. at 45.  The Somerset County court granted a stay of the later-filed case, reasoning that in the interest of efficiency the New Jersey case "should be permitted to proceed to its conclusion" before the court adjudicated any issues before it.  *Id.* at 47.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

15.    In *PNC Bank*, the Superior Court directed the trial court to enter a stay on remand where all of the appellants' rights were being litigated in a previously-filed case. Both cases concerned the same business transaction, and both sought equitable relief, though only one case sought payment on the loans at issue. *PNC Bank*, 14 A.3d at 839-40.

16.    The court in *Klein* granted a stay of a taxpayer action because a separate taxpayer action involving the same municipal contracts was already pending and would be binding on the second action, even though the plaintiffs in the two actions were different. 465 A.2d at 731.

17.    In *Norristown*, the appellate court upheld the trial court's stay, finding that the case "involve[d] a set of circumstances where the litigation of two suits" would lead to duplicative effort and a waste of judicial resources. 562 A.2d at 905. The situation here is no different.

18.    IUOE admits that there is nothing unique about its alleged injury. It claims to have "suffered injuries due to Mallinckrodt's same conduct which caused injury to other payors throughout the country, including the City of Rockford in the federal action, [so] there is necessarily factual overlap in the statement of the claims against Mallinckrodt." Ex. C, Pl's Mem. in Opp'n to Defs' Preliminary Objs. at 16 (Oct. 9, 2018). This same "overlap" exists between this case and *MSP*, which alleges a violation of the UTPCPL based on the same underlying factual allegations.

19.    Given this commonality, adjudication of IUOE's case in this forum concurrently with adjudication of the claims that two plaintiffs have asserted in federal court on behalf of putative classes, purportedly including IUOE, is inefficient and unnecessary. IUOE's counsel has acknowledged the obvious inefficiency that would result from pursuing the same discovery in multiple courts, representing to Judge Lee during a hearing in *Rockford* that he "agree[d] with the principle there shouldn't be more than one deposition . . ." of a Defendant's employee and

7

expressing that "[t]o the extent there is ability to coordinate [between cases], we're doing that." *See* Ex. D, Hr'g Tr. (Sept. 20, 2019) at 14:20-15:4, *Rockford*, ECF No. 273.

20.    Given that IUOE's theory of harm here purportedly is being litigated in *MSP*, and discovery of Defendants in the federal cases will substantially overlap with any discovery taken by IUOE, a stay of this case pending a determination of whether the classes proposed in *Rockford* and *MSP* should be certified, whether IUOE is a member of the certified class(es), and/or a resolution of the federal cases is warranted.

21.    IUOE would not suffer any prejudice if this case were stayed during the pendency of proceedings in *MSP* and *Rockford*. Because IUOE is a putative member in one or both of the classes proposed in the federal cases, a certified class action will advance IUOE's claims in those proceedings. Also, the nearly complete overlap between the factual allegations in the federal cases and the factual allegations in this case means that a substantial amount of the discovery sought by plaintiffs in the federal cases will overlap with that sought by IUOE.

22.    To explain his filing of duplicative lawsuits in this and other jurisdictions to the court presiding over *Rockford* and *MSP*, IUOE's counsel cited concerns about a possible statute of limitations defense. He explained to Judge Lee that because Defendants disagreed that the statute of limitations was tolled by the Federal Trade Commission's filing of a case in 2017 against Mallinckrodt concerning certain of the same allegations underlying the *Rockford* complaint, he has "to move forward in other places with plaintiffs to protect their rights." *See* Ex. D, Hr'g Tr. (Sept. 20, 2019) at 14:12-16, *Rockford*, ECF No. 273. Putting aside the merits of counsel's concern, any applicable limitations period would not run during a stay. Meanwhile, if the classes are certified, the federal court will be adjudicating claims based on the same allegations on behalf of a class of which IUOE is a member as the putative classes are currently defined. A stay in this

8

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

case will not compromise IUOE's rights; a stay will instead ensure that, if the proposed classes are certified in the federal cases, IUOE's theories of harm will be adjudicated in an orderly and uniform manner by the federal court in which IUOE's attorneys first asserted those claims.

23.     If the Court determines that this case should proceed even while *Rockford* and *MSP* are pending, scheduling in the cases should be aligned.  Currently, the cases are not on the same track.  While the Civil Case Management Conference Order entered by this Court on November 4, 2019 sets the same deadline for fact discovery currently in place in the federal cases (September 30, 2020), the remainder of the schedule here diverges from the schedule that governs *MSP* and *Rockford* such that, despite having been filed after both federal cases, this case will move ahead of the federal cases once discovery closes.  *Compare* Minute Entry, *Rockford*, (Mar. 26, 2019) ECF No. 203, *with* Civil Case Mgmt. Order, at 1 (Nov. 4, 2019).[3]

24.     Accordingly, absent the relief requested in this Motion, expert discovery and summary judgment motions in this case, with only one plaintiff and four prescriptions constituting the totality of the alleged harm, will take precedence over the same procedures in the two federal cases, which are brought purportedly on behalf of proposed nationwide classes.

25.     Should the Court decline to enter a stay, aligning this case's schedule with the coordinated proceedings in *Rockford* and *MSP* would require only a modest revision of the case management order as it currently stands.

WHEREFORE, for the reasons stated in this Motion and in Mallinckrodt's accompanying memorandum, good cause exists for the Court to stay this case pending the resolution of the *MSP*

---

[3] For example, Plaintiff's expert reports in this case are due on November 2, 2020, while plaintiffs' expert reports in the federal cases are due on November 30, 2020.  Defendants' expert reports and summary judgment motions in this case are due on December 15, 2020, while Defendants' expert reports in *MSP* and *Rockford* are not due until one month later, on January 15, 2021, and summary judgment motions are due on March 31, 2021.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and *Rockford* cases.   Alternatively, the Court should align the schedule in this case with the schedule in *MSP* and *Rockford*.

Dated:  December 6, 2019

/s/ Ryan Watts

Matthew M. Wolf
Laura S. Shores
Sonia K. Pfaffenroth
Michael B. Bernstein
Ryan Z. Watts
Adam M. Pergament
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942-6609
Matthew.Wolf@arnoldporter.com
Laura.Shores@arnoldporter.com
Sonia.Pfaffenroth@arnoldporter.com
Michael.B.Bernstein@arnoldporter.com
Ryan.Watts@arnoldporter.com
Adam.Pergament@arnoldporter.com

Daniel Sherry
**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**
620 Freedom Business Center
Suite 300
King of Prussia, PA 19406
(610) 354-8256

***Counsel for Defendants Mallinckrodt ARD and Mallinckrodt plc***

10

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**MARSHALL, DENNEHEY, WARNER**
**COLEMAN & GOGGIN**
BY: DANIEL J. SHERRY, ESQUIRE
Attorney I.D. 21654
620 Freedom Business Center, Suite 300
King of Prussia, PA 19406
Telephone: 610/354-8250 Fax: 610/354-8299
djsherry@mdwcg.com

Attorney for Defendants, Mallinckrodt ARD Inc.
and Mallinckrodt plc

| | | |
|---|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542 | : | IN THE MONTGOMERY COUNTY COURT OF COMMON PLEAS |
| | : | |
| v. | : | |
| | : | |
| MALLINCKRODT ARD, INC., formerly known as QUESTCOR PHARMACEUTICALS, INC. | : | No. 2018-14059 |
| | : | |
| MALINCKRODT PLC | : | |
| | : | |
| EXPRESS SCRIPTS HOLDING COMPANY | : | |
| | : | |
| EXPRESS SCRIPTS, INC. CURASCRIPT, INC. | : | |
| | : | |
| CURASCRIPT SD | : | |
| | : | |
| ACCREDO HEALTH GROUP, INC. | : | |
| | : | |
| and | : | |
| | : | |
| UNITED BIOSOURCE CORPORATION, now known as UNITED BIOSOURCE LLC., a wholly owned subsidiary of UNITED BIOSOURCE HOLDINGS, INC. | : | |

## CERTIFICATE OF SERVICE

Daniel J. Sherry, Esquire hereby certifies that a true and correct copy of the foregoing Mallinckrodt ARD, Inc. and Mallinckrodt Plc's Motion to Stay was electronically filed and forwarded to the following via email and/or United States First Class Mail, postage prepaid, on the 6th day of December, 2019:

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Donald E. Haviland, Jr., Esquire
William H. Platt, II, Esquire
Christina M. Philipp, Esquire
Haviland Hughes
201 South Maple Way, Suite 110
Ambler, PA 19002

Joseph P. Walsh, Esquire
Walsh Pancio, LLC
2028 North Broad Street
Lansdale, PA 19446

J. Kirk Goza, Esquire
Quinn Emanuel Urquhart & Sullivan, LLC
1300 I St. NW Suite 900
Washington, D.C. 20005

Sonia Pfaffenroth, Esquire
Adam Pergament, Esquire
Laura Shores, Esquire
Matthew Wolf, Esquire
Ryan Watts, Esquire
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001

Jonathan D. Weiss, Esquire
Marshall  Dennehey Warner Coleman and Goggin
2000 Market Street
Philadelphia, PA 19103

Andrew L. Braunfeld, Esquire
Masterson Braunfeld
600 Old Elm Street
Suite 200
Conshohocken, PA 19428

**MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**

By: _____
DANIEL J. SHERRY, ESQUIRE
Attorney for Defendants,
Mallinckrodt ARD Inc. and
Mallinckrodt plc

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT A

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

CITY OF ROCKFORD and
ACUMENT GLOBAL
TECHNOLOGIES, INC.
*on behalf of themselves and
all others similarly situated*,

          Plaintiffs,

   v.

MALLINCKRODT ARD, INC.,
*formally known as* QUESTCOR
PHARMACEUTICALS, INC.;
MALLINCKRODT PLC; EXPRESS SCRIPTS
HOLDING COMPANY; EXPRESS SCRIPTS,
INC.; CURASCRIPT, INC., *doing business as*
CURASCRIPT, SD; ACCREDO HEALTH
GROUP, INC., *and* UNITED BIOSOURCE
CORPORATION

         Defendants.

Civil Action No.: 3:17-cv-50107

**SECOND AMENDED CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ................................................................................ 1

JURISDICTION AND VENUE ..................................................................... 3

PLAINTIFFS ................................................................................................. 5

DEFENDANTS .............................................................................................. 6

FACTUAL BACKGROUND ......................................................................... 9

RELEVANT MARKETS AND MONOPOLY POWER, ............................. 29

CLASS ACTION ALLEGATIONS .............................................................. 40

COUNT I
CITY OF ROCKFORD v. EXPRESS SCRIPTS
UNJUST ENRICHMENT ............................................................................ 44

COUNT II
CITY OF ROCKFORD v. MALLINCKRODT
UNJUST ENRICHMENT ............................................................................ 45

COUNT III
ACUMENT v. MALLINCKRODT
UNJUST ENRICHMENT ............................................................................ 47

COUNT IV
PLAINTIFFS v. ALL DEFENDANTS
FRAUD ........................................................................................................ 49

COUNT V
PLAINTIFFS v. ALL DEFENDANTS
CONSPIRACY TO DEFRAUD/CONCERTED ACTION ........................... 50

COUNT VI
PLAINTIFFS v. ALL DEFENDANTS
MAINTENANCE OF MONOPOLIZATION OF
THE ACTH MARKET (15 U.S.C. § 2) ....................................................... 52

COUNT VII
PLAINTIFFS v. ALL DEFENDANTS
ANTI-COMPETITIVE AGREEMENTS IN UNREASONABLE
RESTRAINT OF TRADE (15 U.S.C. § 1) .................................................. 56

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

COUNT VIII
PLAINTIFFS v. ALL DEFENDANTS
STATE ANTITRUST LAW CLAIMS ...................................................................59

COUNT IX
PLAINTIFFS v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(c) .....................................................................78

COUNT X
PLAINTIFFS v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(a) .....................................................................85

COUNT XI
PLAINTIFFS v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(d)) ....................................................................86

COUNT XII
CITY OF ROCKFORD V. EXPRESS SCRIPTS
BREACH OF CONTRACT
BREACH OF THE ESI PBM AGREEMENT ......................................................88

COUNT XIII
CITY OF ROCKFORD V. EXPRESS SCRIPTS
PROMISSORY ESTOPPEL .................................................................................89

COUNT XIV
CITY OF ROCKFORD V. EXPRESS SCRIPTS
DECLARATORY JUDGMENT THE ESI PBM AGREEMENT .............................90

COUNT XV
CITY OF ROCKFORD V. EXPRESS SCRIPTS
BREACH OF THE IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING .................................................................91

PRAYER FOR RELIEF .......................................................................................92

JURY DEMAND ..................................................................................................93

Case #: 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## SECOND AMENDED CLASS ACTION COMPLAINT

The City of Rockford ("the City" or "Rockford") and Acument Global Technologies, Inc. ("Acument") (collectively the "Plaintiffs") on behalf of themselves and the Class described below, allege as follows:

## NATURE OF THE CASE

1.      Plaintiffs bring this action on their own behalf and on behalf of all other government payors and private payors similarly situated, excepting those expressly excluded from the Class, to challenge an unjust, unfair, and anti-competitive scheme by Defendants, Mallinckrodt ARD Inc., formally known as Questcor Pharmaceuticals, Inc. ("Questcor") and its parent company, Mallinckrodt plc (collectively "Mallinckrodt") as well as Mallinckrodt's exclusive agent for the delivery of its products, Express Scripts Holding Company and Express Scripts, Inc., including their three (3) wholly-owned subsidiaries, CuraScript, Inc., doing business as CuraScript, SD., Accredo Health Group, Inc., and United BioSource Corporation (collectively referred to as "Express Scripts").  The scheme alleged herein sought to maintain and enhance Mallinckrodt's monopoly power in the U.S. market for adrenocorticotropic hormone (ACTH) drugs in violation of the antitrust laws.

2.      Mallinckrodt manufactures, markets, distributes and sells H.P. Acthar, NDC No. 63004871001 ("Acthar").  Acthar is the only therapeutic ACTH product sold in the United States.  Mallinckrodt is the sole provider in the U.S. of approved ACTH drugs.  Thus, Mallinckrodt is a monopolist.

3.      Mallinckrodt acquired its Acthar monopoly in 2001 when Questcor purchased Acthar from Aventis for $100,000.  By 2014, when Mallinckrodt purchased Questcor, the value of that Acthar monopoly was $5.9 billion—the price paid for the single-product company.

1

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

4.     This case does not seek to challenge the lawfulness of Mallinckrodt's monopoly. It seeks to challenge the lawfulness of Mallinckrodt's exercise of its monopoly power by taking actions to maintain and enhance that monopoly power in violation of the antitrust laws.

5.     The issue is not whether Mallinckrodt possessed monopoly power for Acthar.  It is whether its actions in contracting with the agent of its leading customers, Express Scripts, and in acquiring the only competitive product in the marketplace, Synacthen, constitute unlawful efforts to retain, maintain and enhance Mallinckrodt's monopoly power over Acthar in the ACTH market.

6.     Acthar is a "specialty pharmaceutical".  It is not sold in retail pharmacies, nor is it distributed through wholesalers to retail pharmacies, as with many prescription drugs.  Instead, it is distributed only through "specialty pharmacy distributors".

7.     One of the largest specialty pharmacy distributors in America is ESI's CuraScript, which ESI has owned since 2004.  In 2007, Mallinckrodt decided to embark on a "new strategy" and it changed its distribution of Acthar.  Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt decided to limit Acthar distribution exclusively through ESI's CuraScript.  In effect, Mallinckrodt contracted with the agent of its leading customers in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly.

8.     Immediately after signing the exclusive agreement, Mallinckrodt and Express Scripts agreed to raise the price of Acthar from $1,980 to over $27,927.80 per vial.  As a result, Mallinckrodt was able to charge inflated prices for Acthar to Express Scripts' clients, including the Plaintiffs.

9.     In 2015, Rockford spent $489,057.84 for just nine administrations of Acthar given

2

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

to two infant patients at a gross cost per vial of $54,339.76. When Mallinckrodt acquired the

Acthar monopoly from Aventis, the cost of an individual vial was just $40.00. Just prior to

Mallinckrodt's exclusive agreement with Express Scripts, the cost of an individual Acthar vial

was $1,980. That means the total cost to Rockford would have been less than $15,000, rather

than nearly $490,000, in the absence of the exclusive agreement. As a result, Rockford and other

members of the Class paid more for Acthar than they otherwise would have paid in the absence

of Mallinckrodt's unlawful actions with Express Scripts to maintain and enhance its monopoly

power, and to conspire and agree with Express Scripts to defraud Rockford and the Class of

Acthar purchasers.

10. In a 13-month period between December 2015 and December 2016, Acument

spent $894,617.75 for just 13 administrations of Acthar given to the spouse of one of Acument's

employees.

11. For this reason, Plaintiffs bring this case on behalf of themselves and a Class of

all similarly-situated purchasers of Acthar, to obtain declaratory and injunctive relief, and to

recover money damages. Rockford sues all Defendants for unjust enrichment, fraud, conspiracy

to defraud, federal antitrust and RICO violations, and violations of Illinois and other states' laws.

Rockford also sues Express Scripts for breach of contract, promissory estoppel, declaratory

judgment, and breach of the duty of good faith and fair dealing implied by law. Acument sues

all Defendants for unjust enrichment, fraud, conspiracy to defraud, federal antitrust and RICO

violations, and violations of Tennessee and other states' laws.

## JURISDICTION AND VENUE

12. Plaintiffs bring this action pursuant to sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15(a) and 26, to recover treble damages, costs of suit, and reasonable attorneys' fees

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

for the Defendants' violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

13.    This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the Plaintiffs and members of the Class are diverse from the Defendants and over two-thirds of the Class is situated outside of Illinois. Due to the exorbitant prices charged by Defendants for Acthar to the Class, the aggregate amount in controversy far exceeds $5,000,000.

14.    Further, the Court has supplemental jurisdiction over the Plaintiffs' state common law and statutory claims pursuant to 28 U.S.C. § 1367 because these claims arise from the same occurrence or transaction and are related to the Plaintiffs' federal antitrust and RICO claims as to form part of the same controversy.

15.    This Court has personal jurisdiction over the parties because the Defendants conduct substantial business in this State, have had systematic and continuous contacts with this State, and have agents and representatives that can be found in this State.

16.    The Court has jurisdiction over the Defendants because they have had sufficient minimum contacts with and/or have purposefully availed themselves of the laws and markets of the State of Illinois through, among other things, their conspiratorial communications between themselves and with others (including telephonic and electronic communications) and their distribution, marketing and sales of Acthar to the residents of Illinois.

17.    Furthermore, by the Express Scripts, Inc. Pharmacy Benefit Management Agreement (hereinafter the "ESI PBM Agreement") at issue here, Express Scripts and Rockford agreed that the ESI PBM Agreement "will be construed and governed in all respects according to the laws in the State of Illinois, without regard to the rules of conflict of laws thereof".

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

18.     Venue is proper in this District pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, because the Plaintiffs are situated in this District, and the Defendants transact business in this District.  Venue is also proper because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this District.  Defendants engaged in substantial conduct relevant to the claims of the Plaintiffs and the Class, and caused harm to members of the Class in this District. Venue is also proper pursuant to 28 U.S.C. §1391.

19.     Acthar is sold in interstate commerce and the unlawful activities alleged in this Second Amended Class Action Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

## THE PARTIES

### PLAINTIFFS

20.     The City of Rockford, Illinois, (the "City" or "Rockford"), employs over a thousand individuals in the service of its citizens.  Two such employees have children who had a serious medical condition, for which Acthar was indicated as a treatment option.  These employees received Acthar directly from Mallinckrodt's authorized agent, Express Scripts.  The City, which pays the health care benefits of its employees, including specialty pharmacy drugs, then paid for these administrations of Acthar.  The sum total of these 9 prescriptions (14 administrations) was $489,057.84. The City paid $488,787.84 directly to Express Scripts, as agent for Mallinckrodt.  These monies were then directly transferred by Express Scripts to Mallinckrodt, after Express Scripts deducted its agreed-upon share of the revenues.

21.     Acument Global Technologies, Inc. ("Acument") employs individuals in 12 locations in the United States and Mexico, including in Belvedere, Illinois and Spencer, Tennessee.  The spouse of one of Acument's employees suffers from a condition for which

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Acthar was indicated as a treatment option. Between December 17, 2015 and December 6, 2016, Acument paid a minimum of 80% of its employees' health care benefits, including specialty pharmacy drugs. Acument paid for the administrations of Acthar to its employee's spouse. The sum total of these administrations/prescriptions was $894,617.75 or $68,816.75 per prescription, for which Acument paid the largest share. The employee's co-pay was $2,600.00 in total.

## DEFENDANTS

22.     Questcor Pharmaceuticals, Inc. ("Questcor") was acquired by Mallinckrodt on August 14, 2014 for $5.9 billion, after paying only $100,000 for Questcor's lone product 13 years earlier. Following the acquisition, Questcor became a wholly-owned subsidiary of Mallinckrodt and its name was changed to Mallinckrodt ARD Inc. Mallinckrodt ARD is a biopharmaceutical company incorporated in California, with offices located at 675 McDonnell Blvd., Hazelwood, Missouri 63042. Mallinckrodt ARD now has locations in Hampton, New Jersey and Bedminster, New Jersey. For clarity, where necessary, the entity that existed prior to the Mallinckrodt acquisition is herein referred to as "Questcor".

23.     At the time of the Mallinckrodt acquisition, Questcor's only product sold in the United States was Acthar. As of the date of this Second Amended Class Action Complaint, Mallinckrodt continues to manufacture, distribute and sell Acthar directly to patients, exclusively through Express Scripts, by a program known as the "Acthar Support and Access Program" ("ASAP") described below.

24.     Defendant, Mallinckrodt plc ("Mallinckrodt plc"), is an Irish public limited company, with its corporate headquarters in Staines-upon-Thames, United Kingdom. Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG.

6

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

25.     Mallinckrodt plc, Mallinckrodt ARD and Questcor are collectively referred to as "Mallinckrodt".

26.     Defendants Express Scripts, Inc. and Express Scripts Holding Company are Delaware Corporations with their principle executive offices located at 1 Express Way, Saint Louis, Missouri 63121.  Collectively, Express Scripts, Inc. and Express Scripts Holding Company are referred to as "ESI".

27.     Defendant CuraScript, Inc., *d/b/a* CuraScript, SD, *f/k/a* CuraScript Pharmacy, Inc., ("CuraScript") is a wholly-owned subsidiary of ESI.  CuraScript was acquired by ESI in January 2004, and its operation was expanded when ESI acquired Priority Healthcare Corporation ("Priority") in October 2005.  The combined Priority and CuraScript became one of the nation's largest specialty pharmacy and distribution companies with more than $3 billion in annual revenue.

28.     CuraScript's corporate headquarters are located at 255 Technology Park, Lake Mary, Florida 32746.  This is the same address patients are required to mail any revocation of the broad authorization granted by patients to Mallinckrodt and ESI via the Acthar Start Form (attached to the Complaint, Amended Complaint and this, Second Amended Class Action Complaint as Exhibit "A").  CuraScript is Mallinckrodt's exclusive specialty pharmacy distributor for Acthar.

29.     Defendant Accredo Health Group, Inc. ("Accredo") is a wholly-owned subsidiary of ESI.  Accredo became a wholly-owned subsidiary of Medco Health Solutions, Inc. ("Medco") on August 18, 2005, months before ESI acquired Priority, and then became part of ESI when ESI acquired Medco in 2012.

30.     Accredo is a Delaware corporation with its corporate headquarters at 1640

7

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Century Center Parkway, Memphis, Tennessee 38134. Accredo also has operations in

Warrendale, Pennsylvania, Corona, California, Greensboro, North Carolina, Orlando, Florida,

Indianapolis, Indiana, and Nashville, Tennessee.

31.     Defendant United BioSource Corporation ("UBC") is a Delaware corporation

with its corporate headquarters at 920 Harvest Drive, Blue Bell, Pennsylvania 19422. When

Rockford filed its initial Class Action Complaint on April 6, 2017, as well as when it filed its

subsequent First Amended Class Action Complaint on October 9, 2017, UBC was a wholly-

owned subsidiary of ESI. UBC was acquired by ESI in 2012 as part of the Medco merger.

32.     On November 27, 2017, ESI announced that it sold UBC to Avista Capital

Partners, a private equity firm. As of the date of this filing, Plaintiffs do not know if the sale has

been completed.

33.     UBC is described as Mallinckrodt's "agent" on the ASAP form (Exhibit "A"

hereto) which Mallinckrodt employs exclusively to operate the ASAP program and to manage

ESI's exclusive distribution, sales and reimbursement of Acthar by its 3 operating arms,

CuraScript, Accredo and ESI.

34.     As stated in Paragraph 1, ESI, CuraScript, Accredo and UBC are collectively

referred to herein as "Express Scripts".

35.     Mallinckrodt and Express Scripts are collectively referred to herein as

"Defendants", as appropriate.

36.     The Defendants' acts alleged in this Second Amended Class Action Complaint to

have been done by each of the Defendants were authorized, ordered, done and/or ratified by their

respective officers, directors, agents, employees or representatives while engaged in the

management, direction, control or transaction of their respective business affairs.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## FACTUAL BACKGROUND

37.     "I have a Cadillac in my refrigerator."  That is how one Acthar patient named Sharon Keller described an unused 5-ml vial of the medication sitting in her kitchen refrigerator.

38.     The tale of how a 65 year-old brand medication could rise in price from $40 per vial in 2001, to $40,840.80 per vial by 2015, raising that value of the brand from $100,000 to $5.9 billion, is a story of perhaps the most egregious fraud and monopolistic conduct in U.S. history by a prescription drug company.

39.     The issue in this case is how Mallinckrodt achieved such a startling outcome.

### History of Acthar Development, Distribution and Pricing
### Acthar Development

40.     Acthar was approved by the Food and Drug Administration ("FDA") in 1952 for over fifty conditions, ranging from alcoholism, poison ivy, and radiation sickness to nephrotic syndrome.  Over time, with additional evidence-based requirements for prescription drugs, the list was winnowed to the fewer, present-day nineteen indications.

41.     Acthar is adrenocorticotropic hormone ("ACTH"), which causes the body to produce cortisone and other steroid hormones.  Two Mayo Clinic researchers, Drs. Philip Hench and Edward Kendall, developed the treatment, which won them the Nobel Prize for medicine at the time it was developed.  Acthar was developed by Armour Pharmaceutical Company.  As described by the Seventh Circuit in *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 145-46 (7th Cir. 1960):

> In a human being, . . . (ACTH) appears in the anterior lobe of the pituitary gland located at the base of the brain. When the human body is under stress or attacked by certain diseases, control centers in the brain excite the pituitary, and the pituitary secretes ACTH. In the blood stream the ACTH thus secreted is carried to the adrenal glands situated in the human body above the kidneys. As the ACTH hits the outer wall of the adrenal glands, it stimulates

9

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the adrenals to produce a set of chemical substances such as steroids, including the hormones, cortisone and hydrocortisone.

The cortisone hormones then act in the tissues of the body to suppress inflammations and allergic reactions. ACTH thus is used to relieve such conditions as rheumatoid arthritis and allergies. ACTH does not, itself, directly attack disease. However, it stimulates the adrenals which produce more than twenty-eight steroids, and these hormones attack the diseased tissues. When the human body itself does not supply sufficient ACTH, pharmaceutical ACTH can fill the gap.

42.     By the 1960s, injectable ACTH medications faced a variety of competing products. *See id.* at 145 ("Both Armour and Wilson manufacture and sell gelatin-ACTH preparations . . . . Gelatin-ACTH now constitutes more than 80% [o]f all forms of ACTH products sold by Armour and Wilson.  Other companies . . . produce similar products").

43.     For the majority of the drug's lifespan, however, generic corticosteroids, such as prednisone, effectively treated the majority of the indications for which Acthar was approved. That factor tended to limit the market for Acthar to treating infantile spasms ("IS") which was originally an "off-label" indication.  Consequently, because of the limited, off-label market for Acthar, by 2001, the drug was priced at $40 per vial and accounted for less than a million dollars of revenue for Aventis Pharmaceuticals, Inc. ("Aventis"), the then-owner.

44.     In 2001, Questcor acquired Acthar from Aventis for only $100,000, but in 2014 Mallinckrodt acquired Questcor for $5.9 billion.

45.     Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS").  IS is a serious condition in infants, but one with an annual patient population of less than 2,000 children per year.  However, Acthar was not originally approved by the FDA to treat IS, further limiting its value.  A few years later, the IS indication was approved by the FDA, and orphan drug status was granted.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Acthar Distribution: Mallinckrodt Adopts a "New Strategy" to Restrict Acthar Distribution to Maintain and Enhance its Monopoly Power over Acthar**

46.     Acthar is a specialty pharmaceutical distributed directly to patients, like the beneficiaries of the Plaintiffs and the Class in this case.

47.     For decades, Acthar was distributed to any doctor, hospital, wholesaler or specialty pharmacy who requested the drug to treat seriously ill patients. After Questcor acquired the rights to Acthar, it initially maintained that broad distribution network.

48.     However, on July 2, 2007, Mallinckrodt restricted its distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to just Express Scripts, the agent of its largest customers. Mallinckrodt's announcement stated, **"[e]ffective August 1, 2001, Acthar…will be available exclusively through Specialty Pharmacy Distribution**. Acthar Gel will no longer be available from traditional pharmaceutical wholesalers or retail pharmacies." *See* July 2, 2017, "Urgent Product Alert H.P. Acthar Gel" (attached to the Amended Complaint and this, Second Amended Complaint at Exhibit "B"). All distribution would now be done exclusively through CuraScript. "[A]ll new Acthar Gel prescriptions should be submitted to the Acthar Support & Access Program." *Id.* All aspects of Acthar distribution were handled by Express Scripts.

49.     The goal of this "new strategy" was to lock patients into receiving Acthar through one distribution channel controlled by Mallinckrodt and Express Scripts, and to ensure prescription distribution and payment through one source, Express Scripts. Mallinckrodt has maintained this exclusive arrangement with Express Scripts since 2007 up through the present. Throughout this time, title, dominion and risk for Acthar remained with Mallinckrodt.

50.     Mallinckrodt manages its exclusive arrangement with Express Scripts through a program known as the "Acthar Support & Access Program" or "ASAP." This program is

11

Case: 2:21-cv-60014 BMS Document 14-197 Filed 02/16/21 Page 31 of 352

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

structured so that Mallinckrodt ships Acthar directly to patients and receives payment directly from the associated third party payors.

51.    Once the patient (or their physician) contacts Mallinckrodt for a prescription of Acthar, they are directed to UBC. Otherwise, patients and/or their providers contact UBC directly, as directed by the Acthar Start Form at Exhibit "A" hereto. UBC then serves as the "HUB" for Mallinckrodt and Express Scripts. It confirms the patient's insurance coverage or other source of payment, and then arranges for Acthar to be delivered directly to the patient by CuraScript.

52.    The process, which is laid out in a form provided by Mallinckrodt, the "Acthar Start Form", requires patient, physician and payor authorization before Mallinckrodt agrees to ship Acthar to patients via ESI/CuraScript. *See* Exhibit "A" hereto. Thus, Express Scripts is not at risk. The Acthar Start Form consists of 3 sections: (1) a section requiring signature by the "HCP" (or health care professional); (2) a patient authorization requiring signature by the "patient or legal representative"; and (3) information form concerning Acthar indications and usage. The required signature of the patient authorizes "Mallinckrodt and its agents" to do a number of things in relation to the prescription and distribution of Acthar. It further authorizes Mallinckrodt and its agents, "including Mallinckrodt reimbursement support personnel and United BioSource Corporation ("UBC") or any other operator of the Acthar Support Access Program on behalf of Mallinckrodt (collectively, 'Designated Parties')" to provide Acthar and receive payment, among other things.

53.    Specifically, the patient authorizes Mallinckrodt, UBC, "or any other operator" of ASAP on behalf of Mallinckrodt, "collectively ('Designated Parties'), to provide certain services to [the patient], including reimbursement and coverage support, patient assistance and access

12

Case: 3:17-cv-50107 Document #: 98 Filed: 12/08/17 Page 16 of 97 PageID #:1359

programs, medication shipment tracking, and home injecting training." In other words, the

patient directly authorizes Mallinckrodt and its agents to ship Acthar to them directly via

CuraScript, and authorizes payment by both the patient and any third party payor prior to

obtaining the medication. So, the patient authorizes ESI to bill the payor for Acthar.

54.   Similarly, the physician must "authorize[ ] United BioSource Corporation

("UBC"), the current operator of the Acthar Support and Access Program ("Program"), and other

designated operators of the program, to perform a preliminary assessment of benefit verification

for this patient…". The physician also "agree(s) that the designated specialty pharmacy receive

this prescription via a designated third party, the Program and that no additional confirmation of

receipt of prescription is required by the designated specialty pharmacy."

55.   The interaction of all 4 elements of Express Scripts' functions on behalf of

Mallinckrodt are described below.

56.   Express Scripts is the largest buyers' agent for pharmaceuticals in the United

States. Express Scripts has substantial buying power as a result of its representation of the

largest number of buyers in the pharmaceutical marketplace.

57.   Express Scripts styles itself as a "pharmacy benefit manager" or "PBM", but it

does more than simply process claims for prescriptions filled at retail pharmacies. In addition to

"retail pharmacy claims processing, formulary management, utilization management and home

delivery pharmacy services", Express Scripts offers "specialty services that deliver . . . high-cost

injectable, infused, oral or inhaled drugs," and "compliance programs, . . . drug therapy

management programs, [] data analysis, and [] distribution services."[1] Acting "either directly or

through its subsidiaries", Express Scripts acts as a direct pipeline from a pharmaceutical

---

[1] Express Scripts Holding Company Annual Report on Form 10-K for the Fiscal Year Ending
December 31, 2012.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

manufacturer to the patient, facilitating the direct distribution of a prescription drugs from the factory to the patient's home.

58.     Express Scripts is able to act as a manufacturer's direct distributor of specialty drugs to patients because it provides what it calls "integrated specialty services." (emphasis in original).[2]  As one Express Scripts' executive put it "we're family."  These integrated services include a PBM (ESI), a specialty pharmacy distributor (CuraScript), and a specialty pharmacy provider (Accredo).

59.     Express Scripts coordinates all of these functions through its so-called pharmaceutical support services unit, UBC.  UBC acts as a "'hub,' that serves as a centralized point of contact for [] patients [] and prescribers"[3] by "[w]orking hand-in-hand with Express Scripts' specialty pharmacy and specialty distribution organizations, Accredo and CuraScript [],"[4] to coordinate delivery of and reimbursement for specialty pharmaceuticals.

60.     In total, UBC operates "an integrated service model that involves UBC . . . manag[ing] multiple system applications that support one product.  [UBC's] services include the UBC coordinating center, nurse coordination . . . product fulfillment through Accredo and wholesale fulfillment through CuraScript[].  When a patient is prescribed [a specialty] medication, the doctor sends a referral to the Reimbursement Hub. [UBC's] team serves as the liaison among doctors, patients, and insurance companies as [UBC] . . . navigate[s] the coverage process.  [UBC] . . . ensure[s] a smooth transition from enrollment through shipment of the medication."

61.     Part of the reimbursement hub process is coordination with ESI's CuraScript,

---

[2] https://curascriptsd.com/corporate-overview

[3] http://www.ubc.com/services/loyalty/reimbursement-patient-assistance

[4] http://www.ubc.com/about/about-ubc

14

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

which acts as an "integrated delivery network" connecting patients to manufacturers through "end-to-end distribution services."[5] Simply put, CuraScript is similar to a FedEx, DHL, or UPS for specialty prescription drugs. CuraScript advertises that it is "recognized by the manufacturing community as [] a reliable partner in the management of brands" through CuraScript's "integrated specialty services," which deliver medications to patients "alongside sister organizations Accredo and UBC."[6]

63. To facilitate these end-to-end distribution services, UBC coordinates CuraScript's activities with Accredo, which provides so-called specialty pharmacy services. By acting as the hub, UBC ensures that a patient whose pharmacy benefits are managed by ESI can get a specialty medication delivered to him or her by coordinating direct shipment through CuraScript and Accredo and direct payment through ESI. "As one UBC executive has explained "if UBC is the Hub and Accredo is the [specialty pharmacy] . . . we can send the patient's prescription over to Accredo, and they will not have to duplicate any of our efforts, which another pharmacy would be compelled to do because of risk. Accredo trusts us."

63. Accredo provides specialty pharmacy and related services for patients with certain complex and chronic health conditions. Accredo's staff is comprised of a team of specialty-trained pharmacists, nurses, patient care advocates, social workers and insurance coordinators whom, among other things, "handle everything about" a patients' medications and/or specialty therapy.

64. Along with UBC, Accredo provides: (a) support to orphan and ultra orphan patient populations; (b) HUB employees to navigate insurance requirements, like prior authorizations, for patients and prescribers; (c) clinicians who are available 24/7 to address

---

[5] https://curascriptsd.com/Rare-Disease-Specialty-Distribution-Program

[6] https://curascriptsd.com/supplier-relations

15

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

patient concerns and provide guidance on mitigating adverse events; (d) reimbursement HUB specialists to steer patients to funding solutions, and (e) an integrated solution allowing patients to start therapy twice as fast.

65.     The Rockford patients at issue dealt with Accredo for her fulfillment of Acthar. Accredo publicly represents that by using Accredo's specialty pharmacy services, plan sponsors, like Rockford, can save money by managing their specialty spend through Accredo.  Accredo further promises patients the most effective and affordable medications while ensuring appropriate utilization, manage unit costs, drive out waste and reduce related medical expenses.

66.     The Acument patient at issue dealt with CVS Caremark for their fulfillment of Acthar.  It is believed, and therefore averred, that UBC coordinated the shipment of Acthar directly to the spouse of Acument's employee via the same integrated "hub" network with the lone exception being that Acument's payment was made to its PBM, CVS Caremark, before being routed to Mallinckrodt.

67.     In simple terms, through UBC's coordination with Accredo, CuraScript, and ESI, Express Scripts delivers a prescription drug directly from the manufacturer to the patient, removing all impediments to delivery and payment, whether medical, logistical or financial.

68.     With respect to Acthar, Mallinckrodt has a contract with UBC to coordinate the delivery of Acthar through what it has called the ASAP Program.  Beginning with its July 2, 2007 announcement, Mallinckrodt directed physicians to prescribe Acthar through the ASAP program.  *See* Exhibit "B".  In this announcement, Mallinckrodt directed physicians that "all new Acthar [] prescriptions should be submitted to the [ASAP program]."  Prescriptions are submitted to the ASAP program through the "Acthar Start Form."  *See* Exhibit "A".  This form authorizes UBC to coordinate reimbursement with ESI and direct the prescription to a

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"designated specialty pharmacy." This designated specialty pharmacy is Accredo. Accredo

dealt with the Acument patients in 2015. Part of UBC's activities involve coordinating the

shipment of Acthar from CuraScript through Accredo to the patient. Indeed, in order to revoke

UBC's authorization to perform these services, the patient must mail a letter to CuraScript's

address in Florida. It is believed and therefore averred that Acument's patient provided a similar

authorization to UBC for shipment from CuraScript.

      69.     The Acthar distribution arrangement between Express Scripts and Mallinckrodt is

illustrated in the following two figures. In Figure 1, the distribution arrangement is described in

aggregate.



**Figure 1**

      70.     Figure 2, below, illustrates how Acthar is prescribed, authorized, distributed and

paid for through Express Scripts. Payment flows are represented by green arrows traveling from

payor and patient to Mallinckrodt, while product flows are represented by black chevrons

flowing from Mallinckrodt to the patient. Although these payments pass through Express

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Scripts, payment flows and products flows are ultimately aligned between Mallinckrodt and UBC, Express Scripts' reimbursement hub, through a contract with Mallinckrodt to operate the ASAP program, which ostensibly operates to confirm the medical necessity of the prescription (by Accredo), to arrange payment (to ESI or CVS Caremark) for shipment (from CuraScript) of Acthar to patients. CuraScript has a contract with Mallinckrodt to ship Acthar. Through these contractual arrangements, Acthar travels from Mallinckrodt directly to the patient, and payments are channeled back to Mallinckrodt.

71. The patient, on the other hand, has prescription insurance coverage through his or her health plan. In this case, Rockford had the health plan that covered its two employees. The health plan has a contract with ESI, which requires ESI to collect payments for the price of Acthar. Acument similarly had a contract with CVS Caremark which covered its employees and his spouse. CVS Caremark is required to collect payments for the price of Acthar.

72. By these arrangements, Acthar product flows directly from Mallinckrodt through Express Scripts to the patient, while the money flows directly from the patient and payor through Express Scripts back to Mallinckrodt.

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**Figure 2**

73.     Wielding both the largest collection of patients in the United States and a direct shipment channel for specialty drugs, Express Scripts is in a unique position to negotiate the most competitive, discount prices for specialty drugs in the United States. This bargaining power has allowed Express Scripts to push back against attempts by pharmaceutical drug manufacturers to charges inflated prices for drugs above the actual market value of the drugs.

74.     Mallinckrodt leveraged and enhanced its monopoly power by limiting the distribution of its sole specialty drug to just one specialty pharmacy distributor, CuraScript, and employing as its agents, ESI's Accredo and UBC, along with CuraScript, to coordinate all aspects of the distribution and sales of Acthar: from prescription by the physician, to direct home delivery to the patient, to direct reimbursement by the payor. This allowed Mallinckrodt to raise its prices tenfold initially, and nearly double in the ensuing years.

75.     Mallinckrodt Executive Vice-President, Steve Cartt, admitted "'[w]e did some market research,' . . . [t]alking to physicians and others about pricing 'gave us some comfort that

19

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the [new] strategy would work, and physicians would continue to use the drug, and payers would pay' . . . . 'The reality was better than we expected.' " *See* Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, New York Times, C1, April 19, 2008 (titled The Middleman's Markup in New York Print Ed.).

### Rockford's PBM Contract with Express Scripts

76.     In 2015, Rockford contracted with Express Scripts to provide pharmacy benefit services, among other things.  ESI's Vice President of its Commercial Division, David Brodsky, executed the agreement with Rockford on behalf of Express Scripts (hereinafter, the "ESI PBM Agreement").  The term of the ESI PBM Agreement was for three years, from the commencement date of January 1, 2015 and remains in force.

77.     Under the ESI PBM agreement, ESI agreed to provide Rockford the following services:

  a.  pharmacy network contracting;

  b.  pharmacy claims processing;

  c.  mail and specialty drug pharmacy;

  **d.  cost containment;**

  e.  clinical programs;

  f.  safety programs;

  g.  adherence programs, and

  h.  formulary and rebate administration.

These services were defined as "PBM Services" in the agreement (emphasis added).

78.     ESI bargained with Rockford to serve as Rockford's exclusive specialty pharmacy provider and distributor.  Thus, under the contract, ESI became Rockford's exclusive provider of

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the above-stated PBM Services, including the supply of specialty drugs.

79.     One of the specialty medications Rockford contracted for ESI to supply exclusively was Mallinckrodt's Acthar Gel injection. Acthar was listed as a "specialty drug" in the agreement, and was identified for use to treat "CNS disorders". Infantile spasms is a type of CNS disorder.

80.     Rockford agreed to pay ESI certain reimbursement rates for specialty pharmacy drugs as established by ESI for each such drug. The reimbursement rates for each drug varied from a discount of 0% to 54.25%. For Acthar, Mallinckrodt charged Rockford at a discounted rate of 13.5% off the "average wholesale price", as set forth in the ESI PBM Agreement. Mallinckrodt set the average wholesale prices of Acthar used by Express Scripts for reimbursement.

81.     In 2015, Mallinckrodt had Acthar shipped directly to the children of two Rockford employees (hereinafter identified as "Employee 1" and "Employee 2"). ESI then charged Rockford for the Acthar, pursuant to the terms of the ESI PBM Agreement. Rockford paid ESI such charges.

82.     Despite its express obligation to provide "cost containment" as one of the contracted PBM Services, on April 1, 2015, ESI caused Acthar to be delivered to one of Rockford's employees and Rockford was charged $100,457.64 for the 30-day supply of Acthar.

83.     While "cost containment" is not a defined term in the ESI PBM Agreement, the plain meaning of the words denotes the act, process or means of keeping something within limits, and preventing the expansion of something. Here, the "something" which ESI contracted to "contain" was the "cost" of specialty pharmacy drugs, like Acthar. However, ESI charged Rockford $488,787.84 for the sale of nine Acthar prescriptions to Rockford employees. These

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

charges by ESI were in breach of the obligation under the ESI PBM Agreement to provide cost containment.

84.     Because Express Scripts had entered into an exclusive arrangement with the manufacturer of Acthar for direct distribution of Acthar to patients, ESI had no incentive to fulfill its contractual obligation to obtain a lower cost for Acthar than Mallinckrodt wished to charge. In other instances, including with other specialty pharmaceuticals covered by the ESI PBM Agreement, Express Scripts used its bargaining power to extract lower prices from the manufacturers. One such example, described below, involved Turing's Daraprim.

**ESI and Daraprim**

85.     Turing Pharmaceuticals, LLC ("Turing") acquired the rights to Daraprim, and proceeded to increase the price 5000% from $13.50 to $750.00 per pill. One year's course of treatment rose from $6,500 to $361,000.

86.     Strikingly, ESI employed its market power to counter Turing's action. It worked to create an alternative that was much less expensive than Daraprim.

87.     On December 1, 2015, ESI announced that it would "partner with Imprimis Pharmaceuticals to drive access to a low-cost alternative to Daraprim." ESI, ESI Champions $1 per Pill Access to an Alternative for Daraprim, Dec. 1 2015, http://lab.express-scripts.com/lab/insights/drug-options/express-scripts-champions-1-per-pill-access-to-an-alternative-for-daraprim. In partnership with ESI, "Imprimis [] offer[ed] a compounded oral formulation of pyrimethamine and leucovorin (a form of folic acid) for as low as $1 per capsule for people whose pharmacy benefit is managed by ESI." *Id*. When it is in ESI's interest, it acts to "improve access and affordability." *Id*.

88.     ESI's Chief Medical Officer, Dr. Steve Miller, stated that ESI had found a way to

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

deliver "a safe, high-quality and extremely cost-effective way to provide access to a Daraprim alternative." However, because of its agreement with Mallinckrodt, ESI has not served as an effective agent for pharmaceutical buyers to seek to lower the cost of Acthar, or the availability of reasonably priced alternatives.

## Acthar Pricing

89.     Mallinckrodt acquired the rights to Acthar from Aventis in 2001. At acquisition, the end payor price of a vial of Acthar was approximately $40.00. After acquisition, Mallinckrodt raised the per vial, end payor price of Acthar to approximately $748.00. From 2001 until Mallinckrodt executed its new strategy in 2007, the end payor price of Acthar grew to $1,980.00.

90.     When Mallinckrodt implemented its new strategy on August 27, 2007, the end payor price of Acthar rose to a staggering $27,922.80 – a 1,310% increase in the span of a month, and a 69,707% increase from the time Mallinckrodt acquired the drug.

91.     Until Mallinckrodt obtained FDA approval for the IS indication, the price of Acthar remained stable. However, in 2011, Mallinckrodt increased the price of Acthar 5% on January 3, 2011, another 5% on June 1, 2011, and executed a third price increase on December 27, 2011. In 2012, Acthar's end payor price was $34,150.00.

92.     Near in time to Mallinckrodt plc's $5.9 billion acquisition of Questcor, in 2014, the price of Acthar rose to $40,840.80. Under Mallinckrodt plc's stewardship, the end payor price of Acthar rose in 2016 to $42,942.60, and to $43,658.40 in 2017.

93.     Since the acquisition of Acthar in 2001, the end payor price of Acthar has grown 109,046% reflecting the precipitous rise in the value of the Acthar assets from $100,000 in 2001 to $5.9 billion in 2014 – a 5,899,900% increase in value. The dramatic increase in value of the

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Acthar assets, coupled with the durable and repeated ability to raise the price of Acthar, underscore the monopoly power wielded by Mallinckrodt in the ACTH market. Mallinckrodt's tactics described in this Complaint, however, reflect Mallinckrodt's willingness to undertake actions to maintain and grow its monopoly in the ACTH market, in violation of the antitrust laws.

### The Views of Express Scripts' Chief Medical Officer, Dr. Steve Miller, on Express Scripts' Market Power

94. Beginning in 2007, Express Scripts became the exclusive agent of Mallinckrodt for the distribution of Acthar. *See* Freudenheim, *supra*. When Mallinckrodt chose to increase the price of this 50-plus year old medication, Express Scripts did not push back. Instead, when confronted with the 2007 price increase, ESI's Chief Medical Officer Steve Miller stated that "[t]he increase was a manufacturing decision. I can't comment on it." *Id*.

95. The circumstances demonstrate why Dr. Miller chose to stay silent in the face of Express Scripts' decision to join Mallinckrodt in overcharging payors for Acthar.

96. By the time the Plaintiffs' beneficiaries were prescribed Acthar in 2015, Express Scripts was handling each and every aspect of Acthar distribution through the above-described functions. CuraScript was the exclusive specialty pharmaceutical distributor, Accredo was the specialty pharmacy provider, and UBC coordinated both the product and money flows through the ASAP Program. As Mallinckrodt's exclusive agent, Express Scripts had no interest in lowering the price for Acthar because it was making money off all aspects of its exclusive arrangement with the manufacturer. In other words, by helping Mallinckrodt maintain and enhance its monopoly power in the ACTH market, Express Scripts along with Mallinckrodt realized greater profits at the expense of payors, like Plaintiffs.

97. In the spring of 2017, ESI's Senior Vice President, Supply Chain and Specialty

24

Pharma, Everett Neville, stated "I don't think [Acthar is] a very great [drug] – it's a pretty poor drug with a very limited need and certainly [Express Scripts Chief Medical Officer, Dr,] Steve[Miller] could comment." He went on to say "I think [Dr. Miller] and I both would agree, and **I think everybody in our company would agree, that [Acthar] is vastly overpriced for the value**." (emphasis added). Mr. Neville went on to state that he "personally told [Mallinckrodt's] management team that their drug is hugely overpriced and that he "know[s] [Dr. Miller] has as well."

98. In the same public setting, Dr. Miller stated, "[i]f you look at the data, the indications for the drug are . . . in the compendium, it's listed under a lot of indications, its real use should be very, very limited. It's an old drug. There's better products in the marketplace and so we're going to continue to be very vigilant in our utilization management."

99. Despite this express acknowledgment by Express Scripts' Chief Medical Officer, in the weeks and months following Mallinckrodt's settlement with the FTC, Express Scripts has not acted or made any efforts to contain costs or provide a reasonable alternative for Acthar.

100. Dr. Miller, Express Scripts Chief Medical Officer, has articulated the power of Express Scripts in the prescription drug marketplace to extract lower prices for its customers, using its tremendous buying power and influence. He has made all of the following public comments:

> "When I joined the company, we represented 12 million members. We're at 85 million today. That gives us extraordinary sway in the marketplace. If you think about any other aspect of health care, no one else has that many lives that they can represent."[7]

---

[7] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"We have tremendous scale, which allows us to get the best deals for our plan sponsors from both the pharmaceutical manufacturers and also the pharmacies. If any pharmacy chain ever becomes too large, we're able to move our patients and … get the lowest cost."[8]

"I think that because of the continued escalation of cost, you need a PBM now more than ever. And what a best-in-class PBM like Express Scripts does really ensure is great health outcomes and more affordable costs."[9]

"Pharma has shown that they feel very emboldened with their pricing power. We're using our clout in the marketplace to really tamp these down for our clients."[10]

"There are pharma companies that recognize this is in their best interest," he says. "They, like us, want to get to a sustainable marketplace. They know if they're overcharging for drugs that have very little efficacy, that puts them in a competitive disadvantage."[11]

"Discussions to control costs have never been more important, as recent estimates put global drug spend at $1.5 trillion by 2021, according to data from Quintiles IMS Holding. Yet sometimes, in the drug pricing debate, blame is placed on one part of the drug distribution system when, in fact, all of us – pharmaceutical companies, pharmacy benefit managers (PBMs), policymakers and payers – have a role to play in achieving better affordability and accessibility for medicine. As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with

---

[8] *Business Insurance*, "Q&A: Dr. Steve Miller, Express Scripts Holding Co.," by Shelby Livingston, May 22, 2016, http://www.businessinsurance.com/article/00010101/STORY/305229991/Q&A-Dr-Steve-Miller,-Express-Scripts-Holding-Co

[9] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

[10] *Nightly Business Report*, "Express Scripts Looks to Limit Drug Price Increases," by Meg Tirrell, October 2, 2015, http://nbr.com/2015/10/07/express-scripts-looks-to-limit-drug-price-increases/

[11] *Medical Marketing and Media*, "Express Scripts' Steve Miller Takes on Drug Industry in Pricing Battle," by Jaimy Lee, February 1, 2015, http://www.mmm-online.com/payersmanaged-markets/express-scripts-steve-miller-takes-on-drug-industry-in-pricing-battle/article/460559/

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

our industry partners to make that possible."[12]

"…[I]t is incumbent upon the pharmacy benefits managers to more forcefully illustrate the critical role we play in making medicine more affordable and accessible. For example, we partnered with a drug maker who was willing to lower the price of its hepatitis C drug. In doing so, we were able to provide 50,000 patients affordable access to this medication."[13]

"The biggest problem is not new expensive drugs but repricing old ones, and not just ones being purchased by Martin Shkreli or Valeant. 'You have no new research. You have no innovation. You have nothing but increased drug prices."[14]

"We are constantly trying to be vigilant and chase the bad actors out of the marketplace."[15]

101.    Through such statements, Express Scripts acknowledged its strong influence on pharmaceutical markets. The striking feature of the current circumstance is that Express Scripts has not asserted its influence to effectuate lower prices for Acthar.

102.    While acknowledging the "value" of the medication does not warrant its high prices, Express Scripts has facilitated, rather than forestalled, Mallinckrodt's desire for ever growing profits by "repricing" an "old drug".

---

[12] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017, http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110 550.html

[13] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017, http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110 550.html

[14] *Forbes, Pharma & Healthcare*, "Solving Pharma's Shkreli Problem," by Matthew Herper, January 20, 2016, https://www.forbes.com/sites/matthewherper/2016/01/20/solving-pharmas-shkreli-problem/#6dcce78c6be3

[15] The New York Times, "Specialty Pharmacies Say Benefit Managers Are Squeezing Them Out," by Katie Thomas, January 9, 2017, https://www.nytimes.com/2017/01/09/business/specialty-pharmacies-say-benefit-managers-are-squeezing-them-out.html

27

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

103.    With Acthar, "[y]ou have nothing but increased drug prices," due in large part to Express Scripts' decision to withhold its market power to effectuate cost containment through lower prices.

## THE MALLINCKRODT SYNACTHEN ACQUISITION

104.    Since 2007, Acthar has represented 98% or more of Mallinckrodt's revenue. Acthar was so important to Questcor that its then-CEO, Don Bailey told investors it "is basically a single product company."

105.    Through its exorbitant price increases, Mallinckrodt was able to grow its revenue from Acthar sales from less that $1 million in 2001 to $798.9 million in 2013. Much of this increase occurred between 2011 and 2013 when Mallinckrodt's revenues increased $218.2 million to $798.9 million.

106.    However, by 2013, Mallinckrodt had identified a competitive threat. Novartis AG ("Novartis") had developed Synacthen Depot (cosyntropin depot) ("Synacthen"), a synthetically derived ACTH medication, which, like Acthar, could be injected intra-muscularly. While it was used outside the United States, it was not yet approved by the FDA for use in the United States. Recognizing that the entry of Synacthen in the U.S. market for ACTH drugs would threaten its exercise of its monopoly power, Mallinckrodt first attempted to buy the rights to Synacthen in 2009. It failed.

107.    As of 2013, Novartis agreed to sell Synacthen to Retrophin, Inc., which at the time was helmed by Mr. Shkreli. Mr. Shkreli founded Turing (the maker of Daraprim) after he departed Retrophin.

108.    When faced with a competitive threat to its monopoly, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

been offered by three competitors, including Retrophin. Retrophin had agreed to buy Synacthen for $16 million. Upon learning of this imminent threat, Mallinckrodt acted to protect and enhance its monopoly power by licensing Synacthen for a minimum of $135 million from Novartis. It licensed the U.S. exclusive rights to Synacthen from Novartis, not to bring this viable synthetic alternative to Acthar to market, but to eliminate the nascent competitive threat posed by an independently owned Synacthen.

109.    These actions allowed Mallinckrodt to maintain and enhance its monopoly power in the ACTH market. The Synacthen acquisition had the purpose and effect of suppressing competition and allowing Mallinckrodt to continue to raise prices for Acthar, which it did.

110.    From 2013 through 2017, Mallinckrodt raised the price of Acthar from $36,144 to $43,658.

## RELEVANT MARKETS AND MONOPOLY POWER, AND THE FTC COMPLAINT AGAINST MALLINCKRODT

111.    The supracompetitive and exorbitant prices that Mallinckrodt charges for Acthar, and its limitations on distribution through the entry into an exclusive distribution arrangement with Express Scripts in 2007, are direct evidence of Mallinckrodt's monopoly power and actions to maintain and enhance such monopoly power, in violation of the antitrust laws. That Acthar holds a dominant share of the relevant market for ACTH drugs in the United States shows Mallinckrodt's monopoly power by indirect evidence.

112.    The relevant product market is the sale of ACTH drugs, dominated by just one product, Acthar. The geographic market is the United States. In this market, Mallinckrodt is the single seller, and the third party payors are the leading buyers.

113.    That market is and has been characterized by significant barriers to entry.

114.    There are no medical or reasonably available substitutes for Acthar. The only

29

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

potential substitute was Synacthen, which Mallinckrodt purchased the rights to from Novartis in 2013, only to shelve the product rather than seek to bring it to market in the United States.

115.    On January 18, 2017, the Federal Trade Commission ("FTC") sued Mallinckrodt, alleging that Mallinckrodt exercised, and continues to exercise, monopoly power in the United States in the sale of Acthar. *See generally*, Complaint for Injunctive Relief and Other Equitable Relief ("FTC Complaint") at Exhibit "B" to the original Complaint (Dkt. No. 1-2, filed 04/06/17).

116.    The FTC alleged that such purchases "extinguished a nascent competitive threat to [Mallinckrodt's] monopoly." FTC Complaint, ¶ 1.

117.    At all relevant times material to this case, Mallinckrodt possessed monopoly power—the ability to profitably raise price significantly above competitive levels without losing significant sales—in the relevant product market. None of the vast price increases taken by Mallinckrodt between 2007 and the present have caused a significant loss of sales. To the contrary, Mallinckrodt's sales have increased during that time.

118.    Mallinckrodt has repeatedly and profitably raised Acthar's price from the time it acquired the product for $100,000 in 2001 from Aventis to the present. Mallinckrodt has been able to raise prices unchecked, as set forth above, and achieve corresponding revenue growth to more than $1 billion.

119.    Mallinckrodt has encountered no competitive constraints on its ability to repeatedly increase Acthar's price and, by extension, its revenue and profit margins. Mallinckrodt does not set the price of Acthar in reference to the price of any of the other drugs that are prescribed to treat the same indications that Acthar treats. Acthar is priced significantly higher than non-ACTH drugs used to treat the same indications, except for IS.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

120.     Indeed, one Mallinckrodt executive commented that the price for Acthar "was
chosen by looking at the prices of other specialty drugs and estimating how much insurers and
employers would be willing to bear."  Mallinckrodt took "some comfort that the strategy would
work, and physicians would continue to use the drug, and payers would continue to pay."  In
fact, according to Mallinckrodt, "reality was better than expected."

121.     In its Annual Report on Form 10-K for the Fiscal Year ended December 31, 2007,





| | Cumulative Total Return* | | | | | |
|---|---|---|---|---|---|---|
| | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 |
| QUESTCOR PHARMACEUTICALS, INC. | 100.00 | 73.51 | 54.06 | 106.13 | 151.02 | 588.78 |
| AMEX COMPOSITE INDEX | 100.00 | 143.18 | 175.20 | 215.26 | 257.04 | 299.37 |
| NASDAQ PHARMACEUTICAL INDEX | 100.00 | 144.89 | 160.44 | 160.65 | 163.42 | 154.46 |

*     $100 invested on 12/31/02 in stock or index-including reinvestment of dividends. Fiscal year ended December 31.

     This stock performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange
Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as
amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

Questcor illustrated the effect of its monopolization strategy on its "5 Year Cumulative Total
Return", illustrating a 290% return between 2006 and 2007 as follows:

122.     FDA approval is required to market pharmaceuticals to U.S. consumers.  As a
result, drugs sold outside of the United States are not viable competitive alternatives for U.S.
consumers, even in the event of a significant price increase for ACTH drugs available in the

31

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

United States.

123.    Acthar has a 100% share of the market for ACTH drugs in the United States.  No other ACTH drug is FDA-approved for therapeutic use.

124.    The United States ACTH market is characterized by high barriers to entry. Developing a long-acting, depot-injection formulation of a drug product containing ACTH (natural or synthetic) that is stable, safe, and effective would require significant time, cost, and effort, with no guarantee of success. The requirements for entry include sourcing the active pharmaceutical ingredient, formulating a sustained-release depot-injection formulation, scaling production to clinical scale, and successfully conducting clinical trials necessary for FDA approval.  Mallinckrodt's former CEO Don Bailey assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic."

125.    Former CEO Don Bailey also claimed that one of the barriers to entry is the Acthar drug formulation.  While Acthar is a biologic extraction of porcine pituitaries, Bailey claimed, "[i]t's an undisclosed composition, so that's a trade secret."  He also claimed "[t]he manufacturing process is also a trade secret.  It's complex, it's unique, and we own all elements of the manufacturing process. …The composition of Acthar that comes out of the manufacturing process is tied to the process, so if you don't know the process you can't figure out what's actually in Acthar."

126.    If what the former CEO was saying was that Questcor enjoyed a natural monopoly, that does not necessarily imply the absence of market constraints.  These constraints can come from a new competitive product or from a dominant buyer on the other side of the market.  Both of these factors are relevant here.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

### Mallinckrodt Engaged in Anticompetitive Conduct By Acquiring the Only Competitor Drug, Synacthen

127.    Synacthen posed a threat to Mallinckrodt's ACTH drug monopoly, so Questcor intervened at the time when other firms were attempting to acquire the U.S. rights to Synacthen from Novartis.  Questcor submitted a bid that included substantially more guaranteed money than the other bidders had offered, effectively ending the bidding process.  By acquiring Synacthen, Questcor eliminated the possibility that another firm would develop it and compete against Acthar.

128.    Synacthen constituted a nascent competitive threat to Questcor's ACTH drug monopoly, notwithstanding the uncertainty that Synacthen, a preclinical drug, would be approved by the FDA.

129.    For years, Questcor viewed Synacthen as a significant potential competitive threat to its monopoly.

130.    When Questcor first decided to pursue an "orphan drug" (*i.e.*, high) pricing model for Acthar, it recognized the potential threat Synacthen posed to Acthar's revenue growth.

131.    Nevertheless, in 2007, it adopted and pursued the above-described "new strategy", consolidating Acthar distribution to just one distributor and streamlining its control over sales and distribution through the implementation of ASAP.  These functions were consolidated in one significant company, Express Scripts.

132.    In 2009, Questcor approached Novartis about acquiring Synacthen.  At that time, Questcor continued to view Synacthen as a possible future competitor, especially given the increasing prices Questcor was commanding for Acthar.  Unsuccessful in that initial attempt, Questcor continued to monitor the competitive threat from Synacthen.

133.    Then in 2012, Questcor again concluded that Synacthen posed a more immediate

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

threat to Acthar if Synacthen was approved for sale in the United States.

134.    By 2013, Questcor feared that if another company were to acquire Synacthen and obtain FDA approval, it could undermine its business model.

135.    On information and belief, as long as Questcor believed no other firm was seeking to bring Synacthen to the United States, Questcor did not make further attempts to acquire it. Indeed, just months before Questcor began pursuing the acquisition of Synacthen, top Questcor officials questioned whether Synacthen would provide any affirmative value to Questcor.

### Other Bidders Planned to Use Synacthen to Challenge Acthar's Monopoly

136.    Unbeknownst to Questcor at the time, Novartis decided in late 2011 to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States, along with the marketing rights for Synacthen in over thirty-five other countries where the drug was already approved and sold. Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

137.    It is alleged that each of the three firms planned to develop Synacthen for IS and to use Synacthen to compete directly with Acthar.  With this indication, each firm expected to capture a significant share of the U.S. ACTH market from Questcor by pricing Synacthen below Acthar's prices.  Having the requisite pharmaceutical expertise and financing, the three firms independently conducted due diligence, crafted business plans and regulatory approval strategies, and took other affirmative steps in furtherance of developing Synacthen for the U.S. ACTH market.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## The Value of the Synacthen Assets

138.     The Synacthen assets and related rights provide a proven formulation for a long-acting, depot-injection drug containing synthetic ACTH.  The drug product manufactured using the Synacthen formulation has been safely and effectively used to treat patients suffering from IS and other conditions worldwide for decades.  The Synacthen assets would therefore facilitate commercializing a synthetic ACTH therapy in the United States.

139.     The asset package being sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process.

140.     In possession of the Synacthen assets, a buyer would not need to create a synthetic ACTH drug formulation *de novo*, nor would it need to develop from scratch the manufacturing and testing protocols necessary for production of the drug product.

## Questcor Disrupted the Synacthen Bidding Process

141.     It is alleged that, on October of 2012, Questcor learned that at least one unidentified firm was attempting to acquire Synacthen from Novartis to develop it to compete with Questcor for the U.S. ACTH market.  Questcor immediately reached out to Novartis, signed a confidentiality agreement with Novartis, and submitted a confidential offer for the purchase of Synacthen.

142.     Novartis negotiated with the three alternative bidders in parallel with Questcor.  By the spring of 2013, all three of the alternative bidders had submitted offers for Synacthen, with plans to develop and launch Synacthen in the United States in direct competition with Acthar. At the point where those negotiations left off, each company exchanged deal terms with Novartis and submitted formal offers.  The offers by the three alternative bidders were

35

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

comparable in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. sales of Synacthen.

143.    Unlike the three alternative bidders, Questcor had only incomplete plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. Retrophin ultimately prevailed in the bidding war with a bid of $16 million.

144.    However, on June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements"). By the Agreements, Questcor gained the exclusive rights to develop, market, and sell Synacthen in the United States and over thirty-five other countries. Under the Agreements, Questcor is obligated to pay a minimum of $135 million, and likely will pay $300 million to Novartis for Synacthen.

145.    In other words, Questcor swept in at the eleventh hour to overpay—at least 8 times more than the market had determined—for the only immediate competitive threat to its monopoly for Acthar. Despite paying this amount, they did not seek FDA approval to bring the product to market.

**The Lawsuit Between Retrophin and Questcor for Questcor's Antitrust Violations**

146.    In January 2014, Retrophin sued Questcor for antitrust violations in the United States Federal District Court for the Central District of California. *See* Retrophin, Inc., v. Questcor Pharmaceuticals, Inc., CV-14-00026-JLS (C.D.Cal) ("Retrophin Complaint") (attached to the Complaint and this, Second Amended Complaint at Exhibit "C"). (To the extent relevant to Plaintiff's Complaint, the averments of antitrust conduct interposed by Retrophin are incorporated by reference herein).

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

147.    In the Retrophin Complaint, Retrophin claimed,

> "[i]n June of 2013, plaintiff Retrophin was poised to challenge Questcor's monopoly.  It had negotiated an agreement to purchase from Novartis AG ("Novartis"), the rights to sell in the US a product called Synacthen.  ...
>
> Retrophin planned to obtain FDA approval to sell Synacthen in the US and compete head to head against Questcor by dramatically undercutting Questcor's price for Acthar.  It had negotiated and was ready to sign an agreement to purchase the US rights to Synacthen from Novartis.  The signing was scheduled for June 11, 2013.  The signing of the agreement was so imminent that a press release had been prepared to announce the deal.
>
> On June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor swept in and acquired the rights to Synacthen.  In doing so, it preserved and entrenched its ACTH monopoly in US and eliminated the competitive threat posed by Retrophin's acquisition of Synacthen.  There was no procompetitive aspect of Questcor's acquisition of Synacthen.

Retrophin Complaint, ¶¶ 4-6, at Exhibit "C" to the original Complaint (Dkt. No. 1-3, filed 04/07/17).

148.    The FTC apparently agreed with Retrophin's assessment.

149.    Nevertheless, the government, in its 2017 FTC complaint, mirrored Retrophin's 2014 allegations that Questcor engaged in anticompetitive conduct in violation of the antitrust laws.

150.    Mallinckrodt chose to settle the Retrophin lawsuit for $15.5 million, slightly less than the $16 million Retrophin bid to purchase Synacthen from Novartis.

### Mallinckrodt's Acquisition of Synacthen Harmed Competition

151.    Mallinckrodt's strategy to protect its monopoly power in the market for ACTH drugs was successful.  But for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to

37

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

develop Synacthen for IS to compete directly with Acthar at a lower price. With the acquisition of Synacthen, Mallinckrodt was able to thwart an imminent threat to its Acthar monopoly and thereby harmed competition.

152.    Mallinckrodt claimed that it acquired Synacthen to develop it for new, non-Acthar indications, but given the similarities between the two drugs, any therapeutic indication that Mallinckrodt was to pursue for Synacthen could easily have been pursued for Acthar.

153.    Fourteen months after acquiring Synacthen, Mallinckrodt acquired Questcor for $5.9 billion. The vast majority of Questcor's value was attributable to Acthar and Synacthen.

154.    However, despite its claims, Mallinckrodt has not brought Synacthen to market for any indication. Instead, it keeps Synacthen off the market to protect its monopoly power and high prices for Acthar.

## Mallinckrodt settles with the FTC

155.    On January 18, 2017, the FTC announced that Questcor and its parent Mallinckrodt agreed to pay $100 million to settle FTC charges that Questcor and Mallinckrodt violated antitrust laws when Questcor acquired the rights to Synacthen from Novartis in 2013.

156.    According to FTC Chairwoman Edith Ramirez, "Questcor took advantage of its monopoly to repeatedly raise the prices of Acthar, from $40 in 2001 (when it acquired the rights to sell Acthar for $100,000) to more than $34,000 per vial today – an 85,000 percent increase."

157.    The brunt of these monopoly prices was borne by self-funded payors, like Plaintiffs, located throughout the country, whose employees and beneficiaries whom were at the mercy of Mallinckrodt and treated with Acthar.

158.    From the time it sought FDA approval for the treatment of IS, Mallinckrodt has raised the price of Acthar to over $43,000.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

159.    Questcor claimed that these exorbitant price increases were in response to demand. But its former Chief Executive Officer, Don Bailey, acknowledged in 2009 that "we only have about 800 patients a year. It's a very, very small – tiny – market." Consequently, the limited use of the product did not justify an over 58,000% price increase from acquisition until 2009.

160.    Since the Acthar market for the treatment of IS was so limited, Questcor sought to expand its use. By 2012, Acthar was prescribed for Medicare recipients 3,387 times. To Medicare alone, this represented a cost of $141,500,000 in 2012.

161.    Quantified another way, Dr. William Shaffer, a neurologist in Greeley, Colorado who was the highest prescriber of Acthar in 2012, wrote only 78 prescriptions for the drug, but the prescribed Acthar cost Medicare $4,000,000.

162.    Acthar represented 98% or more of Questcor's sales and revenue from sales since 2007. Its manipulation of the market has resulted in a 266% increase in revenue year-over-year from 2011 to 2013. Total net sales for Questcor in 2011 were $218.2 million, $509.3 million in 2012, and $798.9 million in 2013. In each of those years, Acthar represented at least 95% of Questcor's net sales – over $1.45 billion in revenue.

163.    In the words of former CEO Don Bailey "Questcor is basically a single-product company." But, by flexing its monopoly power, Questcor has been able to raise Acthar prices and increase revenue from Acthar in a "tiny market" from less than $1 million for fiscal 2001 to $799 million for fiscal 2013 - a nearly 80,000% increase. It did so in conjunction with Express Scripts.

164.    Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed ESI's competitive pressure in the

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

marketplace to cause Acthar prices to be lower. Instead, by entering into an exclusive

arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to

raise its Acthar prices above competitive prices throughout the relevant time period from 2007

through the present.

## CLASS ACTION ALLEGATIONS

165.     Plaintiffs bring this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal

Rules of Civil Procedure, on behalf of itself and other similarly-situated persons and entities, and

their beneficiaries, in Illinois and throughout the country. The proposed Class includes:

> All third party payors and their beneficiaries in the United States
> and its Territories that paid for Acthar from August 2007 through
> the present.

Excluded from the above Class are: (a) Defendants and any entity in which Defendants have a

controlling interest, and their legal representatives, offices, directors, assignees and successors,

(b) any co-conspirators with Defendants, (c) any Medicare Advantage Organization ("MAU"),

their representatives, assignors, assignees or related entities, and (d) the States of Alaska,

Maryland, New York, Texas and Washington.

### *Numerosity*

166.     The proposed Class consists of potentially hundreds of public and private payors

in the proposed Class located throughout Illinois and the United States, based on the fact that

Mallinckrodt has sold thousands of vials of Acthar in each quarter over the last few years alone.

Thus, the Class is so numerous that joinder of all of its members is impractical.

167.     Despite the size of the Class, its members are easily identifiable, as each patient

was required by Defendants since 2007 to fill out an Acthar Start Form (Exhibit "A" hereto)

which forms were returned to, and have been maintained by, Express Scripts and/or UBC. As a

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

result, the records needed to identify the members of the Class are in the hands of the Defendants.

*Typicality*

168.    Plaintiffs' claims are typical of the claims of the Class, in that the representative Plaintiffs are entities whom, like other Class Members, paid for Acthar at the inflated prices due to the unlawful conduct of the Defendants.  Plaintiffs, like all similarly-situated Class members, are damaged and sustained or continue to sustain economic injuries in the form of overcharges by the misconduct of the Defendants, because it paid higher prices than it would have paid absent Defendants' improper actions.

*Adequacy of Representation*

169.    Plaintiffs can and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interest that conflicts with or is antagonistic to the interests of the Class.

170.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex actions, including antitrust, RICO and consumer fraud class actions.

*Commonality*

171.    The factual and legal bases for the Defendants' misconduct are common to Class members and represent a common thread of antitrust racketeering and consumer fraud resulting in injury to Plaintiffs and the Class.  Common questions of law and fact in this case include, but are not limited to, the following:

a.  whether the Defendants artificially inflated the prices of Acthar;

b.  whether Plaintiffs and the Class have been overcharged and thus damaged by paying artificially inflated prices for Acthar as a result of the unlawful conduct of Defendants;

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

c.  whether the Defendants have been unjustly enriched by their unlawful conduct;

d.  whether the Defendants defrauded Plaintiffs and the Class;

e.  whether the Defendants engaged in a conspiracy and/or concerted conduct in deceiving and defrauding Plaintiffs and the Class about Acthar and Acthar pricing, and concealing the truth about their unlawful conduct in colluding to artificially inflate the prices of Acthar;

f.  whether Defendants had a monopoly in the market for ACTH drugs;

g.  whether Mallinckrodt exercised monopoly power with respect to Acthar;

h.  whether Defendants took actions to maintain and enhance Mallinckrodt's monopoly power in the ACTH market;

i.  whether Defendants unlawfully impaired or impeded competition in the market for ACTH drugs;

j.  whether Defendants engaged in anticompetitive conduct in order to disadvantage Mallinckrodt's competitors and maintain Mallinckrodt's monopoly power in the market for ACTH drugs;

k.  the effects of Mallinckrodt's anticompetitive conduct on Acthar prices;

l.  whether Mallinckrodt formed the ASAP enterprise with Express Scripts for the purpose of carrying out the scheme to overcharge patients and payors for Acthar;

m.  whether Defendants used the U.S. mails and interstate wire facilities to carry out an unfair ASAP scheme;

n.  whether the Defendants are liable to Plaintiffs and the Class for statutory damages for conduct actionable under the Illinois Consumer Fraud and Deceptive Practices Act, and the antitrust and consumer protection laws of other states;

o.  whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief as to Defendants' conduct;

p.  whether Plaintiffs and members of the Class are entitled to compensatory damages, and, if so, the nature of such damages;

q.  whether Plaintiffs and members of the Class are entitled to statutory damages, including treble damages;

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

r.   the proper measure of damages; and

s.   whether Plaintiffs and members of the Class are entitled to an award of punitive damages, reasonable attorneys' fees, prejudgment interest, post-judgment interest, costs of suit, and other appropriate relief under the circumstances of this case.

*Predominance*

172.   These questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive conduct in monopolizing and attempting to monopolize the ACTH drug market, and other conduct as more fully alleged herein.

*Superiority*

173.   A class action is superior to any other available method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

174.   The prosecution of separate actions by individual members of the Plaintiffs Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class.  These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be disparities of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

175.    The Defendants have acted or refused to act on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

176.    Accordingly, class certification is appropriate under Rule 23(b)(1)(A), 23(b)(1)(B), 23(b)(2) and 23(b)(3).

## COUNT I
## CITY OF ROCKFORD v. EXPRESS SCRIPTS
## UNJUST ENRICHMENT

177.    Rockford hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

178.    This Count alleges unjust enrichment against Express Scripts.

179.    Rockford agreed to retain Express Script's services exclusively and in good faith and in reasonable reliance on Express Script's conduct and representations described herein.

180.    Among other things, Rockford at all times had a reasonable expectation that Express Scripts' conduct would result in affordable services, including "cost containment" for specialty drugs like Acthar.

181.    Rockford and its beneficiaries made direct payments to Express Scripts which were valuable to Express Scripts, and Express Scripts was unjustly enriched by such direct payments, in that, the reimbursement rates charged by Express Scripts at extremely high prices with inequitable discounts were valuable and beneficial to Express Scripts.

182.    By engaging in the conduct described in this Second Amended Class Action Complaint, Express Scripts has knowingly obtained benefits from Rockford and the Class, namely grossly inflated revenue from its direct involvement in coordinating all aspects of Rockford's receipt of and payments for Acthar, under circumstances such that it would be

44

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

inequitable and unjust for Express Scripts to retain such benefits.

183.     By engaging in the unlawful conduct described herein, Express Scripts has been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market, wherein Express Scripts would use its market power to extract lower prices from Mallinckrodt, in fulfillment of its obligation to contain costs, what it could have charged if it had engaged in appropriate cost containment measures.

184.     By assisting Mallinckrodt in maintaining and enhancing its monopoly, and its exercise of monopoly power through increasing prices over a decade, and engaging in other unlawful acts and practices, Express Scripts was able to extract exorbitant revenue from Rockford and the Class beyond what it could have received in the absence of such unlawful conduct.  This conduct violated the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Illinois and other states and, as such, interfered with the legally protected interests of Rockford and the Class.

185.     Rockford and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Rockford demands that judgment be entered in its favor, and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

### COUNT II
### CITY OF ROCKFORD v. MALLINCKRODT
### UNJUST ENRICHMENT

186.     Rockford hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

187. This Count alleges unjust enrichment against Mallinckrodt.

188. Rockford's covered beneficiaries received direct shipments of Acthar from Mallinckrodt via its exclusive distribution mechanism established with Express Scripts. In exchange for such Acthar, Rockford made direct payments to Express Scripts for the benefit of Mallinckrodt. Indeed, such payments were transferred by Express Scripts to Mallinckrodt pursuant to an understanding between the two that the total amount would be forwarded to Mallinckrodt, less a certain amount previously agreed to by Mallinckrodt and Express Scripts. The amount charged by Mallinckrodt for the Acthar was the amount paid by Rockford, pursuant to its agreement with Express Scripts.

189. The amounts paid by Rockford were valuable to Mallinckrodt and Mallinckrodt was unjustly enriched by such direct payments, in that, the reimbursement rates charged by Mallinckrodt at extremely high prices were valuable and beneficial to Mallinckrodt.

190. By engaging in the conduct described in this Second Amended Class Action Complaint, Mallinckrodt has knowingly obtained benefits from Plaintiffs and the Class, namely grossly inflated revenue from its direct involvement in coordinating all aspects of Rockford's receipt of and payments for Acthar, under circumstances such that it would be inequitable and unjust for Mallinckrodt to retain such benefits.

191. By engaging in the unlawful conduct described herein, Mallinckrodt has been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market and what it could have charged if it had engaged in appropriate cost containment measures.

192. By maintaining and enhancing its monopoly, and its exercise of monopoly power through increasing prices over a decade, and engaging in other unlawful acts and practices,

46

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Mallinckrodt was able to extract exorbitant revenue from Rockford and the Class beyond what it could have received in the absence of such unlawful conduct. This conduct violated the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Illinois and other states and, as such, interfered with the legally protected interests of Rockford and the Class.

193. Rockford and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Rockford demands that judgment be entered in its favor, and in favor of the Class, and against Mallinckrodt, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT III**
**ACUMENT v. MALLINCKRODT**
**UNJUST ENRICHMENT**

194. Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

195. This Count alleges unjust enrichment against Mallinckrodt.

196. Acument's covered beneficiary received direct shipments of Acthar from Mallinckrodt via CVS Caremark. In exchange for Acthar, Acument made direct payments to CVS Caremark for the benefit of Mallinckrodt. Indeed, such payments were transferred by CVS Caremark to Mallinckrodt pursuant to a likely understanding between the two that the total amount would be forwarded to Mallinckrodt, less a certain amount previously agreed to by Mallinckrodt and CVS Caremark. The amount charged by Mallinckrodt for the Acthar was the amount paid by Acument, less any applicable co-pays by the beneficiary.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

197.    The amounts paid by Acument were valuable to Mallinckrodt and Mallinckrodt was unjustly enriched by such payments, in that, the prices charged by Mallinckrodt at extremely high prices were valuable and beneficial to Mallinckrodt.

198.    By engaging in the conduct described in this Second Amended Class Action Complaint, Mallinckrodt has knowingly obtained benefits from Plaintiffs and the Class, namely grossly inflated revenue from its coordination all aspects of Acument's receipt of and payments for Acthar, under circumstances such that it would be inequitable and unjust for Mallinckrodt to retain such benefits.

199.    By engaging in the unlawful conduct described herein, Mallinckrodt has been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market.

200.    Mallinckrodt was able to extract exorbitant revenue from Acument and the Class beyond what it could have received in the absence of such unlawful conduct.  This conduct violated the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Tennessee and other states and, as such, interfered with the legally protected interests of Acument and the Class.

201.    Acument and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Acument demands that judgment be entered in its favor, and in favor of the Class, and against Mallinckrodt, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**COUNT IV**
**PLAINTIFFS v. ALL DEFENDANTS**
<u>FRAUD</u>

202.    Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

203.    Defendants' acts violate the common law against negligent misrepresentation and fraud.

204.    In setting the prices for Acthar, which prices Plaintiffs paid, the Defendants made material misrepresentations that those prices represented a calculation of real and fact-based prices for their drugs, and that they represented the actual value of the product in the marketplace.

205.    These representations were material to the transactions at hand in that Plaintiffs and the Class used and relied upon these prices as the amount to pay and/or reimburse for Acthar.

206.    As set forth more fully above, these prices were artificial prices, unrelated to any actual, reasonable price in the marketplace, or actual value of Acthar, but created and manipulated by the Defendants for the purpose of generating exorbitant revenue, thus constituting false representations which the Defendants knew or, in the absence of recklessness, should have known to be false.

207.    The Defendants made these false representations about the prices of Acthar with the intent of misleading Plaintiffs and the Class into relying on the prices as real and fact-based prices, rather than artificially inflated prices.

208.    Plaintiffs and the Class justifiably relied upon these false misrepresentations in purchasing and/or reimbursing Acthar at the amount charged by Express Scripts and CVS

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Caremark based on the price set by Mallinckrodt.

209.    Rockford's and the Class' contracts with Express Scripts all provide for "cost containment" and all provide for discounted prices for specialty drugs at varying rates, intended to reflect the efforts of Express Scripts to provide cost containment.  The prices for Acthar set forth in such contracts were prices set by Mallinckrodt and set forth by Express Scripts in its contracts.  Acument's and the Class' contracts with CVS Caremark also provide for cost containment, and the prices for Acthar in such contracts were the prices set by Mallinckrodt.  As such, all Defendants communicated these false prices directly to Plaintiffs and the Class for the Acthar sold.

210.    As a direct and proximate result of the false representations of the Defendants, as set forth above, Plaintiffs and the Class were harmed in that they were unaware of the artificial, inflated prices of Acthar, would not have paid and/or reimbursed the artificially inflated prices for Acthar had they known of the false representations and, in fact, overpaid for the Acthar because of the false representations.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT V
### PLAINTIFFS v. ALL DEFENDANTS
### CONSPIRACY TO DEFRAUD/CONCERTED ACTION

211.    Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

212.    As set forth more fully above, beginning at least as early as 2007, the exact date being unknown to Plaintiffs, and continuing thereafter until the present, Defendants and other

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

unnamed co-conspirators, between and among themselves and others, entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud and deceive Plaintiffs and the Class by causing them to pay more for Acthar than they otherwise would have paid in the absence of the Defendants' conspiracy and concerted action.

213.    Pursuant to the unfair and deceptive scheme to distribute, market and sell Acthar to derive substantial profits, and the conspiracy alleged herein, and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to deceive Plaintiffs and the Class, and acted or took substantial steps in furtherance of the conspiracy.  Those acts include the following:

a.   discussing and agreeing among themselves and with their co-conspirators that they would directly control the price at which Plaintiffs and the Class paid for Acthar;

b.   discussing and agreeing among themselves and with their co-conspirators that they would increase the price at which Plaintiffs and the Class paid for Acthar;

c.   discussing and agreeing among themselves and with their co-conspirators that they would directly control the ASAP program materials and website which enrolled patients into an exclusive distribution network for the administration of Acthar, allowing Defendants to conduct their unfair pricing scheme for Acthar;

d.   discussing and agreeing among themselves and with their co-conspirators that they would directly control the exclusive distribution network for Acthar through the ASAP Program;

e.   discussing and agreeing among themselves and with their co-conspirators that they would rely on employees to promote the ASAP Program through the marketing alleged herein, and through use of the mail and the wires;

f.   discussing and agreeing among themselves and with their co-conspirators that they would participate in the affairs of the ASAP program by using a fraudulent scheme to market and sell Acthar at inflated prices; and

g.   discussing and agreeing among themselves and with their co-conspirators that they would conceal and suppress the truth about the Acthar inflated prices, the

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

monies earned from payors, like Plaintiffs and the Class, and their exclusive arrangement to maintain and enhance Mallinckrodt's monopoly power as alleged herein.

214.     In addition to the specific facts set forth above, it is alleged the Defendants and their co-conspirators engaged in conspiratorial meetings, among the purposes of which meetings were to discuss the importance of controlling the direct distribution, marketing, sale and administration of Acthar to Plaintiffs and the Class, and deriving substantial profits from these activities.

215.     The Defendants performed the conspiratorial acts set forth herein intending to injure payors of Acthar, like Plaintiffs and the Class, by causing them to pay inflated prices so that the Defendants could derive substantial profits.

216.     The Defendants performed the acts alleged herein in furtherance of the common plan or design for the conspiracy with intent and/or with knowledge of the injury and damage it would cause to the Plaintiffs and the Class, and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

217.     As a direct and proximate result of the Defendants' conspiracy as alleged herein, Plaintiffs and the Class have been injured and damaged, and the Defendants are jointly and severally liable for such injuries and damages.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT VI
## PLAINTIFFS v. ALL DEFENDANTS
## MAINTENANCE OF MONOPOLIZATION OF
## THE ACTH MARKET (15 U.S.C. § 2)

218.     Plaintiffs hereby incorporate by reference the averments of the foregoing

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

paragraphs as if fully set forth herein and further allege as follows.

219.    Mallinckrodt has, and at all relevant times, had, monopoly power in the market for the sale of ACTH drugs in the United States.  While the genesis of this monopoly power may be natural, since 2007 Mallinckrodt has acted and conspired with Express Scripts to maintain and enhance its monopoly power in the ACTH market.

220.    As described above, Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS").  IS is a serious condition in infants, but one with an annual patient population of less than 2,000 patients per year.  However, by 2015, Mallinckrodt was able to grow sales of Acthar to approximately $1.1 billion.

221.    In 2007, Mallinckrodt announced a "New Strategy" in order to maintain and enhance its monopoly.  This new strategy could not have succeeded without the involvement of Express Scripts as Mallinckrodt's exclusive agent.

### Anticompetitive Act 1: Restricted Distribution

222.    On July 2, 2007, Mallinckrodt decided to restrict distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to Express Scripts.  The goal of this strategy was to lock patients into receiving Acthar through one channel and prevent a competitive product from entering the market.

223.    When Mallinckrodt began its new strategy on July 16, 2007, it established the ASAP Program.  *See* Exhibit "B". July 2, 2007 Urgent Product Alert H.P. Acthar Gel.  The ASAP Program allowed Mallinckrodt to limit its direct distribution of the drug to the patient to just one avenue, through Express Scripts.  Mallinckrodt entered an exclusive arrangement with Express Scripts to provide Acthar directly to patients, and to receive payments for Acthar directly from patients.  *See* Freudenheim, *supra.*

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

224.    Express Scripts was Mallinckrodt's exclusive agent to operate the ASAP Program. Through ASAP, UBC facilitated all aspects of Acthar's distribution and payment as Mallinckrodt's exclusive agent.  UBC's utilized Express Script's pharmacy arrangement services (Accredo), specialty drug distribution (CuraScript) and direct billing and payment (ESI) functions to allow Mallinckrodt to maintain and enhance its monopoly power in the ACTH market.

225.    Mallinckrodt has willfully maintained its monopoly power in the ACTH drug market through its exclusive arrangement with Express Scripts from 2007 through 2017.  Having Express Scripts as its exclusive agent, Mallinckrodt was able to raise its prices tenfold initially, and nearly double in the ensuing years.

## Anticompetitive Act 2: The Synacthen Acquisition

226.    By 2013, Mallinckrodt had identified a competitive threat to its monopoly power, despite its exclusive arrangements with Express Scripts.  When Novartis decided to sell Synacthen Depot to a competitor, Mallinckrodt acted to protect its monopoly.  Recognizing that the entry of Synacthen to the ACTH market would threaten its monopoly power, Mallinckrodt first attempted to buy the rights to Synacthen in 2009, it was unable to do so.

227.    When Novartis agreed to sell Synacthen to Retrophin in 2013, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had been offered by Retrophin.  Retrophin had agreed to buy Synacthen for $16 million, Mallinckrodt paid $135 million.  It licensed the U.S. rights to Synacthen from Novartis, but did not bring this viable synthetic alternative to market.  Instead, it acted only to eliminate the nascent competitive threat to its monopoly posed by an independently owned Synacthen.

228.    This conduct contributed to Mallinckrodt's maintenance of monopoly power.

Case: 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Both anticompetitive acts – the exclusive arrangement with Express Scripts and the Synacthen acquisition had the purpose and effect of suppressing rather than promoting competition in the ACTH market. Mallinckrodt was able to raise prices at will.

229. Mallinckrodt used its enhanced monopoly power to inflate the prices of Acthar as set forth herein. Today the prices stand at over $43,000.

230. The challenged conduct caused Plaintiffs and the Class to pay artificially inflated prices for Acthar in the ACTH drug market.

231. There is no procompetitive justification for the conduct of Mallinckrodt and Express Scripts. Rather these two companies combined to lock Acthar into a restricted distribution model, overseen by the ASAP program, to ensure enhanced monopoly profits for both of them. The Synacthen acquisition only prevented competition, and preserved the enhanced monopoly power Mallinckrodt enjoyed due to Express Scripts' collusion.

### Plaintiffs are Direct Purchasers of Acthar Harmed by
### Defendants' Anti-Competitive Conduct

232. The Plaintiffs have been directly injured in their businesses and property by reason of Mallinckrodt's unlawful monopolization in concert with Express Scripts. Plaintiffs' injuries consist of paying higher prices to purchase Acthar than they would have paid absent the conduct of Mallinckrodt and its exclusive agents, Express Scripts. Plaintiffs' injuries are the type of harm the antitrust laws were designed to prevent and flow from which makes Mallinckrodt's and Express Scripts' conduct unlawful.

233. The product ships from Mallinckrodt's agent directly to the patient. Payments flow directly from Rockford to Express Scripts, for the benefit of Mallinckrodt, from Acument to CVS Caremark, for the benefit of Mallinckrodt. Express Scripts only deducts its agreed-upon share of Rockford's payments before forwarding them to Mallinckrodt. CVS Caremark does the

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

same.

234.    Plaintiffs are also direct purchasers because of the conspiracy between Express

Scripts and Mallinckrodt, as Rockford and Acument are direct purchasers from co-conspirators.

235.    As described herein Defendants' acts and practices constitute monopoly

maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor

of the Class, and against Defendants, in an amount to be determined at trial, including but not

limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

### COUNT VII
### PLAINTIFFS v. ALL DEFENDANTS
### ANTI-COMPETITIVE AGREEMENTS IN UNREASONABLE
### RESTRAINT OF TRADE (15 U.S.C. § 1)

236.    Plaintiffs hereby incorporate by reference the averments of the foregoing

paragraphs as if fully set forth herein and further allege as follows.

237.    As set forth above, Mallinckrodt has entered into exclusive agreements with the

agent for its largest customers, Express Scripts.  These agreements preserved and extended

Mallinckrodt's monopoly power, and allowed both Mallinckrodt and Express Scripts to raise the

prices for Acthar to Express Scripts' clients, including Rockford.

### The Role of Express Scripts in the Specialty Drug Market

238.    The maintenance of Mallinckrodt's monopoly over the ACTH market would not

be possible without its agreement in restraint of trade with Express Scripts.

239.    Express Scripts is the largest buying agent of pharmaceuticals in the country.  It

has substantial buying power as a result of its position as the largest representative of

pharmaceutical purchasers.

240.    ESI has developed a consolidated network of specialty pharmaceutical

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

management, distribution and reimbursement that creates a direct pipeline between the manufacturer and the patient. Express Scripts operates a specialty pharmaceutical distributor, a specialty pharmacy, and a reimbursement HUB, all of which operate in service of the specialty drug manufacturer concomitantly with ESI's service as a pharmacy benefit manager for health plans and patients.

241. Because ESI represents more than 80% of pharmaceutical buyers in the United States, it has the unique position to push back against high pharmaceutical prices, especially specialty drugs like Acthar. Express Scripts has demonstrated its ability to wield its market power to effectuate lower costs for high priced specialty drugs.

242. The example of Turing's Daraprim is stark in that Express Scripts has produced a comparable drug for $1. Instead of the $750.00 per pill charged by Turing, Express Scripts charges its clients $1. Instead of one year's course of treatment costing $361,000, it costs less than $100.

### Express Scripts' Agreement with Mallinckrodt to Fix Prices for Acthar

243. In 2007, when Express Scripts entered its exclusive arrangement with Mallinckrodt's predecessor Questor, it did not push back against Questcor's decision to raise prices. Instead, when confronted with the price increase, Dr. Miller asserted that "[t]he increase was a manufacturing decision. I can't comment on it." *Id*.

244. There was no legitimate business justification on the part of Express Scripts to agree to charge the inflated end payor prices set by Questcor to its clients, but it so agreed.

245. By 2015, Express Scripts contracted with Rockford to be its exclusive agent for specialty drugs, including Acthar. But, Express Scripts accepted the inflated end payor prices set by Mallinckrodt, and included them in the ESI PBM Agreement with Rockford.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

246.    It is believed and therefore averred that when Acument contracted with CVS Caremark for the provision of specialty drugs, like Acthar, to its employee beneficiaries, CVS Caremark simply charged the same prices based on the prices set by Mallinckrodt in agreement with Express Scripts, as the product continued to flow directly from Express Scripts to the patients of other PBMs, like CVS Caremark.  As a result, the Mallinckrodt-ESI agreement to fix prices preserved and enhanced Mallinckrodt's monopoly power and injured payors like Acument being charged the same artificially inflated prices for Acthar.

247.    As a result, Express Scripts conspired and agreed with Mallinckrodt to fix and charge artificially inflated prices for Acthar to Express Scripts clients, like Rockford.

248.    At all relevant times, Mallinckrodt's exclusive agreements with Express Scripts assisted Mallinckrodt in: (a) effectively excluding less expensive, potentially superior competitive products from the ACTH drug market; (b) maintaining Mallinckrodt's dominant market share and monopoly power in the ACTH drug market; (c) maintaining prices at artificially high levels for Acthar; and (d) otherwise reaping the benefits of its Mallinckrodt's enhanced monopoly power.

249.    There is no procompetitive justification for the conduct of either Mallinckrodt or Express Scripts.

250.    Plaintiffs have been injured in their businesses and property by reason of the alleged collusion and conspiracy between Mallinckrodt and Express Scripts, its exclusive agent, which had the purpose and effect of raising and stabilizing inflated prices for Acthar.  Express Scripts facilitated, enabled, assisted, and furthered Mallinckrodt's substantial foreclosure and exclusion of competition and monopolization of the ACTH drug market.

251.    Plaintiffs' injuries consist of paying higher prices to purchase Acthar than they

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

would have paid absent the unlawful conduct of Mallinckrodt and Express Scripts. Plaintiffs' injuries are the type the antitrust laws were designed to prevent and flow from that which makes Defendants`` conduct unlawful.

252.    Defendants' acts and practices constitute anti-competitive agreements in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

**WHEREFORE,** Plaintiffs demand that judgment be entered in its favor, and their favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT VIII**
**PLAINTIFFS v. ALL DEFENDANTS**
**STATE ANTITRUST LAW CLAIMS**

253.    Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

254.    In the event the Court finds the Acthar purchases of either Plaintiff were indirect as to Mallinckrodt, they remain direct as to Express Scripts, and Plaintiffs' aforesaid federal antitrust claims may be maintained against Express Scripts. In such event, alternatively, Plaintiffs and the Class seek relief as indirect purchasers as allowed by state and federal law. Under federal antitrust law, as indirect purchasers, Plaintiffs and the Class are allowed to seek an injunction against both Mallinckrodt and Express Scripts for their anticompetitive conduct.

255.    Under the statutory and decisional law of the states identified below, Plaintiffs and the Class are also permitted to seek damages as indirect purchasers against Defendants, including but not limited to the laws of Illinois and Tennessee where the patients covered by Plaintiffs reside and were treated.

256.    Plaintiffs set forth the following allegations in this state law-related section such

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

that each and every allegation as to the factual basis for the violation of the law of one state, no matter where it appears, is incorporated by reference as support for the violation of the law of every state identified herein. Plaintiffs also incorporate the preceding factual allegations of antitrust conduct by the Defendants.

257. Illinois: 740 ILCS 10/7(2) authorizes any person, including municipalities, townships, and any other political subdivision to seek an injunction, damages, and reasonable attorneys fees to prevent and ameliorate the anticompetitive conducted described herein.

258. The acts and circumstances described herein demonstrate that Mallinckrodt and Express Scripts acted willfully within the meaning of 740 ILCS 10/7(2), such that Plaintiffs and the class may be awarded treble damages.

259. Rockford is a political subdivision within the meaning of 740 ILCS 10/7(2) and is therefore a person within the ambit of the statute. Acument is a corporation doing business in Illinois, and made payments for Acthar out of Illinois, and is therefore a "person" within the ambit of the Illinois law. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Illinois law, and hereby seek damages.

260. Tennessee: The Tennessee Unfair Trade Practices Act declares unlawful and void "[a]ll arrangements, contracts, agreements, trusts or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article." Tenn. Code Ann. § 47-25-101. Persons injured may recover "the full consideration or sum… for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust." Tenn. Code Ann. § 47-25-106. *In Sherwood v. Microsoft Corp.*, 2003 WL 21780975, *29 (Tenn. Ct. App. July 31, 2003), the Tennessee Court of Appeal held that indirect purchasers have standing to bring an action

60

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

under the Act to recover damages resulting from price-fixing. *See Freeman Indus. LLC v. Eastman Chem Co.*, 172 S. W.3d 512, 519 (Tenn. 2005).

261.     Tennessee municipalities and TPPs, like Acument, have standing to sue within the meaning of Tenn. Code Ann. § 47-25-106. *See Metro. Gov't of Nashville & Davidson Cnty. v. Ashland Oil, Inc.*, 535 F. Supp. 328 (M.D. Tenn. 1982).

262.     As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Tennessee municipalities and TPPs, like Acument, to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Tennessee municipalities and TPPs are entitled to relief under Tennessee law.

263.     Acument and the Class were injured as a result of Defendants' conduct in violation of Tennessee law, and hereby seek damages.

264.     Arizona: The Arizona Uniform Antitrust Act, A.R.S. § 44-1401, et seq., makes unlawful any "contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce" and confers standing to persons and political subdivisions as indirect purchasers to bring an action for damages, injunctive relief, and attorneys fees and costs.  A.R.S. §§ 44-1402, 1408.

265.     Plaintiffs bring this action on behalf of all third party payors ("TPP"), cities, towns, municipalities, and any other state political subdivision (collectively, "municipality") that has paid for prescriptions of Acthar.  The TPP purchasers of Acthar in Arizona have standing as a class to seek relief against Mallinckrodt and Express Scripts for their scheme to fix the price of

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Acthar at supracompetitve levels and maintain Mallinckrodt's monopoly power.

266.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Arizona law, and hereby seek damages.

267.     Arkansas: The Arkansas Deceptive Trade Practices Act forbids "[d]eceptive and unconscionable trade practices." A.C.A. § 4-88-107(a). It makes illegal "any [] unconscionable, false, or deceptive act or practice in business, commerce, or trade." A.C.A. § 4-88-107(a)(10). Courts have recognized a private right of action for indirect purchasers in antitrust actions. The improper use of economic leverage qualifies as one such unconscionable business practice.

268.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Arkansas law, and hereby seek damages.

269.     California: California's antitrust law, the Cartwright Act, prohibits combinations between two or more persons to "[a]gree in any manner to keep the price of [a product] . . . at a fixed or graduated figure," or to "[e]stablish or settle the price of any [product] . . . , so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of [the product]." Cal. Bus. & Prof. Code § 16720(e)(2)-(3).  Price-fixing is considered a business practice that, due to its pernicious effect on competition and lack of any redeeming virtue is conclusively presumed to be unreasonable and, therefore, illegal without elaborate inquiry as to the precise harm it has caused or the business excuse for its use.

270.     California TPPs and municipalities are persons within the meaning of Section 16750 and 16702.

271.     As alleged in greater detail herein, California TPPs and municipalities suffered economic injury due to Mallinckrodt's and Express Scripts' maintenance of monopoly prices.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

272.    The facts alleged herein establish that California TPPs and municipalities were injured in their property by paying exorbitant prices above what would be paid in a freely competitive market.

273.    Mallinckrodt and Express Scripts created restrictions on trade and commerce through the creation of the exclusive arrangement for Acthar.

274.    Mallinckrodt and Express Scripts agreed to raise the prices of Acthar.

275.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of California law, and hereby seek damages.

276.    Florida: The Florida Deceptive and Unfair Trade Practices Act is designed to protect "the consuming public from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," and mandates that the act be liberally construed to promote that policy. F.S.A. § 501.202. Florida courts have interpreted this law "as a clear statement of legislative policy to protect consumers through the authorization of [] indirect purchaser actions." *Mack v. Bristol Meyers Squibb*, 673 So. 2d 100, 108 (Fla. 1st D.C.A. 1996).

277.    As set forth herein, Florida municipalities and TPPs act as fiduciaries for their employees who receive prescription and health benefits through the TPP or municipality . As such, they are consumers within the meaning of Fla. Stat. § 501.203(7).

278.    As consumers, Florida TPPs and municipalities have suffered losses as a result of the anticompetitive conduct of Mallinckrodt and Express Scripts. Therefore, Florida TPPs and municipalities may recover their actual damages and their attorneys' fees and costs.

279.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Florida law, and hereby seek damages.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

280. Hawaii: Hawaii has declared unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," including one that seeks to "f]ix, control, or maintain, the price of any commodity" or engage in activities "with the result of fixing, controlling or maintaining its price." Haw. Rev. Stat. §§ 480-4(a)-(b).

281. In addition, Hawaii law provides that "indirect purchasers injured by an illegal overcharge shall recover [] compensatory damages, and reasonable attorney's fees."

282. Hawaii municipalities and TPPs are persons within the meaning of Haw. Rev. Stat. § 480-1.

283. As articulated herein, Mallinckrodt possessed monopoly power in the ACTH market. Acting in concert with Express Scripts, Mallinckrodt willfully enhanced its monopoly power by limiting the distribution of Acthar and acquiring Synacthen. This conduct allowed Mallinckrodt to set the prices for Acthar far higher than the value of the product thus injuring Hawaii municipalities and TPPs. Express Scripts agreed to charge these inflated prices to its clients. Accordingly, Hawaii municipalities and TPPs are entitled to relief under Hawaii law.

284. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Hawaii law, and hereby seek damages.

285. Iowa: The Iowa Competition Law prohibits the "attempt to establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing or maintaining prices." Iowa Code § 553.5.

286. Iowa Code § 553.12 authorizes any "person who is injured or threatened with injury" to sue to "[p]revent or restrain conduct. . . through injunction," to "[r]ecover actual damages resulting from" prohibited conduct, the costs of suit, and reasonable attorney fees. Iowa Code § 553.12. When the prohibited conduct is willful, a person may recover twice their

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

damages.  Id.

287.    Iowa TPPs and municipalities are persons within the meaning of Iowa Code § 553.3.

288.    The facts and circumstances described herein demonstrate that Mallinckrodt and Express Scripts acted willfully in their exclusive arrangement, injuring Iowa TPPs and municipalities through the maintenance and enhancement of monopoly prices for Acthar.

289.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Iowa law, and hereby seek damages.

290.    Kansas: Kan. Stat. Ann. § 50-101 outlaws any "combination of capital, skill, or acts, by two or more persons" carried out for the purpose of restricting trade or commerce; increasing or reducing the price of goods; or preventing competition.  Kan. Stat. Ann. § 50-101.  In addition, "all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles" are unlawful under Kansas law.  Kan. Stat. Ann. § 50-112.  Under Kansas law, any person who has suffered a financial loss, "regardless of whether such injured person dealt directly or indirectly with the defendant" may sue.  Kan. Stat. Ann. § 50-163(d)(2).

291.    As described herein, Mallinckrodt and Express Scripts entered into exclusive arrangements that raised and maintained monopoly prices for Acthar and restrained competitors from entering the ACTH market, causing Kansas municipalities and TPPs to overpay for Acthar.

292.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Kansas law, and hereby seek damages.

293.    Massachusetts: Massachusetts' unfair and deceptive trade practices statute

Case 2:21-cv-00014-BMS Document #: 14-19 Filed: 03/16/21 Page 85 of 352

declares as unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws, c. 93A, § 2(a). Massachusetts law allows both consumers and participants in trade or commerce to bring claims for actual damages, multiple recovery for willful violations and attorneys' fees for a prevailing plaintiffs. *See* Mass. Gen. Laws, c. 93A, §§ 9, 11. The Massachusetts Supreme Court "read[s] the language of G.L. c. 93A as a clear statement of legislative policy to" allow indirect purchasers to seek relief for antitrust conduct. *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 66-67 (2002).

294. Massachusetts TPPs and municipalities qualify as consumers or participants in trade in commerce within the meaning of Mass. Gen. Laws, c. 93A.

295. Within respect to the injuries suffered by Massachusetts TPPs and municipalities only, the majority of the injurious conduct occurred within Massachusetts.

296. As alleged in this Complaint, the facts and circumstances demonstrate that Mallinckrodt and Express Scripts acted willfully within the meaning of Mass. G.L. c. 93A entitling Massachusetts TPPs and municipalities to multiple damages for the maintenance of the Acthar monopoly through their exclusive arrangement and the Synacthen acquisition. Therefore, Massachusetts municipalities and TPPs are entitled to relief under Massachusetts law.

297. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Massachusetts law, and hereby seek damages.

298. **Michigan:** The Michigan Antitrust Reform Act deems any "contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market [] unlawful." MCLS § 445.772. In addition, it prohibits the "establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

competition or controlling, fixing, or maintaining prices." MCLS § 445.773. It allows any political subdivision or person "threatened with injury or injured . . . indirectly" to seek injunctive or equitable relief, damages, interest, costs, and attorneys fees for a violation of the Act.

299.     Michigan municipalities and TPPs are units of government or persons within the meaning of MCLS § 445.771.

300.     Mallinckrodt and Express Scripts are persons within the meaning of MCLS § 445.771.

301.     The facts and circumstances, as articulated in this complaint, demonstrate that Mallinckrodt and Express Scripts agreed to maintain and enhance Mallinckrodt's monopoly in the ACTH market through their exclusive arrangement and the Synacthen acquisition. This conduct resulted in Michigan municipalities and TPPs paying far more than they would in a competitive market for Acthar. Therefore, Michigan municipalities and TPPs are entitled to relief under the Michigan Antitrust Reform Act.

302.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Michigan law, and hereby seek damages.

303.     Minnesota: Under Minnesota law, "[a] contract, combination or conspiracy between two or more persons in unreasonable restraint of trade or commerce is unlawful." Minn. Stat. § 325D.51. In addition, section 325D.53 prohibits the maintenance or use of monopoly power to affect competition or control, fixe or maintain prices. *See* Minn. Stat ¶ 325D.52. By law, "any person . . . injured directly or indirectly by a violation of [section 325D.51] shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees." Minn. Stat. § 325D.57. "Minnesota

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

antitrust law expressly provides damages for indirect purchasers injured by antitrust violations." *Gordon v. Microsoft Corp.*, 2001 WL 366432, at *2 (Minn. Dist. Ct. Mar. 30, 2001); *see also,* *Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007).

304. Acthar is a commodity within the meaning of Minn. Stat. § 325D.50.

305. The exclusive arrangement between Mallinckrodt and Express Scripts represents a contract, combination, or conspiracy within the meaning of Minn. Stat. § 325D.50.

306. Minnesota municipalities and TPPs are persons within the meaning of Minn. Stat. § 325D.50 with standing to seek relief from the anticompetitive practices of Mallinckrodt and the ESI Defendants.

307. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive prices of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Minnesota municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, Minnesota municipalities and TPPs are entitled to relief under Minnesota law.

308. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Minnesota law, and hereby seek damages.

309. Mississippi: Under Mississippi law trusts are unlawful, and this includes any "combination, contract, understanding or agreement" that would be inimical to public welfare and the effect of which would be . . . to restraint trade", including any "increase . . . [on] the price of a commodity." Miss. Code. Ann. §§ 75-21-1(a)-(c).

310. Mississippi law allows any party injured by any aforementioned form of trust to

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

seek their full damages and a civil penalty of $500.00 per injury, no matter whether they are a direct or indirect purchaser. Miss. Code. Ann. § 75-21-9. As such Mississippi municipalities and TPPs have standing to sue under Mississippi law.

311. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Mississippi municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, Mississippi municipalities and TPPs are entitled to relief under Mississippi law.

312. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Mississippi law, and hereby seek damages.

313. Nebraska: In Nebraska, the Junkin Act prohibits any "any "contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade of commerce" in Nebraska. R.R.S. Neb. § 59-801. The Nebraska Consumer Protection Act, in relevant part, duplicates the Junkin Act's analogues of the Sherman Act and states that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful . . . . Any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful." R.R.S. Neb. §§ 59-1602-1603. Indirect purchasers injured by price-fixing practices can sue for damages under both statutes, and recover the costs of suit and a reasonable attorney's fee. *See* R.R.S. Neb. § 59-821.

314. Nebraska municipalities are persons within the meaning of Section 59-822 and have such have standing under the Junkin and Consumer Protection Acts.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

315.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Nebraska municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Nebraska municipalities and TPPs are entitled to relief under Nebraska law.

316.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Nebraska law, and hereby seek damages.

317.    Nevada: Nevada has declared several categories of activities that constitute a "contract, combination or conspiracy in restraint of trade, including price fixing, which consists of raising, depressing, fixing, pegging or stabilizing the price of any commodity or service." Nev. Rev. Stat. Ann. § 598A.060.  In addition, Nevada provides a right of action and treble damage remedy for "any person injured or damaged directly or indirectly" by an antitrust violation. Nev. Rev. Stat. Ann. § 598A.210.

318.    Nevada municipalities and TPPs have standing to seek relief under Nevada law.

319.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Nevada municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Nevada municipalities and TPPs are entitled to relief under Nevada law.

320. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Nevada law, and hereby seek damages.

321. **New Mexico:** The New Mexico Antitrust Act prohibits "[e]very contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within" New Mexico. N.M. Stat. Ann. § 57-1-1. Additionally, the statute expressly provides that indirect purchasers who are "threatened with injury or injured" have standing to assert a claim and "may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees." N.M. Stat. Ann. § 57-1-3(A).

322. New Mexico municipalities and TPPs have standing to sue under the New Mexico Antitrust Act. *See City of Sunland Park v. Macias*, 75 P.3d 816 (N.M. Ct. App. 2003).

323. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused New Mexico municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, New Mexico municipalities and TPPs are entitled to relief under New Mexico law.

324. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of New Mexico law, and hereby seek damages.

325. **New York:** New York's Donnelly Act declares that every contract, agreement, arrangement or combination" that restrains, may restrain, or has for its purpose the restraint of competition, the free exercise of any commercial activity, or the performance of a service to be

71

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

unlawful. N.Y. Gen. Bus. Law § 340(1). Among other provisions, the Donnelly Act specifically extends protection to indirect purchasers. *See* N.Y. Gen. Bus. Law § 340(6). The statute also provides that a successful plaintiff "shall recover threefold the actual damages sustained thereby," as well as costs and attorneys' fees. N.Y. Gen. Bus. Law § 340(5).

326. New York municipalities and TPPs have standing to sue under the Donnelly Act because they are persons or political subdivisions within the meaning of N.Y. Gen. Bus. Law §§ 340(5)-(6).

327. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused New York municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, New York municipalities and TPPs are entitled to relief under New York law.

328. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of New York law, and hereby seek damages.

329. North Carolina: North Carolina's Monopolies, Trusts, and Consumer Protection Act, N.C. Gen. Stat. §§ 75-1, et seq., declares any "conspiracy in restraint of trade or commerce" illegal. N.C. Gen. Stat. § 75-1. To prevail under the Act, Plaintiffs must show: (1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby. *Stetser v. TAP Pharmaceutical Products, Inc.*, 165 N.C. App. 1 (2004). "A trade practice is 'unfair' if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers"). The Act also provides standing for individual plaintiffs

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

(§ 75-16), which right was specifically extended to indirect purchasers in *Hyde v. Abbott Labs.*, 123 N.C. App. 572, 584 (1996).

330.    North Carolina municipalities and TPPs have standing as indirect purchasers.

331.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused North Carolina municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, North Carolina municipalities and TPPs are entitled to relief under North Carolina law.

332.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of North Carolina law, and hereby seek damages.

333.    North Dakota:  The North Dakota Antitrust Act provides that, "[a] contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." N.D. Cent. Code § 51-08.1-02. The statute expressly provides a cause of action for indirect purchasers, who may obtain injunctive relief and recover damages. N.D. Cent. Code § 51-08.1-08.

334.    North Dakota municipalities and TPPs have standing as indirect purchasers within the meaning of N.D. Cent. Code § 51-08.1-08.

335.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

North Dakota municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, North Dakota municipalities and TPPs are entitled to relief under North Dakota law.

336.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of North Dakota law, and hereby seek damages.

337.     Oregon: Oregon's Antitrust Law declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce". Or. Rev. Stat. Ann. § 646.725.  In addition, Oregon provides a right of action and treble damages for antitrust violation, "regardless of whether the plaintiff dealt directly or indirectly with the adverse party." Or. Rev. Stat. Ann. § 646.780(1)(a).  In addition, indirect purchasers may recover "reasonable attorney fees, expert witness fees and investigative costs." Or. Rev. Stat. Ann. § 646.780(3)(a)-(b)(A)

338.     Oregon municipalities and TPPs fall within the meaning of political subdivision and person as articulated in Or. Rev. Stat. Ann. § 646.780(1)(a), therefore they have standing to sue regardless if they are indirect purchasers.

339.     As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Oregon municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Oregon municipalities and TPPs are entitled to relief under Oregon law.

340.     Plaintiffs and the Class were injured as a result of Defendants' conduct in

violation of Oregon law, and hereby seek damages.

341.    Rhode Island: Rhode Island law declares "[e]very contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce" unlawful.  R.I. Gen. Laws. Ann. § 6-36-4.  That a person "has no dealt directly with the defendant" does not "bar or otherwise limit recovery".  R.I. Gen. Laws Ann. § 6-36-12(g).  Plaintiffs may obtain an injunction recovery treble damages, costs of suit, and a reasonable attorneys fee under Rhode Island law.

342.    Rhode Island municipalities and TPPs may bring suit pursuant to section 6-36-11 because they are public bodies or persons within the meaning of section 6-36.3.  *See* R.I. Gen. Laws Ann. §§ 6-36-3, 11(a).

343.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Rhode Island municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Rhode Island municipalities and TPPs are entitled to relief under Rhode Island law.

344.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Rhode Island law, and hereby seek damages.

345.    South Dakota: The South Dakota antitrust statute declares unlawful, "[a] contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state S.D.C.L. § 37-1-3.1. Under the statute, any person injured directly or indirectly by an antitrust violation may sue for injunctive and equitable relief as well as to recover treble damages. S.D.C.L. §§ 37-1-14.3, 37-1-33.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

346. South Dakota payors have standing to seek relief within the meaning of S.D.C.L. § 37-1-3.1.

347. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused South Dakota municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, South Dakota municipalities and TPPs are entitled to relief under South Dakota law.

348. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of South Dakota law, and hereby seek damages.

349. **Utah:** Utah law declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce". Utah Code Ann. § 76-10-3104. Persons injured by such antitrust conduct may recover three times their damages in addition to an injunction, the costs of suit, and reasonable attorneys' fees. *See* Utah Code Ann. § 76-10-3109(1). Political subdivisions may recover actual damages in addition to in addition to injunctive relief, costs of suit, and reasonable attorney fee. *See* Utah Code Ann. § 76-10-3109(3).

350. Utah municipalities and TPPs are persons or political subdivisions within the meaning of Utah Code Ann. § 76-10-3109(1) and therefore have standing to obtain relief.

351. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Utah municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, Utah municipalities and TPPs are entitled to relief under Utah law.

352. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Utah law, and hereby seek damages.

353. Wisconsin: The Wisconsin Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal." Wis. Stat. Ann. § 133.03(1). Any person injured directly or indirectly by an antitrust violation may seek injunctive relief and recover treble damages. Wis. Stat. Ann. §§ 133.16, 133.18(1)(a).

354. Wisconsin municipalities and TPPs are persons within the meaning of Wis. Stat. Ann. § 133.02 and therefore have standing to seek relief.

355. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Wisconsin municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, Wisconsin municipalities and TPPs are entitled to relief under Wisconsin law.

356. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Wisconsin law, and hereby seek damages.

**WHEREFORE,** Plaintiffs demand that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT IX
## PLAINTIFFS v. ALL DEFENDANTS
### Violation of 18 U.S.C. § 1962(c)

357.    Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows:

358.    Defendants are each "persons" within the meaning of 18 U.SC. § 1961(3), who each conducted the affairs of an association in fact enterprise affecting interstate commerce through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Plaintiffs and the members of the Class are also persons.

359.    Each Defendant violated 19 U.S.C. § 1962(c) as follows:

a.  Mallinckrodt plc.  At all times relevant hereto, Mallinckrodt plc participated in the wrongful conduct of Questcor and Express Scripts as stated herein.

b.  Questcor.  At all times relevant hereto, Questcor committed the predicate acts of mail and wire fraud through its own acts and through the ASAP Enterprise as stated herein.  Questcor's predicate acts were not limited to the allegations stated herein.

c.  Express Scripts Holding Company.  At all times relevant hereto, Express Scripts Holding Company committed the predicate acts of mail and wire fraud through its own acts and through the ASAP Enterprise as stated herein. Express Scripts Holding Company's predicate acts were not limited to the allegations stated herein.

d.  Express Scripts, Inc.  At all times relevant hereto, Express Scripts, Inc. committed the predicate acts of mail and wire fraud through its own acts and

78

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

through the ASAP Enterprise as stated herein. Express Scripts, Inc.'s predicate acts were not limited to the allegations stated herein.

 e. UBC. At all times relevant hereto, UBC committed the predicate acts of mail and wire fraud through its own acts and through the ASAP Enterprise as stated herein. UBC's predicate acts were not limited to the allegations stated herein.

 f. CuraScript. At all times relevant hereto, CuraScript committed the predicate acts of mail and wire fraud through its own acts and through the ASAP Enterprise as stated herein. CuraScript's predicate acts were not limited to the allegations stated herein.

 g. Accredo. At all times relevant hereto, Accredo committed the predicate acts of mail and wire fraud through its own acts and through the ASAP Enterprise as stated herein. Accredo's predicate acts were not limited to the allegations stated herein.

360. At all relevant times, in violation of 18 U.S.C. § 1962(c), Mallinckrodt plc and Questcor, collectively Mallinckrodt, Express Scripts Holding Company, Express Scripts, Inc., UBC, CuraScript, and Accredo, collectively Express Scripts, and other co-conspirators conducted the affairs of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of Mallinckrodt and Express Scripts, including their directors, employees, and agents, which is manifested in the ASAP program (the "ASAP Enterprise").

 a. The ASAP Enterprise was established to streamlined and cover-up the use of mail and wires to commit fraud so all Defendants could unfairly and illegally profit from the monopolistic and anti-competitive sale of Acthar.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

    b.   These predicated acts of wire fraud and mail fraud occurred over the course of ten (10) years.

361.    The ASAP Enterprise was established in 2007 and is an ongoing and continuing business organization consisting of both the Defendants and individuals associated for the common purpose of illegally profiting from the distribution, marketing, selling, purchasing, and administration of Acthar to Plaintiffs and the Class, and deriving substantial profits from these activities.

362.    The ASAP Enterprise through each Defendant individually and collectively engages in and affects interstate commerce because it engages in the following activities across state boundaries: the manufacture, distribution, marketing, sale, and/or purchase of Acthar, the transmission of ASAP program literature (including the Acthar Start Form at Exhibit "A" hereto), the operating of the ASAP program website, and the transmission and/or the receipt of invoices and payments related to the prescription and use of Acthar. Through these activities the ASAP Enterprise distributes Acthar to thousands of individual patients, including those receiving prescription drug benefits from the Plaintiffs and the Class.

363.    The ASAP Enterprise itself and through each Defendant individually and collectively functioned as a continuing unit as evidenced by the continuing coordination of activities between Mallinckrodt and Express Scripts. There is a common communication network by which Mallinckrodt and Express Scripts shared and continue to share information on a regular basis for all times relevant to this lawsuit, but beginning at least in 2007 and continuing through the present. Typically, this communication occurred by use of the wires and mails, in which Mallinckrodt and Express Scripts all agree to charge inflated prices for Acthar to Plaintiffs and other Class members. These entities functioned as a continuing unit for the purposes of

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

implementing the fraudulent scheme to inflate the prices of Acthar by and through ASAP. When issues arose during the fraudulent scheme, each agreed to take actions to hide the scheme and to continue its existence.

364.    Mallinckrodt and Express Scripts exerted control over the ASAP Enterprise, have associations with the ASAP Enterprise, and have directly or indirectly conducted or participated in the conduct of the affairs of the ASAP Enterprise in the following ways:

      a.  Mallinckrodt establishes the prices of Acthar through fraudulent conduct;

      b.  Mallinckrodt and Express Scripts directly controlled the prices at which Plaintiffs and the Class reimburse for Acthar;

      c.  Mallinckrodt and Express Scripts directly controlled the ASAP Program materials and website which enroll patients in an exclusive distribution network for the administration of Acthar, allowing Mallinckrodt to conduct its unconscionable and unfair pricing of Acthar;

      d.  Mallinckrodt and Express Scripts directly controlled the exclusive distribution network for Acthar through the ASAP Enterprise;

      e.  Mallinckrodt and Express Scripts relied on their employees to promote the ASAP Program through the marketing alleged herein, through the mail and the wires; and

      f.  Mallinckrodt and Express Scripts participated in the affairs of the ASAP Enterprise by using a fraudulent scheme to market and sell Acthar at inflated prices.

365.    Mallinckrodt and Express Scripts conducted and participated in the affairs of the ASAP Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1345, relating to wire fraud.

366.    Mallinckrodt committed mail fraud when they utilized the mail and wires to defraud patients and purchases including Plaintiffs and the Class. Specific examples of the fraud are, included but not limited to:

      a.  Express Scripts explicitly advertised to all existing and prospective patients

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and payors that the ASAP Program would benefit them providing lower and affordable sales prices;

b. Mallinckrodt and Express Scripts misled Rockford by fraudulently stating over the internet and through the mail that Rockford and the Class would receive affordable healthcare and contained costs of Acthar;

c. Despite its explicit promises to the contrary, Express Scripts refused to use its market strength and related bargaining power to convince Mallinckrodt to lower the price of Acthar, because Express Scripts was serving as Mallinckrodt's exclusive agent and conducting the ASAP Enterprise; and *inter alia*,

d. Processing prescriptions via mail and the wire and receiving payments from Rockford as follows:

    i. On April 30, 2015, Rockford paid $100,457.64 for 15 80-Unit (or 29 days of therapy) doses of Acthar;

    ii. On September 10, 2015, Rockford paid $70,654.58 for 10 80-Unit (or 12 days of therapy) doses of Acthar;

    iii. On September 24, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 16 days of therapy) doses of Acthar;

    iv. On October 8, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 20 days of therapy) doses of Acthar;

    v. On October 22, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 22 days of therapy) doses of Acthar;

    vi. On October 29, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 10 days of therapy) doses of Acthar;

    vii. On November 12, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 10 days of therapy) doses of Acthar;

    viii. On November 19, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 10 days of therapy) doses of Acthar and

    ix. On December 3, 2015, Rockford paid $105,981.88 for 15 80-Unit (or 30 days of therapy) doses of Acthar.

f. Processing prescriptions via mail and the wire and receiving payments from Acument as follows:

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

    i.  On December 17, 2015, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    ii.  On January 4, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    iii.  On January 21, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    iv.  On February 18, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    v.  On March 14, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    vi.  On April 7, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    vii.  On April 26, 2016, Acument paid $68,616.75 for 5 80-Unit (or 22 days of therapy) doses of Acthar;

    viii.  On May 24, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    ix.  On June 15, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    x.  On July 11, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    xi.  On August 9, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

    xii.  On November 2, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar and

    xiii.  On December 6, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar.

367.    Defendants' pattern of racketeering activity likely involved hundreds, if not thousands, of separate instances of the use of the United States mail, private shipping services, facsimiles, or interstate wires, including the internet, in furtherance of its fraudulent and unlawful scheme. Each of these fraudulent mailing and interstate wire transmissions separately constitutes

83

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Mallinckrodt and Express Scripts intended to defraud Plaintiffs and members of the Class.

368.    Each of these payments were made by electronic transfer from Rockford to Express Scripts in St. Louis, Missouri, or from Acument via CVS Caremark to Express Scripts.

369.    By conducting the ASAP Enterprise via the fraudulent activities stated herein through the mail and wires, the Defendants both individually and collectively engaged in a repeated, fraudulent, and unlawful course of conduct constituting a pattern of racketeering.

370.    Defendants' pattern of racketeering activity likely involved hundreds, if not thousands, of separate instances of the use of the United States mail, private shipping services, facsimiles, or interstate wires, including the internet, in furtherance of its fraudulent and unlawful scheme. Thousands of ASAP forms, like the one attached hereto as Exhibit "A" were transmitted via facsimile to Express Scripts offices in multiple states. Thousands more phone calls were conducted between physicians and patients with Express Scripts, as directed by the ASAP form (Ex. A). Each of these fraudulent mailing and interstate wire transmissions separately constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Mallinckrodt and Express Scripts intended to defraud Plaintiffs and members of the Class.

371.    Mallinckrodt's and Express Scripts' violations and pattern of racketeering activity directly and proximately caused Plaintiffs harm insofar as Rockford paid $488,787.84 and Acument paid $894,617.75 in inflated reimbursements and other payments for Acthar.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

372.    Likewise the Class is harmed by Mallinckrodt's and Express Scripts' violations and pattern of racketeering activity by making similar inflated payments for Acthar.

373.    By virtue of these violations of 18 U.S.C. § 1962(c), Mallinckrodt and Express Scripts are jointly and severally liable to Plaintiffs and the Class for three times the damages Plaintiffs and the Class have sustained, plus the costs of this suit, including reasonable attorneys fees.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Mallinckrodt and Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

### COUNT X
### PLAINTIFFS v. ALL DEFENDANTS
### Violation of 18 U.S.C. § 1962(a)

374.    Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

375.    Throughout the Class Period, Defendants have violated the RICO statute by using and investing income that was derived from a pattern of racketeering activity as described herein. This income was used to acquire, establish, and/or operate the ASAP Enterprise in and affecting interstate commerce.

376.    The enterprise at issue is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of Mallinckrodt and Express Scripts, including their directors, employees, and agents, which is manifested in the ASAP program (the "ASAP Enterprise").  The ASAP Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals associated for the common purpose of selling, purchasing, and administering

85

Acthar to Plaintiffs and their individual participants, and deriving profits from these activities. Defendants engaged in a pattern of racketeering activity described in greater detail herein.

377. Plaintiffs and members of the Class have been directly and proximately injured in their property by the Defendants' use and investment of the racketeering income in the acquisition, establishment, and operation of the ASAP Enterprise. The injury to Plaintiffs and the Class' businesses or property stemming from these violations has been realized by the over-payment for Acthar.

378. The use and investment of racketeering income by Mallinckrodt and Express Scripts directly and proximately injured the Plaintiffs and the Class in a manner than was distinct from the injury caused by the pattern of racketeering activity described herein.

379. By virtue of these violations of 18 U.S.C. § 1962(a), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages Plaintiffs and the Class have sustained, plus the costs of this suit, including reasonable attorneys fees.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT XI**
**PLAINTIFFS v. ALL DEFENDANTS**
**Violation of 18 U.S.C. § 1962(d))**

380. Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

381. Mallinckrodt and Express Scripts violated 18 USC § 1962(d) by conspiring to associate with a racketeering enterprise, in violation of 18 U.S.C. § 1962(c). Mallinckrodt

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

explicitly contracted with Express Scripts to have Express Scripts serve as Mallinckrodt's exclusive agent in the conduct of the ASAP Program and the ASAP Enterprise, and conspired with Express Scripts to inflate the prices and limit distribution of Acthar in violation of § 1962(c).

382.    Mallinckrodt and Express Scripts knew and adopted the criminal purpose of the ASAP Enterprise.  Mallinckrodt communications reflect an express illegal agreement between Mallinckrodt and Express Scripts to limit the distribution of Acthar in order to charge inflated prices.

383.    Additionally, Mallinckrodt's conduct in sending e-mails, faxes and other communications to Express Scripts to direct the exclusive distribution, sale and reimbursement of Acthar through ASAP is consistent with the existence of an agreement to carry out the scheme to inflate prices and maximize profits.  Express Scripts, in turn, communicated Mallinckrodt's inflated prices to its clients, including Rockford, in its contract schedules and subsequent invoices for Acthar.  These same prices were communicated to the other PBMs, like CVS Caremark, for inclusion in their contracts with payors, like Acument.

384.    Mallinckrodt and Express Scripts actively furthered the goals of the ASAP Enterprise to defraud end payors, like the Plaintiffs.  Mallinckrodt changed its distribution scheme with Acthar with the intention that the changes would affect the prices of Acthar; it engaged in frequent discussions with all other Defendants about its plan to raise Acthar prices in the marketplace; it made requests that Express Scripts change the Acthar prices charged to its clients in conjunction with its price increases; and it publicly boasted about the effects of the scheme without disclosing its details.

385.    Plaintiffs and other members of the Class have been injured in their business or

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

property because they have paid thousands of dollars in overpayments that they would not have made had Defendants not conspired to engage in racketeering activity.

386.    As co-conspirators, Mallinckrodt plc, Questcor, Express Scripts Holding Company, Express Scripts, Inc., UBC, CuraScript, and Accredo are jointly and severally liable for all damage that occurred as a result of both their actions and those of Mallinckrodt plc, Questcor, Express Scripts Holding Company, Express Scripts, Inc., UBC, CuraScript, and Accredo, respectively, in furtherance of the conspiracy to raise prices of Acthar.  All Defendants are liable for all damages arising from Mallinckrodt plc's, Questcor's, Express Scripts Holding Company, Express Scripts, Inc., UBC's, CuraScript's, and Accredo's respective conduct in furtherance of the scheme.

387.    Under the provisions of Section 1964(c) of RICO, Mallinckrodt plc, Questcor, Express Scripts Holding Company, Express Scripts, Inc., UBC, CuraScript, and Accredo are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Mallinckrodt and Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT XII**
**CITY OF ROCKFORD V. EXPRESS SCRIPTS**
**BREACH OF CONTRACT**
**BREACH OF THE ESI PBM AGREEMENT**

388.    Rockford hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

389.    This Count alleges breach of the ESI PBM Agreement against Express Scripts.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

390.    By its representations, manifestations of assent, customs and practices, ESI is bound to and by the terms of the ESI PBM Agreement.

391.    By the foregoing conduct, specifically ESI's failure to provide "cost containment" services either through nonfeasance or malfeasance, ESI breached the ESI PBM Agreement, repudiated its obligations under the ESI PBM Agreement, and is in default of the ESI PBM Agreement.

392.    Rockford performed and met all of its obligations under the ESI PBM Agreement to date and has a right to and is entitled to all remedies ascribed to it under the ESI PBM Agreement and Illinois law.

393.    Rockford has been damaged as a direct and proximate result of ESI's failure to perform under the terms of the ESI PBM Agreement.

**WHEREFORE,** Rockford demands that judgment be entered in its favor, and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT XIII**
**CITY OF ROCKFORD V. EXPRESS SCRIPTS**
**PROMISSORY ESTOPPEL**

394.    Rockford hereby incorporates by reference the preceding and following paragraphs hereof as if fully set forth herein.

395.    This Count alleges promissory estoppel against Express Scripts. It charges that ESI's conduct described above constitutes a promise to perform under the terms of the ESI PBM Agreement; and a promise upon which Rockford relied upon to its detriment.

396.    Rockford seeks enforcement of ESI's promise to continue with ESI's obligations under the ESI PBM Agreement.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

397.    ESI utterly refused and failed to fulfill its representations and promises concerning the terms and obligations under the ESI PBM Agreement, including the promise of cost containment with respect to Acthar.

398.    Rockford relied on the conduct described above and in justifiable reliance thereon, and as a direct and proximate result of its reliance thereon, Rockford has been damaged.

399.    Injustice can be avoided only by enforcing ESI's representations and promises concerning the expectations that it created regarding ESI's obligations under the ESI PBM Agreement, and awarding Rockford damages based on ESI's failure to fulfill its representations and promises.

**WHEREFORE,** Rockford demands that judgment be entered in its favor and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT XIV**
**CITY OF ROCKFORD V. EXPRESS SCRIPTS**
**DECLARATORY JUDGMENT**
**THE ESI PBM AGREEMENT**

400.    Rockford hereby incorporates by reference the preceding and following paragraphs hereof as if fully set forth herein.

401.    This Count seeks declaratory judgment under 28 U.S.C. §§2201 and 2202, because an actual, present and substantial controversy exists between Rockford and Express Scripts concerning the ESI PBM Agreement, and Rockford's entitlement to continue to receive the benefit of its bargain with Express Scripts in the ESI PBM Agreement.

402.    Rockford is statutorily entitled to declarations of its rights, status or relations.

403.    WHEREFORE, Rockford demands that judgment be entered in its favor, and in favor of the Class, declaring that:

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

      a.     ESI has repudiated its obligations to perform under the ESI PBM Agreement and is therefore in default of the ESI PBM Agreement; and

      b.     ESI is estopped from denying its obligations to comply with the provisions of the ESI PBM Agreement.

**COUNT XV**
**CITY OF ROCKFORD V. EXPRESS SCRIPTS**
**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**

404.    Rockford hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

405.    The general duty of good faith and fair dealing in the performance of a contract is found in the Restatement (Second) of Contracts, Section 205, which provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

406.    In Illinois and other states, the duty of good faith is defined as honesty in fact in the conduct or transaction concerned.

407.    The duty to perform contractual obligations in good faith applies to the ESI PBM Agreement and requires ESI to use its best efforts to fulfill its promise to provide "cost containment" services.

408.    By failing to provide "cost containment" services and costing Rockford $488,787.64 for 9 prescriptions of Acthar over the course of 8 months, ESI breached the covenant of good faith and fair dealing.

409.    ESI's breach of the covenant of good faith and fair dealing was the direct and proximate result of injury and damages to Rockford.

**WHEREFORE,** Rockford demands that judgment be entered in its favor and in favor of the Class, and against Mallinckrodt and Express Scripts, in an amount to be determined at trial,

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class request the Court to enter the following relief:

a. Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and denominate Plaintiffs as an adequate representative for the Class and their undersigned counsel as counsel for the Class;

b. Declare unlawful the acts and practices alleged herein, enjoin the Defendants from committing the acts alleged herein, and restore the status quo before the unlawful conduct took place;

c. Enter judgment against all Defendants for the violations alleged herein;

d. Award the actual damages incurred by Plaintiffs and the members of the Class as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

e. Award statutory damages set forth herein under the statutory claims alleged;

f. Award treble damages or multiple damages by operation of law;

g. Award punitive damages;

h. Award Plaintiffs the costs of this action, including reasonable attorneys' fees, and, where applicable, expert fees; and

i. Award such other and further relief as the Court may deem just and appropriate.

92

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**JURY DEMAND**

Plaintiffs and the Class demand a trial by jury of all issues so triable in this cause.

Respectfully submitted,

By: */s/ Donald E. Haviland, Jr.*
Donald E. Haviland, Jr.
*haviland@havilandhughes.com*
William H. Platt, II
*platt@havilandhughes.com*
Haviland Hughes
201 South Maple Avenue
Suite 110
Ambler, PA 19002
Phone: (215) 609-4661
Fax:    (215) 392-4400

Peter J. Flowers, Esquire
(IL Attorney ID No. 06210847)
*pjf@meyers-flowers.com*
Meyers & Flowers, LLC
3 North Second Street, Suite 300
St. Charles, IL 60174
Ph: (630) 232-6333
Fax: (630) 845-8982

Kerry F. Partridge, Esquire
City Attorney
*kerry.partridge@rockfordil.gov*
425 East State Street
Rockford, IL 61104-1068
Ph: (779) 348-7154
Fax: (815) 967-6949

*Attorneys for Plaintiffs and the Class*

93

Case 2:21-cv-00107-RMS Document #: 14-197 Filed: 03/16/21 Page 113 of 352

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2017, a true and correct copy of the foregoing

Second Amended Class Action Complaint was electronically filed with the Clerk of Court using

the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Donald E. Haviland, Jr.*

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT A

# H.P. **Acthar** GEL
(repository corticotropin injection) 80 U/mL

**FAX: 1-877-937-2284**

**Acthar Start Form**
Please complete Start Form and fax toll-free
TEL: 1-888-435-2284
Monday through Friday (8:00 am to 9:00 pm EST)
Saturday (9:00 am to 2:00 pm)

## 1. PATIENT INFORMATION    Patient has been notified of referral ☐ YES ☐ NO

| PATIENT FIRST NAME | PATIENT MIDDLE INITIAL | PATIENT LAST NAME | | DATE OF BIRTH | GENDER |
|---|---|---|---|---|---|

| HOME ADDRESS | | CITY | STATE | ZIP |
|---|---|---|---|---|

| SHIPPING ADDRESS (IF NOT HOME ADDRESS) | CARE OF (IF NOT ADDRESSED TO PATIENT) | CITY | STATE | ZIP |
|---|---|---|---|---|

| HOME PHONE | MOBILE | OK TO TEXT | BEST TIME TO CALL | PREFERRED LANGUAGE IF NOT ENGLISH |
|---|---|---|---|---|

| EMAIL ADDRESS | PATIENT REPRESENTATIVE | RELATIONSHIP | TELEPHONE |
|---|---|---|---|

## 2. INSURANCE INFORMATION (PLEASE INCLUDE COPIES OF CARDS)

| PHARMACY BENEFITS | | SUBSCRIBER ID # | GROUP # | TEL # |
|---|---|---|---|---|

| PRIMARY MEDICAL INSURANCE | POLICY HOLDER | RELATIONSHIP | SUBSCRIBER ID # | GROUP # | TEL # |
|---|---|---|---|---|---|

## 3. HEALTHCARE PROVIDER (HCP) INFORMATION

| HCP FIRST NAME | HCP LAST NAME | HCP MIDDLE INITIAL | NPI # | GROUP NPI # (IF APPLICABLE) | STATE LICENSE # |
|---|---|---|---|---|---|

SPECIALTY: NEPHROLOGY    NEUROLOGY    PULMONOLOGY    RHEUMATOLOGY    OPHTHALMOLOGY    OTHER

IF OTHER PLEASE INDICATE

| FACILITY NAME | TELEPHONE | FAX |
|---|---|---|

| ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|

| OFFICE CONTACT NAME | CONTACT TELEPHONE | EMAIL ADDRESS | PREFERRED METHOD OF COMMUNICATION |
|---|---|---|---|

## 4. PRESCRIPTION: H.P. ACTHAR® GEL        NDC# 63004-8710-1    5 mL multidose vial containing 80 USP units per mL

**PRIMARY DIAGNOSIS:** _____    **ICD-10:** _____

INITIATE PATIENT WITH:
UNITS
DOSE: _____ ML    SCHEDULE/FREQUENCY: _____ | QUANTITY OF 5 ML MULTIDOSE VIALS: _____ REFILLS: _____ | ROUTE OF ADMINISTRATION:    INTRAMUSCULAR    SUBCUTANEOUS

ADDITIONAL SPECIAL INSTRUCTIONS, OR TAPER DOSE, IF APPLICABLE: _____    ALLERGIES: _____

SUPPLIES:
SYRINGE SIZE:    1 mL    3 mL    Other size ____ QUANTITY: _____    NEEDLE SIZE:    20 g needle, 1 inch    23 g needle, 1 inch    25 g needle, 1 inch    Subcutaneous only 25 g needle, 5/8 inch    (other): ____QUANTITY: _____

PATIENT WEIGHT (FOR WEIGHT-BASED DOSING ONLY): _____    SUPPLY REFILLS: _____    SHARPS CONTAINER: _____    OTHER SUPPLIES: _____

**HOME INJECTION TRAINING SERVICES (HITS)**

By initialing here (original required) I request that company-funded HITS services are arranged for my patient. I understand that HITS is for one instruction visit only and NOT a home health nursing service. I also understand that all reasonable efforts will be made to schedule the HITS training visit within 24 hours of the patient's receipt of drug shipment.

INITIALS _____    DATE _____

## 5. PRESCRIPTION, CONSENT AND STATEMENT OF MEDICAL NECESSITY: HCP SIGNATURE REQUIRED

I certify that H.P. Acthar® Gel is medically necessary for this patient and that I have reviewed this therapy with the patient and will be monitoring the patient's treatment. I verify that the patient and healthcare provider information on this enrollment form is complete and accurate to the best of my knowledge. I understand that I must comply with my practicing state's specific prescription requirements such as, e-prescribing, state specific prescription form, fax language, etc. Non-compliance of state specific requirements could result in outreach to me by the dispensing pharmacy.

I authorize United BioSource Corporation ("UBC"), the current operator of the Acthar Support and Access Program ("Program"), and other designated operators of the Program, to perform a preliminary assessment of benefit verification for this patient and furnish information requested by the patient's insurer that is available on this form. I understand that insurance verification is ultimately the responsibility of the provider and third-party reimbursement is affected by a variety of factors. While UBC tries to provide accurate information, they and Mallinckrodt make no representations or warranties as to the accuracy of the information provided.

I understand that representatives from the Program or UBC may contact me or my patient for additional information relating to this prescription. I acknowledge and agree that the designated specialty pharmacy receive this prescription via a designated third party, the Program and that no additional confirmation of receipt of prescription is required by the designated specialty pharmacy

**HCP Prescriber Signature - Please sign ONE LINE below**

| DISPENSE AS WRITTEN | DATE | SUBSTITUTIONS ALLOWED | DATE |
|---|---|---|---|

Prescriber signature required to consent and validate prescriptions. Prescriber attests that this is her/his signature. NO STAMPS. By signing, I certify that the above is medically necessary.

1

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**For Patient:**_____  **DOB:**_____

## 6. DIAGNOSIS AND MEDICAL INFORMATION

**Diagnosis**

**Please select diagnosis and responses to associated questions**

❑ **Ankylosing spondylitis**

❑ **Dermatomyositis**

❑ **Infantile spasms**

Has diagnosis been confirmed by EEG?

❑ YES   ❑ NO

Patient's weight: _____

Requested drug delivery date: _____

❑ **Multiple sclerosis**

Is Acthar to be used to treat an acute exacerbation?

❑ Exacerbation   ❑ Other_____   Must check one

Onset of acute exacerbation   Date:_____

❑ **Optic neuritis**

❑ **Polymyositis**

**Proteinuria in nephrotic syndrome**
Please indicate etiology:

❑ Focal segmental glomerular sclerosis (FSGS)

❑ IgA nephropathy (IgAN)

❑ Lupus nephritis

❑ Membranous nephropathy (MN)

❑ Other: _____

❑ **Psoriatic arthritis**

❑ **Rheumatoid arthritis**

❑ **Sarcoidosis**

❑ **Systemic lupus erythematosus**
Is Acthar to be used to treat an acute exacerbation?

❑ YES   ❑ NO   Must check one

**Lupus nephritis?**

❑ YES   ❑ NO

❑ **Uveitis**

❑ **Other diagnosis** _____

## 7. HISTORY OF CORTICOSTEROID USE (IF APPLICABLE) PLEASE ADD DETAILS IN SECTION 8 BELOW

**Please check all that apply**

**A corticosteroid was tried with the following response(s):**

❑ Corticosteroid use failed, but same response not expected with Acthar

❑ Patient hypersensitive or allergic to corticosteroids

❑ Patient intolerant to corticosteroids

❑ Other: _____

**OR**

**A corticosteroid was not tried due to the following response(s):**

❑ Corticosteroid use is contraindicated for this patient

❑ Intravenous access is not possible for this patient

❑ Patient has known intolerance to corticosteroids

❑ Other:_____

## 8. CONCURRENT MEDICATIONS

## 9. RELEVANT TREATMENT HISTORY (INCLUDING RECENT STEROID HISTORY)

| Therapy Name | Dose | Start Date | Stop Date (if applicable) | Explain Outcome With Detail (ex. type of outcome) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

(Attach additional pages as necessary)

## OTHER RELEVANT CLINICAL INFORMATION

## HCP SIGNATURE: REQUIRED FOR DOCUMENTATION

| NAME | SIGNATURE | DATE |
|---|---|---|
| | | |

H.P. **Acthar** GEL
(repository corticotropin injection) 80 U/mL

For completion by patient or their representative

**Patient Name:**_____  **DOB:**_____

## 10. PATIENT AUTHORIZATION(S)

**For Patient Review and Completion. If patient is not available, authorization will be obtained from patient by Acthar Support and Access Team upon receipt of referral.**

By signing this authorization, I authorize my physician(s), my health insurance company, my pharmacy providers and Mallinckrodt ARD Inc., the distributor of Acthar ("Mallinckrodt"), and its agents, authorized designees and contractors, including Mallinckrodt reimbursement support personnel and United BioSource Corporation ("UBC") or any other operator of the Acthar Support and Access Program on behalf of Mallinckrodt (collectively, "Designated Parties"), to use and disclose to other Designated Parties health information relating to my medical condition, treatment, and insurance coverage (my "Health Information") in order for them to (1) provide certain services to me, including reimbursement and coverage support, patient assistance and access programs, medication shipment tracking, and home injection training, (2) provide me with support services and information associated with my Acthar therapy, (3) for internal business purposes, such as for marketing research, internal financial reporting and operational purposes, and (4) to carry out the Designated Parties' respective legal responsibilities.

Once my Health Information has been disclosed to the Designated Parties, I understand that it may be re-disclosed by them and no longer protected by federal and state privacy laws. However, the Designated Parties agree to protect my Health Information by using and disclosing it only for the purposes detailed in this authorization or as permitted or required by law.

I understand that I may refuse to sign this authorization and that my physician and pharmacy will not condition my treatment on my agreement to sign this authorization form, and my health plan or health insurance company will not condition payment for my treatment, insurance enrollment or eligibility for insurance benefits on my agreement to sign this authorization form. I understand that my pharmacies and other Designated Parties may receive payment in connection with the disclosure of my Health Information as provided in this authorization. I understand that I am entitled to receive a copy of this authorization after I sign it.

I may revoke (withdraw) this authorization at any time by mailing a letter to Acthar Support and Access, 255 Technology Park, Lake Mary, FL 32746. Revoking this authorization will end further disclosure of my Health Information to Designated Parties by my pharmacy, physicians and health insurance company when they receive a copy of the revocation, but it will not apply to information they have already disclosed to the Designated Parties based on this authorization. I also know I may cancel my enrollment in a patient support program at any time in writing by contacting Mallinckrodt via fax at 877-937-2284.

This authorization is in effect for 1 year or until the conclusion of any ongoing coverage support, whichever is longer, once I have signed it unless I cancel it before then.

_____  _____  _____  _____
PATIENT NAME OR LEGAL REPRESENTATIVE       PATIENT SIGNATURE              IF LEGAL REPRESENTATIVE, RELATIONSHIP TO PATIENT        DATE

I authorize Mallinckrodt and its agents to receive, use, and disclose my health information relating to my medical condition, treatment, insurance coverage, and contact information from me, my healthcare providers, my pharmacies, and my health insurance company in order to (1) contact me about participation in Acthar patient programs, (2) provide me with educational or other informational materials, (3) administer its education and other patient-related programs, (4) conduct surveys that request my feedback, and (5) for Mallinckrodt to carry out its legal responsibilities in connection with these education and support programs. I agree to let Mallinckrodt or its agents contact me in the future about these offerings. Once my health information has been disclosed to the education, informational and/or support program I choose to participate in, I understand that it may be redisclosed by Mallinckrodt or its agents, and they are authorized to use or disclose this information in the manner described here and as permitted by this authorization or as otherwise permitted or required by law, and that federal and state privacy laws may no longer protect the information. However, Mallinckrodt and its agents agree to protect my health information by using and disclosing it only for the purposes described in this authorization or as permitted or required by law. This authorization will remain in effect until I cancel it which I may do so at any time by contacting Mallinckrodt via fax at 877-937-2284. Cancelling this authorization will end further use or disclosure of my health information by Mallinckrodt or its agents (except to the extent that such parties took actions based on this authorization prior to my revocation). If I withdraw my permission, I know that this means I may no longer receive information on supplemental education or support programs. Once I withdraw my permission, no new information will be disclosed to Mallinckrodt or its agents, but Mallinckrodt and its agents may continue to use the information that was collected before I withdrew my permission as permitted by this authorization or as otherwise permitted or required by law. I may request a copy of this signed authorization.

_____  _____  _____  _____
PATIENT NAME OR LEGAL REPRESENTATIVE       PATIENT SIGNATURE              IF LEGAL REPRESENTATIVE, RELATIONSHIP TO PATIENT        DATE

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Acthar Support and Access Program**
**FAX: 1-877-937-2284 TEL: 1-888-435-2284**

## INDICATIONS AND USAGE

- **Infantile spasms:** H.P. Acthar Gel (repository corticotropin injection) is indicated as monotherapy for the treatment of infantile spasms in infants and children under 2 years of age
- **Multiple Sclerosis:** H.P. Acthar Gel (repository corticotropin injection) is indicated for the treatment of acute exacerbations of multiple sclerosis in adults. Controlled clinical trials have shown H.P. Acthar Gel to be effective in speeding the resolution of acute exacerbations of multiple sclerosis. However, there is no evidence that it affects the ultimate outcome or natural history of the disease
- **Rheumatic Disorders:** As adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in: psoriatic arthritis, rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy), ankylosing spondylitis
- **Collagen Diseases:** During an exacerbation or as maintenance therapy in selected cases of: systemic lupus erythematosus, systemic dermatomyositis (polymyositis)
- **Dermatologic Diseases:** Severe erythema multiforme, Stevens-Johnson syndrome
- **Allergic States:** Serum sickness
- **Ophthalmic Diseases:** Severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as: keratitis, iritis, iridocyclitis, diffuse posterior uveitis and choroiditis, optic neuritis, chorioretinitis, anterior segment inflammation
- **Respiratory Diseases:** Symptomatic sarcoidosis
- **Edematous State:** To induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus

## IMPORTANT SAFETY INFORMATION

### CONTRAINDICATIONS

- Acthar should never be administered intravenously
- Administration of live or live attenuated vaccines is contraindicated in patients receiving immunosuppressive doses of Acthar
- Acthar is contraindicated where congenital infections are suspected in infants
- Acthar is contraindicated in patients with scleroderma, osteoporosis, systemic fungal infections, ocular herpes simplex, recent surgery, history of or the presence of a peptic ulcer, congestive heart failure, uncontrolled hypertension, primary adrenocortical insufficiency, adrenocortical hyperfunction or sensitivity to proteins of porcine origins

### WARNINGS AND PRECAUTIONS

- The adverse effects of Acthar are related primarily to its steroidogenic effects
- Acthar may increase susceptibility to new infection or reactivation of latent infections
- Suppression of the hypothalamic-pituitary-axis (HPA) may occur following prolonged therapy with the potential for adrenal insufficiency after withdrawal of the medication. Adrenal insufficiency may be minimized by tapering the dose when discontinuing treatment. During recovery of the adrenal gland patients should be protected from the stress (e.g. trauma or surgery) by the use of corticosteroids. Monitor patients for effects of HPA suppression after stopping treatment
- Cushing's Syndrome may occur during therapy but generally resolves after therapy is stopped. Monitor patients for signs and symptoms
- Acthar can cause elevation of blood pressure, salt and water retention, and hypokalemia. Blood pressure, sodium and potassium levels may need to be monitored
- Acthar often acts by masking symptoms of other diseases/disorders. Monitor patients carefully during and for a period following discontinuation of therapy
- Acthar can cause GI bleeding and gastric ulcer. There is also an increased risk for perforation in patients with certain gastrointestinal disorders. Monitor for signs of bleeding
- Acthar may be associated with central nervous system effects ranging from euphoria, insomnia, irritability, mood swings, personality changes, and severe depression, and psychosis. Existing conditions may be aggravated
- Patients with comorbid disease may have that disease worsened. Caution should be used when prescribing Acthar in patients with diabetes and myasthenia gravis
- Prolonged use of Acthar may produce cataracts, glaucoma and secondary ocular infections. Monitor for signs and symptoms
- Acthar is immunogenic and prolonged administration of Acthar may increase the risk of hypersensitivity reactions. Neutralizing antibodies with chronic administration may lead to loss of endogenous ACTH activity
- There is an enhanced effect in patients with hypothyroidism and in those with cirrhosis of the liver
- Long-term use may have negative effects on growth and physical development in children. Monitor pediatric patients
- Decrease in bone density may occur. Bone density should be monitored for patients on long-term therapy
- Pregnancy Class C: Acthar has been shown to have an embryocidal effect and should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus

### ADVERSE REACTIONS

- Common adverse reactions for Acthar are similar to those of corticosteroids and include fluid retention, alteration in glucose tolerance, elevation in blood pressure, behavioral and mood changes, increased appetite and weight gain
- Specific adverse reactions reported in IS clinical trials in infants and children under 2 years of age included: infection, hypertension, irritability, Cushingoid symptoms, constipation, diarrhea, vomiting, pyrexia, weight gain, increased appetite, decreased appetite, nasal congestion, acne, rash, and cardiac hypertrophy. Convulsions were also reported, but these may actually be occurring because some IS patients progress to other forms of seizures and IS sometimes mask other seizures, which become visible once the clinical spasms from IS resolve

Other adverse events reported are included in the full Prescribing Information.

Please see accompanying full Prescribing Information.



©2016 Mallinckrodt Pharmaceuticals. ARDUS/01-07/0316/0002(1) 8/16

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT B

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# QUESTCOR

## URGENT PRODUCT ALERT
## H.P. Acthar® Gel

July 2, 2007

Dear Healthcare Professional,

As you know, H.P. Acthar® Gel (repository corticotropin injection) plays a critical role in many inpatient and outpatient treatment regimens. **Effective August 1, 2007, Acthar Gel (NDC # 63004-7731-1) will be available exclusively through Specialty Pharmacy Distribution.** Acthar Gel will no longer be available from traditional pharmaceutical wholesalers or retail pharmacies. Please be sure to share this information appropriately with your staff and patients.

## *For Hospital Stock Orders*
Beginning July 16, 2007, hospitals should place all stock orders with CuraScript Specialty Distribution **(877-599-7748)**. We suggest that appropriate personnel at your facility contact CuraScript Specialty Distribution **(877-599-7748)** as soon as possible to establish an account.

## *Planning for Patient Discharge – Outpatient Prescriptions*
Beginning July 16, 2007, when treatment with Acthar Gel is initiated in a hospital setting with the intent to continue after discharge, it is imperative that the outpatient prescription order be placed immediately after treatment initiation to ensure an uninterrupted supply of Acthar Gel at discharge. Beginning July 16, 2007, please contact the following support and access program to get prescriptions filled and for assistance with reimbursement:

> ### *Acthar Support & Access Program (ASAP)*
> - **PHONE: 888-435-2284**
> - **FAX: 877-937-2284**

More information and referral forms can be obtained at **www.acthar.com.**

## *Filling Prescriptions*
Please tell your patients currently having Acthar Gel prescriptions filled at retail pharmacies to immediately confirm the pharmacy has stock on hand for their remaining refills. Beginning July 16, 2007, all new Acthar Gel prescriptions should be submitted to the Acthar Support & Access Program **(PHONE: 888-435-2284; FAX: 877-937-2284).**

Questcor is committed to providing uninterrupted availability of Acthar Gel for patients who critically need it. This change in Acthar Gel distribution and the creation of the Acthar Support & Access Program is an important part of this mission.

Sincerely,

Steve Cartt, Executive Vice President, Corporate Development
Questcor Pharmaceuticals

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT C

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 1/06/2019 5:34 PM, Fee = 30.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1  **KATTEN MUCHIN ROSENMAN LLP**
Kristin L. Holland (SBN 187314)
2  kristin.holland@kattenlaw.com
Tami Kameda Sims (SBN 245628)
3  tami.sims@kattenlaw.com
2029 Century Park East, Suite 2600
4  Los Angeles, CA 90067-3012
Telephone: 310.788.4400
5  Facsimile: 310.788.4471

6  **KATTEN MUCHIN ROSENMAN LLP**
James J. Calder (*applying for pro hac vice*)
7  james.calder@kattenlaw.com
Mark T. Ciani (*applying for pro hac vice*)
8  mark.ciani@kattenlaw.com
575 Madison Avenue
9  New York, NY 10022-2585
Telephone: 212.940.8800
10  Facsimile: 212.940.8776

11  Attorneys for Plaintiff Retrophin, Inc.

12  **UNITED STATES DISTRICT COURT**

13  **CENTRAL DISTRICT OF CALIFORNIA**

14  **SOUTHERN DIVISION**

15

16  RETROPHIN, INC., a Delaware
Corporation,                     SA CV14-00026-JLS (JPRx)

17  　　　　　Plaintiff,      **COMPLAINT FOR:**
                              1. **RESTRAINT OF TRADE IN**
18  　　　vs.                     **VIOLATION OF SECTION 1 OF**
                                 **THE SHERMAN ACT**
19  QUESTCOR PHARMACEUTICALS,       **(15 U.S.C. § 1 ET SEQ.)**
INC., a California Corporation,  2. **MONOPOLIZATION IN**
20                                 **VIOLATION OF SECTION 2 OF**
　　　　　Defendant.               **THE SHERMAN ACT**
21                                 **(15 U.S.C. § 2 ET SEQ.)**
                              3. **ATTEMPTED**
22                                 **MONOPOLIZATION IN**
                                 **VIOLATION OF SECTION 2 OF**
23                                 **THE SHERMAN ACT**
                                 **(15 U.S.C. § 2 ET SEQ.)**
24                              4. **UNLAWFUL MERGER IN**
                                 **VIOLATION OF SECTION 7 OF**
25                                 **THE CLAYTON ACT**
                                 **(15 U.S.C. § 18 ET SEQ.)**
26                              5. **VIOLATION OF CALIFORNIA**
                                 **ANTITRUST LAWS**
27                              6. **VIOLATION OF CALIFORNIA**
                                 **UNFAIR COMPETITION LAWS**
28
                              **DEMAND FOR JURY TRIAL**

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Plaintiff Retrophin, Inc. ("Retrophin"), as and for its complaint against Defendant Questcor Pharmaceuticals, Inc. ("Questcor"), alleges as follows:

### Nature of the Action

1. Questcor is a monopolist. It is the sole provider in the US of approved therapeutic preparations of adrenocorticotropic hormone ("ACTH"), a drug used to treat certain life threatening and often fatal diseases. Questcor's ACTH drug is sold under the brand name H.P. Acthar Gel ("Acthar"). The drug is not patented.

2. Questcor acquired the rights to Acthar in 2001. At the time, Acthar sold for $50 a vial or less. Since then, Questcor has raised the price to $28,000 – a 56,000% price increase.

3. Questcor is able to charge such an extortionate price for Acthar because it holds a monopoly in the US. Its monopoly exists for several reasons. First, Acthar is the only long acting ACTH therapeutic drug approved by the Food and Drug Administration ("FDA") for use in the US. Second, Acthar is the most effective and dominant first line treatment for Infantile Spasms, an often fatal disorder that causes epileptic type seizures in babies, toddlers and children under the age of 5. In addition, Questcor has obtained "Orphan Drug Designation" for Acthar from the FDA under the Orphan Drug Act, 21 USC §§301 *et seq.*, giving it the exclusive right to market Acthar – and its chemical equivalent – for use in treating Infantile Spasms. Third, Acthar is also the most commonly used treatment of last resort for patients suffering from Nephrotic Syndrome, a condition that results in excessive protein being secreted through the urine that destroys the kidneys and can lead to kidney failure. Treatments of last resort, as the term implies, are used for patients who do not respond to or cannot tolerate other therapies used to treat their illness.

4. In June of 2013, plaintiff Retrophin was poised to challenge Questcor's monopoly. It had negotiated an agreement to purchase from Novartis AG ("Novartis"), the rights to sell in the US a product called Synacthen, an ACTH drug that contains the same sequence of the first 24 amino acids that is found in Acthar.

1   While there are differences between Acthar and Synacthen – the two are not

2   chemically identical beyond the first 24 amino acids and they are produced differently

3   – Synacthen has been sold for years outside of the US for the treatment of Infantile

4   Spasms, Nephrotic Syndrome, Multiple Sclerosis and other diseases. On information

5   and belief, it is not currently sold in the US because it has never been submitted to the

6   FDA for approval.

7   　　　5.　　Retrophin planned to obtain FDA approval to sell Synacthen in the US

8   and compete head to head against Questor by dramatically undercutting Questcor's

9   price for Acthar. It had negotiated and was ready to sign an agreement to purchase the

10  US rights to Synacthen from Novartis. The signing was scheduled for June 11, 2013.

11  The signing of the agreement was so imminent that a press release had been prepared

12  to announce the deal.

13  　　　6.　　On June 11, 2013, the day Retrophin was to sign its agreement with

14  Novartis, Questcor swept in and acquired the rights to Synacthen. In so doing, it

15  preserved and entrenched its ACTH monopoly in the US and eliminated the

16  competitive threat posed by Retrophin's acquisition of Synacthen. There was no

17  procompetitive aspect of Questcor's acquisition of Synacthen.

18  　　　7.　　When it acquired the rights to Acthar, Questcor did not make a

19  Premerger Notification Filing with the Department of Justice and the Federal Trade

20  Commission under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15

21  USC, §18a *et seq.*

22  　　　8.　　Questcor was quite aware, however, that its agreement with Novartis

23  raised serious antitrust questions. The agreement provides that, if Questcor is forced

24  to divest its rights to Synacthen on antitrust grounds, Novartis will keep the entire $60

25  million that Questcor had paid it. In addition, Questcor remains obligated to make all

26  future milestone payments owed to Novartis under that agreement – an amount in

27  excess of $75 million. Questcor has accepted the entire economic risk – an amount in

28

Case# 2018-14039-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1   excess of $135 million – that the agreement with Novartis would be deemed illegal

2   under the antitrust laws.

3       9.    Questcor's acquisition of Synacthen has delayed, and may completely

4   foreclose, Retrophin's entry into the markets defined below.  It will delay, and may

5   completely prevent, Retrophin from competing against Questcor.  Retrophin brings

6   this lawsuit to recover the damages it has incurred as a result of Questcor's

7   anticompetitive and monopolistic conduct.  It also seeks injunctive relief against

8   Questcor's continuation of such conduct.

9                     **The Parties**

10       10.    Plaintiff Retrophin is organized and exists under the laws of Delaware.

11   Its principal place of business is located at 777 Third Avenue, 22nd Floor, New York,

12   New York 10017.  It also does business in California and Massachusetts.

13       11.    Retrophin is a biopharmaceutical company focused on the development,

14   acquisition and commercialization of drugs for the treatment of serious, catastrophic

15   or rare diseases for which there are currently no viable options for patients.  The

16   diseases on which Retrophin focuses are often considered "orphan" diseases because

17   they affect fewer than 200,000 patients in the United States.  Retrophin has acquired

18   and is building a pipeline of innovative product candidates for several catastrophic

19   diseases, including: Focal Segmental Glomerulosclerosis, a kidney disease;

20   Pantothenate Kinase-Associated Neurodgeneration; and Duchenne Muscular

21   Dystrophy.

22       12.    Defendant Questcor is a corporation organized and existing under the

23   laws of the State of California.  It maintains its principal place of business in

24   Anaheim, California.

25                 **Jurisdiction and Venue**

26       13.    Retrophin brings this action under Sections 4 and 16 of the Clayton Act,

27   15 U.S.C. §§15 and 26, to recover treble damages and costs of suit, including

28   reasonable attorneys' fees, and for injunctive relief, for injuries suffered by Retrophin

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

alleged herein and arising from Questcor's continuing violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18. Jurisdiction for this action is invoked under Sections 4 and 16 of the Clayton Act, as amended, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337(a).

14.    Additionally, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the controversy exceeds the sum or value of $75,000 and Retrophin and Questcor are citizens of different states. This Court has supplemental jurisdiction over Retrophin's state law claims pursuant to 28 U.S.C. § 1367(a).

15.    Venue in this Court exists by virtue of Sections 4 and 12 of the Clayton Act, as amended, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(c). Defendant Questcor is found, has agents, transacts and is doing business in this District, and the unlawful activities complained of herein were carried on, in substantial part, within this District.

16.    Defendant is subject to personal jurisdiction in this Court because it resides in this District and transacts business in this District.

**Trade and Commerce**

17.    The pharmaceutical products at issue in this case are sold in Interstate Commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had and will have, a substantial effect upon, Interstate Commerce.

**The Relevant Markets**

18.    There are a number of separate relevant product markets at issue in this case. They include: (a) the market for ACTH therapeutic drugs (the "ACTH Therapeutic Drug Market"); (b) the market for first-line drug treatments for Infantile Spasms (the "Infantile Spasms Market"); and (c) the market for treatments of last resort for Nephrotic Syndrome for those patients who do not respond to or cannot tolerate primary and secondary treatments for that disease (the "Nephrotic Syndrome

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Market"). The relevant geographic markets for each of these three relevant product markets is the United States, since drugs available in any of these markets are subject to FDA regulation. The ACTH Therapeutic Drug, Infantile Spasms, and Nephrotic Syndrome Markets are collectively referred to as the "Relevant Markets."

### The ACTH Therapeutic Drug Market

19.     ACTH is a drug used to treat certain life threatening and often fatal diseases, including Infantile Spasms and Nephrotic Syndrome. It is a polypeptide tropic hormone produced and secreted by the anterior pituitary gland. In the human body, ACTH activates the Melanocortin System and is referred to as a "Melanocortin agonist." The Melanocortin System affects a wide array of bodily functions ranging from skin pigmentation, inflammation, energy homeostasis and sexual function. As a consequence, ACTH can be used as a therapy for a variety of illnesses resulting from improper functioning of the Melanocortin System, including Infantile Spasms and Nephrotic Syndrome. There is no reasonable interchangeability between drug therapies used to treat other diseases and ACTH drug therapies used to stimulate the Melanocortin System.

20.     Acthar is an ACTH. It is the only FDA approved long-acting ACTH available in the US. It is also the only FDA approved long-acting melanocortin agonist available in the US.

21.     ACTH products have been approved for use as diagnostic agents which are used to test for the presence of certain conditions or diseases. However, those products are short acting and are not used as therapies in treating illnesses.

22.     Consumers faced with a small but significant non-transitory increase in the price of ACTH therapeutic drugs, cannot and will not shift to other classes of drugs such that the increase in price will be rendered unprofitable. This is evidenced by the fact that Questcor, the only supplier of ACTH for therapeutic purposes in the US, has raised the price of a vial of Acthar to $28,000 and is able to maintain that price.

23. FDA regulation and the difficulty of developing and manufacturing ACTH based therapeutic drugs reduce or eliminate any "supply elasticity" whereby manufacturers of other drug therapies convert their existing manufacturing facilities to the manufacture of ACTH therapeutic drugs.

24. The relevant geographic market for ACTH therapeutic drugs is national because therapeutic ACTH drugs cannot be sold in the US without FDA approval.

**The Infantile Spasms Market**

25. Babies and little children suffering from Infantile Spasms must have treatments that cure that affliction. Without it they suffer from epileptic type seizures and other symptoms of the disease. If untreated, they may suffer permanent brain or neurological damage and may develop other seizure disorders. The disease can be fatal. Only therapies that treat Infantile Spasm Syndrome can meet the medical needs of these patients. Therapies for other diseases do not cure or control Infantile Spasms and are not substitutes for Infantile Spasm therapeutics. There is no reasonable interchangeability between drug therapies used to treat other diseases and drug therapies used to treat children with Infantile Spasms.

26. Consumers faced with a small but significant non-transitory increase in the price of therapeutic drugs to treat Infantile Spasms, cannot and will not shift to other drug treatments for Infantile Spasms such that the increase in price will be rendered unprofitable. This is evidenced by the fact that Questcor has raised the price of a vial of Acthar to $28,000 and is able to maintain that price.

27. There are also regulatory entry barriers that limit the Relevant Market to first line therapies for Infantile Spasms. In 2010, Questcor obtained from the FDA, "Orphan Drug designation" for Acthar for Infantile Spasms under the Orphan Drug Act. Despite the fact that Acthar is not patented, the Orphan Drug designation gives Questcor a seven year exclusive right to sell Acthar, and its chemical equivalent, for Infantile Spasms with immunity from generic competition. Questcor's exclusive marketing right extends to 2017. Therapies that are excluded by Acthar's Orphans

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1  Drug Designation (generic versions of Acthar) cannot be labeled or marketed for the
2  treatment of Infantile Spasms.

3      28.    FDA regulation and the difficulty of developing and manufacturing
4  treatments for Infantile Spasms preclude any "supply elasticity" whereby
5  manufacturers of other drug therapies convert their manufacturing facilities to the
6  manufacture of Infantile Spasm therapies.

7      29.    The relevant geographic market for first line Infantile Spasm drug
8  therapies is national because therapeutic drugs cannot be marketed in the US for
9  Infantile Spasms without FDA approval.

10  **The Nephrotic Syndrome Market**

11      30.    Nephrotic Syndrome is a condition in which excessive amounts of
12  protein pass through the kidneys and are secreted through the urine. This results in
13  kidney damage and can lead to kidney failure. Nephrotic Syndrome is treated on a
14  first and second line basis with corticosteroids, such as Prednisone, or
15  immunosuppressant drugs. In some patients the disease does not respond to these
16  treatments and in others the patient cannot tolerate the drugs' side effects. In such
17  cases, ACTH (Acthar) is the primary and dominant treatment of last resort. Only
18  therapies that treat Nephrotic Syndrome effectively can meet the medical needs of
19  Nephrotic Syndrome patients who do not respond to or cannot tolerate traditional first
20  and second line therapies for that illness. Therapies for other diseases do not cure or
21  control Nephrotic Syndrome and are not substitutes for last resort treatments for
22  Nephrotic Syndrome. There is no reasonable interchangeability between drug
23  therapies used to treat other diseases and drug therapies used to treat victims of
24  Nephrotic Syndrome.

25      31.    Consumers faced with a small but significant non-transitory increase in
26  the price of last resort therapeutic drugs to treat Nephrotic Syndrome cannot and will
27  not shift to other drug treatments such that the increase in price will be rendered
28

1    unprofitable. This is evidenced by the fact that Questcor has raised the price of a vial

2    of Acthar to $28,000 and is able to maintain that price.

3         32.    There are also regulatory entry barriers that limit the Relevant Market to

4    therapies of last resort for Nephrotic Syndrome. Therapies for other conditions cannot

5    be marketed for the treatment of Nephrotic Syndrome without FDA approval. In

6    addition, it is particularly difficult for the maker of a generic drug to obtain FDA

7    approval when it is trying to prove that its synthetically manufactured product, which

8    is manufactured in a laboratory setting, is the biopharmaceutical equivalent of a drug

9    such as Acthar which is produced from animals.

10        33.    FDA regulation and the difficulty of developing and manufacturing

11   treatments for Nephrotic Syndrome preclude any "supply elasticity" whereby

12   manufacturers of other drug therapies convert their manufacturing facilities to the

13   manufacture of Nephrotic Syndrome therapies.

14        34.    The relevant geographic market for therapies of last resort for Nephrotic

15   Syndrome is national because such therapies cannot be marketed in the US for

16   Nephrotic Syndrome without FDA approval.

17   **Questcor Has Market and Monopoly Power in the Relevant Markets**

18        35.    There are no meaningful substitutes for Acthar or ACTH in the Relevant

19   Markets. Nor are manufacturers of other pharmaceutical products able to shift their

20   production to the manufacture of Acthar or other ACTH products. Even if they were

21   able to do so, they could not sell those products without first obtaining FDA approval.

22   Questcor has market and monopoly power in all of the Relevant Markets.

23        36.    Questcor's monopoly power in all three of the Relevant Markets is

24   further evidenced by a single price increase that it imposed in 2007. In that year,

25   Questcor raised the price of Acthar from $1,650 per vial to $23,000 per vial, an

26   overnight increase of over 1,300%. Questcor's ability to make that price increase

27   "stick" is conclusive evidence of its market and monopoly power.

28

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

### The ACTH Therapeutic Drug Market

37.     In the ACTH Therapeutic Drug Market, Acthar is the only FDA approved long acting ACTH therapeutic drug available to consumers in the United States.

38.     Questcor's market and monopoly power in the ACTH Therapeutic Drug Market is further protected by the fact that other chemical variations of ACTH for use as therapeutic drugs require FDA approval for sale in the United States.

39.     Questcor effectively has 100% of the market for ACTH Therapeutic Drugs.  It has market and monopoly power in that market which is dramatically demonstrated by its continued ability to charge $28,000 for a vial of Acthar.

### The Infantile Spasms Market

40.     In the Infantile Spasms Market, Acthar is considered the "gold standard" of treatment.

41.     Questcor's market and monopoly power in the Infantile Spasms Market is protected by the Orphan Drug Designation that protects Questcor from generic competition to Acthar.  Its monopoly position is further protected by the fact that alternative therapies, that would not be precluded by the Orphan Designation, require FDA approval if they are to be marketed as therapies for Infantile Spasms.

42.     Questcor admits that it has more than 50% share of the Infantile Spasms Market and its actual market share may be far greater.  Questcor's market and monopoly power in the Infantile Spasms Market is demonstrated dramatically by its continued ability to charge $28,000 for a vial of Acthar.

### The Nephrotic Syndrome Market

43.     In the Nephrotic Syndrome Market, Acthar is the primary and dominant treatment of last resort for Nephrotic Syndrome patients who do not respond to or cannot tolerate first or second line treatments for that disease.

44. Questcor's market and monopoly power in the Nephrotic Syndrome Market is further protected by the fact that alternative drug therapies require FDA approval if they are to be marketed as therapies for Nephrotic Syndrome.

45. Questcor's market and monopoly power in the Nephrotic Syndrome Market is demonstrated dramatically by its continued ability to charge $28,000 for a vial of Acthar.

**Retrophin's Acquisition of Synacthen Threatened Questcor's Monopoly**

46. Synacthen is an ACTH derivative that has been sold for years outside of the US and has been used successfully to treat patients with Infantile Spasms and Nephrotic Syndrome in other countries. It has not been commercially developed in the US and it has not been submitted to the FDA for approval for therapeutic use.

47. Synacthen is similar, but not chemically identical, to Acthar. Both drugs share the identical sequence of the first 24 amino acids in their respective molecules. This sequence of amino acids gives both drugs their therapeutic properties. Acthar, however, has a longer amino acid chain. The two drugs are also produced in very different ways. Acthar is "porcine derived." It is extracted from the pituitary gland found in the brains of slaughtered pigs. Synacthen, by contrast, is synthetically manufactured in a laboratory setting. These differences give Synacthen three competitive advantages over Acthar. First, Synacthen is less expensive to manufacture. Second, because it is manufactured in a controlled setting, the product is less susceptible to variation. Third, consumers are more comfortable knowing that the drugs they are taking – or giving to their infants – are produced in a sterile environment rather than being derived from slaughtered animals.

48. Retrophin planned to purchase the rights to Synacthen, obtain FDA approval for its use as a therapeutic, and enter the Relevant Markets in competition with Questcor. Retrophin planned to price Synacthen at a fraction of the price charged by Questcor and use its competitive pricing and Synacthen's other competitive advantages to take substantial market share from Acthar.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

49.     In the late summer of 2012, Retrophin entered negotiations with Novartis to purchase the rights to manufacture and sell Synacthen in the US. After approximately nine months of due diligence and negotiations, Retrophin and Novartis agreed to terms on which Retrophin would acquire the rights to Synacthen. Final documents had been prepared and were merely awaiting the parties' signatures. The signing was set for June 11, 2013. Retrophin had prepared a press release announcing the deal.

50.     In anticipation of the transaction, Retrophin had prepared a plan to obtain regulatory approvals for, and sell Synacthen. It devised a strategy for going directly to Phase III clinical drug trials in order to obtain FDA approval for the use of Synacthen to treat Infantile Spasms and Nephrotic Syndrome. It also planned to file a Treatment Investigational New Drug Application which, if approved by the FDA, would have allowed Retrophin to offer Synacthen to patients for free while it was awaiting FDA approval to market Synacthen for Infantile Spasms and Nephrotic Syndrome. This would have given patients immediate relief from Questcor's pricing and would have developed substantial goodwill for Retrophin and Synacthen in both the patient and medical communities. Retrophin believed that the history of Synacthen's use in other countries would aid it in obtaining FDA approval.

51.     In anticipation of the product launch, Retrophin had put in place a clinical apparatus to conduct clinical trials necessary to obtain FDA approval. It planned to begin to market Synacthen upon FDA approval.

52.     Given its expertise as a biopharmaceutical company focusing on rare diseases, Retrophin was ready, willing and able to enter the Relevant Markets with Synacthen subject to FDA approval. Retrophin's entry into the Relevant Markets would have broken Questcor's monopoly. The result would have been unambiguously procompetitive. Retrophin's entry into the market and its introduction of Synacthen as an alternative to Acthar would have benefitted all participants in the markets – other than Questcor. Prices to patients and payors would have dropped;

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1  patients who were unable to pay for the drug would have been able to get it; other

2  patients who were forced by Questcor's pricing to limit their dosages of the drug

3  would have been able to take the medically prescribed amounts; and Retrophin would

4  have earned substantial profits from sales of its product.

5  **Questcor Illegally Acquires Synacthen to Preserve its Monopoly**

6  53.  Faced with a direct threat to its monopoly, Questcor acted to preserve its

7  market dominance and its ability to charge extraordinary prices for Acthar.  It swept in

8  and secretly negotiated a deal to buy the rights to Synacthen from Novartis.

9  54.  On June 11, 2013, the very day that Retrophin and Novartis were to sign

10  their agreement, Questcor acquired the rights to Synacthen.  The acquisition was

11  closed on the day of the announcement.  Questcor made no Premerger Notification

12  filing with the Department of Justice and the Federal Trade Commission under the

13  Hart Scott Rodino Act Antitrust Improvements Act of 1976.  Nor did it observe the

14  waiting period provided by the Hart Scott Act before closing the acquisition.

15  55.  As part of the Agreement, the entire risk of an antitrust challenge to the

16  transaction is borne by Questcor.  The Agreement between Novartis and Questcor

17  provides that Novartis receives the full consideration it is entitled to from Questcor

18  even if the US antitrust enforcement agencies (The Federal Trade Commission or the

19  Department of Justice) force Questcor to divest its rights in Synacthen.  If such a

20  divestiture occurs, the Agreement provides that Novartis keeps the entire $60 million

21  that Questcor has paid it and Questcor will make all future milestone payments

22  required by the Agreement – an amount in excess of $75 million.  In short, the

23  acquisition of the rights to Synacthen was so important to Questcor that it put at least

24  $135 million at risk to keep Synacthen out of Retrophin's hands.  There was no

25  procompetitive aspect of Questcor's acquisition of Synacthen.

26  56.  Questcor's acquisition of the rights to Synacthen unreasonably restrained

27  trade, maintained Questcor's monopolies and may result in a substantial lessening of

28  competition in the Relevant Markets.  As a result of Questcor's acquisition of the

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1  rights to Synacthen, prices to patients and payors for Acthar will remain at monopoly

2  levels;  patients who are unable to pay for the drug will not be been able to get it;

3  other patients who are forced by Questcor's pricing to limit their dosages of the drug

4  will not be able to take the medically prescribed amounts; and Retrophin will not earn

5  the  substantial profits it expected to earn from selling Synacthen at a fraction of the

6  price Questcor charges for Acthar.

## Retrophin Is Continuing to Try to Enter the Relevant Markets

7

8  57.    Despite Questcor's anticompetitive and monopolistic conduct, Retrophin

9  is continuing to try to enter the Relevant Product Markets.  To that end, it has taken

10  the highly unusual step of trying to create from scratch a drug – that it has designated

11  as RE-034 – that will match Synacthen.  Retrophin is endeavoring to create a new

12  formulation of the drug that will incorporate the same active pharmaceutical

13  ingredient used in Synacthen and match Synacthen's therapeutic effects for patients

14  suffering from Infantile Spasms and Nephrotic Syndrome.

15  58.    Retrophin's efforts to develop RE-034 will take substantial time and

16  money and will require FDA approval.  It will also require that the drug successfully

17  complete both Phase I and Phase III clinical trials for both Infantile Spasms and

18  Nephrotic Syndrome.  There is no guarantee that RE-034 will succeed in the clinical

19  trials or that Retrophin will succeed in obtaining FDA approval or entering the

20  Relevant Markets.

21  59.    Entering the Relevant Markets through RE-034 is more difficult, risky

22  and time consuming than entering those markets through Synacthen.  Synacthen is an

23  existing product that has been manufactured and used outside of the US for decades in

24  the treatment of a variety of illnesses, including Infantile Spasms and Nephrotic

25  Syndrome.  The owner of the rights to Synacthen has the information, know-how and

26  ability to manufacture the drug and has decades of clinical data from outside the

27  United States that can be used to facilitate and speed the regulatory approval process

28

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1    in the US. Retrophin will need to develop all of that knowledge from scratch in

2    seeking to enter the Relevant Markets with RE-034.

3         60.    Entering the Relevant Markets through RE-034 will be more difficult,

4    less likely to succeed and take longer than entry into those markets through the

5    acquisition of Synacthen. Questcor's conduct has delayed, and may entirely foreclose,

6    Retrophin from entering the Relevant Markets.

7    **Questcor Has Damaged Competition in the Relevant Markets and Has Caused**

8    **Retrophin to Suffer Both Injury in Fact and Antitrust Injury**

9         61.    Questcor's unlawful acquisition of the rights to Synacthen has foreclosed

10   or delayed Retrophin from entering the Relevant Markets, has restrained trade, and

11   has preserved and entrenched Questcor's monopoly and may substantially lessen

12   competition. As a result, competition in the Relevant Markets has been damaged and

13   Retrophin has been injured. Those injuries are intertwined and inseparable.

14   Excluding or delaying Retrophin from entering the Relevant Markets with Synacthen

15   was and is an integral aspect of Questcor's anticompetitive conduct.

16        62.    Retrophin has suffered and continues to suffer injury in fact from

17   Questcor's acquisition of the rights to Synacthen and the preservation of its monopoly.

18        63.    Retrophin has suffered and continues to suffer antitrust injury from

19   Questcor's acquisition of the rights to Synacthen and the preservation of its monopoly.

20   Retrophin has been injured directly as a result of Questcor's unlawful conduct.

21   Retrophin is a potential entrant into the Relevant Markets and, but for Questcor's

22   unlawful conduct, would be entering those markets with Synacthen. There are no

23   aspects of Questcor's conduct that are beneficial to competition. Retrophin's injury is

24   an integral aspect of Questcor's unlawful conduct; flows from that which renders

25   Questcor's conduct unlawful; and its injury is of the type the antitrust laws were

26   intended to prevent.

27

28

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# FIRST CAUSE OF ACTION

## (COMBINATION IN THE RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT)

64.    Retrophin repeats and realleges the allegations set forth in paragraphs 1 through 63 as if fully set forth herein.

65.    In acquiring the rights to Synacthen, Questcor entered into a contract, conspiracy or combination that unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

66.    Questcor's acquisition of the rights to Synacthen unlawfully and unreasonably restrains trade by preventing or delaying Retrophin from entering the Relevant Markets and challenging Questcor's market power in those markets.

67.    Questcor's violation of Section 1 of the Sherman Act has caused, and will cause, damages to Retrophin in an amount to be determined at trial, such damages to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15.

68.    Questcor's unlawful conduct is ongoing, irreparably injures Retrophin, harms the public interest, and unless restrained will continue.  Retrophin has no adequate remedy at law.

# SECOND CAUSE OF ACTION

## (MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT)

69.    Retrophin repeats and realleges the allegations set forth in paragraphs 1 through 68 as if fully set forth herein.

70.    Questcor has monopoly power in the Relevant Markets.  In acquiring the rights to Synacthen in the US, Questcor has intentionally acted to maintain and entrench its monopoly position in Relevant Markets, and has done so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

71.     Questcor's violation of Section 2 of the Sherman Act has caused, and will cause, damages to Retrophin in an amount to be determined at trial, such damages to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15.

72.     Questcor's unlawful conduct is ongoing, irreparably injures Retrophin, harms the public interest, and unless restrained will continue.  Retrophin has no adequate remedy at law.

### THIRD CAUSE OF ACTION

### (ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT)

73.     Retrophin repeats and realleges the allegations set forth in paragraphs 1 through 72 as if fully set forth herein.

74.     In acquiring the rights to Synacthen, Questcor has engaged in monopolistic and anticompetitive conduct with the specific purpose and intent of monopolizing the Relevant Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

75.     The sole purpose of Questcor's acquisition of the rights to Synacthen is to enable Questcor to gain or maintain a monopoly position in the Relevant Markets.

76.     A dangerous probability exists that Questcor has succeeded, and if not restrained, will continue to succeed in monopolizing the Relevant Markets.

77.     Questcor's acts of attempted monopolization has unlawfully prevented and delayed Retrophin from entering the Relevant Markets and otherwise injure competition in those markets by reducing choice, inflating prices, and lessening innovation.

78.     Questcor's violation of Section 2 of the Sherman Act has caused, and will cause, damages to Retrophin in an amount to be determined at trial, such damages to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

16

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents

79. Questcor's unlawful conduct is ongoing, irreparably injures Retrophin, harms the public interest, and unless restrained will continue. Retrophin has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (UNLAWFUL MERGER IN VIOLATION OF SECTION 7 OF THE CLAYTON ACT)

80. Retrophin repeats and realleges the allegations set forth in paragraphs 1 through 79 as if fully set forth herein.

81. Questcor's acquisition of the rights to Synacthen is likely to substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

82. Questcor's acquisition of the rights to Synacthen is likely to result in a substantial lessening of competition in the Relevant Markets.

83. Questcor's violation of Section 7 of the Clayton Act has caused, and will cause, damages to Retrophin in an amount to be determined at trial, such damages to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15.

84. Questcor's unlawful conduct is ongoing, irreparably injures Retrophin, harms the public interest, and unless restrained will continue. Retrophin has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (VIOLATION OF CALIFORNIA ANTITRUST LAWS)

85. Retrophin repeats and realleges the allegations set forth in paragraphs 1 through 84 as if fully set forth herein.

86. In acquiring the rights to Synacthen, Questcor entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the California antitrust laws referenced below. Questcor has acted in violation of these laws in an effort to maintain, entrench, and/or create a monopoly,

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and otherwise injure competition in the Relevant Markets. Questcor's conduct substantially affected commerce in California.

87. In acquiring the rights to Synacthen in the US, Questcor has maintained and entrenched its monopoly position in the Relevant Markets.

88. Questcor's acquisition of the rights to Synacthen is likely to result in a substantial lessening of competition in the Relevant Markets.

89. By reason of the foregoing, Questcor violated California's Cartwright Act, California Business and Professions Code §§ 16720 *et seq.*

90. Questcor's violation of California's Cartwright Act, California Business and Professions Code §§ 16720 *et seq.* has caused, and will cause, damages to Retrophin in an amount to be determined at trial, with such damages to be trebled.

91. Questcor's unlawful conduct is ongoing, irreparably injures Retrophin, harms the public interest, and unless restrained will continue. Retrophin has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

## (UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

92. Retrophin repeats and realleges the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

93. California Unfair Competition Law, Business and Professions Code Section 17200 *et seq.*, provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act."

94. Questcor's conduct as alleged herein meets the "unlawfulness" prong of California Business and Professions Code §§ 17200 *et seq.* Questcor has committed and continues to commit unlawful business practices by illegally acquiring the rights to Synacthen and engaging in anticompetitive and monopolistic conduct in violation of antitrust laws.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

95.     Questcor's conduct as alleged herein also meets the "unfair" prong of California Business and Professions Code §§ 17200 *et seq.*  Questcor's anticompetitive and monopolistic conduct harms the public interest, threatens an incipient violation of an antitrust law and/or violates the policy or spirit of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

96.     Pursuant to California Business and Professions Code § 17203, Retrophin seeks the disgorgement of Questcor's profits earned by its unlawful and/or unfair business practices to the extent it constitutes restitution to Retrophin.

97.     Pursuant to California Business and Professions Code § 17203, Retrophin seeks an order of this court enjoining Questcor from continuing to engage, use, or employ the unlawful and/or unfair business practices complained of herein.

98.     Questcor's wrongful conduct has caused and, if it continues, will continue to cause irreparable harm to Retrophin that cannot be fully compensated by money and for which Retrophin has no adequate remedy at law.  Retrophin is thus entitled to permanent injunctive relief preventing Questcor from continuing to engage in the conduct alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Retrophin respectfully demands judgment against Questcor:

A.      DECLARING that Questcor's acquisition of the rights to Synacthen is an unlawful contract, combination or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act;

B.      DECLARING that Questcor's acquisition of the rights to Synacthen constitutes unlawful monopolization of the Relevant Markets in violation of Section 2 of the Sherman Act;

C.      DECLARING that Questcor's acquisition of the rights to Synacthen constitutes an unlawful attempt to monopolize the Relevant Markets in violation of Section 2 of the Sherman Act;

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

D. DECLARING that Questcor's acquisition of the rights to Synacthen constitutes an acquisition that may result in a substantial lessening of competition in the Relevant Markets in violation of Section 7 of the Clayton Act;

E. DECLARING that Questcor's acquisition of the rights to Synacthen constitutes an unlawful trust in restraint of trade and commerce in violation of California Business and Professions Code §§ 16720 *et seq.*;

F. DECLARING that Questcor's acquisition of the rights to Synacthen constitutes unfair competition in violation of California Business and Professions Code § 17200 *et seq.*;

G. PERMANENTLY ENJOINING Questcor from enforcing or maintaining its Rights to Synacthen under its agreement with Novartis or any similar formal or informal agreement;

H. PERMANENTLY ENJOINING Questcor from engaging in further anticompetitive conduct in violation of Section 1 of the Sherman Act;

I. PERMANENTLY ENJOINING Questcor from engaging in further anticompetitive conduct in violation of Section 2 of the Sherman Act;

J. PERMANENTLY ENJOINING Questcor from engaging in further anticompetitive conduct in violation of Section 7 of the Clayton Act;

K. PERMANENTLY ENJOINING Questcor from engaging in further anticompetitive conduct in violation of California Business and Professions Code §§ 16720, *et seq.*;

L. PERMANENTLY ENJOINING Questcor from engaging in further unlawful and/or unfair business practices in violation of California Business and Professions Code § 17200 *et seq.*;

M. DISGORGING any profits generated by Questcor as a result of its unlawful and/or unfair business practices to the extent it constitutes restitution to Retrophin;

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

N.      AWARDING Retrophin damages in an amount to be proved at trial, such damages to be trebled, including its costs and attorneys' fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 and/or California's Cartwright Act, California Business and Professions Code §§ 16720, *et seq.*;

O.      AWARDING Retrophin its costs, expenses and attorneys' fees incurred in connection with the action;

P.      AWARDING Retrophin interest to the maximum extent permitted by law; and

Q.      GRANTING Retrophin such other and further relief as this Court deems just and proper.

Dated: January 7, 2014

KATTEN MUCHIN ROSENMAN LLP

By: _____

Kristin L. Holland
Attorneys for Plaintiff Retrophin, Inc.

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee: $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## DEMAND FOR JURY TRIAL

Retrophin hereby demands a trial by jury on all of its claims and causes of action.

Dated: January 7, 2014

KATTEN MUCHIN ROSENMAN LLP

By: _____

Kristin L. Holland
Attorneys for Plaintiff Retrophin, Inc.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Retrophin, Inc.

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Questcor Pharmaceuticals, Inc.

**(b)** County of Residence of First Listed Plaintiff    New York, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Orange, CA
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310-788-4400

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

N/A

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ Over $75k, TBD

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Plaintiff is suing defendant for entering an illegal agreement and engaging in conduct that violates federal and state antitrust and competition laws, 15 U.S.C. §§ 1, 2, 18, and California Business and Professions Code §§ 16720, et seq, California Business and Professions Code §§ 17200, et seq

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**    Case Number:    CV14-00026

CV-71 (11/13)    CIVIL COVER SHEET    Page 1 of 3

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No  If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?** Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?** Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☐ Yes ☒ No  If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☒ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Southern Division |

CV-71 (11/13)      CIVIL COVER SHEET      Page 2 of 3

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _K H Holland_     DATE: 1/7/2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT B

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware limited liability company; MAO-MSO RECOVERY II, LLC, SERIES PMPI, a Delaware limited liability company; and MSPA CLAIMS 1, LLC, a Florida limited liability company, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| MALLINCKRODT ARD INC., a California corporation; MALLINCKRODT PLC, an Irish public limited company; EXPRESS SCRIPTS HOLDING COMPANY, a Delaware corporation; EXPRESS SCRIPTS, INC., a Delaware corporation; CURASCRIPT, INC., d/b/a CURASCRIPT, SD, a Delaware corporation; and UNITED BIOSOURCE LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## FIRST AMENDED
## CLASS ACTION COMPLAINT

Plaintiffs, MSP RECOVERY CLAIMS, SERIES LLC, a Delaware limited liability company; MAO-MSO RECOVERY II, LLC, SERIES PMPI, a Delaware limited liability company; and MSPA CLAIMS 1, LLC, a Florida limited liability company (collectively "Plaintiffs"), on behalf of themselves and the Class described herein, bring this action against MALLINCKRODT ARD INC., a California corporation, MALLINCKRODT PLC, an Irish public limited company, (collectively "Mallinckrodt"); EXPRESS SCRIPTS HOLDING COMPANY, a Delaware corporation, EXPRESS SCRIPTS, INC., a Delaware corporation; CURASCRIPT, INC. d/b/a CURASCRIPT, SD, ("CuraScript"); and UNITED BIOSOURCE LLC, a Delaware limited

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

liability company, ("UBC") (collectively "Express Scripts"), (collectively "Defendants") and allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs are assignees of recovery rights originally held by Medicare Advantage ("MA") Plans, including Medicare Advantage Organizations, Health Maintenance Organizations, Management Service Organizations, Independent Physician Associations, and other Medicare first tier and downstream entities, all of whom act as third party payers, providing Medicare benefits to their beneficiaries. (These entities are generally referred to herein as "Medicare Advantage Plans" or "MA Plans"). Plaintiffs bring this action to challenge Defendants' monopolistic and anti-competitive pricing scheme for the drug H.P. Acthar Gel ("Acthar").

2.     Mallinckrodt manufactures, markets, distributes and sells Acthar, currently identified by the National Drug Code ("NDC") No. 63004871001. Acthar is an adrenocorticotropic hormone ("ACTH") used to treat rare illnesses, including but not limited to infantile spasms in children under two years of age, multiple sclerosis, nephrotic syndrome and rheumatology related conditions (e.g., collagen diseases). Acthar currently is the only ACTH product sold in the United States ("U.S.").

3.     Mallinckrodt acquired its Acthar monopoly in 2001 when its predecessor Questcor purchased Acthar from Aventis Pharmaceuticals, Inc. ("Aventis") for $100,000.

4.     Questcor subsequently contracted with Express Scripts to distribute Acthar. Since 2007, Acthar has been exclusively distributed by Express Scripts and its wholly-owned subsidiary, CuraScript. Acthar prescriptions are obtained through the "Acthar Support & Access Program," which is managed by UBC.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

5.     Defendants have engaged in egregious price-gouging, taking advantage of the fact that people have no other choices besides Achtar and that parents will pay almost anything to save the life of a child. In 2001, when Questcor acquired Acthar, the average cost was $40.00 per vial. Prior to Express Scripts becoming the exclusive distributor of Acthar, the price per vial was $1,980.00. After the contract with Express Scripts was signed, the price per vial was increased to over $27,927.80. Today, a vial of Acthar costs over $43,000.00, amounting to an 107,400% increase in price since 2001. As discussed below, Defendants were able to take advantage of consumers, government payers, and private payers by deliberately shelving a low cost synthetic competing drug, while increasingly raising the price of Acthar, the only ACTH on the market.

6.     Between 2013 and 2017, Plaintiffs' Assignors paid $125,550,620.09 on Acthar prescriptions for their beneficiaries.

7.     As alleged in greater detail below, the Defendants' monopolistic and anti-competitive behavior, which has allowed them to drastically increase the cost of Acthar, has violated numerous federal and state antitrust and consumer protection laws.

8.     Defendants behavior has caused third-party payers, including Plaintiffs' Assignors, to overpay for Acthar on behalf of thousands of individual beneficiaries throughout the U.S., including Illinois.

9.     Therefore, this action seeks damages, damage multipliers, and injunctive relief under federal antitrust, state antitrust, and consumer protection laws to put an end to this anti-consumer behavior.

## JURISDICTION AND VENUE

10.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees against

3

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Defendants for the injuries sustained by Plaintiffs and the members of the Class described herein by reason of the violations of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§§ 1, 2, 3).

11.     Jurisdiction is conferred upon this Court by 18 U.S.C. § 1331 and § 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367.

12.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the class is a citizen of a state different from the Defendants and the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

13.     Venue is proper in this District pursuant to to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period (August 1, 2007 to the Present), Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affecting interstate trade and commerce, discussed below, has been carried out in this District.

14.     Acthar is sold and distributed throughout the U.S. and the unlawful activities alleged in this Complaint have occurred in and have had a substantial effect on interstate commerce.

## THE PARTIES

15.     Plaintiff MSP RECOVERY CLAIMS, SERIES LLC, is a Delaware limited liability company with its principal place of business located at 2701 S. Le Jeune Rd., Coral Gables, Florida 33134. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries

4

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

for which Defendants are liable. As alleged below, various assignments have been allocated to specific numbered entities within MSP RECOVERY CLAIMS, SERIES LLC.

16.  Series 16-11-509 is a series of MSP Recovery Claims, Series LLC. Series 16-11-509 is a Delaware designation for the holdings of SummaCare, Inc. ("SummaCare").

17.  Series 16-08-483 is a series of MSP Recovery Claims, Series LLC. Series 16-08-483 is a Delaware designation for the holdings of EmblemHealth Services Company, LLC ("Emblem").

18.  Series 15-09-157 is a series of MSP Recovery Claims, Series LLC. Series 15-09-157 is a Delaware designation for the holdings of ConnectiCare, Inc. ("ConnectiCare").

19.  Series 15-08-25 is a series of MSP Recovery Claims, Series LLC. Series 15-08-25 is a Delaware designation for the holdings of University Health Care MSO, Inc. ("UNHC").

20.  Series 15-12-404 is a series of MSP Recovery Claims, Series LLC. Series 15-12-404 is a Delaware designation for the holdings of Alianza Profesional de Cuidado Medico ("APCM").

21.  Plaintiff MSPA CLAIMS 1, LLC, is a Florida limited liability company, with its principal place of business located at 2600 S. Douglas Rd., Suite 1008, Coral Gables, Florida 33134. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries for which Defendants are liable.

22.  Plaintiff, MAO-MSO RECOVERY II, LLC, SERIES PMPI, is a Delaware limited liability company with its principal place of business at 45 Legion Drive, Cresskill, New Jersey 07626. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes

Case 2:18-cv-00279-DBMS Document #: 165 Filed: 04/15/19 Page 6 of 1239 PageID #:1920

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries for which Defendants are liable.

23.     Defendant MALLINCKRODT PLC, is an Irish public limited company, with its corporate headquarters in Staines-upon-Thames, United Kingdom. Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG.

24.     Mallinckrodt PLC purchased Questcor Pharmaceuticals ("Questcor") on August 14, 2014 for $5.9 billion. At the time of acquisition, Acthar was essentially the only product sold by Questcor. With Mallinckrodt PLC's acquisition, Questcor became a wholly-owned subsidiary of Mallinckrodt PLC and its name was changed to Mallinckrodt ARD, Inc.

25.     For clarity where necessary, the entity that existed prior to the Mallinckrodt acquisition in 2007 will be referred to as Questcor.

26.     Defendant MALLINCKRODT ARD, INC., is a California corporation with its principal place of business at 675 McDonnell Blvd., Hazelwood, Missouri 63042.

27.     Mallinckrodt PLC and Mallinckrodt ARD, Inc. are collectively referred to as "Mallinckrodt." Mallinckrodt will be used when discussing actions by the manufacturer of Acthar after the 2014 acquisition of Questcor.

28.     Defendant EXPRESS SCRIPTS HOLDING COMPANY, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.

29.     Defendant EXPRESS SCRIPTS, INC., is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.

30.     Collectively Express Scripts Holding Company and Express Scripts, Inc. are referred to as "ESI."

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

31.     ESI is one of the largest Pharmacy Benefit Managers ("PBM") in the U.S., with a market share of approximately 24%.

32.     Defendant, CURASCRIPT, INC., d/b/a CuraScript, SD, f/k/a CuraScript Pharmacy, Inc. ("CuraScript") is a Delaware corporation with its principal place of business at 255 Technology Park, Lake Mary, Florida 32746.

33.     CuraScript is a specialty distribution company and a wholly-owned subsidiary of ESI. ESI acquired CuraScript in January 2004. In October 2005, ESI acquired Priority Healthcare Corporation, a large specialty pharmacy and distribution company. With the addition of Priority Healthcare Corporation, CuraScript became one of the largest specialty pharmacy and distribution companies in the U.S., with over $3 billion in annual revenue.

34.     Defendant UNITED BIOSOURCE, LLC f/k/a United BioSource Corporation ("UBC"), is a Delaware limited liability company with its principal place of business at 920 Harvest Drive, Blue Bell, Pennsylvania 19422.

35.     UBC provides pharmaceutical and patient support services and was a wholly-owned subsidiary of ESI acquired in the 2012 purchase of Medco. UBC was purchased by Avista Capital Partners, a private equity firm in November 2017.

36.     ESI, CuraScript, and UBC are collectively referred to as "Express Scripts."

37.     Mallinckrodt and Express Scripts are collectively referred to as "Defendants."

### INTRODUCTION TO PLAINTIFFS' ASSIGNORS:
### THIRD PARTY PAYERS THAT ARE MEDICARE ADVANTAGE PLANS

38.     As stated above, Plaintiffs' assignors are MA Plans. With regard to the allegations herein, MA Plans operate like any third party payer: providing payment for medical items and services for their beneficiaries. This section is provided to introduce and clarify the types of MA Plans.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## I.     Medicare Advantage Plans

39.     Medicare benefits are divided into four parts. Medicare Part A, 42 U.S.C. § 1395c, *et seq.*, provides coverage for costs of inpatient hospital services and is available without payment of premiums to most persons who paid Medicare payroll taxes prior to becoming Medicare-eligible. Medicare Part B, 42 U.S.C. § 1395j, *et seq.*, funded through premiums and general tax revenue, is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of his or her medically-necessary outpatient services, such as doctors' office visits. Medicare Part C, 42 U.S.C. § 1395w-21(a)(1), *et seq.*, permits individuals eligible for Medicare to elect to receive their Medicare benefits through enrollment in an MA Plan. Medicare Part D, 42 U.S.C. § 1395w-101 *et seq.*, provides voluntary prescription drug coverage to Medicare enrollees.

### A.     Medicare Advantage Organizations

40.     Medicare Advantage Organizations ("MAOs")[1] enter into contracts with the Centers for Medicare and Medicaid Services ("CMS") to administer and provide the same benefits under traditional Medicare. 42 U.S.C. §§ 1395w-21, 1395w-23. Pursuant to this contract, MAOs receive a fixed payment from CMS for each enrollee. MAOs do not issue a Medicare "insurance policy" but, rather, send out a document describing the Medicare benefits that beneficiaries receive. They do not pay benefits pursuant to a "policy," but rather under a statutory framework. Thus, MAOs pay healthcare providers directly for the care received by Part C beneficiaries. If the

---

[1] Consistent with the Medicare Advantage statutory terminology and framework, Plaintiffs refer to "MA Plans" as inclusive of *all* entities described herein that provide benefits to enrolled beneficiaries. "MAOs" are the subset of MA Plans that contract directly with CMS, as described in this paragraph.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

costs of this care exceed the fixed payment received from the government, the MAO assumes the risk and cost. Some Health Maintenance Organizations ("HMOs") are also MAOs.

41.     To become an MAO, a private insurer must enter a bidding process, meeting certain requirements set by CMS. Additionally, in providing the basic benefits offered to traditional Medicare beneficiaries, MAOs must abide by coverage determinations provided by CMS and all coverage disputes between beneficiaries and MAOs must go through the traditional Medicare appeals process. CMS sets the fixed rate at which MAOs will be remunerated per enrollee and establishes services the MAO must provide.

42.     Currently, there are over 16 million individuals enrolled in MA Plans nationwide. More than 37 million individuals are enrolled in Medicare prescription drug plans, either on a stand-alone basis or in connection with an MA Plan.

**B.      First-Tier and Downstream Entities**

43.     A first-tier entity is any party that enters into a written arrangement with an MAO, acceptable to CMS, to provide administrative or health care services for a Medicare-eligible individual under the MA program. 42 C.F.R. § 422.2; *see also Medicare Managed Care Manual*, Ch. 11 (Rev. 83, 04-25-07).

44.     A downstream entity is any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MAO (or applicant) and a first-tier entity. *See* 42 C.F.R. § 422.2.

45.     First-tier and downstream entities administer and provide Medicare services to the enrollees. The first-tier and downstream entities bear the full risk of loss pursuant to their contractual obligation with MAOs.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

46.     First-tier and downstream entities include Management Service Organizations ("MSOs") and Independent Physician Associations ("IPAs").

## II.     Medicare Prescription Drug Coverage

47.     Medicare does not offer its beneficiaries prescription drug coverage directly. Instead, prescription drug coverage is an optional benefit. Prescription drug benefits are provided by insurance companies and other private companies approved by Medicare ("Part D").

48.     Medicare beneficiaries have two options for obtaining Part D prescription drug coverage, (1) through their MA Plan that offers Part C benefits as well as prescription coverage; or (2) through a separate Medicare Prescription Drug Plan.

49.     Generally, MA Plans that offer Part C benefits include prescription drug benefits. In fact, an MA Plan that offers prescription drug coverage can disenroll a beneficiary if the beneficiary enrolls in a separate Part D plan instead of using the MA Plan's drug coverage.

50.     Plans that provide Part D coverage must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits.

51.     Part D has different stages of cost sharing until a beneficiary reaches a set limit on out-of-pocket costs for the year. For 2019, the limit on out-of-pocket costs is $5,100.00.[2] After that, the MA Plan pays most of the costs for the drug throughout the remainder of the year.

---

[2] *Catastropic Coverage*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/catastrophic-coverage

10

52.     MA Plans may require a deductible be met prior to paying for drug coverage. In 2019, the maximum deductible a beneficiary can be charged is $415.00.[3]  During the deductible stage, the beneficiary pays all costs for their prescriptions.

53.     Once the deductible is met, the initial coverage period begins. During this period, the beneficiary pays a portion of the drug's cost and the MA Plan pays the remainder. The amount paid by the beneficiary will be either a copayment or coinsurance. A copayment is a set amount for all drugs based on what tier the drug falls into on the MA Plan's drug formulary (e.g., $50 for brand-name drugs on Tier 1, $25 for brand-name drugs on Tier 2). With coinsurance, a beneficiary will pay a percentage of the cost (e.g. 25%) of the drug.

54.     Most Part D plans have a coverage gap called the "donut hole" wherein there is a temporary limit on what the Part D plan will cover. The coverage gap begins after the beneficiary and MA Plan have paid a certain amount for covered drugs. In 2019, once the cost has reached $3,820.00 spent on prescriptions, a beneficiary will enter the coverage gap.[4]

55.     During the coverage gap, the beneficiary pays 25% of the price for brand-name drugs and the MA Plan pays 75%. For generic drugs, the MA Plan pays 63% of the price and beneficiary pays 37%.[5]

56.     Once the beneficiary and MA Plan have spent $5,100.00, the beneficiary is out of the coverage gap. Once out of the coverage gap the beneficiary automatically gets "catastrophic coverage." This means the beneficiary only pays their copayment or coinsurance amount for the rest of the year.

---

[3] *Yearly Deductible for Drug Plans*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/yearly-deductible-for-drug-plans

[4] *Costs in the Coverage Gap*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/costs-in-the-coverage-gap

[5] Id.

11

Case #2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



"Medicare Made Clear, Part D Coverage & Costs," UnitedHealthcare (May 8, 2018), https://www.medicaremadeclear.com/basics/medicare-coverage-and-costs/medicare-part-d (last visited March 15, 2019).

57.     Because of the high cost of Acthar, a Part D beneficiary reaches the catastrophic coverage stage after one prescription. Therefore, the MA Plan bears the brunt of the cost of Acthar for the entire year.

## STANDING

58.     Plaintiffs hold irrevocable assignments of recovery rights from numerous MA Plans, collectively referred to as "Assignors" herein.

59.     Plaintiffs allege the following exemplar assignments to establish standing.

60.     On May 12, 2017, SummaCare irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery, LLC ("SummaCare Recovery Agreement").

12

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

61.     The SummaCare Recovery Agreement is attached hereto as **Exhibit A**[6], and expressly provides:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"… This assignment is irrevocable and absolute.

**Ex. A**, at 1-2.

62.     That same day, SummaCare executed a stand-alone assignment, attached hereto as **Exhibit B**, which states:

> Client hereby irrevocably assigns, transfers, and sets over to MSP Recovery, and any of its successors and assigns, for purposes of collection, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, including but not limited to Medicare Secondary Payer Act, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to Claims, including claims under consumer protection statutes and laws, and all information relating thereto, for claims payments made for or on behalf of beneficiaries, members and enrollees arising from dates of service beginning January 1, 2009 up to and including May 12, 2017, all of which shall constitute the "Assigned Claims"… This assignment is irrevocable and absolute.

**Ex. B**, at 1-2.

63.     Thereafter, on June 12, 2017, MSP Recovery LLC irrevocably assigned all rights under the SummaCare Assignment to Series 16-11-509, a series of MSP Recovery Claims, Series

---

[6] Plaintiffs have redacted confidential business information from all the assignment agreements.

LLC ("Series 16-11-509 Assignment"). The Series 16-11-509 Assignment is attached hereto as

**Exhibit C** and states:

> Assignor ... irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets" and "Assigned Documents"...as such terms are defined in the Recovery Agreement dated May 12, 2017, by and among SummaCare, Inc. ... and MSP Recovery, LLC ... irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

**Ex. C**, at 1.

64.     From 2013 to 2017, SummaCare spent approximately \$2,323,404.98 on Acthar prescriptions for its beneficiaries.[7]

65.     On May 3, 2016, Preferred Medical Plan, Inc. ("PMPI") irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery, LLC ("PMPI Recovery Agreement").

66.     The PMPI Recovery Agreement is attached hereto as **Exhibit D**, and expressly provides:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to subrogation) to pursue and/or recover monies for Client that Client had,

---

[7] The amounts Plaintiffs' Assignors allege herein are meant to be used merely to allege damages. These figures are derived from a single NDC code found throughout Plaintiffs claims data and records. Acthar has had multiple NDC codes that have been deemed inactive during the class period. Discovery will reveal if multiple NDC codes are associated with the schemes alleged herein.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = \$0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto … The Assignment shall be complete and irrevocable.

**Ex. D, § 3.1.**

67.     Thereafter, on August 8, 2016, MSP Recovery, LLC irrevocably assigned all rights under the PMPI Recovery Agreement to MAO-MSO Recovery II, LLC, Series PMPI ("MAO-MSO Assignment"). The MAO-MSO Assignment is attached as **Exhibit E** and states:

> Assignor hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims, plus all proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, of which shall constitute the "Assigned Claims".

**Ex. E, § 1.1.**

68.     From 2013 to 2017, PMPI spent approximately $193,950.00 on Acthar prescriptions for its beneficiaries.

69.     On June 25, 2015, Professional Health Choice ("PHC") irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSPA Claims XI, LLC ("PHC Recovery Agreement").

70.     The PHC Recovery Agreement is attached hereto as **Exhibit F**, and expressly provides:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSPA Claims, or its assigns, any and all of Client's right, title, ownership and

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

interest in and to all rights and entitlements, that Client has, may have had, or has asserted against any party including primary payors and/or third parties that may be liable to Client arising from or relating to the Claims related to services and/or supplies.

**Ex. F**, § 1.1.

71. Thereafter, MSPA Claims XI, LLC irrevocably assigned all rights, title, interest in

and ownership of Medicare Recovery Claims to MSP Recovery Services, LLC ("MSPA Claims

XI Assignment"), the assignment stating:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to only the Claims set forth in Services Entities Schedule 2 attached hereto.

72. That same day, MSP Recovery Services, LLC irrevocably assigned all rights, title,

interest in and ownership of Medicare Recovery Claims to MSPA Claims 1, LLC, stating:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted only as specifically delineated in the assignment agreement attached hereto as Item 1.

73. Thereafter, MSPA Claims XI, LLC irrevocably assigned all rights under the PHC

Recovery Agreement to MSPA Claims 1, LLC ("PHC Assignment") The PHC Assignment is

states:

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against any party including primary payors and/or third parties that may be liable to Assignor arising from or relating to the Claims … in the Claims Cost Recovery Agreement and Assignment of Claims and Causes of Action dated June 25, 2015 … irrespective of when the claims were vested in Client, inclusive of any and all causes of action, claims and demands of whatsoever nature, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies

16

that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

74.    From 2013 to 2017, PHC spent approximately $938,384.80 on Acthar prescriptions for its beneficiaries.

75.    On March 20, 2018, Emblem irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC, and MSP Recovery, LLC ("Emblem Assignment Agreement").[8]

76.    The Emblem Assignment Agreement is attached hereto as **Exhibit G** and expressly provides:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership, and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and Claims against primary payers and/or…third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable. … The assignment is irrevocable and absolute.

**Ex. G**, § 2(b).

77.    Thereafter, on April 4, 2018, MSP Recovery LLC, irrevocably assigned all rights under the Emblem Assignment Agreement to Series 16-08-483 ("Series 16-08-483 Assignment"). The Series 16-08-483 Assignment is attached as **Exhibit H** and states:

> MSP Recovery, LLC … hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, Series 16-08-483, … and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned

---

[8] The Assignment Agreement included the assignment of rights for Health Insurance Plan of Greater New York and Group Health Incorporated (Emblem subsidiaries). All three parties were signatories to the Assignment Agreement.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Claims", "Claims", "Assigned Assets", "Assigned Medicare Recovery Claims" and "Assigned Documents" (and all proceeds and products thereof) as such terms may be defined in the March 20, 2018 Assignment Agreement, irrespective of when the claims were vested, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that EmblemHealth Services Company, LLC, Group Health Incorporated and Health Insurance Plan of Greater New York, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to them arising from or relating to the Claims and all information relating thereto.

**Ex. H**, at 1.

78.     From 2013 to 2017, Emblem spent approximately $35,854,853.98 on Acthar prescriptions for its beneficiaries.

79.     On March 20, 2018, ConnectiCare irrevocably assigned all rights, title, interest in and ownership of Medicare recovery claims to Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC and MSP Recovery, LLC ("ConnectiCare Assignment").

80.     The ConnectiCare Assignment is attached hereto as **Exhibit I**, and expressly provides:

Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership, and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and Claims against primary payers and/or … third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable. This Assignment includes all of Assignor's right, title, and interest in and to the Assignor's any legal or equitable actions, rights, causes of action or lawsuits of any nature whatsoever, arising out of or in connection with the Assigned Medicare Recovery Claims. … The assignment is irrevocable and absolute.

**Ex. I**, at 2.

18

81.     Thereafter, on April 4, 2018, MSP Recovery, LLC irrevocably assigned all rights under the ConnectiCare Assignment to Series 15-09-157 ("Series 15-09-157 Assignment"). The Series 15-09-157 Assignment is attached hereto as **Exhibit J** and states:

> MSP Recovery, LLC ... hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, Series 15-09-157 ... and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all assigned Subject Medicare Recovery Claims inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment Agreement and in connection with the assigned Subject Medicare Recovery Claims and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the assigned Subject Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable as such terms may be defined in the March 20, 2018 Assignment Agreement, irrespective of when the claims were vested.

**Ex. J,** at 1.

82.     From 2013 to 2017, ConnectiCare spent approximately $27,692,937.30 on Acthar prescriptions for its beneficiaries.

83.     On November 23, 2015, UNHC irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery, LLC ("UNHC Recovery Agreement").

84.     The UNHC Recovery Agreement is attached hereto as **Exhibit K**, and expressly provides:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

**Ex. K**, § 4.1.

19

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

85.     Thereafter, on June 12, 2017, MSP Recovery LLC irrevocably assigned all rights under the UNHC Recovery Agreement to Series 15-08-25, LLC, a designated series of MSP Recovery Claims, Series LLC. ("Series 15-08-25 Assignment"). The Series 15-08-25 Assignment is attached hereto as **Exhibit L** and states:

> Assignor … irrevocably assigns, sells, transfers, conveys sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets", and "Assigned Documents" (and all proceeds and products thereof) as such terms are defined in … Recovery Agreement dated November 23, 2015…irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

**Ex. L**, at 1.

86.     From 2013 to 2017, UNHC spent approximately $550,871.00 on Acthar prescriptions for its beneficiaries.

87.     On, December 10, 2015, APCM irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery 15-627, LLC ("APCM Recovery Agreement").

88.     The APCM Recovery Agreement is attached hereto as **Exhibit M**, and expressly provides:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party including, but not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

20

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Ex. **M**, § 1.1.

89.    Thereafter, on June 12, 2017, MSP Recovery 15-627, LLC irrevocably assigned all rights under the APCM Recovery Agreement to Series 15-12-404 LLC, a designated series of MSP Recovery Claims, Series LLC.   ("Series 15-12-404 Assignment"). The Series 15-12-404 Assignment is attached hereto as **Exhibit N** and states:

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets", and "Assigned Documents" (and all proceeds and products thereof) as such terms are defined in … Recovery Agreement dated December 10, 2015…irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

Ex. **N**, at 1.

90.    From 2013 to 2017, APCM spent approximately $686,560.20 on Acthar prescriptions for its beneficiaries.

## FACTUAL ALLEGATIONS

### The Pharmaceutical Supply Chain

I.    **Drug Distribution**

91.    The traditional pharmaceutical supply chain in the U.S. consists of four major actors: drug manufacturers, wholesale distributors, pharmacies (retail, mail-order, and specialty), and PBMs.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

92.     Drug manufacturers manage the distribution of drugs from their manufacturing facilities to wholesale distributors, and sometimes, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospitals and some health plans.

93.     Usually, wholesale distributors purchase the pharmaceutical product from the manufacturer and distribute them to customers, including retail and mail-order pharmacies. However, wholesale distributors can also offer specialized services such as specialty drug distribution.

94.     Most pharmacies purchase drugs from the wholesale distributor, although some pharmacies such as specialty and mail-order pharmacies, often purchase directly from the manufacturer.

95.     More often than not, patients then purchase their prescriptions directly from their pharmacy of choice.

## II.     Drug Pricing

96.     Manufacturers have the most control over the price of their drugs. The manufacturers establish a "wholesale acquisition cost" ("WAC"). After the WAC is established, the "average wholesale price" ("AWP"), or the list price, is established by the manufacturer or a company that publishes a price compendium.

97.     The AWP is used by some public and private third-party payers as a basis for reimbursement (e.g., AWP minus 5 or 25 percent) and it often serves as the base price for negotiations between manufacturers and private sector purchasers of drugs.

98.     The AWP is used by Plaintiffs' Assignors and all Part D sponsors to calculate payment amounts.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

99.     There is also the "average sales price" ("ASP") which is the weighted average of all non-Federal sales to wholesaler distributors net of chargebacks, discounts, rebates, and other benefits tied to the purchase of a drug, whether it is paid to the wholesaler or retailer. The ASP is the basis for reimbursement for products covered under Medicare Part B.

100.     Retail pharmacies negotiate with manufacturers for discounts and rebates based on the pharmacies' ability to sell specific volumes of the drug or to achieve a certain share of the market.

101.     Pharmacies will negotiate and contract with PBMs to be included in the PBM's pharmacy network and for reimbursement for the cost of the drug plus dispensing fees. The pharmacy network consists of a group of retail and independent pharmacies that offer plan members lower prescription drug costs. As part of the contract, pharmacies must agree to a guaranteed reimbursement formula for prescription drugs. For brand-name medication, the reimbursement formula is usually determined by subtracting a negotiated percentage from the drug's AWP and adding the dispensing fee.

102.     Specialty pharmacies serve patients with chronic or rare diseases by dispensing high-cost biotechnology drugs. Most specialty pharmacy providers manage the costs of specialty drugs by negotiating directly with manufacturers and by running quality-focused programs intended to lower costs. Large PBMs often own pharmacies and in some cases these entities are able to negotiate greater discounts with manufacturers.

103.     PBMs like Express Scripts contract with third-party payers, (e.g., MA Plans) to provide a range of services such as developing the drug formulary (the list of drugs included in coverage at various pricing "tiers"), processing claims, creating a network of retail pharmacies,

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and negotiating drug prices. Most third-party payer and PBM contracts require the PBM to provide cost-containment (i.e., control the cost of drugs for the third-party payer's beneficiaries).

104.    As discussed in detail below, the sale and distribution of Acthar deviated from the traditional pharmaceutical supply chain. As a result, Plaintiffs' Assignors paid more for Acthar than they would have had the Defendants not manipulated the marketplace by limiting the distribution of Acthar and purchasing the only potential competitive drug. These actions allowed Defendants to maintain a monopoly for Acthar which allowed them to drastically increase the cost of the drug.

### History of Acthar

105.    Acthar was first developed by the Mayo Clinic, a division of Armour Pharmaceutical Company, in 1948.

106.    Acthar is an adrenocorticotrophic hormone ("ACTH"), which stimulates the adrenal cortex to secrete cortisol, corticosterone, aldosterone, and other androgenic substances.

107.    Acthar was approved by the U.S. Food and Drug Administration ("FDA") on April 29, 1952, as a slow-release injectable form of ACTH for the treatment of over fifty conditions. This approval was prior to the Kefauver Harris Amendment of 1962, which required drug manufacturers to provide proof of efficacy as well as safety.

108.    Acthar is currently approved for nineteen indications.[9]

---

[9] Acthar is approved for the following indications: (1) monotherapy for the treatment of infantile spasms in infants and children under 2 years of age; (2) treatment of acute exacerbations of multiple sclerosis in adults; adjunctive therapy for short-term administration in: (3) psoriatic arthritis; (4) rheumatoid arthritis; (5) ankylosing spondylitis; during an exacerbation or as maintenance therapy in select cases of (6) systemic lupus erythematosus, (7) systemic dermatomyositis (polymyositis); (8) severe erythema multiforme; (9) Stevens-Johnson syndrome; (10) serum sickness; severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as (11) keratitis; (12) iritis, (13) iridocyclitis, (14) diffuse posterior uveitis, (15) choroiditis, (16) optic neuritis, (17) anterior segment inflammation; (18) symptomatic

109.     Of the nineteen indications, Mallinckrodt generates most of its revenue from Acthar through prescriptions for infantile spasms ("IS"), multiple sclerosis, nephrotic syndrome and rheumatology related conditions (e.g., collagen diseases).

110.     Rhone-Poulenc Rorer (merged with Hoechst AG to form Aventis which subsequently merged with Sanofi) acquired the rights to Acthar from Armour. Around the time of acquisition, a vial of Acthar cost $40.00.

111.     Aventis lost millions of dollars per year following the acquisition of Acthar, producing only $500,000.00 a year in sales for the drug. Low sales were due to the limited market for Acthar.  Most of Acthar's approved indications could be treated with generic corticosteroids (e.g., prednisone) which limited the market to treatment of IS. However, IS was not an approved indication for Acthar at this time, making its use "off-label."[10] Further limiting the market was the low patient population for patients with IS, which had an annual patient population of around 2,000 children.

112.     In 2001, Questcor acquired Acthar from Aventis for $100,000.00 plus a royalty rate for sales over 10 million.

113.     Immediately after acquisition, Questcor increased the price of Acthar to $748.00. From 2001 until 2014 the end payer price of Acthar grew to $1,980.00.

114.     In 2014, Questcor was purchased by Mallinckrodt for $5.9 billion. At the time of acquisition, Acthar comprised 98% of Questcor's sales.

115.     Sales for Acthar, particularly to Part D beneficiaries, has substantially increased over time. In 2013, the program spent $262.6 million, in 2014 it increased to $391.2 million, and

---

sarcoidosis; and (19) to induce a diuresis or remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus.

[10] Acthar was approved for use as a monotherapy for infantile spasms by the FDA in 2010.

25

Case #2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

by 2015 Acthar was one of the top 20 drugs bought for Medicare Part D patients, with over $500 million spent on Acthar for 3,104 patients.

116.   By 2017, Acthar was generating approximately $1.2 billion in sales, accounting for 35% of Mallinckrodt's total revenue.

### Acthar Distribution: Exclusive Distribution through Express Scripts and the Price-Fixing and Monopolization Scheme

117.   Mallinckrodt (and previously Questcor) has exercised, and continues, to exercise monopoly power in the U.S. with Acthar. The supra-competitive prices that Mallinckrodt charges for Acthar and its restriction on Acthar's distribution, as outlined below, are evidence of this monopoly power.

118.   Prior to 2007, Acthar was sold through the typical distribution chain as discussed in more detail above. In fact, most of Questcor's products (and thus Acthar) were sold through three distributors which accounted for 91% of their business in 2006.

119.   The chain of distribution was as follows: Questcor would sell Acthar to distributors who in turn sold Acthar to pharmacies. The pharmacies placed orders with the distributors based on their respective levels of sales and inventory practices. Physicians would write prescriptions for Acthar which would be sent to the pharmacies and patients would purchase the drug directly from the pharmacy of their choice.

120.   On July 2, 2007, Questcor issued an Urgent Product Alert advising health care professionals that as of August 1, 2007, Acthar would be available exclusively through the specialty pharmacy distributor, CuraScript (owned by ESI) and coordinated through the "Acthar Hub" which is operated by UBC (owned by ESI at this time). Acthar would no longer be available through traditional pharmaceutical wholesalers or retail pharmacies.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

121.     Beginning July 16, 2007, all new Acthar prescriptions had to be submitted through the "Acthar Support & Access Program" ("ASAP").

122.     According to Questcor's Interim President, Don Bailey, "the goal of Questcor's new strategy is to make manufacturing and distribution of Acthar economically viable on a stand-alone basis."[11]

123.     The new distribution system was supposed to provide "seamless support for Acthar" but came with a significant increase in the price of treatment. Questcor believed that the cost for one course of treatment could approach $80,000 to $100,000.[12]

124.     Instead of making the use of Acthar "economically viable," the new distribution system allowed Questcor and Express Scripts to conspire to increase the price of Acthar. Following the new agreement with ESI, the price of Acthar was increased from $1,980 to $27,922.80 per vial.

## I.     Organization of Express Scripts

125.     Express Scripts offers "integrated specialty services" which includes ESI, CuraScript, and Accredo Health Group Inc. ("Accredo").[13]

126.     Prior to its sale in November 2017, UBC acted as Express Scripts' pharmaceutical support services unit.

127.     ESI is the largest PBM in the U.S. and offers the following services: "network-pharmacy claims processing, home delivery pharmacy care, specialty pharmacy care, benefit-design consultation, drug utilization review, formulary management and medical and drug data

---

[11] Questcor Press Release, *Questcor Board Approves New Strategy and Business Model for H.P. Acthar Gel* (Aug. 27, 2007), www.businesswire.com/news/home/20070827005278/en/Questcor-Board-Approves-New-Strategy-Business-Model (last visited March 15, 2019).

[12] Id.

[13] CuraScript Corporate Overview, https://curascriptsd.com/corporate-overview (last visited March 18, 2019).

analysis services. Express Scripts also distributes a full range of biopharmaceutical products and provides extensive cost-management and patient-care services."[14]

128. CuraScript is a specialty distributor and Accredo a specialty pharmacy. CuraScript "provides integrated delivery solutions" for the distribution of specialty drugs. CuraScript works with "its ESI sister company, Accredo, by offering healthcare practitioners seamless access to essential therapies and customized business solutions."[15]

129. UBC provides services to pharmaceutical and biotechnology companies related to late-stage clinical trials, risk management, drug safety and reimbursement and patient assistance.

130. Beginning in July 2007, Questcor contracted with Express Scripts to use its integrated services to handle distribution for Acthar.

131. Following the agreement, CuraScript became the exclusive distributor for Acthar.

132. UBC was contracted to become the coordinator for ASAP. UBC is responsible for receiving and processing Acthar prescriptions, providing patient reimbursement and coverage assistance, patient assistance programs (including handling financial assistance for eligible patients, running the commercial co-pay assistance program), and coordinating shipment of the prescription through CuraScript and Accredo (or another specialty pharmacy).

## II. Acthar Support & Access Program (ASAP)

133. A prescription for Acthar can only be obtained through ASAP.

---

[14] Express Scripts Corporate Overview, available for download at lab.express-scripts.com/about/ (last visited March 18, 2019).
[15] CuraScript Specialty Distribution Group Purchasing, https://curascriptsd.com/specialty-distribution-group-purchasing (last visited on March 18, 2019).

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

134. Once a physician determines that a prescription for Acthar is necessary, the physician must complete an "Acthar Start Form" ("AS Form") (neurology form attached hereto as **Exhibit O**) and fax the form to the "Acthar Hub."

135. The AS Form requires the following information be provided: (1) patient demographics; (2) insurance information; (3) health care provider information; (4) Acthar prescription information (e.g., diagnosis, injection instructions); (5) prescription, consent, and statement of medical necessity; (6) diagnosis information; (7) history of corticosteroid use; (8) concurrent medications; (9) relevant treatment history and other relevant clinical information.

136. The form requires multiple signatures from the prescribing physician. The physician must sign a statement of medical necessity wherein the physician authorizes "United BioSource LLC ("UBC"), the current operator of the Acthar Hub, and other designated operators of the Program to perform a preliminary assessment of benefit verification for this patient…"

137. Each patient must acknowledge that by signing the AS Form, they are authorizing their insurance company, physicians, and pharmacy to "disclose to Mallinckrodt ARD Inc. ("Mallinckrodt"), the distributor and its agents, authorized designees and contractors, including Mallinckrodt reimbursement support personnel and United BioSource LLC ("UBC") or any other operator of the Acthar Hub on behalf of Mallinckrodt" health information relating to their medical condition, treatment and insurance coverage. The authorization allows for "Mallinckrodt and its agents" to provide services to the patient including reimbursement and coverage support, patient assistance and access programs, medication shipment tracking, and home injection training.

138. The "Acthar Hub" is managed by UBC, which assigns each patient a case manager. The case manager calls each patient to discuss insurance coverage, affordability of copayments,

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

injection training, etc. Once the prescription is approved by the insurance company, the case manager arranges for the drug to be delivered by a specialty pharmacy.

139.    The specialty pharmacy receives the Acthar directly from CuraScript, as the exclusive distributor of Acthar. The specialty pharmacy then sends a starter kit directly to the patient. This distribution process is coordinated by UBC.

140.    Patients who obtained Acthar prescriptions from August 2007 until November 2017 could not receive their prescription without going through at least two ESI subsidiaries. Patients were required to participate in ASAP to obtain their prescriptions which was operated by UBC and their Acthar prescriptions were distributed exclusively through CuraScript who then sent the product to the patients' specialty pharmacy.

141.    Since ESI sold UBC, patients who have received Acthar from November 2017 to present still must go through an ESI subsidiary to obtain their prescriptions, as CuraScript remains the exclusive distributor of the drug.

## Acthar Price Increase

142.    At the time Questcor acquired Acthar in 2001 the cost of a vial was approximately $40.00. Following the acquisition, Questcor raised the end payor price of Acthar to approximately $748.00. From 2001 to 2007, the end payor price grew to $1,980.00.

143.    Following, the deal with Express Scripts to make CuraScript the exclusive distributor and the implementation of ASAP through UBC, the price rose to $27,922.80 – a 1,310% increase in one month, and a 69,707% increase from 2001.

144.    From 2007 to 2010, the price remained stable. However, once Acthar was approved for IS, Questcor increased the price of Acthar 5% on January 3, 2011, another 5% on June 1, 2011 and another increase on December 27, 2011. By 2012, the end payor price was $34,150.00.

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

145.    In 2014, near in time to Mallinckrodt's purchase of Questcor, the price of Acthar rose to $40,840.80. After acquisition, Mallinckrodt increased the price to $42,942.60 in 2016 and $43,658.40 in 2017.

146.    Since the acquisition of Acthar in 2001, the end payor price has grown 107,400%.



Business Insider, *Jim Chanos' pharma short got crushed after an alley bashed it at Wall Street* (Jun. 6, 2017), www.businessinsider.com/mallinckrodt-stock-price-after-express-scripts-question-acthar-2017-6 (last visited on March 18, 2019).

### Express Scripts Role in the Price-Fixing and Monopolization Scheme

147.    As the largest PBM in the U.S., Express Scripts is in a position wherein it can negotiate the most competitive, discount prices for specialty drugs. This power allows Express Scripts to challenge attempts by drug manufacturers to charge inflated prices well above the market value.

148.    This bargaining power and ability to provide "cost containment" is one of the reasons a third-party payor hires ESI as its PBM.

149.    In fact, Express Scripts asserts it helps control costs by:

a. "identifying products and offering solutions that focus on improving patient outcomes and assist in controlling costs";

b. "evaluating drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary";

c. "offering cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members";

d. "leveraging purchasing volume to deliver discounts to health benefit providers"; and

e. "promoting the use of generics and lower-cost brands."[16]

150.    Express Scripts' Chief Medical Officer, Dr. Steve Miller, has discussed the power of Express Scripts to obtain lower prices for its customers in multiple public forums. A selection of his comments regarding Express Scripts' power are below:

When I joined the company, we represented 12 million members. We're at 85 million today. That gives us extraordinary sway in the marketplace. If you think about any other aspect of health care, no one else has that many lives that they can represent.[17]

I think because of the continued escalation of cost, you need a PBM now more than ever. And what a best-in-class PBM like Express Scripts does really ensures is great health outcomes and more affordable costs.[18]

Pharma has shown that they feel very emboldened with their pricing power. We're using our clout in the marketplace to really tamp these down for our clients.[19]

---

[16]    Express Scripts 2017 Annual Report, available for download at https://expressscriptsholdingco.gcs-web.com/financial-information/annual-reports (last viewed on March 18, 2019).

[17] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma (last visited March 18, 2019).

[18] Id.

[19] *Nightly Business Report*, "Express Scripts Looks to Limit Drug Price Increases" by Meg Tirrell, October 2, 2015, http://nbr.com/2015/10/07express-scripts-looks-to-limit-drug-price-increases/ (last visited March 18, 2019).

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with our industry partners to make that possible.[20]

151.    Through these statements, Express Scripts has acknowledged its strong influence on the pharmaceutical market and its ability to lower the costs of drugs.

152.    Despite the power to influence and effect the costs of drugs, Express Scripts has done nothing to help lower the cost of Acthar.

153.    After Express Scripts became the exclusive agent for the distribution of Acthar in 2007, the PBM had no incentive to negotiate lower prices on behalf of its customers and their beneficiaries.

154.    The higher the price for Acthar the more money Express Scripts stands to make as the sole distributor. Express Scripts can make as much as 10 to 15 percent on each sale of a specialty drug. Approximately one-third of the company's revenue comes from specialty pharmacy distribution.

155.    By helping Questcor (and now Mallinckrodt) maintain and enhance its monopoly power in the ACTH market, Express Scripts along with the manufacturer, realized greater profits at the expense of third-party payers, like Plaintiffs' Assignors.

156.    When confronted by the 2007 price increase, shortly after Express Scripts became the exclusive distributor, Dr. Steve Miller, stated that "[t]he increase was a manufacturing decision. I can't comment on that."[21]

---

[20] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Steve Miller, April 14, 2017, http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110 550.html (last visited March 18, 2019).

[21] Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, New York Times, C1, April 19, 2008, available at www.nytimes.com/2008/04/19/business/19specialty.html (last visited on March 18, 2019).

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

157.     While Express Scripts management has now acknowledged Acthar to be overpriced, the company has done nothing to reduce the price for patients. Instead, the price for Acthar remains outrageously high.

158.     Express Scripts failure to use its substantial power to negotiate and reduce the cost of Acthar is in stark contrast to its prior actions regarding the drug Daraprim.

159.     In 2015, Turing Pharmaceuticals, LLC ("Turing") acquired the rights to Daraprim and increased the price from $13.50 to $750.00 per pill. A years' worth of treatment rose from $6,500.00 to $361,000.00.

160.     On December 1, 2015, ESI announced that it would partner with Imprimis Pharmaceuticals to "drive access to a low-cost alternative to Daraprim."[22] Express Scripts would provide an alternative to Daraprim for the cost of $1.00 per pill.

161.     Dr. Steve Miller explained, "[o]ur goal is always to put medicine within reach by making it more affordable and accessible."[23]

162.     However, because of the agreement with Questcor (and now Mallinckrodt), Express Scripts has not made it their goal to make Acthar more affordable and accessible. Instead, it was and continues to be, Express Scripts' goal to continue to profit off the increasingly inflated price of Acthar.

**Questcor Engaged in Anticompetitive Behavior by Acquiring Synacthen**

163.     Acthar represented 98% of Questcor's revenues prior to its acquisition by Mallinckrodt.

---

[22] Express Scripts Press Release, *Express Scripts Champions $1 per Pill Access to an Alternative for Daraprim*, (Dec. 1, 2015), lab.express-scripts.com/lab/insights/drug-options/express-scripts-champions-1-per-pill-access-to-an-alternative-for-daraprim (last visited March 18, 2019).
[23] Id.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

164.     Since the acquisition in 2014, Acthar has become an important revenue source for Mallinckrodt, accounting for 35% of the company's revenue in 2018. The company has stated that "[a]ny disruption in our ability to generate net sales from Acthar could have an adverse impact on our business, financial condition, results of operations and cash flow."[24]

165.     Through the price increases, Acthar sales grew from $1 million in 2001 to over $1 billion in 2017.

166.     Questcor was able to increase the price of Acthar because it was the only ACTH drug on the market. Any competitive product would reduce Questcor's monopoly power and would make it difficult for the company to continue to price-gouge. Thus, the company was on high alert for any potential competitor ACTH drug that could hit the U.S. market.

167.     Questcor discovered a competitive threat to their Acthar monopoly in the U.S. with the development of Synacthen Depot ("Synacthen") by Novartis AG ("Novartis"). Synacthen, a synthetically derived ACTH medication which is injected intra-muscularly, was not yet approved by the FDA for use in the U.S. However, Synacthen was approved in Europe and other countries to treat IS among other disorders.

168.     In 2009, Questcor, recognizing the potential threat to its monopoly if Synacthen was approved in the U.S., attempted to buy the drug. Questcor was unsuccessful.

169.     In 2011, Novartis decided to divest its rights to seek FDA approval for Synacthen in the U.S., along with the marketing rights in over thirty-five other countries where the drug was already approved. Three companies proceeded into negotiations with Novartis, submitting formal

---

[24]     Mallinckrodt     2018     Form     10-K,     available     for     download     at www.mallinckrodt.com/investors/annual-reports (last visited March 19, 2019).

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

offers and drafting near-final agreements. Each of the three companies planned to develop Synacthen for IS and use it to directly compete with Acthar.

170.    In October 2012, Questcor learned that the rights to acquire Synacthen and develop it for the U.S. market were up for sale. Questcor immediately contacted Novartis, signing a confidentiality agreement and submitting an offer for Synacthen.

171.    Novartis continued to negotiate with the three bidders and Questcor. By spring of 2013, each of the three prior bidders had submitted a formal offer, each comparable in value and structured similarly with upfront payments, milestone payments upon FDA approval, and significant royalties on U.S. Synacthen sales.

172.    One of the three bidders was Retrophin which had agreed to pay Novartis $16 million for the rights to Synacthen.

173.    In 2014, Retrophin filed suit against Questcor alleging antitrust violations. Retrophin claimed that it had negotiated and was ready to sign an agreement with Novartis to purchase the U.S. rights to Synacthen. But on June 11, 2013, the day Retrophin was to sign the agreement, Questcor swept in and acquired the rights from under them. Mallinckrodt settled the Retrophin lawsuit for $15.5 million.

174.    On June 11, 2013, Questcor and Novartis acquired the exclusive rights to develop, market, and sell Synacthen in the U.S. and over thirty-five countries. Questcor would pay Novartis $60 million in up-front cash with additional payments totaling $75 million over several years (for a total of $135 million).

175.    Thus, acquiring the sole competitive threat to Acthar, Questcor was able to retain its monopoly. But for Questcor's acquisition of Synacthen, another bidder would have acquired

the rights to Synacthen to develop the drug for use in the U.S. for the treatment of IS, competing directly with Acthar and at a lower price.

176.    Questcor claimed that it acquired Synacthen with the intent to "develop and seek FDA approval for Synacthen and are committed to developing this product not only in conditions different than Acthar but also in conditions where Synacthen would potentially provide a clinical benefit over Acthar."[25]

177.    Questcor had no intention of seeking FDA approval for use of Synacthen to treat IS. This approval would destroy their Acthar monopoly.

178.    Questcor did submit a request for a Fast Track designation for its Investigational New Drug application for Synacthen in 2016. However, the application was for the treatment of Duchenne muscular dystrophy and not IS or any other indication for which Acthar was already approved.

179.    On January 18, 2017, the FTC announced that Mallinckrodt, as the parent company of Questcor, agreed to pay $100 million to settle FTC charges that Questcor violated antitrust laws when it purchased the rights to Synacthen.

180.    As stated by FTC Chairwoman Edith Ramirez, "Questcor took advantage of its monopoly to repeatedly raise the price of Acthar, from $40 per vial in 2001 to more than $34,000 per vial today – an 85,000 percent increase. We charge that, to maintain its monopoly pricing, it

---

[25] Genetic Engineering & Biotechnology News, *Questcor Acquires Synacthen Rights from Novartis in $135M+ Deal*, https://www.genengnews.com/news/questcor-acquires-synacthen-rights-from-novartis-in-135m-deal/, (last visited March 20, 2019).

37

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

acquired the rights to its greatest competitive threat, a synthetic version of Acthar, to forestall future competition. This is precisely the kind of conduct the antitrust laws prohibit."[26]

181.    The settlement required Mallinckrodt to grant a license to develop Synacthen to treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC. The FTC approved the sublicense of Synacthen to Marathon Pharmaceuticals, LLC in July 2017.

182.    From the time it sought FDA approval for the treatment of IS, Mallinckrodt has raised the price of Acthar to over $43,000.00.

183.    Through the exclusive contract for distribution of Acthar with Express Scripts and its purchase of Synacthen, the only potential competitive product, Mallinckrodt has retained 100% of the market for ACTH products. This monopoly power allowed Defendants to increasingly raise the prices of Acthar to the detriment of third-party payers such as Plaintiffs' Assignors.

## CLASS ALLEGATIONS

184.    Plaintiffs bring this action on behalf of themselves and the following class ("Class" or "Class Members"):

> All third-party payers, or their assignees, in the United States and its territories, who have, as indirect purchasers, in whole or in part, paid for, provided reimbursement for, and/or possess the recovery rights to reimbursement for the indirect purchase of Acthar from August 1, 2007 to present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; and (c) any judges or justices involved in this action and any members of their immediate family.

---

[26] FTC Press Release, Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained Its Monopoly of Specialty Drug Used to Treat Infants, (Jan. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it (last visited March 19, 2019).

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

185.    Plaintiffs bring this action pursuant to Rule 23, both individually and on behalf of (a) a national injunctive class and/or (b) a national damages class and/or (c) various state-wide damages sub-classes, during the period from August 1, 2007 to present.

186.    As discussed in this Class Action Complaint, Defendants have enjoyed ill-gotten gains from the sales of Acthar at the expense of Class Members, who suffered damages to their property and business. Such damages apply to all Class Members (and Plaintiffs as the rightful assignees of those organizations). Class action law has long recognized that, when a company engages in conduct that has uniformly harmed many claimants such as Plaintiffs, other direct payers, third-party payers, and consumers, class resolution is an effective tool to redress the harm.

187.    Here, the Class Members have been deprived of property and money by being forced to purchase prescriptions of Acthar at unlawfully elevated prices as a direct result of Defendants engaging in anti-competitive conduct, as alleged throughout this Complaint.

188.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy shown as follows:

a.    Numerosity: Joinder of all Class Members is impracticable. Upon information and belief, there are many hundreds of third-party payers throughout the United States that were forced to pay artificially inflated, anti-competitive prices for Acthar. Thus, the numerosity element for class certification is met.

b.    Commonality: Questions of law and fact are common to all members of the Class. Specifically, Defendants' misconduct was directed at all Class Members, their affiliates, and those respective organizations that provide prescription benefits. Defendants' illegal pattern of anti-competitive conduct had a common, adverse

39

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

effect on all purchasers of Acthar. All members of the Class have common questions of fact or law. Each Class Member shares the same needed remedy, i.e., reimbursement for the inflated prices and lost money due to Defendants' monopolistic actions, and imposition of injunctive and equitable relief to stop Defendants from continuing in their anti-competitive activities.

c.   Typicality: Plaintiffs' claims are typical of the Class Members' claims, as all have been damaged in the same manner. Plaintiffs' and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, and share the same legal theory. As the putative class representatives, Plaintiffs possess the same interests and suffered the same injury as the other Class Members, which demonstrates a legal sufficient nexus between Plaintiffs' claims and the Class Members' claims. Plaintiffs' claims are typical of the Class Members' claims because Defendants monopolistic and anti-competitive behavior caused Plaintiffs to pay inflated prices for Acthar. Plaintiffs, like the Class Members, have a right to reimbursement for prescriptions of Acthar at anti-competitive prices. Plaintiffs' and Class Members' claims are based on the same statutes, regulations, legal theories and factual situations. Defendants' business practices, acts and omissions are materially the same with respect to Plaintiffs' and the Class Members' claims, as will be Defendants' legal defenses. Plaintiffs' claims are, therefore, typical of the Class.

d.   Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests in vindicating these claims are shared with all members of the Class and there are no conflicts between the named Plaintiffs and

the putative Class Members. In addition, Plaintiffs are represented by counsel who are competent and experienced in class action litigation and also have no conflicts.

e.  <u>Ascertainability</u>: Locating members of the Class would be relatively simple. For MA Plans, CMS maintains records of all MAOs, i.e., those entities that have contracted directly with CMS pursuant to Medicare Part C and D and providing notice to such entities could be accomplished by direct communication. For third party payers that are not MA Plans, multiple regulatory frameworks will provide for identification and notification. Classes of third-party payers have been certified and successfully administered throughout the state and federal courts many times.

189.   The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action in this context is superior. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class.

190.   Proceeding with a class action is superior to other methods for fair and efficient adjudication of this controversy because, *inter alia*, such treatment will allow a large number of similarly-situated third-party payers to litigate their common claims simultaneously, efficiently, and without the undue duplications of effort, evidence, and expense that individual actions would induce; individual joinder of the individual members is wholly impracticable; the economic damages suffered by the individual class members may be relatively modest compared to the expense and burden of individual litigation; and the court system would benefit from a class action because individual litigation would overload court dockets and magnify the delay and expense to all parties. The class action device presents far fewer management difficulties and provides the comprehensive supervision by a single court with economies of scale.

191.    A class action is superior in that the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class. These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be disparities of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

192.    The Class is properly brought under Rule 23(b)(2) as Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class.

## CAUSES OF ACTION

193.    Plaintiffs and the putative Class allege that Defendants participated in a vertical price fixing scheme and their monopolistic, anti-competitive behavior caused them to suffer harm by paying inflated prices for Acthar prescriptions for their beneficiaries.

194.    The collusion and monopolistic activity between Defendants supplied an atmosphere which drove up the costs of Acthar, resulting in Class damages.

## COUNT I
## SHERMAN ACT VIOLATIONS PURSUANT TO 15 U.S.C. § § 1, 3

195.    Plaintiffs re-allege and and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

196.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

197.     During the Class Period, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, inflate, stabilize, and/or maintain artificially anti-competitive prices for Acthar in the U.S.

198.     Defendants' anti-competitive conduct described above was knowing, willful and constituted violations or flagrant violations of state antitrust statutes as described below.

199.     There is no legitimate business jusitification on the part of Defendants for these exclusive and exclusionary agreements, and these agreements: (a) substantially foreclosed and excluded competition from other potential ACTH manufacturers and distributors, and (b) resulted in Defendants' willful maintenance and unlawful exercise of monopoly power in the market for ACTH drugs.

200.     At all relevant times, Defendants' exclusive and exclusionary agreements allowed Defendants to (a) effectively exclude less expensive, potentially superior competive products from the ACTH drug market; (b) maintain a dominant market share and monopoly power in the ACTH drug market; (c) maintain prices at artificially elevated levels for Acthar; and (d) otherwise reap the benefits of its illegal monopoly power.

201.     Plaintiffs and Class members have been injured and will continue to be injured in their business and property by paying higher prices for Acthar than they would have paid absent Defendants' unlawful conduct.

202.     Plaintiffs' injuries are the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

203.     Plaintiffs and Class Members are entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## COUNT II
## SHERMAN ACT VIOLATIONS PURSUANT TO 15 U.S.C. § 2

204. Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

205. Defendants monopolized the market for the pharmaceutical Acthar, and thereby, violated the Sherman Act, 15 U.S.C. § 2.

206. Defendants have, and at all relevant times had, monopoly power in the market for the sale of ACTH drugs in the U.S.

207. During the Class Period, Defendants bought the rights to bring Acthar's AB rated bioequivalent, Synacthen, to the U.S.

208. After purchasing these rights, Defendants have not brought Synacthen, to the U.S. market and have not allowed any other entity to bring the pharmaceutical to market.

209. These acts have caused unreasonable restraints of trade in the market for Acthar.

210. Defendants' actions had the following effects, among others: (a) price competition in the market for Acthar has been restrained, suppressed, and/or eliminated in the U.S.; (b) prices for Acthar provided by Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S.; and (c) Plaintiffs and Class Members who purchased Acthar from Defendants have been deprived of the benefits of free and open competition.

211. As a result of Defendants' unlawful conduct, Plaintiffs and all other similarly situated Class Members that purchased Acthar have been harmed and will continue to be harmed in their business and property by paying inflated, anti-competitive prices that they would not have paid if not for Defendants' unlawful conduct.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

212.     Plaintiffs and Class Members are entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT III**
**VIOLATION OF STATE ANTITRUST LAWS**

213.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

214.     During the Class Period, Defendants engaged in a continuing contract, combination or conspiracy with respect to the sale of Acthar, which resulted in unreasonable restraint of trade and commerce and in violation of various state antitrust statutes, as set forth below.

215.     The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anti-competitive prices for Acthar in the U.S.

216.     Defendants performed acts in furtherance of the combination and conspiracy, including meetings and participating in conversations among themselves, which took place in the U.S., during which they agreed to fix, increase, inflate, maintain, or stabilize prices that Plaintiffs and the Class Members paid for Acthar.

217.     Defendants engaged in the actions described above for the purpose of carrying out their unlawful monopolization of Acthar.

218.     Defendants' anti-competitive conduct described above was knowing, willful and constituted violations or flagrant violations of state antitrust statutes as described below.

219.     Plaintiffs and other similarly situated payers in the Class in each of the below states have been injured in their business and property due to Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and other similarly situated payers in the Class have paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

conduct. This injury is of the type the antitrust laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of Plaintiffs and other similarly situated payers in the Class.

220.     Accordingly, Plaintiffs and other similarly situated payers in the Class, in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

## A.    ALABAMA

221.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Ala. Code § 6-5-60.

222.     Ala Code § 6-5-60 provides that "any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct, or indirect, may in each instance of such injury or damage, recover the sum of $500 and all actual damages."

223.     Defendants combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Alabama; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Alabama.

224.     During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Ala. Code § 6-5-60.

225.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

226.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ala. Code § 6-5-60.

## B.    ARIZONA

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. Ann. § 44-1401, *et seq*. ("The Arizona Uniform Antitrust Act").

228.    The Arizona Uniform Antitrust Act makes "a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce" illegal. Ariz. Rev. Stat. Ann. § 44-1402. Moreover, "the establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce … for the purpose of excluding competition or controlling, fixing, or maintaining prices is unlawful." Ariz. Rev. Stat. Ann. § 44-1403.

229.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Ariz. Rev. Stat. Ann. § 44-1401.

230.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Arizona; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

competitive, artificially inflated prices for Acthar, including in Arizona.

231. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of The Arizona Uniform Antitrust Act.

232. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

233. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ariz. Rev. Stat. Ann. § 44-1408(b).

## C. CALIFORNIA

234. Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.* ("The Cartwright Act").

235. The Cartwright Act, prohibits a combination of two or more persons "to create or carry out restrictions in trade or commerce … to make or enter into or execute or carry out any contracts, obligations or agreements … by which they do all or any or any combination of the following … agree in any manner to keep the price of such article, commodity, … at a fixed or graduated figure." Cal. Bus. & Prof. Code § 16720.

236. Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Cal. Bus. & Prof. Code § 16702.

237. Action may be brought by any person injured in his business or property "by reason

of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant." Cal. Bus. & Prof. Code § 16750(a).

238.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout California; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout California; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in California.

239.    During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of The Cartwright Act.

240.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

241.    Plaintiffs' Assignor, UNHC paid $69,769.70 for Acthar prescriptions that were delivered to its beneficiaries through OptumRX, Inc., located in Carlsbad, California.[27]

242.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Cal. Bus. & Prof. Code § 16750(a).

---

[27] Plaintiffs were able to identify Optum Rx using the National Provider Identifier number or "NPI."

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## D.    DISTRICT OF COLUMBIA

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code Ann. §§ 28-4501, *et seq.*

244.    The District of Columbia declares "every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. D.C. Code § 28-4502. Moreover, it is "unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce." D.C. Code Ann. § 28-4503.

245.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of D.C. Code Ann. § 28-4501.

246.    Indirect purchasers are deemed injured pursuant to D.C. Code § 28-4509(a).

247.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout the District of Columbia; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including throughout the District of Columbia.

248.    During the Class Period, Defendants' illegal conduct substantially affected the District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of D.C. Code Ann. §§ 28-4501, *et seq.*

Case # 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

249.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

250.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under D.C. Code Ann. § 28-4508.

## E.    HAWAII

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1, *et seq.*

252.    Haw. Rev. Stat. § 480-4 declares "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade" illegal. Such acts include efforts to "(1) fix, control, or maintain the price of any commodity; (2) limit, control, or discontinue, the product, manufacture or sale of any commodity for the purpose or with the result of fixing, controlling or maintaining its price." Haw. Rev. Stat. § 480-4(a)-(b). Moreover, in Hawaii "no person shall monopolize, or attempt to monopolize, or combine or conspire with any other persons to monopolize any part of the trade or commerce in any commodity." Haw. Rev. Stat. § 480-9.

253.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Haw. Rev. Stat. § 480-1.

254.    Indirect purchasers may bring actions pursuant to Haw. Rev. Stat. § 480-3.

255.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Hawaii; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Hawaii.

256.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1, *et seq.*

257.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

258.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Haw. Rev. Stat. § 480-13.

## F.    ILLINOIS

259.    Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. 10/ *et seq.* ("Illinois Antitrust Act")

260.    The Illinois Antitrust Act states that any contract with, or combination or conspiracy with, any person "for the purpose or with the effect of fixing, controlling, or maintaining the price or rate for any commodity sold" is a violation of the Act. 740 Ill. Comp. Stat. 10/3.

261.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of 740 Ill. Comp. Stat.  10/4.

262.    Defendants' combinations or conspiracies had the following effects: (1) price

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

competition for Acthar was restrained, suppressed, and/or eliminated throughout Illinois; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Illinois.

263. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Illinois Antitrust Act.

264. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

265. Plaintiffs' Assignors spent approximately $270,262.50 on Acthar prescriptions in Illinois. For example, PHC paid $60,960.40 for Acthar prescriptions that were delivered to its beneficiaries through Caremark, LLC located in Mt. Prospect, Illinois.[28]

266. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/7.

## G. IOWA

267. Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* ("Iowa Competition Law").

---

[28] Plaintiffs were able to identify Caremark, LLC using the NPI number.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

268.    Iowa Competition Law states that "a contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code 553.4. Moreover, "a person shall not attempt to establish or establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing, or maintaining prices." Iowa Code § 553.5.

269.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Iowa Code 553.3.

270.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Iowa; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Iowa.

271.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Iowa Competition Law.

272.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

273.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

forms of relief available under Iowa Code § 553.12.

## H.  KANSAS

274.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.* ("Kansas Restraint of Trade Act").

275.    The Kansas Restraint of Trade Act § 50-101 declares any "combination of capital, skill, or acts, by two or more persons" carried out for the purpose of restricting commerce or trade unlawful. Moreover, "all arrangements, contracts, agreements, trusts, or combinations between persons, designed or which tend to advance, reduce or control the price of the cost to the producer or to the consumer of any such products or articles" are unlawful. Kan. Stat. Ann. § 50-112.

276.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Kan. Stat. Ann. § 50-161.

277.    The restraint of trade act "shall not be construed to prohibit: … (2) actions or proceedings by indirect purchasers." Kan. Stat. Ann. § 50-161(b).

278.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Kansas; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Kansas.

279.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury.  Due to the foregoing, Defendants entered into agreements in

restraint of trade in violation of the Kansas Restraint of Trade Act

280.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

281.    Plaintiffs' Assignor, UNHC paid $205,665.80 for Acthar prescriptions that were delivered to its beneficiaries through OptumRX, Inc. located in Overland Park, Kansas.[29]

282.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Kan. Stat. Ann. § 50-161.

## I.    MAINE

283.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

284.    Me. Rev. Stat. Ann. tit. 10 §§ 1101, declares "every contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce" illegal.

285.    Anyone "injured directly or indirectly" may bring suit under Me. Rev. Stat. tit. 10 § 1104.

286.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Maine; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Maine.

---

[29] Plaintiffs were able to identify Optum RX using the NPI number.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

287.     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

288.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

289.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10 § 1104.

## J.     MARYLAND

290.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law §§ 11-201, *et seq.* ("Maryland Antitrust Act").

291.     The Maryland Antitrust Act prohibits unreasonable restraint of trade "by contract, combination, or conspiracy." Md. Code Ann., Com. Law § 11-204. Moreover, the Act states that a person may not "monopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce … for the purpose of excluding competition or controlling, fixing, or maintaining prices in trade or commerce." Md. Code Ann., Com. Law § 11-204(a)(1)-(2).

292.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Md. Code Ann., Com. Law § 11-201.

293.     A person whose business or property is injured or threatened may bring an action

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"regardless of whether the person maintaining the action dealt directly or indirectly with the person who has committed the violation." Md. Code Ann., Com. Law § 11-209(b)(2)(i).

294.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Maryland; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Maryland.

295.    During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury.  Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Maryland Antitrust Act.

296.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

297.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Md. Code Ann., Com. Law § 11-209.

## K.    MICHIGAN

298.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.* ("Michigan Antitrust Reform Act").

299.    The Michigan Antitrust Reform Act declares "a contract, combination, or

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market" unlawful. Mich. Comp. Laws Ann. § 445.772. Moreover, the "establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful." Mich. Comp. Laws Ann. § 445.773.

300.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Mich. Comp. Laws Ann. § 445.771.

301.    Any person "threatened with injury or injured directly or indirectly" may bring action under Mich. Comp. Laws Ann. § 445.778(2).

302.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Michigan; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Michigan.

303.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury.  Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Michigan Antitrust Reform Act.

304.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants'

unlawful conduct.

305.    Plaintiffs' Assignor, SummaCare paid $59,407.44 for Acthar prescriptions that were delivered to its beneficiaries through Walgreens Specialty Pharmacy, LLC, located in Canton, Michigan.[30]

306.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Mich. Comp. Laws Ann. § 445.778.

## L.    MINNESOTA

307.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. Ann. §§ 325D.49, *et seq.* ("Minnesota Antitrust Law of 1971").

308.    The Minnesota Antitrust Law of 1971 declares "a contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce" unlawful. Minn. Stat. Ann. § 325D.51. Moreover, the "establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful." Minn. Stat. Ann. § 325D.52. Any contract, combination, or conspiracy with the purpose of effect of "affecting, fixing, controlling or maintaining the market price, or fee of any commodity or service" or "affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity … for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service" is unlawful. Minn. Stat. Ann. § 325D.53.

309.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Minn. Stat. Ann. § 325D.50.

---

[30] Plaintiffs were able to identify Walgreens Specialty Pharmacy LLC using the NPI number.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

310. The Minnesota Antitrust Law of 1971 allows any person "injured directly or indirectly" to bring an action. Minn. Stat. Ann. § 325D.57.

311. Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Minnesota; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Minnesota.

312. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Minnesota Antitrust Law of 1971.

313. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

314. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Minn. Stat. Ann. § 325D.57.

## M. MISSISSIPPI

315. Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

316. Miss. Code Ann. § 75-21-1 declares trusts unlawful, which includes "any

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

combination, contract, understanding, or agreement, express or implied" that would be inimical to public welfare and the effect of which would be restraint of trade and/or any "increase … on the price of a commodity." Moreover, any monopolization or "attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business" is not allowed. Miss. Code Ann. §§ 75-21-3.

317.    Any person "natural or artificial, injured or damaged by a trust or combine … or by its effects direct or indirect" may bring suit. Miss. Code Ann. §§ 75-21-9.

318.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Mississippi; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Mississippi.

319.    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

320.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

321.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

forms of relief available under MS Code § 75-21-9.

## N.   NEBRASKA

322.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801, *et seq.* ("Junkin Act").

323.   The Junkin Act declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal.  Neb. Rev. Stat. § 59-801.

324.   Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Neb. Rev. Stat. § 59-822.

325.   Any person injured, "whether such injured person dealt directly or indirectly with the defendant" may bring suit. Neb. Rev. Stat. § 59-821.

326.   Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Nebraska; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Nebraska.

327.   During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Junkin Act.

328.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

329.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Neb. Rev. Stat. § 59-821.

## O.    NEVADA

330.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* ("Nevada Unfair Trade Practices Act").

331.    The Nevada Unfair Trade Practices Act prohibits "price fixing, which consists of raising, depressing, fixing, pegging or stabilizing the price of any commodity or service." Nev. Rev. Stat. Ann. § 598A.060.

332.    Any person injured "directly or indirectly" may bring suit. Nev. Rev. Stat. Ann. § 598A.210(2).

333.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Nevada; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Nevada.

334.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Nevada Unfair Trade Practices Act

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

335.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

336.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Nev. Rev. Stat. Ann. § 598A.210.

## P.    NEW HAMPSHIRE

337.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann §§ 356:1, *et seq.*

338.    N.H. Rev. Stat. Ann § 356:2 declares "every contract, combination, or conspiracy … which has the purpose or the effect of: (a) fixing, controlling, maintaining prices, rates, quotations or fees in any part of trade or commerce" unlawful. N.H. Rev. Stat. Ann § 356:2. Moreover, "the establishment, maintenance or use of monopoly power, or any attempt to establish, maintain or use monopoly power over trade or commerce for the purpose of affecting competition or controlling, fixing or maintaining prices is unlawful." N.H. Rev. Stat. Ann § 356:3.

339.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.H. Rev. Stat. Ann § 356:1.

340.    Any person injured "whether that person dealt directly or indirectly with the defendant" may bring suit. N.H. Rev. Stat. Ann § 356:11.

341.    Defendants combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout New Hampshire; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and other similarly situated payers in the Class were deprived of

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in New Hampshire.

342.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of N.H. Rev. Stat. Ann § 356:1, *et seq.*

343.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

344.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.H. Rev. Stat. Ann § 356:11.

**Q.    NEW MEXICO**

345.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et. seq.* ("New Mexico Antitrust Act").

346.    The New Mexico Antitrust Act declares "every contract, agreement, combination or conspiracy of trade or commerce" illegal. N.M. Stat. Ann. § 57-1-1. Moreover, it is unlawful "for any person to monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize, trade or commerce." N.M. Stat. Ann. § 57-1-2.

347.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.M. Stat. Ann. § 57-1-1.2.

348.    Any person injured "directly or indirectly" may bring suit under N.M. Stat. Ann. §

57-1-1.3.

349.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout New Mexico; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in New Mexico.

350.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the New Mexico Antitrust Act.

351.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

352.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.M. Stat. Ann. § 57-1-3.

**R.     NEW YORK**

353.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.* ("Donnelly Act").

354.     The Donnelly Act declares "every contract, agreement, arrangement or combination" where a "monopoly … may be established" or where "competition or the free

67

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

exercise of any activity … may be restrained" illegal. N.Y. Gen. Bus. Law § 340(1).

355.    The fact that "any person who sustained damages by reason of violation of this section has not dealt directly with the defendant shall not bar or otherwise limit recovery." N.Y. Gen. Bus. Law § 340(6).

356.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout New York; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in New York.

357.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Donnelly Act.

358.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

359.    Plaintiffs' Assignor, Emblem, paid $9,814,270.02 for Acthar prescriptions that were delivered to its beneficiaries throughout New York, including through Procare Pharmacy,

LLC, located in New York, NY.[31]

360.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.Y. Gen. Bus. Law § 340(5).

## S.    NORTH CAROLINA

361.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

362.    N.C. Gen. Stat. Ann. § 75-1 declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. Moreover, it is "unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce." N.C. Gen. Stat. Ann. § 75-2.1.

363.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout North Carolina; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in North Carolina.

364.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements

---

[31] Plaintiffs were able to identify the prescribing physicians  for Acthar prescriptions and Procare Pharmacy, LLC using the NPI numbers.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

in restraint of trade in violation of N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

365.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

366.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.C. Gen. Stat. Ann. § 75-15.2.

## T.    NORTH DAKOTA

367.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code. Ann. §§ 51-08.1-01, *et seq.* ("Uniform State Antitrust Act").

368.    The Uniform State Antitrust Act declares a "contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market" unlawful. N.D. Cent. Code. Ann. § 51-08.1-02. Moreover, the "establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful." N.D. Cent. Code. Ann. § 51-08.1-03.

369.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.D. Cent. Code. Ann. § 51-08.1-01.

370.    The fact that a person injured or threatened with injury "has not dealt directly with the defendant does not bar recovery." N.D. Cent. Code. Ann. § 51-08.1-08(3).

371.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout North Dakota; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout

North Dakota; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in North Dakota.

372.     During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Uniform State Antitrust Act.

373.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

374.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.D. Cent. Code. Ann. § 51-08.1-08(2).

## U.     OREGON

375.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Ore. Rev. Stat. §§ 646.705, *et seq.*

376.     Ore. Rev. Stat. § 646.725 declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. Moreover, it is unlawful for any person to "monopolize, or attempt to monopolize, co combine or conspire with any other person or persons, to monopolize any part of trade or commerce." Ore. Rev. Stat. § 646.730.

377.     An action may be brought "regardless of whether the plaintiff dealt directly or indirectly with the adverse party." Ore. Rev. Stat. § 646.780(1)(a).

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

378.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Oregon; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Oregon.

379.    During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury.  Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Ore. Rev. Stat. § 646.705, *et seq.*

380.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

381.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ore. Rev. Stat. § 646.780.

## V.    PUERTO RICO

382.    Defendants have entered into an unlawful agreement in restraint of trade in violation of P.R. Laws Ann. tit 10 §§ 257, *et seq.*

383.    P.R. Laws Ann. tit 10 § 258, declares "every contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce" illegal.

384.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

P.R. Laws Ann. tit 10 § 257.

385.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Puerto Rico; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Puerto Rico; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Puerto Rico.

386.     During the Class Period, Defendants' illegal conduct substantially affected Puerto Rico commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of P.R. Laws Ann. tit 10 §§ 257, *et seq.*

387.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

388.     Plaintiffs' Assignor, APCM paid $343,280.10 for Acthar prescriptions that were delivered to its beneficiaries throughout Puerto Rico.

389.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under P.R. Laws Ann. tit 10 § 268(a).

## W.     RHODE ISLAND

390.     Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.* ("Rhode Island Antitrust Act").

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

391.    The Rhode Island Antitrust Act declares "every contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce" unlawful. R.I. Gen. Laws § 6-36-4. Moreover, "the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful." R.I. Gen. Laws § 6-36-5.

392.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of R.I. Gen. Laws § 6-36-3.

393.    The fact that a person "has not dealt directly with the defendant shall not bar or otherwise limit recovery." R.I. Gen. Laws § 6-36-7(d).

394.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Rhode Island; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Rhode Island.

395.    During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of S.D. Codified Laws R.I. Gen. Laws §§ 6-36-1, *et seq.*

396.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants'

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

unlawful conduct.

397.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under R.I. Gen. Laws § 6-36-11.

## X.    SOUTH DAKOTA

398.    Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws §§ 37-1-1, *et seq.*

399.    S.D. Codified Laws § 37-1-3.1 declares "a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce" unlawful. Moreover, "the monopolization by any person, or an attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any of the trade or commerce" is unlawful. S.D. Codified Laws § 37-1-3.2.

400.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of S.D. Codified Laws § 37-1-3.1.

401.    No person "who is injured directly or indirectly" may be denied the right to bring this action. S.D. Codified Laws § 37-1-33.

402.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout South Dakota; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in South Dakota.

403.    During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of S.D. Codified Laws §§ 37-1-1, *et seq.*

404.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

405.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under S.D. Codified Laws §§ 37-1-14.3, 37-1-24.

## Y.    TENNESSEE

406.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

407.    Tenn. Code Ann. § 47-25-101 declares "all arrangements, contracts, agreements, trusts, or combinations between persons or corporations ... which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article" against public policy, unlawful, and void.

408.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Tennessee; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Tennessee.

409.    During the Class Period, Defendants' illegal conduct substantially affected

76

Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*.

410.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

411.    Plaintiffs' Assignors have spent approximately $3,191,986.22 on Acthar prescriptions in Tennessee. For example, Emblem paid $1,312,815.89 for Acthar prescriptions that were delivered to its beneficiaries through Accredo Health Group, Inc. located in Memphis, Tennessee.[32]

412.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Tenn. Code Ann. § 47-25-106.

## Z.    UTAH

413.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq*. ("Utah Antitrust Act").

414.    The Utah Antitrust Act declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. Utah Code Ann. § 76-10-3104. Moreover, it is unlawful "for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce." Utah Code Ann. § 76-10-3104.

---

[32] Plaintiffs were able to identify Accredo Health Group, Inc. using the NPI number.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

415. Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Utah; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Utah.

416. During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Utah Antitrust Act.

417. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

418. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Utah Code Ann. § 76-10-3109.

## AA. VERMONT

419. Defendants have entered into an unlawful agreement in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

420. Vt. Stat. Ann. tit. 9 § 2453 makes "unfair methods of competition in commerce" unlawful.

421. The fact that a person "has not dealt directly with a defendant shall not bar or

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case #2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

otherwise limit recovery." Vt. Stat. Ann tit. 9 § 2465.

422.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Vermont; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Vermont.

423.    During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

424.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

425.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Vt. Stat. Ann. tit. 9 § 2465.

## BB.    WEST VIRGINIA

426.    Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code Ann. §§ 47-18-1, *et seq.* ("West Virginia Antitrust Act").

427.    The West Virginia Antitrust Act declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" unlawful. W. Va. Code Ann

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

§ 47-18-3(a). A contract, combination or conspiracy "for the purpose or with the effect of fixing, controlling, or maintaining the market price, rate or fee of any commodity or service" is unlawful. W. Va. Code Ann. § 47-18-3(b)(1). Moreover, the establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce … by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." W. Va. Code Ann. § 47-18-4.

428. Defendants, Plaintiffs, and Class Members are "persons" within the meaning of W. Va. Code Ann. § 47-18-2.

429. Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout West Virginia; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in West Virginia.

430. During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the West Virginia Antitrust Act.

431. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

432.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under W. Va. Code Ann. § 47-18-2.

## CC.    WISCONSIN

433.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

434.    Wis. Stat. Ann. § 133.03 declares "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" illegal.

435.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Wis. Stat. Ann. § 133.02.

436.    Any person who is injured "directly or indirectly" may bring suit. Wis. Stat. Ann. § 133.18.

437.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Wisconsin; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Wisconsin.

438.    During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

439.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

440. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Wis. Stat. Ann. § 133.18.

## COUNT IV
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES

441. Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

442. During the Class Period, Defendants engaged in continuing unfair, false, unconscionable, or deceptive acts or practices with respect to the sale of Acthar, in violation of various state consumer protection statutes, as set forth below.

443. The unfair, false, unconscionable, or deceptive acts or practices consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anti-competitive prices for Acthar in the U.S. Moreover, Defendants concealed their agreements from Plaintiffs, Class Members, and the public.

444. Defendants' anti-competitive conduct described above was knowing, willful and constituted flagrant violations of several state consumer protection statutes as described below.

445. Plaintiffs and other similarly situated payers in the Class in each of the below states have been injured in their business and property due to Defendants' unfair, false, unconscionable, or deceptive acts or practices. Plaintiffs and other similarly situated payers in the Class have paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct. In addition, Defendants have profited significantly from the aforesaid unlawful behavior. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

of members of Plaintiffs and other similarly situated payers in the Class.

446. Accordingly, Plaintiffs and other similarly situated payers in the Class, in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## A.  ALASKA

447. Defendants have willingly and knowingly engaged in unfair methods of competition, and unfair and deceptive acts or practices in violation of Alaska Stat. §§ 45.50.471, *et seq.* ("Alaska Unfair Trade Practices and Consumer Protection Act).

448. The Alaska Unfair Trade Practices and Consumer Protection Act declares "unfair methods of competition and unfair or deceptive acts or practices" unlawful. Alaska Stat. § 45.50.471

449. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Class.

450. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

451. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

which Plaintiffs could avoid the overcharges.

452.     Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

453.     Defendants' took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

454.     Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Alaska; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Alaska; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Alaska.

455.     During, the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers.

456.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Alaska Stat. §§ 45.50.531, and 45.50.537.

**B.     ARKANSAS**

457.     Defendants have willingly and knowingly engaged in unconscionable, false, or deceptive acts or practices in violation of Ark. Code Ann. §§ 4-88-101, *et seq.* ("The Arkansas Deceptive Trade Practices Act").

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

458. The Arkansas Deceptive Trade Practices Act forbids "engaging in any … unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(10).

459. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Class.

460. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

461. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

462. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

463. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

464.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Arkansas; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Arkansas.

465.    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

466.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

467.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ark. Code Ann. § 4-88-113.

## C.    CONNECTICUT

468.    Defendants have willingly and knowingly engaged in in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Conn. Gen. Stat. §§ 42-110a, *et seq.* ("Connecticut Unfair Trade Practices Act").

469.    The Connecticut Unfair Trade Practices Act prohibits engagement in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §§ 42-110b.

470.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

471.    Defendants, Plaintiffs, and Class Members are "persons" as defined by Conn. Gen. Stat. § 42-110a.

472.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Connecticut and took efforts to conceal their agreements from Plaintiffs and members of the Class.

473.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

474.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

475.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

476.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

477.    Defendants' unlawful conduct had the following effects: (1) Acthar price

competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Connecticut; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Connecticut.

478.    During, the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

479.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

480.    Plaintiffs' Assignor, ConnectiCare, a Connecticut corporation, has spent approximately $9,218,702.18 on Acthar prescriptions that were delivered to its beneficiaries throughout Connecticut.[33]

481.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Conn. Gen. Stat. § 42-110g.

**D.    DELAWARE**

482.    Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of Del. Code Ann. tit 6, §§ 2511, *et seq.*

483.    Del. Code Ann. tit 6, § 2513 declares "the act, use or employment of any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with the intent that others rely upon such

---

[33] Plaintiffs were able to identify the prescribing physicians for Acthar prescriptions using the NPI number.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

concealment, suppression or omission, in connection with the sale … or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged" unlawful.

484.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Del. Code Ann. tit 6, § 2511.

485.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Delaware and took efforts to conceal their agreements from Plaintiffs and members of the Class.

486.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

487.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

488.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

489.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

paid and the value received for Acthar.

490.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Delaware; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Delaware; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Delaware.

491.    During the Class Period, Defendants' illegal conduct substantially affected Delaware commerce and consumers.

492.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

493.    Plaintiffs' Assignor, ConnectiCare paid $3,968,008.52 for Acthar prescriptions that were delivered to its beneficiaries through Accredo Health Group, Inc. located in New Castle, Delaware.[34]

494.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Del. Code Ann. tit 6, § 2525.

E.    **FLORIDA**

495.    Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable, or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.* ("The Florida Deceptive and Unfair Trade Practices Act").

496.    The Florida Deceptive and Unfair Trade Practices Act is designed to "protect the

---

[34] Plaintiffs were able to identify Accredo Health Group Inc. using the NPI number.

consuming public from those that engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202. The Act declares "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Fla. Stat. § 501.204.

497.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Florida and took efforts to conceal their agreements from Plaintiffs and members of the Class.

498.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

499.     Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

500.     Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

501.     Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in

91

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

502.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Florida; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Florida; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Florida.

503.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

504.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

505.    Many of Plaintiffs' Assignors are Florida entities and limited liability companies. Plaintiffs' Assignors have spent approximately $2,683,773.00 on Acthar prescriptions in Florida. For example, PMPI, a Florida entity, paid $96,975.00 for Acthar prescriptions that were delivered to its beneficiaries throughout Florida.[35]

506.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Fla. Stat. § 501.207.

---

[35] Plaintiffs were able to identify the prescribing physicians for Acthar prescriptions using the NPI number.

92

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## F.    GEORGIA

507.    Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of Ga. Code Ann. §§ 10-1-370, *et seq.* ("Uniform Deceptive Trade Practices Act").

508.    Georgia's Uniform Deceptive Trade Practices Act forbids persons to engage in deceptive trade practice, including but not limited to, "engaging in any other conduct which … creates a likelihood of confusion or misunderstanding." Ga. Code Ann. § 10-1-373.

509.    Defendants, Plaintiffs, and Class Members are "persons" as defined by Ga. Code Ann. § 10-1-371.

510.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Georgia and took efforts to conceal their agreements from Plaintiffs and members of the Class.

511.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

512.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

513.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

expense of Plaintiffs and the public.

514.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

515.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Georgia; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Georgia; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Georgia.

516.    During, the Class Period, Defendants' illegal conduct substantially affected Georgia commerce and consumers.

517.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

518.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ga. Code Ann. § 10-1-373.

### G.    ILLINOIS

519.    Defendants have willingly or knowingly engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 501/1, *et seq*. ("Consumer Fraud and Deceptive Business Practices Act").

520.    The Consumer Fraud and Deceptive Business Practices Act declares "unfair

Case #2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact" unlawful. 815 Ill. Comp. Stat. Ann. 501/2.

521. Defendants, Plaintiffs, and Class members are within the meaning of "persons" as defined by 815 Ill. Comp. Stat. Ann. 501/1.

522. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Illinois and took efforts to conceal their agreements from Plaintiffs and members of the Class.

523. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

524. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

525. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

526. Defendants took grossly unfair advantage of Plaintiffs. The suppression of

Case #2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

527. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Illinois; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Illinois.

528. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce and consumers.

529. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

530. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under 815 Ill. Comp. Stat. Ann. 501/10.

## H.    IDAHO

531. Defendants have engaged in in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Idaho Code Ann. §§ 48-601, *et seq.* ("Idaho Consumer Protection Act").

532. The Idaho Consumer Protection Act declares unlawful "unfair methods of competition and unfair or deceptive acts or practices" including "engaging in any unconscionable method, act or practice in the conduct of trade or commerce." Idaho Code Ann. §§ 48-603 and 48-

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

603c.

533.     Defendants, Plaintiffs, and Class Members are "persons" as defined by Idaho Code Ann. § 48-602.

534.     As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of the Idaho Consumer Protection Act.

535.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Idaho and took efforts to conceal their agreements from Plaintiffs and members of the Class.

536.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

537.     Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

538.     Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

539.     Defendants took grossly unfair advantage of Plaintiffs. The suppression of

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

540.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Idaho; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Idaho; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Idaho.

541.    During, the Class Period, Defendants' illegal conduct substantially affected Idaho commerce and consumers.

542.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

543.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Idaho Code Ann. § 48-608.

## I.    MAINE

544.    Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1211, *et seq.* ("Uniform Deceptive Trade Act").

545.    The Uniform Deceptive Trade Act forbids any deceptive trade practices including but not limited to "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Me. Rev. Stat. Ann. tit. 10 § 1212.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

546. Defendants, Plaintiffs, and Class Members are within the meaning of "person" as defined in Me. Rev. Stat. Ann. tit. 10 § 1211.

547. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of the Uniform Deceptive Trade Act

548. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Maine and took efforts to conceal their agreements from Plaintiffs and members of the Class.

549. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

550. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

551. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

552. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

553. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Maine; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Maine; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Maine.

554. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce and consumers.

555. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

556. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10 § 1213.

## J. MASSACHUSETTS

557. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, § 1, *et seq.*

558. Mass. Gen. Laws ch. 93A, § 2 declares "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. Mass. Gen. Laws ch. 93A, § 2(a).

559. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

violation of Mass. Gen. Laws ch. 93A, § 1, *et seq.*

560.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Class.

561.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

562.     Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

563.     Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

564.     Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

565.     Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Acthar

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Massachusetts; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Massachusetts.

566.    During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

567.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

568.    Plaintiffs' Assignor, ConnectiCare, paid $209,495.54 for Acthar prescriptions that were delivered to its beneficiaries through Procare Pharmacy, LLC located in Boston, Massachusetts.[36]

569.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Mass. Gen. Laws ch. 93A, § 11.

### K.    MINNESOTA

570.    Defendants have engaged in fraud, misrepresentations, or deceptive acts or practices in violation of Minn. Stat. Ann. §§ 325F.68, *et seq.*

571.    Minn. Stat. Ann. § 325F.68 declares "the act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in … whether or not any person has in fact been misled, deceived, or damaged thereby."

572.    Defendants, Plaintiffs, and Class Members are within the meaning of "person" as

---

[36] Plaintiffs were able to identify Procare Pharmacy, LLC using the NPI number.

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

defined under Minn. Stat. Ann. § 325F.68.

573. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of Minn. Stat. Ann. §§ 325F.68, *et seq.*

574. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Minnesota and took efforts to conceal their agreements from Plaintiffs and members of the Class.

575. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

576. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

577. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

578. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

paid and the value received for Acthar.

579. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Minnesota; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Minnesota.

580. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers.

581. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

582. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Minn. Stat. Ann. § 325F.70.

## L.    NEBRASKA

583. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.* ("Consumer Protection Act").

584. Nebraska's Consumer Protection Act declares "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. Neb. Rev. Stat. § 59-1602.

585. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

violation of Nebraska's Consumer Protection Act.

586.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Nebraska and took efforts to conceal their agreements from Plaintiffs and members of the Class.

587.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

588.     Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

589.     Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

590.     Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

591.     Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Acthar prices

105

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Nebraska; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Nebraska.

592. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

593. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

594. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Neb. Rev. Stat. § 59-1609.

## M. NEVADA

595. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

596. Nev. Rev. Stat. Ann. § 598A.0915 forbids deceptive trade practices, including but not limited to, knowingly making "false representation in a transaction."

597. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

598. Plaintiffs and Class Members can bring this suit pursuant to Nev. Rev. Stat. Ann. § 41.600, which permits "any person who is a victim of consumer fraud" to file suit.

599. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels,

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the prices at which Acthar was sold, distributed or obtained in Nevada and took efforts to conceal their agreements from Plaintiffs and members of the Class.

600.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

601.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

602.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

603.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

604.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Nevada; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar,

Case #2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

including in Nevada.

605. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce and consumers.

606. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

607. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Nev. Rev. Stat. Ann. §§ 41.600 and 598.0993.

## N.    NEW HAMPSHIRE

608. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of N.H. Rev. Stat. Ann §§ 358-A:1, *et seq.*

609. N.H. Rev. Stat. Ann § 358-A:2 declares "any unfair method of competition or any unfair or deceptive act or practice" unlawful.

610. Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.H. Rev. Stat. Ann §§ 358-A:1.

611. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of N.H. Rev. Stat. Ann §§ 358-A:1, *et seq.*

612. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in New Hampshire and took efforts to conceal their agreements from Plaintiffs and members of the Class.

613. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore

Case 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

614.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

615.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

616.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

617.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout New Hampshire; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in New Hampshire.

618.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

619. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

620. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.H. Rev. Stat. Ann § 358-A:10.

## O.   NEW MEXICO

621. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.* ("Unfair Practices Act").

622. New Mexico's Unfair Practices Act declares "unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce" unlawful. N.M. Stat. Ann. § 57-12-3.

623. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of New Mexico's Unfair Practices Act.

624. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class.

625. The conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Class and the prices paid by them for Acthar as set forth in N.M. Stat. Ann. § 57-12-2E.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

626.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

627.     Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

628.     Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

629.     Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

630.     Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout New Mexico; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in New Mexico.

631.     During the Class Period, Defendants' illegal conduct substantially affected New

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Mexico commerce and consumers.

632.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

633.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.M. Stat. Ann. § 57-12-10.

## P.    NEW YORK

634.    Defendants have engaged in deceptive acts or practices in violation of N.Y. Gen. Bus Law § 349.

635.    N.Y. Gen. Bus. Law § 349 declares "deceptive acts or practices in the conduct of any business, trade or commerce" unlawful.

636.    Defendants made public statements about the prices of Acthar that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Acthar; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

637.    Because of Defendants' unlawful trade practices in the New York, New York Class Members who purchased Acthar were misled to believe that they were paying a fair price for Acthar or the price increases for Acthar were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

638.     Defendants knew that their unlawful trade practices with respect to the pricing of Acthar would have an impact on New York consumers and not just the Defendants' direct customers.

112

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

639.     Defendants knew that their unlawful trade practices with respect to pricing Acthar would have a broad impact, causing Class Members who purchased Acthar to be injured by paying more for Acthar than they would have paid in the absence of Defendants' unlawful trade acts and practices.

640.     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York in an honest marketplace in which economic activity is conducted in a competitive manner.

641.     Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout New York; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout New York; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in New York.

642.     During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

643.     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

644.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.Y. Gen. Bus Law § 349.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Q.    NORTH DAKOTA

645.    Defendants have engaged in p deceptive acts or practices in violation of N.D. Cent. Code. Ann. §§ 51-15-01, *et seq.*

646.    N.D. Cent. Code. Ann. § 51-15-02 declares "the act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation" unlawful.

647.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.D. Cent. Code. Ann. § 51-15-01.

648.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of N.D. Cent. Code. Ann. §§ 51-15-01, *et seq.*

649.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in North Dakota and took efforts to conceal their agreements from Plaintiffs and members of the Class.

650.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

651.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

652. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

653. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

654. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout North Dakota; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in North Dakota.

655. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

656. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

657. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.D. Cent. Code. Ann. § 51-15-09.

**R.     PENNSYLVANIA**

658. Defendants have engaged in unfair methods of competition, or unfair acts or

115

practices, or deceptive acts or practices in violation of 73 Pa. Stat. Ann. §§ 201-2, *et seq.* ("Unfair Trade Practices and Consumer Protection Law").

659.  The Unfair Trade Practices and Consumer Protection Law declares unfair methods of competition and unfair or deceptive acts or practices illegal, including but not limited to, "engaging in any fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. §§ 201-2 and 201-3.

660.  Defendants, Plaintiffs, and Class Members are "persons" within the meaning of 73 Pa. Stat. Ann. § 201-2.

661.  As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of the Unfair Trade Practices and Consumer Protection Law.

662.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Pennsylvania and took efforts to conceal their agreements from Plaintiffs and members of the Class.

663.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

664.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

116

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

665. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

666. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

667. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Pennsylvania; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Pennsylvania; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Pennsylvania.

668. During the Class Period, Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

669. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

670. Plaintiffs' Assignor, ConnectiCare, paid $169,669.40 for Acthar prescriptions that were delivered to its beneficiaries through Walgreens Specialty Pharmacy located in Pittsburgh, Pennsylvania.[37]

---

[37] Plaintiffs were able to identify Walgreens Specialty Pharmacy using the NPI number.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

671.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under 73 Pa. Stat. Ann. §§ 201-4.1 and 201-9.2.

## S.    SOUTH DAKOTA

672.    Defendants have engaged in deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq.*

673.    S.D. Codified Laws § 37-24-6 declares that it is a deceptive act or practice to "knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."

674.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of S.D. Codified Laws § 37-1-1.

675.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq.*

676.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in South Dakota and took efforts to conceal their agreements from Plaintiffs and members of the Class.

677.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

price.

678.   Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

679.   Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

680.   Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

681.   Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout South Dakota; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in South Dakota.

682.   During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

683.   As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

684. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under S.D. Codified Laws §§ 37-24-31 and 37-24-32.

## T.  WISCONSIN

685. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Wis. Stat. §§ 100.18, *et seq.*

686. Wis. Stat. § 100.20 prohibits "unfair methods of competition in business and unfair trade practices."

687. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of Wis. Stat. §§ 100.18, *et seq.*

688. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Wisconsin and took efforts to conceal their agreements from Plaintiffs and members of the Class.

689. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

690. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

691. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

692.     Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

693.     Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Wisconsin; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Wisconsin.

694.     During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

695.     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

696.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Wis. Stat. §§ 100.20 and 100.25.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury of all issues so triable in this cause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class described herein, pray for the following relief:

a. Certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3);

b. Designate Plaintiffs as representatives for the respective Class and Plaintiffs' undersigned counsel as Class Counsel for the respective Class;

c. Enter a judgment against Defendants for the violations alleged herein;

d. Enjoin and restrain Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anti-competitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anti-competitive practices set forth above;

e. Award to Plaintiffs and Class Members actual damages incurred as a result of the wrongful acts complaint of herein, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

f. Award statutory damages set forth herein under the statutory claims alleged;

g. Award Plaintiffs the costs of this action, including reasonable attorneys' fees;

h. Grant Plaintiffs and Class Members alleged herein such other and further relief as the Court deems just and proper.

122

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DATED:     April 10, 2019

Respectfully submitted by,

*/s/ David M. Hundley*
David M. Hundley
PENDLEY, BAUDIN & COFFIN, LLP
2505 Energy Center
1100 Poydras St.
New Orleans, LA 70163
Phone: (504) 355-0086
Fax: (504) 249-5459
dhundley@pbclawfirm.com

R. Brent Wisner
Adam M. Foster
Pedram Esfandiary
BAUM HEDLUND ARISTEI
& GOLDMAN, P.C.
12100 Wilshire Blvd., Ste. 950
Phone: (310) 207-3233
Fax: (310) 820-7444
rbwisner@baumhedlundlaw.com
afoster@baumhedlundlaw.com
pesfiandiary@baumhedlundlaw.com

*Attorneys for Plaintiffs*

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT C

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CIVIL DIVISION

INTERNATIONAL UNION OF OPERATING :
ENGINEERS LOCAL 542 :
:
VS. : NO.   2018-14059
:
MALLINCKRODT ARD, INC., et al. :
:

## COVER SHEET OF RESPONDENT

Date of Filing ___10/9/2018___     Respondent ___Plaintiff, IUOE Local 542___

Counsel for Respondent ___Donald E. Haviland, Jr., Esq.___     I.D. No. ___66615___

Document Filed (Specify) ___Plaintiff's Opposition to the Preliminary Objections of Defendants___

___Mallinckrodt ARD, Inc., and Mallinckrodt PLC to Plaintiff's Amended___
___Complaint___

**RULE RETURN DATE of Related Motion** _____

Matter is (Check One)     ___X___ (Appealable) _____ (Interlocutory)

Oral Argument     ___X___ (Yes) _____ (No)

-------------------------------------------------------------------------------

Respondent Requires (Specify Reason Only if Interlocutory) :

_____ DISCOVERY     _____

_____

_____

_____

07/26/04

**IN THE COURT OF COMMON PLEAS**
**FOR MONTGOMERY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| **INTERNATIONAL UNION OF**<br>**OPERATING ENGINEERS LOCAL 542**<br><br>Plaintiff,<br><br>v.<br><br>**MALLINCKRODT ARD, INC.,** *et al.*<br><br>Defendants. | Civil Action No. 2018-14059 |

*[PROPOSED]* **ORDER**

AND NOW, this _____ day of _____, 2018, upon consideration of

Defendants Mallinckrodt ARD Inc. and Mallinckrodt plc (collectively "Mallinckrodt")'s

Preliminary Objections to Plaintiff's Amended Complaint and Plaintiff's response thereto, it is

hereby ORDERED and DECREED that Mallinckrodt's Preliminary Objections are

OVERRULED.

BY THE COURT:

_____
                                                              J.

Case# 2018-14059-0 Docketed at Montgomery County Prothonotary on 02/02/2018 9:04 AM, Fee = $0.00. This file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/05/2019 5:34:44 PM / Fee = $0.00 . The file contains 6 pages plus the cover page . This file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Donald E. Haviland, Jr., Esquire (PA I.D. #66615)
*haviland@havilandhughes.com*
William H. Platt II, Esquire (PA I.D. #83585)
*platt@havilandhughes.com*
Christina M. Philipp, Esquire (PA I.D. #92804)
*philipp@havilandhughes.com*
**Haviland Hughes**
201 South Maple Way, Suite 110
Ambler, PA 19002
(215) 609-4661 Telephone
(215) 392-4400 Facsimile

*Counsel for Plaintiff,*
    *International Union of Operating Engineers Local 542*

**IN THE COURT OF COMMON PLEAS
FOR MONTGOMERY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| **INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542**<br><br>Plaintiff,<br><br>v.<br><br>**MALLINCKRODT ARD, INC.,** *et al.*<br><br>Defendants. | Civil Action No. 2018-14059 |

**PLAINTIFF INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL 542'S OPPOSITION TO THE PRELIMINARY OBJECTIONS
OF DEFENDANTS MALLINCKRODT ARD INC AND MALLINCKRODT PLC
TO PLAINTIFF'S AMENDED COMPLAINT**

Plaintiff, International Union of Operating Engineers Local 542 (hereinafter "Plaintiff" or

"IUOE Local 542"), pursuant to Rules 1028 and 1029 of the Pennsylvania Rules of Civil

Procedure and by and through its undersigned counsel, hereby responds to the Preliminary

Objections of Defendants Mallinckrodt ARD, Inc. and Mallinckrodt PLC (collectively,

"Mallinckrodt"), as follows:

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2019 3:04 PM. Fee = $0.00. This file certified public access. Public probability. Unified Justice System/Remote Public Access/Electronic Filing. The filing staff identified informational documents/documents.

## I.     BACKGROUND AND PLAINTIFF'S ALLEGATIONS

1.      Admitted.

2.      Admitted.

3.      Admitted in part, denied in part.  It is admitted only that the quoted portions of the Plaintiff's Amended Complaint (hereinafter Am. Cmplt.) accurately quote the language used.  However, it is specifically denied that Plaintiff seeks to bring any antitrust claim in this lawsuit, as later charged by Mallinckrodt.

4.      Admitted in part, denied in part.  It is admitted only that the quoted portions of the Plaintiff's Amended Complaint accurately quote the language used.  However, it is specifically denied that Plaintiff seeks to bring any antitrust claim in this lawsuit, as later charged by Mallinckrodt.  In fact, the quoted language from paragraph 112 of the Amended Complaint – relating to Mallinckrodt's ability to "maintain and enhance its monopoly power" by its acquisition of Synacthen – was directly alleged and proven by the Federal Trade Commission ("FTC") in its Complaint filed against Mallinckrodt, as described at Am. Cmplt. ¶¶ 114-125.  *See* FTC Complaint at Exhibit "C" to the Am. Cmplt.  Mallinckrodt chose to settle these charges of antitrust, rather than fight them.  Am. Cmplt. ¶¶ 152-165.  But the fact that Mallinckrodt was prosecuted for antitrust by the FTC, and chose to settle, does not change the fact that Plaintiff here seeks to hold Mallinckrodt accountable for its unfair and deceptive conduct under Pennsylvania law, as described at Am. Cmplt. ¶¶ 126-132, and elsewhere.

5.      Admitted.  It is noteworthy that nowhere does Plaintiff allege any claim for antitrust, under either federal law or Pennsylvania common law.  *Cf. XF Enterprises, Inc. v. BASF Corp.*, 47 Pa. D&C 4th 147, 150 (Pa. Com. Pl. Phila. Cty. 2000)(granting defense preliminary objections as to claim for violations of Pennsylvania antitrust laws).

6.     Denied.  It is specifically denied that Plaintiff "copied … allegations of a federal antitrust and RICO class action" pending in federal court.  Obviously, since Local 542 suffered injuries due to the Mallinckrodt's same conduct which caused injury to other payors throughout the country, including the City of Rockford in the federal action, there is necessarily factual overlap in the statement of the claims against Mallinckrodt.  However, Plaintiff's well-pleaded Amended Complaint makes no claim for antitrust or RICO, as the plaintiffs in federal court allege.  Plaintiff's claims here are brought exclusively under Pennsylvania state law.

Mallinckrodt's attempt to re-caste Plaintiff's well-pleaded Amended Complaint here should be rejected.  *See County of Allegheny v. Commonwealth*, 507 Pa. 360, 372, 490 A.2d 402 (1985)("A demurrer can only be sustained where the complaint is clearly insufficient to establish the pleader's right to relief.  For the purpose of testing the legal sufficiency of the challenged pleading a preliminary objection in the nature of a demurrer admits as true all well-pleaded, materials, relevant facts.")(citations omitted).  Consequently, the Court must rule upon Mallinckrodt's Preliminary Objections in light of the factual averments of Plaintiff's Amended Complaint, not those set forth in the original Complaint, because the averments were amended in response to Mallinckrodt's Preliminary Objections, as is appropriate under the Pennsylvania Rules to make clear what this case is about, and what it is not about.  Since Mallinckrodt's Preliminary Objections are unchanged from its original Preliminary Objections, despite the multiple, clarifying changes made in Plaintiff's Amended Complaint, Mallinckrodt's current Preliminary Objections miss the mark as they continue to argue issues – like antitrust – clarified by the Amended Complaint.  As a result, the Court should deny Mallinckrodt's Preliminary Objections.  *See, e.g., Allegheny Inst. Taxpayers Coalition v. Allegheny Reg'l Asset Dist.*, 556 Pa. 102, 113, 727 A.2d 113, 119, n. 1 (1999)("If the amendment [of the complaint] removes all of

4

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2018 9:04 AM. Filed & Attested by the Office of Judicial Records of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records Public Access Policy that filing a filing statement identifies confidential information in documents the filing party certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records Public Access Policy that filing a filing statement identifies confidential information in documents.

which the defendant has complained, the preliminary objections should be withdrawn or dismissed by the court.")(brackets in original).[1]

     7.     Admitted.

     8.     Admitted.

     9.     Admitted in part, denied in part.  It is admitted only that Plaintiff filed an Amended Complaint on August 27, 2018.  It is specifically denied that the amended pleading "removes some antitrust buzzwords and attempts to recast [Plaintiff's] claims as something other than antitrust in nature."  To the contrary, Plaintiff's claims in this case have always sought relief only for Mallinckrodt's unfair and deceptive acts or practices in violation of the Pennsylvania consumer fraud laws and common law.  The original pleading included no claim for antitrust, under federal or state law.  So too, the Amended Complaint includes no claim for antitrust.  To the extent Mallinckrodt seeks to argue about the purported meaning of Plaintiff's original pleading in relation to the amended pleading, such argument must be rejected as the only operative pleading in this case is the Amended Complaint.  *See*, *e.g.*, *Brooks v. B&R Touring Co.*, 2007 Pa. Super. 387, 939 A.2d 398 (2007)("filing of an amended complaint constitutes 'virtually a withdrawal of the first'")(*quoting Reichert v. TRW, Inc., Cutting Tools Div.*, 531 Pa. 193, 611 A.2d 1191, 1194 (1992)).

     Mallinckrodt continues to erroneously label this case as "antitrust" in order to pigeon-hole it into favorable, but inapposite, antitrust jurisprudence.  The purported "antitrust buzzwords" that Mallinckrodt seized upon in its original Preliminary Objections have been removed.  With such removal, Mallinckrodt has no colorable basis to continue to argue that

---

[1] In the event finds that any of Mallinckrodt's Preliminary Objections should be sustained, leave to amend the Amended Complaint should be granted to address the Court's concerns.  *See*, *e.g.*, *Com. of Pa. Game Comm'n v. Hilliard*, 3 Pa. Cmwlth. 560, 562, 484 A.2d 326, 327 (1971)(allowing further amendment to amended complaint after preliminary objections granted).

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 10/26/2018 9:30:47 AM. Fee = $60.00. This file contains that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Plaintiff's Amended Complaint claims antitrust. *See Tagliaterra v. State Police*, 2010 Pa. Dist. & Cnty. Dec. LEXIS 878 (Ct. Com. Pl. Northampton Cty. June 30, 2010) at * 20 ("Defendants could only have supposed that an amended pleading was likely to be filed at some point, [so] Defendants cannot fairly complain that they are either surprised or prejudiced by the elimination of claims against them.")  It's time to focus on what this case is about; not what Mallinckrodt wants it to be about.

10.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

## II.    ARGUMENT

### A.    PRELIMINARY OBJECTIONS PURSUANT TO PA. R. CIV. P. 1028(a)(4)

11.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

#### i.    Plaintiff Cannot Recover Damages for Alleged Antitrust Violations under Pennsylvania Law (Counts I, II, III, IV, V).

12.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).  Further, Mallinckrodt is wrong that Plaintiff seeks to make any claim for antitrust violations under Pennsylvania law.

To the extent Mallinckrodt argues that the *XF Enterprises* case provides legal support for its argument that all five (5) of Plaintiff's counts against Mallinckrodt should be dismissed, the case provides no such support.  Contrary to the case at bar, the plaintiff in *XF Enterprises* filed a "claim for violation of Pennsylvania antitrust laws", in addition to claims for violations of the UTPCPL and common law civil conspiracy, fraud and negligent misrepresentation.  The Court of Common Pleas of Philadelphia County sustained defendants' preliminary objections to the

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2019 9:04 AM / Fee = $0.00 / This file certified as a true and exact copy of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing offices to disable certain documents that contain confidential information through the electronic filing system to protect certain confidential information from being publicly accessible electronically within the public filing system.documents.

antitrust claim, because "[n]o court to date has held that a private remedy is available for damages under Pennsylvania's common law on antitrust violations." *Id.*, 47 Pa. D&C 4th at 150. Unlike here, the "plaintiff filed a praecipe for dismissal" of the UTPCPL claims. *Id.* at 151. And, the court denied the preliminary objections as to the claims for fraud and negligent misrepresentation. *Id.* at 152. Accordingly, Mallinckrodt's lone cited authority stands for the proposition that, even where a plaintiff makes a claim for antitrust, which is dismissed on preliminary objections, common law claims for fraud and negligent misrepresentation may proceed *for the same conduct*. *XF Enterprises* thus supports denial of Mallinckrodt's preliminary objections to IUOE Local 542's Amended Complaint.

13.     Denied.  Plaintiff claims no antitrust injury by its Amended Complaint.

What is truly remarkable about Mallinckrodt's claim is that it completely ignores the fact Local 542 is not suing for antitrust injury.  This averment in Defendants' renewed Preliminary Objections is identical to the averment in the original Preliminary Objections.  However, the original averment included the following line, which Mallinckrodt removed from its current Preliminary Objections: "[h]ere, 'charges of antitrust form the bases of the unlawful of the unlawful conduct charged in this Complain under Pennsylvania law.", citing paragraph 5 of the original Complaint.  That line does not appear in the current Preliminary Objections because paragraph 5 of the Amended Complaint does not include the quoted line.  It was removed.  It was removed in response to the Preliminary Objection that claimed this case concerned antitrust injury.  It does not.  But, Mallinckrodt continues to make such baseless claim in the face of (1) the removal of the quoted line and (2) Local 542's express averment that this case does not concern antitrust.  Am. Cmplt. at ¶ 13.

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/06/2019 9:34 AM, Fee = $0.00. The file certificate that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records Public Access Policy that requires filers to redact or omit that information from all documents that are filed with the court.

14.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).  Further, the averment is denied because Plaintiff makes no claim for "alleged antitrust violations under Pennsylvania law."

ii.     **Motion to Dismiss Pennsylvania Unfair Trade Practices and Consumer Protection Law Claim (Count I).**

15.     Admitted.  Local 542 pleads a well-stated claim for violations of the Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201.1 *et seq.* ("UTPCPL") under Count I of the Amended Complaint.

16.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).  Further, Plaintiff has standing to sue under Pennsylvania law.  Mallinckrodt cites no legal authority holding otherwise.

17.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Mallinckrodt makes the baseless legal argument the Local 542 does not have standing to sue under the UTPCPL.  Mallinckrodt ignores the fact the UTPCPL defines a "person" as including entities like Local 542, and that Pennsylvania courts have long held that union funds have standing to sue drug companies under the UTPCPL.

The term "person" is defined by the UTPCPL as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities."  73 Pa. Stat. § 201-2(2).

In a case involving multiple union funds suing Pennsylvania-based Cephalon for its drug Actiq, the Eastern District of Pennsylvania court wrote on this subject as follows:

8

As discussed in *Am. Fed'n of State County and Mun. Employees v. Ortho-McNeil-Janssen Pharms., Inc.*, No. 08-cv-5904, 2010 U.S. Dist. LEXIS 23181, 2010 WL 891150, *3-4 (E.D. Pa. 2010) ("AFSCME"), Pennsylvania courts have taken a longstanding position of validating third party payor claims against drug manufacturers under the UTPCPL:

"Pennsylvania courts, however, have long recognized the ability of third-party trusts and associations to assert UTPCPL claims on behalf of their constituent members based on the statute's broad definition of 'person.'  Section 201-9.2(a) of the UTPCPL permits a private action for the recovery of damages for '[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money ... as a result of ... [any] act or practice declared unlawful by this act ....' The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." In addition, the 'purpose' requirement of § 201-9.2(a) focuses on whether the final consumer uses the product for personal, family or household use, not whether the third-party entity personally uses the product or merely purchases it.  Furthermore, the court determined that because third party payors purchased the prescription drug in question on behalf of their members, and such drugs were purchased for personal, family and household use, plaintiff payors had the right to bring their claims under the UTPCPL."

*AFSCME v. Cephalon, Inc. (In re Actiq Sales & Mktg. Practices Litig.)*, 790 F.Supp. 2d 313, 326-327 (E.D.Pa. 2011)(citations omitted).

Undersigned counsel for Local 542 successfully prosecuted the UTPCPL claims of self-funded Commonwealth entities who reimbursed the prescription drugs of their beneficiaries all the way through trial.  In 2005, the Commonwealth Court agreed that third party payors have standing to sue under the UTPCPL. *See Com. v. TAP Pharm. Indus. Ltd.*, *et. al.*, 885 A.2d 1127, 1142-42 (Pa. Cmwlth. 2005).  Mallinckrodt fails to mention or discuss this binding precedent.

18.   Admitted in part, denied in part.  It is admitted that IUOE Local 542 is a "Taft-Hartley union fund providing health and welfare benefits to its members and their families." Amended Complaint ¶19.  It is also admitted that Plaintiff purchased and/or reimbursed the costs of Acthar for its members.  It is denied that there is not a "single (conclusory) allegation" concerning IUOE's purchases and reimbursements at Amended Complaint ¶ 171.  To the

9

Case# 2018-14059-89 DDocketedatMontgomeryCCountyProthonotaryonn102/0202/0089:3:0:4AM,/Ffee=$$00.00.TThiseffileiceettifileesthhatthihisffiliingcomplieiswithhtthegoproviscioscobofttherPbPublicicAccesscsPbolicicyppfthfthednified Wunfiield Jofystesm Soff Pennnsyl/Pennia Cecases/R GazetesRecordecsapppuldbilaRqperdatafictalfifctalcCourtrts)thhat flilrequirehat fileiflengsgnfileiling stdarthat fleerd thatferd tehaterde satdeaninfitefernrd information.

contrary, detailed allegations of Plaintiff's purchases and reimbursements of Acthar are contained in paragraphs 11, 14, 21-23, and 78-84.

19.     Admitted in part, denied in part.  It is admitted the UTPCPL prohibits an enumerated list of "unfair methods of competition" and "unfair and deceptive acts or practices". It is denied the Mallinckrodt's conduct "is neither fraudulent nor deceptive" under the UTPCPL. To the contrary, Plaintiff alleges that Mallinckrodt's conduct is both unfair ***and*** deceptive, in violation of several, enumerated provisions of the UTPCPL.  Am. Cmplt. at ¶¶ 5-6, 126-142, 166-175.  Specifically, Plaintiff alleges Mallinckrodt's conduct constitutes "unfair methods of competition" and "unfair or deceptive acts or practices" in violation of the following sub-sections of 73 Pa. Stat. Ann. §§201, *et seq.*:

> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
>
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
>
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
>
> (viii) Disparaging the goods, services or business of another by false or misleading representation of fact;
>
> (xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and
>
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

Amended Complaint at ¶ 167.

Consistent with its theme of trying to recast this case as an antitrust action, Mallinckrodt cites two antitrust cases which are inapposite to the case at bar, because

they unsuccessfully sought to establish antitrust conduct as "unfair and deceptive" under the UTPCPL. *See In re Niaspan Antitrust Litig.*, 42 F.Supp. 3d 735 (E.D.Pa. 2014) and *In re Lidoderm Antitrust Litig.*, 103 F.Supp. 3d 1155 (N.D.Cal. 2015).

20.     Denied.    To the contrary, detailed, non-conclusory averments of fact concerning Mallinckrodt's unfair, deceptive and fraudulent conduct appear throughout the Amended Complaint. *See* Amended Complaint at ¶¶ 6 ("concealing from IUOE Local 542 the true costs for Acthar through undisclosed, direct contractual agreements between Mallinckrodt and Express Scripts…, charging inflated prices for Acthar, and collecting the money from Plaintiff for such prices…"), 48-75 (describing the "new strategy" to deceive), 83 (deceptively listing Acthar as "available at participating pharmacies"), 97-106 (describing the "manufacturing decision" to "vastly overprice[]" Acthar based on fraudulent and deceptive claims of "value"), 107-113 (fraudulent and deceptive scheme to acquire Synacthen to prevent competition in ACTH market and raise the prices for Acthar), 166-175.

21.     Denied.  It is specifically denied that Mallinckrodt's conduct is anything close to "ordinary business practices".

It is not an *ordinary business practice* to raise the prices of 65-year-old orphan drug 1,000s of percents, from $40 to $40,000. *See* Amended Complaint at ¶¶ 93, 96, 153, 156, 160.  Ordinary businesses in America do not have that power, unless they cheat.

It is not an *ordinary business practice* for a one-product company like Questcor to enter into an exclusive distribution agreement with the largest payor representative in the country, and then raise the prices for that lone product to exorbitant levels without the same largest payor representative pushing back against such price increases for the

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2018 9:04 AM / Fee = $0.00 The file certified that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

benefit of their contracted payor clients.  *See* Amended Complaint at ¶¶50-77, 81-83, 93, 97-106, 161.  It was far from ordinary for Questor to embark on a "new strategy" six years after acquiring Acthar, a strategy that involve direct sales and marketing and sales to patients and doctors the ASAP Program, and directly marketing to patients and doctors using the Acthar Start Form to bypass payment protections Local 542 had put in place with Express Scripts to save money on high priced drugs.  Amended Complaint ¶¶ 8, 35, 47-75, and Exhibit "A" to Amended Complaint (Acthar Start Form).

The Court must wonder why Mallinckrodt takes the time to complain about the fact Local 542 was not permitted by Express Scripts' claims of confidentiality to attach its contract with Express Scripts to the Amended Complaint,[2] for purposes of its breach of contract claims against Express Scripts but <u>not</u> Mallinckrodt, but Mallinckrodt makes no mention of the Acthar Start Form – its own form – attached as Exhibit "A" to the Am. Cmplt. which forms the basis of Plaintiff's UTPCPL claims against it.

It is not an *ordinary business practice* for a company to be sued by its competitor, and then settle for nearly the same amount of money the competitor would have *paid* for a competitive product.  *See* Amended Complaint at ¶¶111, 126,141-142, 143-147.

*Ordinary* businesses are not prosecuted by the federal government, but then choose to settle [rather than defend themselves and fight], paying $100 million for

---

[2] As discussed below, in response to Mallinckrodt's "Preliminary Objection pursuant to PA.R.Civ.Proc. 1028(a)(2) (at paragraphs 55 – 58 below), in Plaintiff's response to the Preliminary Objections filed by Express Scripts, Plaintiff attaches the communications of its counsel with counsel for Express Scripts as to the issue of the contract.  This Court will see the problem Express Scripts has created, wanting the supposed confidential contract filed of record in the absence of a protective order, which the parties have negotiated in the federal court case. The matter will have to be resolved by the Court on motions practice.

conduct they supposedly did not commit. *See* Am. Cmplt. at ¶¶114-125, 145-147, 152-165.

It is also specifically denied that "Defendants publically disclosed the existence" of their unlawful conduct, as Mallinckrodt contends contrary to the well-pleaded allegations of the Amended Complaint. *See* Am. Cmplt. at ¶¶6, 9, 50, 111, 183, 192-201.

22.    Denied.  Plaintiff alleges both reliance and causation, as required where required. *See* Am. Cmplt. at ¶¶ 10-11, 180-182, 186-187, 189-191, 230.

23.    Denied.  Plaintiffs' Amended Complaint, 248 separate averments over 65 pages of text, is replete with its descriptions of the unfair and deceptive conduct at issue. *See generally*, Am. Cmplt. at ¶¶ 1-11 (introductory paragraphs explaining case), 23-38 (identifying Defendants and their respective roles in the consumer fraud), 39-75 (background of unfair and deceptive conduct), 92-96 (Acthar pricing), 97-106 (lack of value of Acthar for prices charged), 107-165 (Mallinckrodt's illegal scheme to acquire competitive product, Synacthen, and lawsuits by FTC and Retrophin), and 166-175 (Count I for violations of UTPCPL).

The Amended Complaint details Mallinckrodt's conduct, from taking a 65-year old, orphan drug that cost only $40 to purchase in 2001, to a blockbuster product (in terms of revenue generated) by the time Local 542 had members take the drug, costs Plaintiff hundreds of thousands of dollars.  Mallinckrodt paid $5.9 billion to acquire the one-product company Questcor in 2014, when Questcor only paid $100,000 to acquire Acthar in 2001.  Am. Cmplt. at ¶¶ 3, 24, 46, 96.  Mallinckrodt got there by adopting a "new strategy", focused not on improving Acthar, but only on exclusive distribution, marketing and pricing to increase by sales and sales revenue.  Am. Cmplt. at ¶¶ 9, 48-77,

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2019 3:04 PM, Fee = $0.00. The file certified is the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records Section 8.0(b). In compliance with this filing complies with the public access policy of the theoretical and confidential information documents.

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2018 9:04 AM. Fee = $600.00. This file certified as true and correct by Winfield Baptiste, Sheriff of Montgomery County. Access Records via the Public Access Portal of the Unified Judicial System of Pennsylvania. Cases are scanned and available to the public at the official filing office. The original document is filed with the Prothonotary. This file certifies the filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

92-93, 128.  Importantly, Mallinckrodt's selected exclusive distributor, Express Scripts – which is the same company with whom Local 542 contracted to **save** costs on prescription drugs – conspired and agreed with Mallinckrodt to **raise** the price of Acthar to the exorbitant levels paid by Plaintiff.  Express Scripts did so, even as its Chief Medical Officer, Steve Miller, admitted last year that Acthar was not worth what Express Scripts and Mallinckrodt were charging Local 542 for it.  Am. Cmplt. at ¶¶ 100-101, 169.  As a result, Local 542 paid over $150,000 for a drug that cost only a few thousand dollars before the Defendants embarked on a strategy to commit consumer fraud and make exorbitant profits at the expense of Local 542.  Am. Cmplt. at ¶¶ 22-23.

The unfair and deceptive acts and practices which underlie the Defendants' scheme to price gouge and profiteer are detailed in Count I, alleging multiple violations of the Pennsylvania CPL.  *See* Am. Cmplt. Count I.  The details of such conduct are also woven throughout the Amended Complaint, as discussed above.

24.      Denied.

### iii.     Motion to Dismiss Negligent Misrepresentation Claim

25.      Admitted in part, denied in part.   It is admitted Plaintiff alleges Mallinckrodt is liable for negligent misrepresentation; it is denied Plaintiff fails to state such claim.

26.      This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

The requirements for pleading a claim for negligent misrepresentation under Pennsylvania law have been satisfied.  *See* Am. Cmplt. Count II; *see also, Com. v. TAP*, 36 A.3d 1197, 1277 (Pa. Cmwlth. 2011), *vacated and remanded on other grounds*, 626 Pa. 25, 94 A.3d

364 (2014)(noting that "the application of this Section [552 of the Restatement], within the drug-pricing context, appears to be an issue of first impression in Pennsylvania", but holding that it applies to claims of a third party payor, like Local 542, against a prescription drug company, like Mallinckrodt).

27.     Denied.  In making the blanket statement that Plaintiff's Count II "fails to allege facts establishing that Mallinckrodt made a negligent misrepresentation", Mallinckrodt's Preliminary Objection is strikingly similar to the one rejected by the Commonwealth Court in *Koken v. Steinberg*, 825 A.2d 723, 731 (Pa. Cmwlth. 2003), wherein the objecting defendant "cynically ignores fifty previous paragraphs of the Complaint that exhaustively detail the elements necessary to constitute fraudulent misrepresentation", as defined by the Supreme Court in *Porreco v. Porreco*, 571 Pa. 61, 811 A.2d 566, 570 (2002).  Here, Count II of the Amended Complaint is preceded by *more than* 50 paragraphs detailing Mallinckrodt's fraudulent misrepresentations about the value of its Acthar at the high prices charged, through the ASAP Program and otherwise.

28.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

29.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Moreover, the economic loss doctrine does not bar Plaintiff's claims for negligent misrepresentation premised upon violations of section 552 of the Restatement (Second) of Torts. *See Com. v. TAP*, 36 A.3d at 1277 ("we hold that the economic loss rule does not apply to claims of negligent misrepresentation sounding under Section 552", *quoting Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 483-84, 866 A.2d 270, 288 (2005)).

15

30.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

The economic loss doctrine does not bar Plaintiff's claims for negligent misrepresentation premised upon violations of section 552 of the Restatement (Second) of Torts. *See Com. v. TAP*, 36 A.3d at 1277 ("we hold that the economic loss rule does not apply to claims of negligent misrepresentation sounding under Section 552", *quoting Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 483-84, 866 A.2d 270, 288 (2005)).

31.     Admitted in part, denied in part.  It is admitted only that Mallinckrodt accurately quotes paragraph 189 of the Amended Complaint.  However, that one line is taken out of context.  Plaintiff does not allege that Mallinckrodt is not also in the business of supplying information about Acthar to payors, like Local 542, and its patients, both directly through the ASAP Program and indirectly through Express Scripts.  As a result, Mallinckrodt's cited authorities are inapposite.

32.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d). Mallinckrodt's cited federal court precedents are inapposite.

33.     Denied.

34.     Denied.

### iv.     Motion to Dismiss Aiding and Abetting/Conspiracy Claim

35.     Denied.

36.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

37.     Denied.

Mallinckrodt completely misapprehends this claim. Aiding and abetting allows Plaintiff to hold Mallinckrodt liable "for harm caused to [Local 542] arising from the tortuous conduct of another." In this case, the "other" is Express Scripts and all its subsidiary companies, UBC, Curascript and/or Accredo. Mallinckrodt is an alleged co-conspirator with *these* companies for *their* unlawful conduct, not "an underlying tortuous act … by Mallinckrodt", as alleged. Plaintiff alleges facts sufficient to support claims for multiple violations of the UTPCPL (Count I) and negligent misrepresentation (Count II) as against Express Scripts, either of which is sufficient to support a claim for aiding and abetting against Mallinckrodt. Because Mallinckrodt does not allege or prove otherwise in its Preliminary Objections, its objections fail as a matter of law.

In citing the *Cummins* case, Mallinckrodt conceded that the torts of concert of action and aiding and abetting – being based on the Restatement – relate to the wrongful conduct of another. Yet Mallinckrodt erroneously argues about a claimed lack of wrongful conduct *on its part*, as opposed to Express Scripts. *See Cummins v. Firestone Tire & Rubber Co.*, 344 Pa. Super. 9, 21, 495 A.2d 963, 969 (1985)(describing the standards for aiding and abetting as set forth in §876 of the Restatement (Second) of Torts). Aiding and abetting is properly pleaded where, as here, Mallinckrodt is alleged to have given substantial assistance to Express Scripts and its subsidiary companies in the tortuous breach of their duties to Local 542.

38.    This averment constitutes a statement of a legal position to which no response is required. Consequently, the averment is deemed denied. Pa. R. Civ. Proc. 1029(d).

39.    This averment constitutes a statement of a legal position to which no response is required. Consequently, the averment is deemed denied. Pa. R. Civ. Proc. 1029(d).

17

Mallinckrodt continues to wrongly claim Plaintiff alleges "anticompetitive conduct".

40.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Mallinckrodt continues to wrongly claim Plaintiff alleges "antitrust violations."

41.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Here, Plaintiff alleges viable claims against Mallinckrodt for its role in assisting Express Scripts in its wrongful conduct in charging its customer, Local 542, the exorbitant prices for Acthar it did pursuant to multiple unfair and deceptive acts and practices set forth in the Amended Complaint.  Plaintiff's Amended Complaint is far from being "vaguely worded", as the complaint at issue in the *Nelson* case.

### v.     Motion to Dismiss Unjust Enrichment Claims

42.     Admitted.

43.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

44.     Denied.   Plaintiff expressly avers that it provided benefits directly to Mallinckrodt, by and through its exclusive agent, Express Scripts.  Am. Cmplt. at ¶¶6, 73, 206-208, 214-216.  Plaintiff also alleges that retention of such exorbitant payments for Acthar would be unjust, in light of the lack of value for the medication and the unconscionable price increase from $40 in 2001 to over $40,000 today.  Am. Cmplt. at ¶¶ 6, 11, 41, 45, 92, 153, 202-211.

45.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Furthermore, Local 542 received Acthar directly from Mallinckrodt via its direct distribution arrangement with Plaintiff's PBM, Express Scripts.  Am. Cmplt. at ¶¶ 21, 25, 48, 52-55, 59.  Mallinckrodt directly communicated with Local 542 beneficiaries about their receipt and use of Acthar through both the ASAP Program and the Acthar Start Form.  Am. Cmplt. at ¶¶ 25, 52, 55, 70-72 and Exhibit "A".  Indeed, Mallinckrodt required Local 542 beneficiaries to sign its Acthar Start Form, authorizing the payments for Acthar Local 542 ultimately made.  Mallinckrodt has no basis for its factual assertion that Local 542 "is an indirect purchaser."  Strict proof thereof is required.

46.     Denied.  Plaintiff's Amended Complaint at Count IV states a claim for unjust enrichment against Mallinckrodt.

### vi.     Motion to Dismiss Declaratory or Injunctive Relief Claim

47.     Denied.

48.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

49.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

50.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

51.     This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2018 9:30:4 AM / Fee = $600.00 This file certifies this filing complies with the legal provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require that the filing staff id email information not made publicly accessible on the court filing system to email or redact documents.

52.    This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

53.    This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Plaintiff is seeking relief for the potential future harm of additional beneficiaries who may be prescribed Acthar.  Such claim is cognizable under Pennsylvania law.  "[A]n injunction can issue to restrain conduct based on prior unlawful conduct".  *Commonwealth v. TAP Pharm. Prods.*, 36 A.3d 1112, 1172 (Pa. Cmwlth. 2011)

54.    Denied.

**B.    PRELIMINARY OBJECTIONS PURSUANT TO PA. R. CIV. P. 1028(a)(2) FOR FAILURE TO CONFORM TO A RULE OF COURT**

55.    Admitted in part, denied in part.  It is admitted the Rule provides a party the right to file a preliminary objection, but the objection must relate to a claim or issues concerning that party, not a different party, as here.

Since this averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

56.    This averment also constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Mallinckrodt fails to demonstrate how the Plaintiff's breach of contract claim against Express Scripts, Mallinckrodt's co-defendant but a separate party represented by separate counsel, relates to it.  As a result, Mallinckrodt has not standing to assert a

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 10/02/2018 9:34 AM / Fee = $0.00 / This file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

preliminary objection under Rule 1028(a)(2) for Plaintiff's alleged failure to comply with Pa.R.Civ.Proc. 1019(i).  As a result, this Preliminary Objection should be denied.

57.    Admitted in part, denied in part.  Because this issue relates to Express Scripts, and it separately addressed in Plaintiff's response to Preliminary Objections filed by Express Scripts, Mallinckrodt's Preliminary Objection should be denied.

58.    Denied.  The proper resolution of this issue is between Plaintiff, Express Scripts and the Court.

### C.    PRELIMINARY OBJECTIONS PURSUANT TO PA. R. CIV. P. 1028(a)(2) FOR INCLUSION OF SCANDALOUS OR IMPERTINENT MATTER

59.    Admitted.  However, since Mallinckrodt provides this Court with no case law as to what constitutes "scandalous or impertinent matter" rising to the level that warrants an averment being stricken from a complaint, Plaintiff provides the Court with such authority, so it can see that the cited averments of the Amended Complaint should not be stricken.

"Pennsylvania Rule of Civil Procedure 1028(a)(2), provides that a party may file preliminary objections to a pleading if it fails to 'conform to [a] law or rule of court or' if it includes 'scandalous or impertinent matter.'"  *Britt v. Chestnut Hill Coll.*, 429 Pa. Super. 263, 269, 632 A.2d 557, 559-60 (1993) *quoting* Pa. R.C.P. No. 1028.  However, though "[s]candalous and impertinent has been defined as 'immaterial and inappropriate to the proof of the cause of action,'" the "right to strike impertinent matter should be exercised sparingly, unless there is prejudice, the motion should not be granted.  Further, 'where matter is impertinent but not injurious, it need not be stricken.'"  *Baird v. Macklin*, 6 Pa.D.&C.5th 193, 206 (C.P. Beaver 2008) (internal citations omitted); *see*

*also*, *JHE, Inc. v. SEPTA*, Nos. 1790, 010312, 020586, 2002 Phila. Ct. Com. Pl. LEXIS 78, at *32-34 (C.P. Philadelphia May 17, 2002)("Pennsylvania courts have been restrained in striking scandalous and impertinent pleadings, however:  There is some authority for the proposition that, even if the pleading of damages was impertinent matter, that matter need not be stricken but may be treated as 'mere surplusage' and ignored.")(citation omitted).

60.     Denied.  There is nothing "scandalous" or "impertinent" about the cited averments of the Amended Complaint.  Inconvenient, but truthful, facts about a case are not to be stricken by courts, simply because the defendant desires not to be faced with such facts.

Here, Mallinckrodt complains about two sets of facts, and seeks to have them stricken from the Amended Complaint: (1) it was sued by the FTC for some of the same conduct as at issue in this case, and (2) it was sued by a competitor, Retrophin, for some of the same conduct at issue in this case.  Mallinckrodt chose to settle both lawsuits, and to pay tens of millions of dollars in settlement, rather than fight the claims against it. Importantly, in resolving the FTC lawsuit, Mallinckrodt agreed to license Synacthen to another company to abate the antitrust problem created by Mallinckrodt's unlawful acquisition of Synacthen previously.

These are facts.  They should not be stricken from the Amended Complaint.

Furthermore, Plaintiff attaches to its Amended Complaint the actual complaints filed by the FTC and Retrophin.  *See* Am. Cmplt. Exhibits "C" and "D", respectively. Mallinckrodt does not seek to have these complaints stricken as either scandalous or impertinent.  As a result, the facts of these two complaints, incorporated by reference

22

thereto into Local 542's Amended Complaint, will remain, regardless of what the court chooses to do with Mallinckrodt's Preliminary Objection.  *E.g.*, Am. Cmplt. at ¶143 (incorporating complaint), 163 (quoting admission in other case).

61.   Denied.

## D.   PRELIMINARY OBJECTIONS PURSUANT TO PA. R. CIV. P. 1028(a)(3)

62.   This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

63.   This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Moreover, Plaintiff's Amended Complaint provides the requisite fact pleading.

64.   This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

63.   This averment constitutes a statement of a legal position to which no response is required.  Consequently, the averment is deemed denied.  Pa. R. Civ. Proc. 1029(d).

Moreover, Plaintiff's Amended Complaint does not allege "fraud".  Therefore, the standard of Rule 1019(b) does not apply.  Alternatively, were such standard to be applied, the detailed allegations of the Plaintiffs' Amended Complaint provide such particularity.

65.   Denied.   However, in the event any Count of Plaintiff's Amended Complaint was found to "lack[] the necessary specificity", Plaintiff agrees that leave to replead should be granted.

**WHEREFORE,** Plaintiff IUOE Local 542 respectfully request the Court deny the Mallinckrodt's' Preliminary Objections to Plaintiff's Amended Complaint.

23

Respectfully submitted,

Dated:  October 9, 2018

By:   *s/ Donald E. Haviland, Jr.*
Donald E. Haviland, Jr.
*haviland@havilandhughes.com*
William H. Platt II
*platt@havilandhughes.com*
Christina M. Philipp
*philipp@havilandhughes.com*
Haviland Hughes
201 South Maple Avenue, Suite 110
Ambler, PA 19002
Phone: (215) 609-4661
Fax:     (215) 392-4400

*Counsel for Plaintiff,*
*International Union of Operating*
*Engineers Local 542*

24

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 10/22/2018 5:04 PM. Fee = $0.00. The file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Donald E. Haviland, Jr., Esquire (PA I.D. #66615)
*haviland@havilandhughes.com*
William H. Platt II, Esquire (PA I.D. #83585)
*platt@havilandhughes.com*
Christina M. Philipp, Esquire (PA I.D. #92804)
*philipp@havilandhughes.com*
**Haviland Hughes**
201 South Maple Way, Suite 110
Ambler, PA 19002
(215) 609-4661 Telephone
(215) 392-4400 Facsimile

*Counsel for Plaintiff,*
   *International Union of Operating Engineers Local 542*

**IN THE COURT OF COMMON PLEAS**
**FOR MONTGOMERY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| **INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542**<br><br>Plaintiff,<br><br>v.<br><br>**MALLINCKRODT ARD, INC.,** *et al.*<br><br>Defendants. | Civil Action No. 2018-14059 |

**CERTIFICATE OF SERVICE**

I, Donald E. Haviland, Jr. hereby certify that on this 9th day of October, 2018, a true and correct copy of the foregoing Opposition to the Preliminary Objections of Defendants Mallinckrodt ARD, Inc. and Mallinckrodt PLC was electronically filed, causing service to be made through the Court's ECF system as follows:

|  |  |
|---|---|
| G. Patrick Watson, Esquire | Herbert R. Giorgio, Jr., Esquire |
| Lindsay Sklar Johnson, Esquire | Bryan Cave Leighton Paisner, LLP |
| Bryan Cave Leighton Paisner, LLP | One Metropolitan Square |
| One Atlantic Center, 14th Floor | 211 North Broadway, Suite 3600 |
| 1201 W. Peachtree Street, NW | St. Louis, MO 63102 |
| Atlanta, GA 30309 | |

Philip D. Bartz, Esquire
Bryan Cave Leighton Paisner, LLP
1155 F. Street, N.W.
Washington, D.C.  20004

Daniel J. Sherry, Esquire
Wendy J. Bracaglia, Esquire
Marshall, Dennehey, Warner, Coleman &
Goggin
620 Freedom Business Center
Suite 300
King of Prussia, PA 19406

Joanne C. Lewers, Esquire
Victoria Andrews, Esquire
Drinker Biddle & Reath, LLP
One Logan Square
Suite 2000
Philadelphia, PA 19103-6996

Matthew M. Martino, Esquire
Evan Kreiner, Esquire
Michael Menitove, Esquire
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036-6522

_s/ Donald E. Haviland, Jr._
Donald E. Haviland, Jr., Esq.

2

Donald E. Haviland, Jr., Esquire (PA I.D. #66615)
*haviland@havilandhughes.com*
William H. Platt II, Esquire (PA I.D. #83585)
*platt@havilandhughes.com*
Christina M. Philipp, Esquire (PA I.D. #92804)
*philipp@havilandhughes.com*
**Haviland Hughes**
201 South Maple Way, Suite 110
Ambler, PA 19002
(215) 609-4661 Telephone
(215) 392-4400 Facsimile

*Counsel for Plaintiff,*
*International Union of Operating Engineers Local 542*

**IN THE COURT OF COMMON PLEAS**
**FOR MONTGOMERY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| **INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542**<br><br>Plaintiff,<br><br>v.<br><br>**MALLINCKRODT ARD, INC.,** *et al.*<br><br>Defendants. | Civil Action No. 2018-14059 |

**PLAINTIFF INTERNATIONAL UNION OF OPERATING ENGINEERS**
**LOCAL 542'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION**
**TO THE PRELIMINARY OBJECTIONS OF DEFENDANTS**
**TO THE AMENDED COMPLAINT**

Plaintiff, International Union of Operating Engineers Local 542 (***"Plaintiff"*** or ***"Local***

***542"***), by and through their undersigned counsel, hereby files this omnibus response in

Opposition to the Preliminary Objections filed by the Defendants Mallinckrodt ARD Inc. and

Mallinckrodt plc (collectively ***"Mallinckrodt"***) and Express Scripts Holding Company's

(***"ESHC"***), Express Scripts, Inc.'s (***"ESI"***), CuraScript, Inc.'s, CuraScript SD's, Accredo Health

1

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2019 3:04 PM / Fee = $0.00. The file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

Group, Inc.'s (*"Accredo"*) and United BioSource Corporation's (*"UBC"*) (the movants are collectively referred to as *"Express Scripts"*) jointly filed Preliminary Objections (the *"POs"*).

The POs should be denied for the reasons set forth in the detailed Oppositions filed contemporaneously herewith.

## INTRODUCTION

In their Preliminary Objections to the Plaintiff's Amended Complaint, both Mallinckrodt and Express Scripts try to recast this case as one alleging antitrust. They do so to try to pidgeon-hole this case into favorable jurisprudence. However, because this case sounds in consumer fraud, it may not be dismissed.

This overlapping argument by the defense demonstrates that the defense POs ignore the well-pleaded allegations of the 65-page Amended Complaint in order to try to garner dismissal, with prejudice. Defendants present a false narrative to try to contradict the well-pleaded factual allegations of the Amended Complaint, which this Court must accept as true. But this high-profile case deserves the opportunity to proceed to the discovery. It was recently featured on CBS News' "60 Minutes".[1] As here, the Defendants chose not to comment on the merits of the plaintiffs' claims, but to limit their responses to narrow issues, hoping the Court will ignore the forest for the trees.

The "forest" of this case is that a 65-year old drug, Acthar, was purchased by Questcor from Pennsylvania-based Aventis in 2001 for $100,000. The price to payors like Plaintiff Local 542 was then $40. By 2007, the price was raised to $25,000. Today it costs over $40,000. Questcor was sold to Mallinckrodt for nearly $6 billion. This doesn't happen in America, unless companies cheat.

---

[1] https://www.cbsnews.com/news/the-problem-with-prescription-drug-prices/

2

Mallinckrodt cheated.  It was prosecuted by the FTC and paid $100 million in fines and settlement.  It was ordered to divest the competitive product it acquired in violation of the federal antitrust laws.  Then, Local 542 found out it was cheated.  So, it sued in this Court.

There is no question that Mallinckrodt has engaged in one or more acts or practices that were "unfair or deceptive" in the language of the Pennsylvania UTPCPL.  As a result, its POs should be denied.

Express Scripts accepted all "factual allegations in the Amended Complaint as true."[2] *See Express Scripts' Preliminary Objections to the Amended Complaint*, p. 2, footnote 3. However, most of these allegations are ignored in Express Scripts' Preliminary Objections and the ones it accepts as true are presented to this Court out of order and at times arbitrarily so as to mischaracterize and recast the Plaintiff's well-pleaded Complaint.  As a result, Plaintiff's claims against Express Scripts should proceed to discovery.

In its opening, perhaps as its only resort to challenge the Amended Complaint, Express Scripts labels Plaintiff's lawsuit "a copycat containing nearly identical allegations to federal class action antitrust litigation."  Not so.  Unfortunately, Express Scripts fails to disclose to this Court that it was aware of the pendency of this lawsuit because Plaintiff's counsel (on the Record in the Federal case) informed the United States District Court for the Northern District of Illinois that several other lawsuits were going to be filed.  Despite the utter lack of relevance or justification, Express Scripts leads its Memorandum with references to the Federal Court Complaint and the Plaintiff's original complaint filed in this Court ***as if they are somehow relevant*** to this Court's determination of the sufficiency of the Amended Complaint ("Amended Complaint").  They are

---

[2] The Amended Complaint is 65 pages long and contains 248 paragraphs and hundreds of factual allegations.

3

not.[3]  An amended pleading replaces the prior pleading.  The Amended Complaint is being challenged and the other pleadings in this lawsuit or in other Courts should be disregarded entirely.

All of the entities described herein as Express Scripts played a specific role in the sale, distribution, delivery and administration of Acthar.  The Amended Complaint contains numerous allegations of deception by Express Scripts which caused harm to Plaintiff.  To assert otherwise is wrong.  The Amended Complaint alleges that Express Scripts joined with Mallinckrodt[4] (collectively "Defendants") in acting collectively to maintain and enhance Mallinckrodt's monopoly power in the U.S. market for adrenocorticotropic hormone (ACTH) drugs in violation Pennsylvania law.  While Express Scripts is one company, the Amended Complaint goes into great detail as to how the company operates through its subsidiary operations in effectuating the joint goal of the Defendants to limit distribution and raise prices for Acthar, to the substantial detriment of Express Scripts' direct customers, like Plaintiff.

The Amended Complaint also establishes that Plaintiff relied on Express Scripts' unlawful conduct to its detriment.

Finally, Express Scripts seeks to avoid liability for its breach of contract by urging an interpretation of the agreement it signed with Rockford that does not comport with the language or structure of the document.  There is nothing vague or immaterial about the use of the phrase "cost containment" as part of the core "PBM Services" Express Scripts contracted to provide to Plaintiff.

---

[3] Express Scripts' attempt to ascribe some ulterior motive to Plaintiffs' amended pleading as well as its "last ditch effort" inferences also should be rejected.  *ESI Br.* At 1-2.

[4] "Mallinckrodt" refers to Mallinckrodt ARD Inc., formally known as Questcor Pharmaceuticals, Inc. ("Questcor") and its parent company, Mallinckrodt plc.  SAC ¶¶ 1, 21, 24-25.

4

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 10/02/2018 9:30:44 PM / Fee = $6.00 // This file is certified as the official filed/unfiled Winfield /Baptiste/ 3/ Rems/ Rems/ Cases: Express Scripts v/ the rest of the filing staff identified in/ the entity/ the oral/ documents staff identified in/ document/ document/ documents.

For these reasons, Express Scripts Motion to Dismiss should be denied.

## FACTUAL ALLEGATIONS

The Defendants provide a lengthy statement of "Factual Allegations" that largely quote from the Amended Complaint. At times, however, the statements do not accurately reflect the averments of the Amended Complaint, and should be ignored in favor of the pleading. This Court shall accept all well-pled facts as true in favor of the Plaintiff and therefore, Plaintiff incorporates the allegations contained in the Amended Complaint—many of which are referenced explicitly herein. Express Scripts even went further and accepted as true all facts alleged in the Amended Complaint, even though no law requires it to do so. Those admissions alone support overruling Express Scripts' Preliminary Objections.

## LEGAL STANDARDS

In ruling on preliminary objections, the Court must accept well-pled facts as true. *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 26 (Pa. 2006). The Court need not accept as true legal conclusions, unwarranted factual inferences, argumentative or conclusory allegations, or opinions. *Id.* The standard of review in sustaining Preliminary Objections is that the Court ***must*** accept as true all well-pleaded material provided in the Plaintiff's Complaint and any reasonable inferences which may be drawn from those facts. *Reardon v. Allegheny College*, 2007 PA Super 160, 926 A.2d 477, 480 (Pa. Super. Ct. 2007). Preliminary Objections are sustained ***only*** where they are clear from doubt. *Id*. It must appear that the law would not permit the plaintiff to recover based upon the facts averred in order for a case to be clear and free from doubt. *Id.*

"The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." *Soto v. Nabisco, Inc.*, 2011 PA Super 249, 32 A.3d

787, 790 (Pa.Super. 2011).  If there is any doubt, it should be resolved by overruling the

demurrer. *Mellon Bank N.A. v. Fabinyi*, 437 Pa. Super. 559, 650 A.2d 895 (Pa. Super. 1994).

Defendants attempt to re-caste Plaintiff's well-pleaded Amended Complaint.  This is

improper, and should be rejected. *See County of Allegheny v. Commonwealth*, 507 Pa. 360, 372,

490 A.2d 402 (1985)("A demurrer can only be sustained where the complaint is clearly

insufficient to establish the pleader's right to relief.  For the purpose of testing the legal

sufficiency of the challenged pleading a preliminary objection in the nature of a demurrer admits

as true all well-pleaded, materials, relevant facts.")(citations omitted).

Defendants' Preliminary Objections are also unchanged from their original Preliminary

Objections, despite the multiple, clarifying changes made in Plaintiff's Amended Complaint,

Both Defendants Preliminary Objections miss the mark as they continue to argue issues – like

antitrust – clarified by the Amended Complaint.  As a result, the Court should deny the

Preliminary Objections. *See, e.g., Allegheny Inst. Taxpayers Coalition v. Allegheny Reg'l Asset

Dist.*, 556 Pa. 102, 113, 727 A.2d 113, 119, n. 1 (1999)("If the amendment [of the complaint]

removes all of which the defendant has complained, the preliminary objections should be

withdrawn or dismissed by the court.")(brackets in original).[5]

To the extent Defendants seek to argue about the purported meaning of Plaintiff's

original pleading in relation to the amended pleading, such argument must be rejected as the only

operative pleading in this case is the Amended Complaint. *See, e.g., Brooks v. B&R Touring

Co.*, 2007 Pa. Super. 387, 939 A.2d 398 (2007)("filing of an amended complaint constitutes

---

[5] In the event finds that any of Defendants' Preliminary Objections should be sustained, leave to amend the Amended Complaint should be granted to address the Court's concerns. *See, e.g., Com. of Pa. Game Comm'n v. Hilliard*, 3 Pa. Cmwlth. 560, 562, 484 A.2d 326, 327 (1971)(allowing further amendment to amended complaint after preliminary objections granted).

6

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2018 9:34 AM. Filee=$600.00 This file is certified that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

'virtually a withdrawal of the first'")(*quoting Reichert v. TRW, Inc., Cutting Tools Div.*, 531 Pa. 193, 611 A.2d 1191, 1194 (1992)).

### <u>ARGUMENT</u>

Preliminarily, both Express Scripts and Mallinckrodt seek to dismiss the following Counts of the Amended Complaint:

    a.       Count I—Pennsylvania's Unfair Trade Practices and Consumer Protection Law;

    b.       Count II—Negligent Misrepresentation;

    c.       Count III—Aiding and Abetting;

    d.       Count IV—Unjust Enrichment and

    e.       Count IX—Declaratory and Injunctive Relief

Mallinckrodt seek dismissal of the following Count independent of Express Scripts:

    a.       Count V—Unjust enrichment.

Express Scripts seek dismissal of the following Counts independent of Mallinckrodt:

    a.       Count VI—Express Scripts' Breach of the ESI PBM Agreement;

    b.       Count VII—Promissory Estoppel and

    c.       Count VIII—Express Scripts' Breach of the Implied Covenant of

                Good Faith and Fair Dealing.

This Memorandum will address each in the order above.

**I.**    **Plaintiff's Unfair Trade Practices and Consumer Protection Law Claims Are <u>Adequately Pled And Defendants' Objections Should Be Overruled.</u>**

The UTPCPL makes unlawful any "unfair methods of competition" and "unfair or deceptive practices, including the following, among others:

7

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2018 3:30:44 PM | Fee = $500.00 | The file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

 (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities that they do not have or that a person has sponsorship, approval, status, affiliation or connection that he does not have;

 (viii) Disparaging the goods, services or business of another by false or misleading representation of fact;

(xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding

73 P.S. § 201-2(4).

The Amended Complaint includes charges that Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices as those terms are defined in Section 2(4) of the Law, UTPCPL, 73 P.S. § 201-2(4).

### A.     Defendants' Conduct Was Unfair and Deceptive.

The Amended Complaint details Mallinckrodt's conduct, from taking a 65-year old, orphan drug that cost only $40 to purchase in 2001, to a blockbuster product (in terms of revenue generated) by the time Local 542 had members take the drug, costs Plaintiff hundreds of thousands of dollars.   Mallinckrodt paid $5.9 billion to acquire the one-product company Questcor in 2014, when Questcor only paid $100,000 to acquire Acthar in 2001.  Am. Cmplt. at ¶¶ 3, 24, 46, 96.  Mallinckrodt got there by adopting a "new strategy", focused not on improving Acthar, but only on exclusive distribution, marketing and pricing to increase by sales and sales

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2019 3:04 PM. Fee = $0.00 This file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records Public Access Policy that require filing parties to redact/that filing party filing parties to redact confidential documents differently than they are filed in cases with confidential information and documents.

revenue. Am. Cmplt. at ¶¶ 9, 48-77, 92-93, 128. Importantly, Mallinckrodt's selected exclusive distributor, Express Scripts – which is the same company with whom Local 542 contracted to **save** costs on prescription drugs – conspired and agreed with Mallinckrodt to **raise** the price of Acthar to the exorbitant levels paid by Plaintiff. Express Scripts did so, even as its Chief Medical Officer, Steve Miller, admitted last year that Acthar was not worth what Express Scripts and Mallinckrodt were charging Local 542 for it. Am. Cmplt. at ¶¶ 100-101, 169. As a result, Local 542 paid over $150,000 for a drug that cost only a few thousand dollars before the Defendants embarked on a strategy to commit consumer fraud and make exorbitant profits at the expense of Local 542. Am. Cmplt. at ¶¶ 22-23.

The unfair and deceptive acts and practices which underlie the Defendants' scheme to price gouge and profiteer are detailed in Count I, alleging multiple violations of the Pennsylvania CPL. *See* Am. Cmplt. Count I. The details of such conduct are also woven throughout the Amended Complaint, as discussed above.

As alleged in Paragraph 167 of the Amended Complaint, Defendants engaged in the following unfair and deceptive acts or practices, which violate the aforesaid provisions of the UTPCPL:

> a.    By entering into the exclusive distribution arrangement described herein in 2007, and not disclosing the same to IUOE Local 542, Defendants engaged in deceptive acts and made misrepresentations to Plaintiff that impeded Plaintiff's efforts to contain costs for specialty drugs like Acthar, and then sending bills for Acthar which charged the artificially inflated prices which Defendants agreed amongst themselves to charge Plaintiff. This caused at least a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval and/or certification of Acthar sold by Mallinckrodt, misrepresented the same, and/or constituted fraudulent or deceptive conduct which created a likelihood of confusion or a misunderstanding by Plaintiff.

b.   Defendants conspired and agreed to adopt the above-described ASAP program and the ASAP form (Exhibit "A" hereto) in 2007, and to maintain the Program and form through 2011-2015 (when Plaintiff paid for Acthar), in order to mislead and deceive IUOE Local 542 and its beneficiaries about Express Scripts' direct role as the "hub" of patient care as it concerns the medical conditions for which Acthar is indicated, and to bypass Plaintiff's efforts to contain and reduce costs for specialty drugs.

c.   Starting in July 2007, Mallinckrodt issued a misleading and deceptive announcement about its new distribution strategy, but the announcement failed to disclose that more than pharmacy distribution was being handed over to Express Scripts; all aspects of distribution, pricing and product sales were now being handled by Express Scripts, and its wholly-owned subsidiaries, as part of a "hub" of services for which Mallinckrodt contracted.

d.   Express Scripts made material misrepresentations and engaged in deception about its contractual relationships with Mallinckrodt and the real reasons for the exorbitant Acthar price increases between August 2007 and 2015.  In 2007, when asked directly about the huge price increase, Dr. Miller of Express Scripts' misled and deceived the public by claiming "[t]he increase was a manufacturing decision.  I can't comment on it."  In truth, it was a joint decision by Defendants, reflected in contracts between them.

e.   Express Script's Dr. Miller and Express Scripts remained silent about the truth about Acthar's "value" for years, so that Express Scripts could continue to charge false, misleading and excessive prices for Acthar to payors like Plaintiff.  In fact, it was not until the spring of 2017 – 6 years after Plaintiff made its first payment for Acthar—that Express Scripts admitted Acthar was not worth the price Express Scripts and Mallinckrodt were charging for it.  That year, ESI's Senior Vice President of Supply Chain and Specialty Pharma, Everett Neville, stated, "I don't think [Acthar is] a very great [drug] – it's a pretty poor drug with a very limited need and certainly [ESI's Chief Medical Officer, Dr,] Steve[Miller] could comment."  Mr. Neville went on to say, "I think [Dr. Miller] and I both would agree, and I think everybody in our company would agree, that [Acthar] is vastly overpriced for the value.".   Mr. Neville stated that he "personally told [Mallinckrodt's] management team that their drug is hugely overpriced and that he "know[s] [Dr. Miller] has as well."  In the same public setting, Dr. Miller stated, "[i]f you look at the data, the indications for the drug are . . . in the compendium, it's listed under a lot of indications, its real use should be very, very limited.

10

It's an old drug.  There's better products in the marketplace and so we're going to continue to be very vigilant in our utilization management." These revelations came far too late to save Plaintiff from being overcharged for Acthar, and demonstrate that Defendants conspired and agreed to commit acts or practices in violation all of the above-described sub-sections of 73 Pa. Stat. Ann. §§201.  For instance, Express Scripts misled Plaintiff and deceived Plaintiff about its approval of Acthar and the benefits of Acthar as a valuable specialty drug "worth" what it and Mallinckrodt were charging, in relation to other drugs and treatments (in violation of subsections (ii), (v), (vii), (viii)).

f.      Defendants misled and deceived IUOE Local 542 and the public about their direct relationship, their joint decision to raise the prices of Acthar, and the lack of value of Acthar for the prices being charged, in order to intentionally and deceptively charge false, misleading and excessive prices for Acthar, during the period between 2007 (when they entered into their exclusive distribution arrangement), through 2013 (when Mallinckrodt acquired Synacthen in 2013 and Express Scripts did nothing about it), and up to at least 2017 when Express Scripts began to tell the truth. Express Scripts then offered discounts off the inflated prices of Acthar which were far less than the discounts offered for either brands or generics, while failing to disclose the truth about the pricing disparity for Acthar (even with the discounts), thereby misleading Plaintiff as to the reasons for, existence of, or amounts of the Acthar price reductions, in violation of sub-section (xi).

g.      Defendants acts or practices, including the failures to act and to speak the truth in the face of false, misleading and deceptive statements about Acthar's pricing, distribution and value, constitute "other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, in violation of sub-section (xxi).

Am. Cmplt ¶167.

Plaintiff's Amended Complaint contains detailed, non-conclusory averments of fact concerning Defendants' unfair, deceptive and fraudulent conduct, which appear throughout the Amended Complaint. *See* Amended Complaint at ¶¶ 6 ("concealing from IUOE Local 542 the true costs for Acthar through undisclosed, direct contractual agreements between Mallinckrodt

and Express Scripts…, charging inflated prices for Acthar, and collecting the money from Plaintiff for such prices…"), 48-75 (describing the "new strategy" to deceive), 83 (deceptively listing Acthar as "available at participating pharmacies"), 97-106 (describing the "manufacturing decision" to "vastly overprice[]" Acthar based on fraudulent and deceptive claims of "value"), 107-113 (fraudulent and deceptive scheme to acquire Synacthen to prevent competition in ACTH market and raise the prices for Acthar), 166-175.

Mallinckrodt argues its conduct is "ordinary business practices".

It is not an *ordinary business practice* to raise the prices of 65-year-old orphan drug 1,000s of percents, from $40 to $40,000. *See* Amended Complaint at ¶¶ 93, 96, 153, 156, 160. Ordinary businesses in America do not have that power, unless they cheat.

It is not an *ordinary business practice* for a one-product company like Questcor to enter into an exclusive distribution agreement with the largest payor representative in the country, and then raise the prices for that lone product to exorbitant levels without the same largest payor representative pushing back against such price increases for the benefit of their contracted payor clients. *See* Amended Complaint at ¶¶50-77, 81-83, 93, 97-106, 161. It was far from ordinary for Questor to embark on a "new strategy" six years after acquiring Acthar, a strategy that involve direct sales and marketing and sales to patients and doctors the ASAP Program, and directly marketing to patients and doctors using the Acthar Start Form to bypass payment protections Local 542 had put in place with Express Scripts to save money on high priced drugs. Amended Complaint ¶¶ 8, 35, 47-75, and Exhibit "A" to Amended Complaint (Acthar Start Form).

The Court must wonder why Mallinckrodt takes the time to complain about the fact Local 542 was not permitted by Express Scripts' claims of confidentiality to attach its contract with

Express Scripts to the Amended Complaint,[6] for purposes of its breach of contract claims against Express Scripts but <u>not</u> Mallinckrodt, but Mallinckrodt makes no mention of the Acthar Start Form – its own form – attached as Exhibit "A" to the Am. Cmplt. which forms the basis of Plaintiff's UTPCPL claims against it.

It is not an *ordinary business practice* for a company to be sued by its competitor, and then settle for nearly the same amount of money the competitor would have *paid* for a competitive product. *See* Amended Complaint at ¶¶111, 126,141-142, 143-147.

*Ordinary* businesses are not prosecuted by the federal government, but then choose to settle [rather than defend themselves and fight], paying $100 million for conduct they supposedly did not commit. *See* Am. Cmplt. at ¶¶114-125, 145-147, 152-165.

Plaintiff specifically denies that "Defendants publically disclosed the existence" of their unlawful conduct, as Mallinckrodt contends contrary to the well-pleaded allegations of the Amended Complaint. *See* Am. Cmplt. at ¶¶6, 9, 50, 111, 183, 192-201.

Both Defendants argue Plaintiff fails to plead reliance and causation. Not so. Plaintiff alleges both reliance and causation, as required where required. *See* Am. Cmplt. at ¶¶ 10-11, 180-182, 186-187, 189-191, 230.

Mallinckrodt also makes the baseless legal argument the Local 542 does not have standing to sue under the UTPCPL. Mallinckrodt ignores the fact the UTPCPL defines a

---

[6] As discussed below, in response to Mallinckrodt's "Preliminary Objection pursuant to PA.R.Civ.Proc. 1028(a)(2) (at paragraphs 55 – 58 below), in Plaintiff's response to the Preliminary Objections filed by Express Scripts, Plaintiff attaches the communications of its counsel with counsel for Express Scripts as to the issue of the contract. This Court will see the problem Express Scripts has created, wanting the supposed confidential contract filed of record in the absence of a protective order, which the parties have negotiated in the federal court case. The matter will have to be resolved by the Court on motions practice.

"person" as including entities like Local 542, and that Pennsylvania courts have long held that

union funds have standing to sue drug companies under the UTPCPL.

The term "person" is defined by the UTPCPL as "natural persons, corporations, trusts,

partnerships, incorporated or unincorporated associations, and any other legal entities." 73 Pa.

Stat. § 201-2(2).

In a case involving multiple union funds suing Pennsylvania-based Cephalon for its drug

Actiq, the Eastern District of Pennsylvania court wrote on this subject as follows:

> As discussed in *Am. Fed'n of State County and Mun. Employees v. Ortho-McNeil-Janssen Pharms., Inc.*, No. 08-cv-5904, 2010 U.S. Dist. LEXIS 23181, 2010 WL 891150, *3-4 (E.D. Pa. 2010) ("AFSCME"), Pennsylvania courts have taken a longstanding position of validating third party payor claims against drug manufacturers under the UTPCPL:
>
> "Pennsylvania courts, however, have long recognized the ability of third-party trusts and associations to assert UTPCPL claims on behalf of their constituent members based on the statute's broad definition of 'person.'  Section 201-9.2(a) of the UTPCPL permits a private action for the recovery of damages for '[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money ... as a result of ... [any] act or practice declared unlawful by this act ....' The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." In addition, the 'purpose' requirement of § 201-9.2(a) focuses on whether the final consumer uses the product for personal, family or household use, not whether the third-party entity personally uses the product or merely purchases it. Furthermore, the court determined that because third party payors purchased the prescription drug in question on behalf of their members, and such drugs were purchased for personal, family and household use, plaintiff payors had the right to bring their claims under the UTPCPL."

*AFSCME v. Cephalon, Inc. (In re Actiq Sales & Mktg. Practices Litig.)*, 790 F.Supp. 2d 313,

326-327 (E.D.Pa. 2011)(citations omitted).

Undersigned counsel for Local 542 successfully prosecuted the UTPCPL claims of self-

funded Commonwealth entities who reimbursed the prescription drugs of their beneficiaries all

the way through trial.  In 2005, the Commonwealth Court agreed that third party payors have

14

standing to sue under the UTPCPL. *See Com. v. TAP Pharm. Indus. Ltd.*, *et. al.*, 885 A.2d 1127, 1142-42 (Pa. Cmwlth. 2005). Mallinckrodt fails to mention or discuss this binding precedent.

### B.    No Antitrust Claim is Pled.

Local 542 specifically denies that it seeks to bring any antitrust claim in this lawsuit, as charged by Defendants. In fact, the language Mallinckrodt quotes from paragraph 112 of the Amended Complaint – relating to Mallinckrodt's ability to "maintain and enhance its monopoly power" by its acquisition of Synacthen – was directly alleged and proven by the Federal Trade Commission ("FTC") in its Complaint filed against Mallinckrodt, as described at Am. Cmplt. ¶¶ 114-125. *See* FTC Complaint at Exhibit "C" to the Am. Cmplt. Mallinckrodt chose to settle these charges of antitrust, rather than fight them. Am. Cmplt. ¶¶ 152-165. But the fact that Mallinckrodt was prosecuted for antitrust by the FTC, and chose to settle, does not change the fact that Plaintiff here seeks to hold Mallinckrodt accountable for its unfair and deceptive conduct under Pennsylvania law, as described at Am. Cmplt. ¶¶ 126-132, and elsewhere.

Consistent with its theme of trying to re-caste this case as an antitrust action, Mallinckrodt cites two antitrust cases which are inapposite to the case at bar, because they unsuccessfully sought to establish antitrust conduct as "unfair and deceptive" under the UTPCPL. *See In re Niaspan Antitrust Litig.*, 42 F.Supp. 3d 735 (E.D.Pa. 2014) and *In re Lidoderm Antitrust Litig.*, 103 F.Supp. 3d 1155 (N.D.Cal. 2015). These cases are inapposite.

It is noteworthy that nowhere does Plaintiff allege any claim for antitrust, under either federal law or Pennsylvania common law. *Cf. XF Enterprises, Inc. v. BASF Corp.*, 47 Pa. D&C 4th 147, 150 (Pa. Com. Pl. Phila. Cty. 2000)(granting defense preliminary objections as to claim for violations of Pennsylvania antitrust laws). It is specifically denied that Plaintiff "copied …

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2018 9:30:44 PM, Fee = $600.00 This file certified that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania Case Records Public Access Policy that require filing confidential information and documents differently than non-confidential information and documents.

allegations of a federal antitrust and RICO class action" pending in federal court. Obviously, since Local 542 suffered injuries due to the Mallinckrodt's same conduct which caused injury to other payors throughout the country, including the City of Rockford in the federal action, there is necessarily factual overlap in the statement of the claims against Mallinckrodt. However, Plaintiff's well-pleaded Amended Complaint makes no claim for antitrust or RICO, as the plaintiffs in federal court allege. Plaintiff's claims here are brought exclusively under Pennsylvania state law.

Mallinckrodt's attempt to re-caste Plaintiff's well-pleaded Amended Complaint here should be rejected. *See County of Allegheny v. Commonwealth*, 507 Pa. 360, 372, 490 A.2d 402 (1985)("A demurrer can only be sustained where the complaint is clearly insufficient to establish the pleader's right to relief. For the purpose of testing the legal sufficiency of the challenged pleading a preliminary objection in the nature of a demurrer admits as true all well-pleaded, materials, relevant facts.")(citations omitted).

Mallinckrodt continues to erroneously label this case as "antitrust" in order to pigeon-hole it into favorable, but inapposite, antitrust jurisprudence. The purported "antitrust buzzwords" that Mallinckrodt seized upon in its original Preliminary Objections have been removed. With such removal, Mallinckrodt has no colorable basis to continue to argue that Plaintiff's Amended Complaint claims antitrust. *See Tagliaterra v. State Police*, 2010 Pa. Dist. & Cnty. Dec. LEXIS 878 (Ct. Com. Pl. Northampton Cty. June 30, 2010) at * 20 ("Defendants could only have supposed that an amended pleading was likely to be filed at some point, [so] Defendants cannot fairly complain that they are either surprised or prejudiced by the elimination of claims against them.") It's time to focus on what this case is about; not what Mallinckrodt wants it to be about. The Preliminary Objections premised on this argument should be denied.

16

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 10/02/2019 3:04:44 PM / Fee = $0.00 / The file certified at this filing complies with the provisions of the PB Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## II.     Plaintiff's Negligent Misrepresentation Claim Is Adequately Pled and Express Scripts' Objections Should Be Overruled.

The elements of misrepresentation or fraud are: (1) a misrepresentation; (2) that is made knowingly, or if innocently made relates to a matter material to the transaction; (3) where the maker of the misrepresentation intended that the recipient will be induced to act by virtue of the misrepresentation; (4) the recipient justifiably relied upon the misrepresentation; and (5) damage to the recipient is the proximate result. *Gibbs v. Ernst*, 538 Pa. 193, 207-8, 647 A.2d 882, 889 (1994) (citing *W. Page Keating, Prosser and Deaton on the Law of Torts* § 105 (5th ed. 1984)).

The requirements for pleading a claim for negligent misrepresentation under Pennsylvania law have been satisfied.  *See* Am. Cmplt. Count II; *see also, Com. v. TAP*, 36 A.3d 1197, 1277 (Pa. Cmwlth. 2011), *vacated and remanded on other grounds*, 626 Pa. 25, 94 A.3d 364 (2014)(noting that "the application of this Section [552 of the Restatement], within the drug-pricing context, appears to be an issue of first impression in Pennsylvania", but holding that it applies to claims of a third-party payor, like Local 542, against a prescription drug company, like Mallinckrodt).

In making the blanket statement that Plaintiff's Count II "fails to allege facts establishing that Mallinckrodt made a negligent misrepresentation", Mallinckrodt's Preliminary Objection is strikingly similar to the one rejected by the Commonwealth Court in *Koken v. Steinberg*, 825 A.2d 723, 731 (Pa. Cmwlth. 2003), wherein the objecting defendant "cynically ignores fifty previous paragraphs of the Complaint that exhaustively detail the elements necessary to constitute fraudulent misrepresentation", as defined by the Supreme Court in *Porreco v. Porreco*, 571 Pa. 61, 811 A.2d 566, 570 (2002).  Here, Count II of the Amended Complaint is preceded by *more than* 50 paragraphs detailing Mallinckrodt's fraudulent misrepresentations about the value of its Acthar at the high prices charged, through the ASAP Program and otherwise.

17

Among other things, Plaintiff alleges that Defendants misrepresented the "average wholesale prices" of Acthar. *See, e.g*, Am. Complt. ¶¶ 22 ("IUOE paid the listed amounts based on the Average Wholes Price ("AWP") as established by Defendants), 82 (contract "rates have been determined by ESI to be based on the "average wholesale price" or AWP for the drugs), 83 ("This exclusive arrangement has caused the AWP-based prices for Acthar to increase each year, including at the exorbitant amounts described herein"), 84 ("Defendants have agreed to additional Acthar prices increases leading to the inflated prices paid by Plaintiff form 2011-2015"), 86 (Express Scripts "conspired and agreed with Mallinckrodt to raise the AWP in 2007"), 179 ("in setting the AWP-based prices for Acthar … Defendants made material misrepresentations…. Defendants called these prices 'average wholesale prices [] when they knew they were not").

The Commonwealth Court has held such a claim is viable. *See generally, Com. v. TAP Pharm. Indus. Ltd., et. al.*, 885 A.2d 1127, 1138 (Pa. Cmwlth. 2005)(denying preliminary objections and holding "the Amended Complaint does aver that, in reporting the AWPs to the publishing compendia, the Defendants were making representations that these figures reflected real, fact-based average wholesale prices. Further evidentiary exploration may show that the medical community and others who rely upon the published AWP have a reasonable expectation that the AWP represents a figure close to a real average wholesale price that the publisher prints with only the expectation of such being the case. Accordingly, contrary to the Defendants' characterization of the AWP being a case of non-disclosure, we believe the Amended Complaint could very well establish this as a case of disclosure rather than non-disclosure, with the former not requiring the Commonwealth to establish that the Defendants had a duty to

disclose the true nature of the published AWP. Accordingly, we need not address the Defendants' arguments that the Commonwealth failed to aver necessary facts showing a duty to disclose.")

Defendants are wrong that economic loss doctrine bars Plaintiff's claim.  The economic loss doctrine does not bar Plaintiff's claims for negligent misrepresentation premised upon violations of section 552 of the Restatement (Second) of Torts.  *See Com. v. TAP*, 36 A.3d at 1277 ("we hold that the economic loss rule does not apply to claims of negligent misrepresentation sounding under Section 552", quoting *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 483-84, 866 A.2d 270, 288 (2005)).

## III.   Plaintiff's Aiding and Abetting/Conspiracy Claim Is Adequately Pled and Express Scripts' Objections Should Be Overruled.

"Civil conspiracy occurs when two or more persons combine or agree intending to commit an unlawful act or do an otherwise lawful act by unlawful means." *Brown v. Blaine*, 833 A.2d 1166, 1173, n.16 (Pa. Cmwlth. 2003).  A party asserting such a claim is required to aver "material facts which will either directly or inferentially establish elements of conspiracy." *Id.* at 1173.  The Court in *Brown* noted that, in addition to alleging the combination above, a plaintiff must allege facts supporting a claim for conspiracy, namely that (1) the persons combine with a common purpose to do an unlawful act or to do a lawful act by unlawful means or unlawful purpose, (2) that an overt act in furtherance of the common purpose has occurred, and (3) the plaintiff has incurred actual legal damage. *Id.* at 1173, n.16 (citing *McKeeman v. Corestates Bank, N.A.*, 2000 PA Super 117, 751 A.2d 655 (Pa. Super. 2000)).

Defendants' completely misapprehend this claim.  Aiding and abetting allows Plaintiff to hold Defendants liable "for harm caused to [Local 542] arising from the tortuous conduct of another."  In this case, the "other" is Express Scripts, in the case of Mallinckrodt, and Mallinckrodt, in the case of Express Scripts.  Express Scripts includes all its subsidiary

19

Case# 2018-14059-89 DDocketdataMontgomeryCOountyProthboataycon102/02/02018959304PM/Fee=$60.00TThsfilefcertifestthbbtthisfilfigcomplxeswithtthegproviosioasobfthe-PBublioAccessPBbihypobfthbd/nified Uundfield Juuddsiain3systeemof3/Aforms)/Reinies/Caes:Reexacex5SedchedSyobtela:Repmadtear/oTiisal1Couurtcytthat:filingcan/ilfag:staiffidefikal:Infobmati/documentals:authffentclyt/teamiby:theonfidesatafidefikal:Infobmatt/documentals:authffentcal;documentsts:documents.

companies, UBC, Curascript and/or Accredo.  Mallinckrodt is an alleged co-conspirator with **these** companies for **their** unlawful conduct, not "an underlying tortuous act ... by Mallinckrodt", as alleged.

In citing the *Cummins* case, Mallinckrodt conceded that the torts of concert of action and aiding and abetting – being based on the Restatement – relate to the wrongful conduct of another. Yet Mallinckrodt erroneously argues about a claimed lack of wrongful conduct **on its part**, as opposed to Express Scripts.  *See Cummins v. Firestone Tire & Rubber Co*., 344 Pa. Super. 9, 21, 495 A.2d 963, 969 (1985)(describing the standards for aiding and abetting as set forth in §876 of the Restatement (Second) of Torts).  Aiding and abetting is properly pleaded where, as here, Mallinckrodt is alleged to have given substantial assistance to Express Scripts and its subsidiary companies in the tortuous breach of their duties to Local 542.

Plaintiff alleges facts sufficient to support claims for multiple violations of the UTPCPL (Count I) and negligent misrepresentation (Count II) as against both Mallinckrodt and Express Scripts, either of which is sufficient to support a claim against the other for aiding and abetting. Because Defendants do not allege or prove otherwise in its Preliminary Objections, their objections fail as a matter of law.

## IV.    Plaintiff's Unjust Enrichment Claim Is Adequately Pled and Express Scripts' Objections Should Be Overruled.

Unjust Enrichment is an equitable doctrine.  *Styer v. Hugo*, 422 Pa. Super. 262, 619 A.2d 347 (Pa. Super. 1993), affirmed, 535 Pa. 610, 637 A.2d 276 (1994).  Under the doctrine, the law implies that a contract exists when a party is found to have been unjustly enriched; the doctrine requires the offending party to pay the plaintiff the value of the benefit he has conferred on the defendant.  *Mitchell v. Moore*, 1999 PA Super 77, 729 A.2d 1200 (Pa. Super. 1999), petition for allowance of appeal denied, [**19] 561 Pa. 698, 751 A.2d 192 (2000).  A party alleging that a

20

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 10/02/2018 9:30:4 AM / Fee = $600.00 The file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

defendant has been unjustly enriched must establish the following: (1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit. *Styler*, 619 A.2d at 350. Further, a defendant need not have accepted and appreciated the benefit intentionally; instead, the focus remains on the question of whether the defendant has been unjustly enriched. *Torchia v. Torchia*, 346 Pa. Super. 229, 499 A.2d 581 (Pa. Super. 1985). Additionally, the plaintiff bears the burden of establishing either that the defendant wrongfully secured the benefit or passively received a benefit that it would be unconscionable to retain. *Id.*

However, while it is not inappropriate for a Defendant to get a case dismissed via Preliminary Objections "out of the starting gate", the theory that unjust enrichment is not available when there is a "contract" is "premature and that theory "must wait a full development of the facts." *Green v. Pnc Fin. Servs. Grp.*, No. GD 13-020135, 2014 Pa. Dist. & Cnty. Dec. LEXIS 14024, at *4 (C.P. Allegheny Feb. 28, 2014).

Plaintiff expressly avers that it provided benefits directly to Mallinckrodt, by and through its exclusive agent, Express Scripts. Am. Cmplt. at ¶¶6, 73, 206-208, 214-216. Plaintiff also alleges that retention of such exorbitant payments for Acthar would be unjust, in light of the lack of value for the medication and the unconscionable price increase from $40 in 2001 to over $40,000 today. Am. Cmplt. at ¶¶ 6, 11, 41, 45, 92, 153, 202-211.

Furthermore, Local 542 received Acthar directly from Mallinckrodt via its direct distribution arrangement with Plaintiff's PBM, Express Scripts. Am. Cmplt. at ¶¶ 21, 25, 48, 52-55, 59. Mallinckrodt directly communicated with Local 542 beneficiaries about their receipt and use of Acthar through both the ASAP Program and the Acthar Start Form. Am. Cmplt. at ¶¶ 25,

52, 55, 70-72 and Exhibit "A".  Indeed, Mallinckrodt required Local 542 beneficiaries to sign its

Acthar Start Form, authorizing the payments for Acthar Local 542 ultimately made.

Mallinckrodt has no basis for its factual assertion that Local 542 "is an indirect purchaser."

Strict proof thereof is required.

Thus, Plaintiff's Amended Complaint at Count IV states a claim for unjust enrichment

against Mallinckrodt.

### A.    Declaratory or Injunctive Relief Claim

Defendants' Preliminary Objection claims Plaintiff cannot recover for alleged future

harm.  But, Plaintiff is seeking relief for the potential future harm of additional beneficiaries who

may be prescribed Acthar.  Such claim is cognizable under Pennsylvania law.  "[A]n injunction

can issue to restrain conduct based on prior unlawful conduct".  *Commonwealth v. TAP Pharm.*

*Prods.,* 36 A.3d 1112, 1172 (Pa. Cmwlth. 2011).  Thus, the objection should be denied.

### B.    The Breach of Contract Claim

Express Scripts did "accept the factual allegations in the Amended Complaint as true."

*See Express Scripts' Preliminary Objections to the Amended Complaint,* p. 2, footnote 3.  As

such, ESI admits that it "agreed with Mallinckrodt to inflate the AWPs for Acthar in violation of

the letter and spirit of the contract" and (2) "diverted monies from Plaintiff that should have been

paid as rebates." Am. Complt. at ¶223. Contrary to Express Scripts' claim, Plaintiff did allege it

received less than it was entitled to in rebates.  *See* Am. Cmplt. at ¶¶ 87-89, 223, 236.The breach

of contract claim should proceed.

### C.    The Promissory Estoppel Claim

Paragraph 229 alleged Express Scripts' failure to fulfill its representations and promises,

express and implied.  Express Scripts did "accept the factual allegations in the Amended

22

Case# 2018-14059-89 Docketed at Montgomery County Prothonotary on 02/02/2019 9:04 AM, Fee = $0.00. The file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Complaint as true." *See Express Scripts' Preliminary Objections to the Amended Complaint*, p. 2, footnote 3. As such, it accepts: (a) all promises it made under the ESI PBM Agreement; (b) that Plaintiff relied on those promises to its detriment; (c). It is denied that Plaintiff's claim is limited, as Express Scripts suggests. The Preliminary Objection should be denied.

### D.   Breach of the Implied Covenant Claim

The covenant of good faith and fair dealing is implied in every contract at law in Pennsylvania. Express Scripts contends otherwise. Pennsylvania law implies a duty of good faith and fair dealing in all contracts at law. *See Toy v. Metro. Life Ins. Co.,* 593 Pa. 20, 37, 928 A.2d 186, 197 (2007)(the implied covenant of good faith and fair dealing "is part of every contract, and which provides that neither party to a contract will do anything to injure the right of the other to receive the benefits of their agreement."). The Preliminary Objection should be denied.

### E.   The Declaratory and Injunctive Relief Claim

Plaintiff is seeking relief for the potential future harm of additional beneficiaries who may be prescribed Acthar. Such claim is cognizable under Pennsylvania law. Plaintiff is seeking relief for the potential future harm of additional beneficiaries who may be prescribed Acthar. Such claim is cognizable under Pennsylvania law. "[A]n injunction can issue to restrain conduct based on prior unlawful conduct". *Commonwealth v. TAP Pharm. Prods.,* 36 A.3d 1112, 1172 (Pa. Cmwlth. 2011).

### V.   Preliminary Objections Pursuant to Pa. R. Civ. P. 1028(A)(2) for Failure to Conform to a Rule Of Court

Mallinckrodt fails to demonstrate how the Plaintiff's breach of contract claim against Express Scripts, Mallinckrodt's co-defendant but a separate party represented by separate counsel, relates to it for purpose of its Preliminary Objection for the alleged failure to attached

the Express Scripts contract to the Amended Complaint.  As a result, Mallinckrodt has no

standing to assert a preliminary objection under Rule 1028(a)(2) for Plaintiff's alleged failure to

comply with Pa.R.Civ.Proc. 1019(i) and this Preliminary Objection should be denied.

As for Express Scripts' claim, Express Scripts misleads this Court by failing to

acknowledge that Plaintiff conferred with Express Scripts through respective counsel and could

not agree on how to attach contracts that Express Scripts repeatedly deems "confidential" and

demands be presented to this Court "under seal." *Ex. A.*

## CONCLUSION

Plaintiff IUOE Local 542 respectfully request this Court deny the Defendants'

Preliminary Objections to Plaintiff's Amended Complaint.

Respectfully submitted,

Dated:  October 9, 2018                           By:   *s/ Donald E. Haviland, Jr.*
                                                               Donald E. Haviland, Jr.
                                                               *haviland@havilandhughes.com*
                                                               William H. Platt II
                                                               *platt@havilandhughes.com*
                                                               Christina M. Philipp
                                                               *philipp@havilandhughes.com*
                                                               Haviland Hughes
                                                               201 South Maple Avenue, Suite 110
                                                               Ambler, PA 19002
                                                               Phone: (215) 609-4661
                                                               Fax:    (215) 392-4400

                                                               *Counsel for Plaintiff,*
                                                               *International Union of Operating*
                                                               *Engineers Local 542*

24

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT D

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

```
1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                          WESTERN DIVISION

3    _____
                                 )
     CITY OF ROCKFORD            )
4                                )
                                 ) CIVIL ACTION NO.
5    VS.                         ) 17 CV 50107
                                 ) Rockford, Illinois
6    MALLINCKRODT ARD, INC., ET AL )
                                 )
7    _____)

8    _____
                                 )
     MSP RECOVERY CLAIMS, SERIES, LLC, )
9    ET AL.,                     )
                                 )
10                               ) CIVIL ACTION NO.
     VS.                         ) 18 CV 00379
11                               )
     MALLINCKRODT ARD, INC., ET AL )
12   _____)

13

14

15                         STATUS HEARING
                      TRANSCRIPT OF PROCEEDINGS
16               BEFORE THE HONORABLE JOHN Z. LEE
                        SEPTEMBER 20, 2019

17

18   APPEARANCES:

19   For the Plaintiffs:        MR. DONALD E. HAVILAND, JR.
                                Haviland Hughes
20                              201 South Maple Avenue
                                Suite 110
21                              Ambler, PA  19002

22

23   For the Plaintiffs:        MR. JONATHAN P. MINCIELI
                                Meyers & Flowers LLC
24                              3 North Second Street
                                Suite 300
25                              St. Charles, IL  60174
```

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

```
 1    APPEARANCES (Continued):

 2


 3    For the MSP plaintiffs:        MR. PEDRAM ESFANDIARY
                                     Baum Hedlund Aristei Goldman
 4                                   10940 Wilshire Blvd., 17th Floor
                                     Los Angeles, CA  90024
 5
      For the MSP plaintiffs:        MS. TRACY TURNER
 6                                   Pendley, Baudin & Coffin, LLP
                                     1100 Poydras St.
 7                                   Suite 2505
                                     New Orleans, LA  70163
 8
      For the Mallinckrodt           MS. LAURA S. SHORES
 9    defendants:                    MR. ADAM PERGAMENT
                                     MS. SONIA PFAFFENROTH
10                                   Arnold & Porter
                                     601 Massachusetts Ave., NW
11                                   Washington, D.C.  20001

12    For the Mallinckrodt           MR. SCOTT SULLIVAN
      defendants:                    Williams McCarthy LLP
13                                   120 West State Street
                                     Rockford, IL  61105
14
      For United Biosource           MR. ERIC LYTTLE
15    defendants:                    MS. MEGHAN McCAFFREY
                                     Quinn Emanuel
16                                   1300 I Street NW, Suite 900
                                     Washington, D.C.  20005
17
      For the Express Script         MR. JAN OHLANDER
18    defendants:                    Reno & Zahm
                                     2902 McFarland Rd.
19                                   Suite 400
                                     Rockford, IL  61107
20

21


22    Transcribed by:                BARBARA BARNARD, RPR, CRR
                                     Official Court Reporter (Retired)
23                                   869 E. Schaumburg Road
                                     Box 196
24                                   Schaumburg, Illinois  60194-3654
                                     (956)572-3074
25
```

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1     THE COURT:  Good morning.

2     COURT CLERK:  18 CV 379, MSP Recovery Claims Series

3  versus Mallinckrodt ARD.

4     THE COURT:  Call the Rockford, City of Rockford case as

5  well.

6     COURT CLERK:  17 CV 50107, City of Rockford versus

7  Mallinckrodt ARD.

8     THE COURT:  Can you please state your name for the

9  record.

10     MS. SHORES:  Laura Shores, Your Honor, on behalf of the

11  Mallinckrodt entities.  And with me at counsel table are Sonia

12  Pfaffenroth and Adam Pergament.

13     MR. LYTTLE:  Good morning, Your Honor.  Eric Lyttle for

14  the Express Script entities, and with me is Meghan McCaffrey and

15  Jan Ohlander.

16     MR. ESFANDIARY:  Good morning, Your Honor.  Pedram

17  Esfandiary on behalf of the MSP plaintiffs.  And with me at

18  counsel table is Ms. Tracy Turner.

19     MR. HAVILAND:  Good morning, Your Honor.  Don Haviland,

20  Haviland Hughes for the City of Rockford for the class.

21     MR. MINCIELI:  Jonathan Mincieli, Meyers & Flowers, also

22  for Rockford.

23     THE COURT:  Good morning, everyone.  So I just wanted to

24  get an update on how things are going with regard to discovery.

25  I know that you've been working with Magistrate Jensen, and I

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1   believe you have a hearing with her to check in at 11:00 today,

2   if I'm not mistaken.

3       So can you just give me a overview of how things are going

4   in discovery, what issues remain, and your thoughts on the --

5   what remains to be done in this case with regard to discovery?

6       Let's start with plaintiffs.

7       MR. HAVILAND:  Thank you, Your Honor.  Don Haviland for

8   the City of Rockford again.

9       In a word, slow.  This case is two-and-a-half years old.

10  The Court denied the motions to dismiss in January of 2019.  We

11  propounded discovery in 2018 pursuant to Judge Johnston --

12  former Magistrate Judge Johnston's directive.  We asked for a

13  couple of basic categories of information:  The FTC documents

14  that preceded our lawsuit, some lawsuit documents from a

15  competitor company by the name of Retrophin, and then we wanted

16  contract documents because this is, at bottom, an antitrust case

17  that involves price fixing and actual contracts.

18      So we were able to get through those categories of

19  documents, but we've been bogged down in what has really taken

20  over the federal court system, the whole ESI protocol.  And it

21  has been a struggle, to tell you the truth, Judge.

22      We have asked for generic categories of noncustodial files.

23  We wanted the contract documents, the files that led to the

24  contracts.  It took a while for the defendants to commit that

25  there are no such files, and so we spent the better part of 90

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1    days now, and we're back at 11:00 trying to hopefully wrap that

2    up on one issue, just the iterations that led to the signed

3    agreements that are the beginning of this case.

4        But to tell you how difficult it's been from the plaintiffs'

5    standpoint, we don't have sales records yet.

6        And just to back up, Judge, this is essentially a

7    one-product company, Questcor, that sold a drug called Acthar to

8    two babies in the City of Rockford back in 2015 to the tune of

9    $500,000, a drug that used to cost $40.  And overnight the two

10   defendant companies decided to raise the prices.  And that's

11   really the genesis of our case in 07 that led to the lawsuit in

12   2017.

13       So when I say it's a struggle, I understood when Judge

14   Johnston wanted us to proceed cautiously until the Rule 12

15   motions were decided; but that was January, and we are still

16   struggling to get what I call new discovery.

17       The FTC documents was a ready-made set of documents sitting

18   at Greensfelder down in Chicago.  And we got those finally.  But

19   to try to break the logjam and to answer Your Honor's question,

20   so this morning we propounded some very simple requests to get

21   past this custodial issue.  We asked for all of the Questcor

22   documents, all of them.

23       Questcor is a legacy company to Mallinckrodt, acquired in

24   2014.  The CEO says its legacy matters.  We want the documents

25   because it's a one-product company.  In this case there's such

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1   overarching principles with some other litigation going on in

2   the country.  There's a qui tam lawsuit in Philadelphia Judge

3   Schiller has had since 2012.  We didn't know about it, Your

4   Honor, because it was unsealed in June.  But there is overlap

5   since it involves Acthar, so we certainly want to coordinate the

6   effort in Philadelphia with this court.

7         THE COURT:  Has the government -- what was the

8   government's position with regards to qui tam?

9         MR. HAVILAND:  They intervened, Your Honor.  And what's

10  important about that, there are really two acts or practices,

11  not antitrust.

12        So to back up, the DOJ intervened in that lawsuit.  The FTC

13  prosecuted the lawsuit that led to the antitrust.  There's

14  really two cases.  They settled the FTC case for $100 million.

15  Just last week they settled one of the two cases for

16  $15 million.

17        And what's interesting about that is, you know, we're

18  struggling to get discovery, Judge, and we're concerned about

19  Mallinckrodt's viability.  If you read the media, they're

20  talking bankruptcy.  They have exposures in opioids, and it

21  could bankrupt the company.  And so we're trying to get to

22  closure here, but we can't seem to get off the ground in

23  discovery.

24        So we have basic document requests for sales data just so we

25  can understand who bought what and when; we can put together a

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1    class-wide proof of damages for our class certification motion.

2    I don't have that to this day.  This company sold the product

3    through one portal, through Express Scripts through a form, an

4    ASAP form.  We attached it to our complaint.  We've asked for

5    the forms.  We don't have the forms.

6         So you see the struggle.  And I could go on, but Judge

7    Jensen knows full well where we are in that.  But I hope today

8    to speak to her about breaking the logjam to get to the actual

9    noncustodial files that these companies have that will allow us

10   to move forward with at least presenting the Rule 23 motion this

11   year.  It will be three years, but -- and I know the federal

12   courts struggle with moving cases along, but we've been trying

13   to move since January, Judge, in all honesty.

14        We've had new lawyers come in.  Both companies fired their

15   counsel, and that's been difficult because new sheriff comes in

16   town, and all the goodwill and the things we worked through are

17   gone.  And probably the most overarching thing is defense

18   counsel from Mallinckrodt committed to discuss settlement after

19   Rule 12.  Well, that guy is gone, and so we have no mediation to

20   plan.  We have no plan to try to get the City of Rockford's case

21   at the table before this company goes bankrupt.

22        And Judge Ulstrom -- I'm sure Your Honor reads the media.

23   He's very active in trying to get the companies to speak.  I'm

24   not suggesting they have to settle, but they should be speaking

25   to us now that we have viable claims as we work through these

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

 1   discovery issues.

 2       So I know I gave you a big answer, but we've really been

 3   struggling to get some closure on basic issues.  ESI protocols

 4   notwithstanding, custodians notwithstanding, we all deal with

 5   that, but it's been used as a block to some baseline discovery

 6   that we need to get in this case.  Thank you for your time.

 7       MS. SHORES:  Your Honor, Laura Shores for the

 8   Mallinckrodt entities, and I want to get to the question you

 9   actually asked, but a couple things.

10       First, as Mr. Haviland pointed out, we are new to the case.

11   We were hired about three weeks ago, I believe.  And I believe

12   that we have negotiated some of the impasse away in good faith,

13   and I'll have Mr. Pergament speak exactly to that issue.

14       But one thing that Mr. Haviland did not mention is that he

15   has filed, after this case, five other cases.  So one is the one

16   that he mentioned that is pending in the Eastern District of

17   Philadelphia, and the claims are patterned after the qui tam

18   case that he referred to.

19       That was -- that was the most recent case.  But he's also

20   filed another class action in New Jersey state court with the

21   same claims as these, and two other -- actually four other cases

22   on behalf of opt-out payers from his own class in state court.

23       So we have moved to transfer the Philadelphia case to this

24   court, same parties, overlapping plaintiffs and similar claims

25   or some overlapping allegations.  And we wanted to bring that to

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1   Your Honor's attention.  Obviously that's pending before Judge

2   Schiller in Philadelphia.  It is not fully briefed.  We're

3   waiting for -- we still have a reply brief to file, but it will

4   be fully briefed in October.

5       I don't know whether Mr. Haviland has plans to file other

6   cases.  He has certainly alluded to that in some of his filings,

7   and so I don't know if this is it or if we've got several more.

8   But it seems to us to make sense not to have a standing count of

9   six other courts dealing with the same claims and plaintiffs.

10  So I wanted to bring that to your attention.

11          THE COURT:  All right.  And what about the overall

12  status of this case and the discovery in this case?

13          MS. SHORES:  So I'm going to let Mr. Pergament speak to

14  that.

15          MR. PERGAMENT:  Adam Pergament, Your Honor.

16      There is -- Mallinckrodt has produced a significant amount

17  of discovery in the case.  There is no live issue before the

18  magistrate.  We most recently were able to reach agreement on

19  custodian search terms that were made to what have been termed

20  the contract files.  Mallinckrodt has produced, in connection

21  with an FTC investigation, investigational hearing transcripts,

22  privilege logs, pleadings, motions, orders, all discovery, all

23  documents in a litigation called the Retrophin litigation that

24  is somewhat related to that case.

25      Mallinckrodt has produced organizational charts,

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1   directories, all the due diligence materials from the merger

2   between Questcor, the predecessor company, and Mallinckrodt, as

3   well as contracts, and have looked for and tried to find all of

4   the noncustodial contract files that Mr. Haviland referenced.

5       With regard to sales data, we're happy to have a

6   conversation.  I'm not aware of any ongoing meet and confer with

7   regard to that.  My understanding is that there is a provision

8   in the ESI order that provides a process for discussing sales

9   data, and we're happy to engage on that issue with Mr. Haviland,

10  which I've never heard any issue about that until today.

11      In terms of his recent document request, this is something

12  that came in, I think, this morning.  We haven't had a chance to

13  review it, but we're happy to meet and confer with the plaintiff

14  about that.

15          MR. LYTTLE:  Your Honor, if I may?  For Express Script,

16  just a quick update on discovery.

17      I don't share Mr. Haviland's view that discovery has

18  progressed slowly here.  We have done an exhaustive search for

19  noncustodial contract files and have produced all of them that

20  we've been able to locate.  Today is the first day I've heard

21  that we're looking for noncustodial files for sales records.  He

22  can come talk to us about that.  We'll look for that as well.

23  But Mr. Haviland has 217,000 documents from my clients from 15

24  custodians.

25      In addition, we've agreed to all the additional custodians

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1   that he has now asked for.

2        So the only dispute currently pending over discovery with my

3   client is over a few search terms.  And it's pretty patently

4   overbroad, Your Honor.  He literally wants us to run Express

5   Scripts in our files.  Well, that's going to return every file

6   in our documents.  That's just not a viable search term.  We're

7   going to discuss that with Judge Jensen.  But we certainly have

8   produced all of the relevant noncustodial files we've been able

9   to locate and that we understood him to be looking for.  And on

10  the custodial front, it is progressing well with 217,000

11  documents produced, more to come once we can agree on a few

12  disputed search terms, and we'll produce those.

13       Mr. Haviland has noticed two depositions in one of those

14  related cases that Ms. Shores talked about.  We'll give him that

15  witness, but we have told him and he has promised to this Court

16  multiple times, including in the case scheduling order, the

17  Court needs discovery.  We know there are more documents coming

18  from these custodians.

19       We have told him we're only providing these witnesses once.

20  We've asked him to hold off.  If he chooses to go forward,

21  that's his right, but we will not be voluntarily producing these

22  witnesses in multiple times because he has chosen to file six

23  cases.

24            THE COURT:  Has the -- has there been a deadline for the

25  completion of fact discovery set in this case?

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1          MR. HAVILAND:  Yes, Your Honor, September 2020.  And

2     each time it's come up with Judge Jensen, I've reminded the

3     Court about the slow pace.  And I, for one, would like to keep

4     the deadline, but it's becoming increasingly difficult for the

5     reasons counsel just said.

6          We noticed a deposition in June.  We knew the individual

7     would be in Philadelphia.  We noticed it for Philadelphia, and

8     we didn't get a response unless the day before saying he's

9     unavailable.  They've now given us a date in October.

10          That's one deposition.  This Court has allowed the plaintiff

11     50 of each party.  And by the way, that wasn't willy-nilly.

12     That was Judge Johnston taking proposals, realizing the

13     complexities.  Express Scripts has four separate entities, one

14     of which has been spun out as a separate company.  So that's

15     about 12 per company if you do the count.  But we can't get one

16     deposition, Judge.  It's been a struggle.

17          THE COURT:  The -- what about the statements from

18     counsel regarding any efforts to try to coordinate discovery in

19     these cases?

20          MR. HAVILAND:  So, Your Honor, I have been crystal clear

21     since the moment I stepped foot in this courtroom with Judge

22     Johnston.  We never talked to Judge Kapala, but the record is

23     clear.  I said that we've been engaged by multiple clients over

24     these claims.  And I pointed out to the Court in my earlier

25     remarks that there was a qui tam case unsealed.  Now, that was

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1    too late to do anything about it with the case we filed in

2    Philadelphia on behalf of the Union client, Operating Engineers.

3    But, Judge, that case is as big as this case.  The City of

4    Rockford spent $500,000, so that plaintiff sued in state court

5    as its right.  It got past the equivalent of motion to dismiss.

6         THE COURT:  Do any of the other cases have the same

7    plaintiffs as in these two cases?

8         MR. HAVILAND:  No.  So Pennsylvania does not have an

9    antitrust statute, Judge, as you probably know.  There's a

10   federal antitrust statute, so they have argued to the Court

11   about the indirect purchaser rule and the application.  So

12   unless they're committing that all these plaintiffs are going to

13   be covered by any resolution, those clients are on a clock.  I

14   imagine at some point in time, someone is going to raise the

15   statute of limitations.

16    I have been crystal clear, and I want to be with this Court.

17   We are going to file those cases.  So in response to Ms. Shores'

18   comments, yes, we have other cases we're going to be filing.  If

19   they fit within the paradigm of this Court, they will be

20   available as additional representatives of the class that this

21   Court chooses to certify and sees that as a need.  Judge

22   Kapala's ruling didn't go that far.  He found that Rockford had

23   the ability to represent at least the federal claims and

24   potentially the indirect purchaser claims.

25        But these are the issues that are coming, right?  They're

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1   going to want to see additional representative plaintiffs.  I

2   know Judge Johnston raised that issue, so we are prepared for

3   that.

4        But where there's no coverage of the federal antitrust

5   claims which are going forward, I have to represent the clients

6   that hire us to do the job.  And when counsel talks about the

7   filing in New Jersey, well, New Jersey has an antitrust statute.

8   New Jersey has a civil consumer fraud statute.  But New Jersey

9   doesn't have a indirect purchaser antitrust statute.  So whether

10  or not that case is going to be part of this case will

11  ultimately be decided by this Court.

12       But as I said, the revelation of the FTC case in 2017 which

13  precipitated this, I believe that the statute of limitations

14  should be tolled by this filing, but I don't hear the defendants

15  telling us that, so we've got to move forward in other places

16  with plaintiffs to protect their rights.

17       And, Your Honor, if this Court were to decide that class

18  certification is inappropriate, the Supreme Court has directed

19  us that we can and should proceed in state courts.

20       So we're not looking to duplicate.  We're not overlapping.

21  To the extent there is the ability to coordinate, we're doing

22  that.  But there are claims in the state court case.  For

23  instance, we noticed the deposition of a gentleman by the name

24  of Paul Groove who is the Express Scripts account representative

25  for the Operating Engineers 542.  It has nothing to do with

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1    Rockford, in fairness.  I told counsel for MSP that if there's

2    the opportunity to coordinate, we will.

3        I agree with the principle there shouldn't be more than one

4    deposition, but I also heard something different.  We're not

5    going to give you the documents to allow you to take one

6    deposition.  We're still struggling to get the documents of

7    Mr. Osbourne, the gentleman we noticed in June.  We're told

8    there's more coming.  When?  I just want to know when, because

9    the dep was noticed in June.  We've set it for October.  Your

10   Honor, we did a duces tecum to try to get closure on that issue.

11       So I really hope Your Honor will work with us and Judge

12   Jensen to get some deadlines in the matter.  But the lead was

13   it's September 2020.  Judge Jensen has not indicated a

14   willingness to move that date.

15            MR. ESFANDIARY:  Your Honor, just to echo some of the

16   points that Mr. Haviland made.  With respect to the sales data,

17   for example, counsel for Mallinckrodt, Mr. Pergament, said that

18   he's not aware of any meet and confer over second sales data.

19   However, we've had sales data discovery outstanding since start

20   of this year, actually going back to last year.  And they've

21   agreed to produce them, and we have actually entered into a --

22   negotiated and entered custodian search terms with Mallinckrodt.

23   We're in the process of working something out with Express

24   Scripts too.  But at least with Mallinckrodt, they're in a

25   position to produce the bulk of our discovery that has been

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1    outstanding for quite some time.

2        Again, I just want to echo the fact that the slow pace of

3    discovery is really not warranted by the facts -- by the

4    agreements that have been entered and the kind of

5    representations made by defense counsel.

6        THE COURT:  All right.  I'll give defendants any final

7    word.

8        MS. SHORES:  There's a lot to respond to, but I don't

9    want to respond to every point.

10       First of all with respect to discovery, I can represent to

11   this Court and to plaintiffs' attorneys that he will find us

12   very cooperative.  So I'm not sure what goodwill would be lost

13   in the process, but I think he will -- I think he will be able

14   to negotiate in good faith with us, and we're eager to move

15   things along as well.

16       With respect to his filing of cases in different courts, I'm

17   sure Your Honor has experience in these kinds of cases, but it's

18   common for members of a class to file both state law claims and

19   federal law claims in a federal court complaint.

20       And as to his point about needing other representative class

21   members, I don't know why they couldn't be added to his

22   complaint in this court which is, you know, the same claims and

23   facts.

24       But I guess we'll wait to see what else he intends to file

25   down the road.  It seems to us, again, incredibly inefficient to

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1  have different courts all over the place deal with the same

2  parties and claims and allegations.

3       THE COURT:  I tend to agree with that.  But on the other

4  hand, forced cooperation can only go so far.  And so I

5  understand that the parties want to try to go about discovery

6  efficiently by trying to coordinate discovery, but my main

7  concern is -- are these cases and making sure that the parties

8  are on track to satisfy the deadlines that have been set in this

9  case.

10      And so to put it bluntly, I am not going to wait around to

11  see how those other cases go, kind of progress in their lives to

12  make sure the parties are complying with their obligations for

13  discovery in this case.

14      MS. SHORES:  I didn't mean to suggest that, Your Honor.

15      THE COURT:  I'm not saying you did.  I just wanted the

16  parties to be clear on where I stand, all right?

17      Between now and September of 2020, that's a lot of time.

18  And I recognize that this is a complicated case, but it's not

19  that complicated.  I've had cases that are certainly more

20  complicated than this.

21      And so the -- my goal is to just make sure that things are

22  proceeding at a reasonable and efficient pace so that when -- so

23  that plaintiffs will be in a position to file their motion for

24  classification.  To the extent that they don't provide adequate

25  class representatives in this case, they're doing it at their

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1   own risk.  So we'll see how that goes, all right?

2        All right.  Well, thank you very much for the update.  Just

3   so that I can continue to touch base with you all as things go

4   forward, I'm going to set this case for status again on

5   November 22nd, which is one of the days that I'm scheduled to be

6   here, which is a Friday, and we'll set it for 10:00 that

7   morning.

8        All right.  Thank you very much.

9        CHORUS OF ATTORNEYS:  Thank you, Your Honor.

10                              *  *  *

11     (End of requested transcript)

12                            -oOo-

13     I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above matter.

15

16   Date:  September 22, 2019

17

18

19   /s/_____
     Signature of Court Reporter
20   Barbara Barnard

21

22

23

24

25

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN THE COURT OF COMMON PLEAS
FOR MONTGOMERY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| **INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542,**<br><br>Plaintiff,<br><br>v.<br><br>**MALLINCKRODT ARD INC.,** *et al.*,<br><br>Defendants. | ⋮<br>⋮<br>⋮<br>⋮<br>⋮<br>⋮<br>⋮<br>⋮<br>⋮<br>⋮<br>⋮ | Civil Action No. 2018-14059 |

**MEMORANDUM IN SUPPORT OF MALLINCKRODT ARD INC. AND
MALLINCKRODT PLC'S MOTION TO STAY**

**I.    MATTER BEFORE THE COURT**

Mallinckrodt ARD Inc. and Mallinckrodt plc's (collectively, "Mallinckrodt") Motion to Stay all proceedings in this case during the pendency of earlier-filed putative class actions in the United States District Court for the Northern District of Illinois, which assert the same claims on behalf of putative classes of payors of which Plaintiff International Union of Operating Engineers Local 542 ("IUOE") would be a member.

**II.    QUESTION PRESENTED**

Is there good cause to stay all proceedings in this case to conserve judicial resources, avoid duplicative discovery, and avoid potentially inconsistent rulings of law because Defendants are litigating two earlier-filed putative class action cases in federal court (one of which was filed by IUOE's attorneys) based on the same operative facts and alleged violations of law asserted by IUOE here, the earlier-filed cases are in discovery, and a stay would cause no prejudice to IUOE?

**Answer:  Yes.**

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## III.   INTRODUCTION

Two putative class actions against Defendants alleging the same operative facts and violations of federal antitrust law[1]—the first of which was filed by the attorneys who represent IUOE in this case—have been pending in federal court in the Northern District of Illinois for more than two years.  In the first, the city of Rockford, Illinois, represented by IUOE's attorneys, purports to assert claims on behalf of a class consisting of "all third party payors and their beneficiaries . . . that paid for Acthar from August 2007 through the present."  Second Am. Class Action Compl. ¶ 165, *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 3:17-cv-50107 (N.D. Ill. Dec. 8, 2017) ("*Rockford*"), ECF No. 98 (attached as Ex. A).  The second case, which was originally filed in the Central District of California then transferred to the Northern District of Illinois to be coordinated with *Rockford*, was filed by a different plaintiff on behalf of a putative class consisting of "all third-party payors, or their assignees, who have, as indirect purchasers, in whole or in part, paid for, provided reimbursement for, and/or possess the recovery rights to reimbursement for the indirect purchase of Acthar from August 1, 2007 to present."  First Am. Class Action Compl. at ¶ 184, *MSP Recovery Claims Series LLC, et al., v. Mallinckrodt ARD Inc., et al.*, No. 1:18-cv-00379 (N.D. Ill. Apr. 10, 2019) ("*MSP*") (together with *Rockford*, the "federal cases"), ECF No. 165 (attached as Ex. B).  Plaintiff IUOE falls into at least one and arguably both of the classes proposed by plaintiffs suing Defendants in the federal cases.

The core allegations in the federal cases are the same as those asserted by IUOE here:  all three cases challenge Mallinckrodt's distribution agreement for Acthar® with Curascript and the acquisition of the rights to develop Synacthen by Questcor, which Mallinckrodt acquired in 2014.

---

[1] All three actions name two Mallinckrodt entities (Mallinckrodt ARD, Inc. and Mallinckrodt plc) and five Express Scripts entities (Express Scripts Holding Company, Express Scripts, Inc., Curascript, Inc., Curascript SD, and United BioSource Corporation).  This action adds a sixth Express Scripts defendant, Accredo Health Group, Inc.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*Rockford* and *MSP* involve alleged violations of federal antitrust law. *Rockford* also involves alleged violations of state antitrust laws. *MSP* involves alleged violations of state consumer protection statutes, including the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§201, *et seq.* ("UTPCPL").

Almost all of IUOE's legal claims have been asserted in the federal cases. Like the putative class in *MSP*, IUOE alleges that Defendants violated the UTPCPL. The putative *Rockford* class originally alleged the same common law and contract claims as IUOE—unjust enrichment; conspiracy to defraud (aiding and abetting); breach of contract; breach of the implied covenant of good faith and fair dealing; and promissory estoppel.[2] The only claim asserted by IUOE not asserted in *Rockford* or *MSP* is negligent misrepresentation.

Furthermore, IUOE relies on the same factual allegations asserted in the federal cases. A great number of IUOE's allegations in support of its claims are the same as or similar to the allegations in from the *Rockford* complaint. For example:

---

[2] The court in *Rockford* dismissed the common law and contract claims without prejudice, leaving only the federal and state antitrust claims. *See City of Rockford v. Mallinckrodt ARD Inc.*, 360 F.Supp.3d 730, 778 (N.D. Ill. 2019).

3

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| IUOE Amended Complaint | Rockford Second Amended Complaint |
|---|---|
| "One of the largest [specialty pharmacy distributors] in America is ESI's CuraScript, which ESI has owned since 2004. In 2007, Mallinckrodt decided to embark on a 'new strategy' and it changed its distribution of Acthar. Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt decided to limit Acthar distribution exclusively through ESI's CuraScript. In effect, Mallinckrodt contracted with the agent of its leading customers, **including IUOE Local 542**, and the largest SPD at the time, in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly. . . ." ¶¶ 8-9 (emphasis added). | "One of the largest specialty pharmacy distributors in America is ESI's CuraScript, which ESI has owned since 2004. In 2007, Mallinckrodt decided to embark on a 'new strategy' and it changed its distribution of Acthar. Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt decided to limit Acthar distribution exclusively through ESI's CuraScript. In effect, Mallinckrodt contracted with the agent of its leading customers in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly." ¶ 7 |
| "Mallinckrodt's strategy to protect its monopoly power in the market for ACTH drugs was successful. But-for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price." ¶ 148 | "Mallinckrodt's strategy to protect its monopoly power in the market for ACTH drugs was successful. But for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price." ¶ 151 |
| "Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed ESI's competitive pressure in the marketplace to cause Acthar prices to be lower. Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present." ¶ 161 | "Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed ESI's competitive pressure in the marketplace to cause Acthar prices to be lower. Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present." ¶ 164 |

Moreover, IUOE's complaint frames the underlying dispute in this case nearly identically to the dispute underlying *MSP*. *Compare* IUOE Am. Compl. ¶ 5 ("[The issue is] whether

4

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Mallinckrodt's actions in contracting with the largest agent of its leading customers, Express Scripts, and in acquiring the only competitive product in the marketplace, Synacthen, constitute unlawful efforts to retain, maintain and enhance Mallinckrodt's monopoly power over Acthar in the ACTH market."), *with* Ex. B, First Am. Class Action Compl. ¶ 183, *MSP*, ECF No. 165 ("Through the exclusive contract for distribution of Acthar with Express Scripts and its purchase of Synacthen, the only potential competitive product, Mallinckrodt has retained 100% of the market for ACTH products.  This monopoly power allowed Defendants to increasingly raise the prices of Acthar to the detriment of third-party payers such as Plaintiffs' Assignors.").

Given the overlap in the theories of harm and the factual allegations in IUOE's complaint and those in the federal cases, Mallinckrodt respectfully requests that the Court stay this case. Importantly, a stay will not be prejudicial to IUOE because it is a member of one or both of the proposed classes in the earlier-filed cases.  Plaintiff's counsel apparently filed this case out of concern for a statute of limitations defense.  But staying this case, now that it has been filed, will not affect IUOE's rights.  Proceeding with IUOE's case in parallel with *MSP* and *Rockford* would unnecessarily strain the Court's resources, impose duplicative litigation burdens on the parties, and could result in potentially inconsistent rulings.

Furthermore, the nearly complete overlap between the factual allegations in the federal cases and the factual allegations in this case means that a substantial amount of the discovery sought by plaintiffs in the federal cases will overlap with that sought by IUOE.  There is no reason for two courts to supervise discovery simultaneously.  *Rockford* and *MSP* are coordinated for discovery purposes and fact discovery is ongoing.  Magistrate Judge Lisa Jensen is holding frequent in-person status conferences in the federal cases to manage discovery and adjudicate any disputes.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In the alternative, should this Court decide to continue the proceedings in parallel, it should align discovery management and the schedule in this case with the federal cases.

## IV.   ARGUMENT

Proceeding concurrently with the federal cases would result in unnecessary use of judicial resources and duplicative effort by all involved. This court "has the inherent, equitable power to stay the proceedings in the second suit during the pendency of the prior suit." *Singer v. Dong Sup Cha*, 550 A.2d 791, 793 (Pa. Super. Ct. 1988) (citing *Klein v. City of Philadelphia*, 465 A.2d 730, 731 (Pa. Commw. Ct. 1983)). *See also Pezzino v. Seven Springs*, 17 Pa. D. & C. 4th 44, 46 (Pa. Ct. C.P. 1992). A stay is appropriate where proceeding in two or more cases in different courts would "create a duplication of effort on the part of the parties and waste judicial resources by requiring two courts . . . to litigate a matter that in all likelihood could be fully addressed in one forum." *PNC Bank, Nat. Ass'n v. Bluestream Tech., Inc.*, 14 A.3d 831, 835 (Pa. Super. Ct. 2010) (quoting *Norristown Automobile Co., Inc. v. Hand*, 562 A.2d 902, 905 (Pa. Super. Ct. 1989)).

### A.  A Stay in this Case Would Prevent a Waste of Judicial Resources and Promote Efficiency

Courts routinely grant stays of cases that seek to adjudicate the same causes of action on behalf of the same parties as a case already pending in another court. In *Pezzino*, for example, the plaintiff filed a negligence suit in New Jersey Superior Court, then an identical complaint in the Somerset County Court of Common Pleas. *Pezzino*, 17 Pa. D. & C. at 45. The Somerset County court granted a stay of the later-filed case, reasoning that in the interest of efficiency the New Jersey case "should be permitted to proceed to its conclusion" before the court adjudicated any issues before it. *Id.* at 47.

In *PNC Bank*, the Superior Court directed the trial court to enter a stay on remand where all of the appellants' rights were being litigated in a previously-filed case. Both cases concerned

6

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the same business transaction, and both sought equitable relief, though only one case sought payment on the loans at issue. *PNC Bank*, 14 A.3d at 839-40. The court in *Klein* granted a stay of a taxpayer action because a separate taxpayer action involving the same municipal contracts was already pending and would be binding on the second action, even though the plaintiffs in the two actions were different. 465 A.2d at 731. In *Norristown*, the appellate court upheld the trial court's stay, finding that the case "involve[d] a set of circumstances where the litigation of two suits" would lead to duplicative effort and a waste of judicial resources. 562 A.2d at 905. The situation here is no different.

IUOE admits that there is nothing unique about its alleged injury. It claims to have "suffered injuries due to Mallinckrodt's same conduct which caused injury to other payors throughout the country, including the City of Rockford in the federal action, [so] there is necessarily factual overlap in the statement of the claims against Mallinckrodt." Ex. C, Pl's Mem. in Opp'n to Defs' Preliminary Objs. at 16 (Oct. 9, 2018). This same "overlap" exists between this case and *MSP*, which alleges a violation of the UTPCPL based on the same underlying factual allegations.

Given this commonality, adjudication of IUOE's case in this forum concurrently with adjudication of the claims that two plaintiffs have asserted in federal court on behalf of putative classes, purportedly including IUOE, is inefficient and unnecessary. IUOE's counsel has acknowledged the obvious inefficiency that would result from pursuing the same discovery in multiple courts, representing to Judge Lee during a hearing in *Rockford* that he "agree[d] with the principle there shouldn't be more than one deposition . . ." of a Defendant's employee and

7

expressing that "[t]o the extent there is ability to coordinate [between cases], we're doing that." *See* Ex. D, Hr'g Tr. (Sept. 20, 2019) at 14:20-15:4, *Rockford*, ECF No. 273.

Given that IUOE's theories of harm are being litigated in the federal cases, and discovery of Defendants in the federal cases will substantially overlap with any discovery taken by IUOE, a stay of this case pending a determination of whether the classes proposed in *Rockford* and *MSP* should be certified, whether IUOE is a member of the certified class(es), and/or a resolution of the federal cases is warranted.

## B. A Stay Would Not Prejudice IUOE

IUOE would not suffer any prejudice if this case were stayed during the pendency of proceedings in *MSP* and *Rockford*. Because IUOE is a putative member in one or both of the classes proposed in the federal cases, a certified class action will advance IUOE's claims in those proceedings. Also, the nearly complete overlap between the factual allegations in the federal cases and the factual allegations in this case means that a substantial amount of the discovery sought by plaintiffs in the federal cases will overlap with that sought by IUOE.

To explain his filing of duplicative lawsuits in this and other jurisdictions to the court presiding over *Rockford* and *MSP*, IUOE's counsel cited concerns about a possible statute of limitations defense. He explained to Judge Lee that because Defendants disagreed that the statute of limitations was tolled by the Federal Trade Commission's filing of a case in 2017 against Mallinckrodt concerning certain of the same allegations underlying the *Rockford* complaint, he has "to move forward in other places with plaintiffs to protect their rights." *See* Ex. D, Hr'g Tr. (Sept. 20, 2019) at 14:12-16, *Rockford*, ECF No. 273. Putting aside the merits of counsel's concern, any applicable limitations period would not run during a stay. Meanwhile, if the classes are certified, the federal court will be adjudicating claims based on the same allegations on behalf

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

of a class of which IUOE is a member as the putative classes are currently defined. A stay in this case will not compromise IUOE's rights; a stay will instead ensure that, if the proposed classes are certified in the federal cases, IUOE's theories of harm will be adjudicated in an orderly and uniform manner by the federal court in which IUOE's attorneys first asserted those claims.

## C.  If This Case Is Not Stayed, Scheduling Should Be Aligned With The Federal Cases

If the Court determines that this case should proceed even while *Rockford* and *MSP* are pending, scheduling in the cases should be aligned. Currently, the cases are not on the same track. While the Civil Case Management Conference Order entered by this Court on November 4, 2019 sets the same deadline for fact discovery currently in place in the federal cases (September 30, 2020), the remainder of the schedule here diverges from the schedule that governs *MSP* and *Rockford* such that, despite having been filed after both federal cases, this case will move ahead of the federal cases once discovery closes. *Compare* Minute Entry, *Rockford*, (Mar. 26, 2019) ECF No. 203, *with* Civil Case Mgmt. Order, at 1 (Nov. 4, 2019).[3]  Accordingly, absent the relief requested in this Motion, expert discovery and summary judgment motions in this case, with only one plaintiff and four prescriptions constituting the totality of the alleged harm, will take precedence over the same procedures in the two federal cases, which are brought purportedly on behalf of proposed nationwide classes. Should the Court decline to enter a stay, aligning this case's schedule with the coordinated proceedings in *Rockford* and *MSP* would require only a modest revision of the case management order as it currently stands.

## V.    RELIEF REQUESTED

---

[3] For example, Plaintiff's expert reports in this case are due on November 2, 2020, while plaintiffs' expert reports in the federal cases are due on November 30, 2020. Defendants' expert reports and summary judgment motions in this case are due on December 15, 2020, while Defendants' expert reports in *MSP* and *Rockford* are not due until one month later, on January 15, 2021, and summary judgment motions are due on March 31, 2021.

Case# 2018-14059-197 Docketed at Montgomery County Prothonotary on 12/06/2019 5:34 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

For the reasons discussed in Mallinckrodt's motion and in this memorandum, good cause exists for the Court to stay this case pending the resolution of the *MSP* and *Rockford* cases. Alternatively, the Court should align the schedule in this case with the schedule in *MSP* and *Rockford*.

Dated: December 6, 2019

/s/ Ryan Watts

Matthew M. Wolf
Laura S. Shores
Sonia K. Pfaffenroth
Michael B. Bernstein
Ryan Z. Watts
Adam M. Pergament
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942-6609
Matthew.Wolf@arnoldporter.com
Laura.Shores@arnoldporter.com
Sonia.Pfaffenroth@arnoldporter.com
Michael.B.Bernstein@arnoldporter.com
Ryan.Watts@arnoldporter.com
Adam.Pergament@arnoldporter.com

Daniel Sherry
**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**
620 Freedom Business Center
Suite 300
King of Prussia, PA 19406
(610) 354-8256

***Counsel for Defendants Mallinckrodt ARD and Mallinckrodt plc***

10